UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

    vs.

SUNG KOOK (BILL) HWANG; PATRICK HALLIGAN;
WILLIAM TOMITA; SCOTT BECKER;  and
ARCHEGOS CAPITAL MANAGEMENT, LP,

                    Defendants.

**No. 1:22-cv-3402 (JPO)**

---

**DEFENDANT ARCHEGOS CAPITAL MANAGEMENT, LP'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

Carmen J. Lawrence
William F. Johnson
Russell W. Johnston
Eric A. Hirsch
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100

*Attorneys for Defendant
Archegos Capital Management, LP*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

LEGAL STANDARD.............................................................................................. 12

ARGUMENT............................................................................................................ 13

   I.   The SEC Has Failed to State a Market Manipulation Claim .......................... 13

      A.   The SEC's Market Manipulation Theory Is Not Viable............................... 13

         1. There Is No Liability For Open-Market Trading Without A False Signal to the Market or An Artificial Price Impact........................................................... 13

         2. Archegos' Swaps Transactions Were Not Trades in the Market ................................. 16

      B.   The Complaint Fails to State a Claim Even Under an Open-Market Trading Theory . 19

         1. Allegations of Large Trades With a Price Impact Are Insufficient To Show Manipulation ................................................................................ 20

         2. The SEC's Daily Trading Volume Allegations Fail ................................. 22

         3. The SEC's Trade Timing Allegations Fail................................. 27

         4. The SEC Has Failed To Specify Examples of Manipulative Trades ........................... 29

         5. The SEC Has Not Sufficiently Alleged Scienter in Connection with Its Market Manipulation Claim................................................................. 31

         6. The SEC's Theory of Liability Makes No Economic Sense....................................... 36

      C.   The Alleged Misrepresentations Do Not Support the Market Manipulation Claim..... 38

   II.   The SEC Does Not Have Jurisdiction Over The Alleged Misrepresentations to Archegos' Counterparties ...................................................................... 41

CONCLUSION.......................................................................................................... 45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anatian v. Coutts Bank (Switzerland) Ltd.*,
    193 F.3d 85 (2d Cir. 1999)................................................................................43

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................ *passim*

*Chadbourne & Park LLP v. Troice*,
    571 U.S. 377 (2014)................................................................................42, 44

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018)................................................................42, 44

*Chemical Bank v. Arthur Andersen & Co.*,
    726 F.2d 930 (2d Cir. 1984)................................................................41-43

*Chris-Craft Indus. Inc. v. Piper Aircraft Corp.*,
    480 F.2d 341 (2d Cir. 1973)................................................................21, 33

*Citibank, N.A. v. K-H Corp.*,
    745 F. Supp. 899 (S.D.N.Y. 1990)................................................................44

*In re Citigroup, Inc.*,
    2011 WL 744745 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn v. Barney*,
    471 F. App'x 30 (2d Cir. 2012) ................................................................3

*In re College Bound Consol. Litig.*,
    No. 93 Civ. 2348 (MBM), No. 94 Civ. 3033 (MBM), 1995 WL 450486
    (S.D.N.Y. Jul. 31, 1995) ................................................................23, 26, 37

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.*,
    No. 1:08-cv-02764-LAK (S.D.N.Y. June 2, 2008)................................................ 18, 40

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)................................................................................14

*Gallop v. Cheney*,
    642 F.3d 364 (2d Cir. 2011)................................................................12

*Gurfein v. Ameritrade, Inc.*,
    411 F. Supp. 2d 416 (S.D.N.Y. 2006)................................................................12

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................................31

*Koch v. SEC*,
    793 F.3d 147 (D.C. Cir. 2015) ....................................................................28, 29

*Levitin v. Paine Webber Inc.*,
    933 F. Supp. 325 (S.D.N.Y. 1996), *aff'd on other grounds*, 159 F.3d 698 (2d
    Cir. 1998) ......................................................................................................44

*Markowski v. SEC*,
    274 F.3d 525 (D.C. Cir. 2001) ....................................................................37

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)....................................................................................42

*In re NYSE Specialists Secs. Litig.*,
    503 F.3d 89 (2d Cir. 2007)..........................................................................12

*Production Res. Grp., L.L.C. v. Stonebridge Partners Equity Fund*,
    6 F. Supp. 2d 236 (S.D.N.Y. 1998)..............................................................44

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ....................................................................................14

*Sarafianos v. Shandong Tada Auto-Parking Co. Ltd.*,
    No. 13–cv–3895 (SAS), 2014 WL 7238339 (S.D.N.Y. Dec. 19, 2014)................43

*SEC v. Fiore*,
    416 F. Supp. 3d 306 (S.D.N.Y. 2019).......................................................14, 31

*SEC v. Frohling*,
    851 F.3d 132 (2d Cir. 2016)........................................................................14

*SEC v. Malenfant*,
    784 F. Supp. 141 (S.D.N.Y. 1992)..............................................................14

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007).......................................................27, 31

*SEC v. Parnes*,
    No. 01 Civ. 0763 (LLS) (THK), 2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ..............31, 35

*SEC v. U.S. Envtl. Inc.*,
    82 F. Supp. 2d 237 (S.D.N.Y. 2000)............................................................31

*SEC v. Way*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017)..........................................................38

*SEC v. Zandford,*
    535 U.S. 813 (2002)............................................................................42

*Set Capital LLC v. Credit Suisse Gr. AG,*
    996 F.3d 64 (2d Cir. 2021)................................................... 15, 39, 40

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994)................................................................38

*Sullivan & Long Inc. v. Scattered Corp.,*
    47 F.3d 857 (7th Cir. 1995) ....................................................15, 16, 21

*Taylor v. Westor Capital Group,*
    943 F. Supp. 2d 397 (S.D.N.Y. 2013)..........................................12, 44

*Trane Co. v. O' Connor Securities,*
    561 F. Supp. 301 (S.D.N.Y. 1983)...........................................15, 21, 33

*U.S. v. Gilbert,*
    668 F.2d 94 (2d Cir. 1981)..................................................................24

*U.S. v. Mulheren,*
    938 F. 2d 368 (2d Cir. 1991) .................................................... *passim*

*U.S. v. Regan,*
    937 F.2d 823 (2d Cir.), *amended by,* 946 F.2d 188 (2d Cir. 1991) .................................39, 40

*U.S. v. Stein,*
    456 F.2d 844 (2d Cir. 1972)................................................................24

*United States v. Naftalin,*
    441 U.S. 768 (1979)............................................................................41

*Wilson v. Merrill Lynch & Co.,*
    671 F.3d 120 (2d Cir. 2011)...................................................... *passim*

**Statutes**

15 U.S.C. § 77q(a) ............................................................................14, 41

15 U.S.C. § 78j(b)..............................................................................14, 41

15 U.S.C. § 78i(a)(2)...............................................................................14

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ...............................................12

Federal Rule of Civil Procedure 9(b).......................................................12

George O. Aragon, Michael Hertzel & Zhen Shi, *Why Do Hedge Funds Avoid Disclosure? Evidence from Confidential 13F Filings, 48 J. Fin. & Quantitative Analysis 1499, 1517 (2013)* .................................................................5

Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 Duke L.J. 479, 503 (2018)...........................................37

Defendant Archegos Capital Management, LP ("ACM"), the investment manager of the Archegos family office ("Archegos"), submits this brief in support of its motion to dismiss the Complaint with prejudice. The SEC asserts claims against ACM for violations of Sections 17(a) of the Securities Act of 1933 (the "Securities Act"), and Sections 9(a)(2), 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"). The Complaint offers two theories of liability – first, that ACM manipulated the market prices of certain securities, causing their value to appreciate during a seven-month Relevant Period spanning from September 2020 to March 2021, and second, that certain Archegos employees violated the federal securities laws by making misrepresentations about Archegos' portfolio to its bank counterparties in an attempt to secure better credit terms – margin rates and additional trading capacity. Neither of these theories state a claim for relief, and all claims against ACM should be dismissed with prejudice.

The SEC's market manipulation theory fails on multiple levels. First and foremost, the SEC alleges Archegos engaged in manipulation not by its own market trading, but rather based on the market activity of Archegos' counterparties, who allegedly engaged in some form of hedge-related trading in response to its private transactions with Archegos. More specifically, the SEC alleges that Archegos mostly entered into total return swap transactions with counterparties, and when the counterparties entered the market to hedge those transactions by purchasing the underlying securities referenced in the swap, the counterparties' trading caused an increase in the price of those securities, resulting in a manipulation by Archegos. Total return swaps are private contracts between Archegos and a counterparty bank in which the two parties agree to exchange cash flows based on the value of a reference security. What the SEC does not allege, because they cannot, is that Archegos' counterparties purchased a share of equity stock

for each notional share of a swap entered into with Archegos. This failure dooms their claim, because the SEC has not alleged a required element of manipulation claims: what effect Archegos' swaps trades had – indirect as they may be – on the market price of the securities at issue.

Moreover, the Complaint does not allege that Archegos had actual knowledge or control over the counterparties' hedges or that there was any agreement with the counterparties regarding their hedging activity. Archegos cannot be held responsible for allegedly manipulating securities that it has not purchased (or sold), or for purchases (or sales) over which it has no knowledge or control. The hedging activity that underlies the SEC's manipulation theory was within the full discretion and control of the counterparties, not Archegos.

The SEC's manipulation claim is also not premised on any allegation that Archegos engaged in deceptive conduct accompanying the securities transactions at issue or injected false information into the markets. Although the SEC makes the conclusory allegation that Archegos engaged in "multiple deceptive tactics," what it alleges in support are perfectly lawful investment activities – that Archegos purchased equity shares and swaps in excessive amounts, in high volumes, in the premarket, during the course of the trading day, and in the last 30 minutes of trading before market close, and accumulated "massive" positions – mostly via swaps – in its top 10 holdings using multiple counterparties. The Complaint piles inference upon inference to draw the unreasonable conclusion that this lawful activity adds up to a "scheme." The SEC's allegations do not distinguish Archegos' transactions from the transactions of an enthusiastic investor with the means to pursue an investment opportunity. Although the Complaint characterizes Archegos' transactions as "non-economic" (without defining what that means), there are no facts alleged in the Complaint that support the claim that any of Archegos'

transactions lacked an investment purpose or lacked economic substance. At all times, Archegos retained the risk of loss on its investments, a loss Archegos experienced many times over when its top holdings collapsed the week of March 22, 2021. The SEC's allegations fail to plead the required deceptive conduct with particularity and to plead a strong inference of scienter.

The SEC's misrepresentation claims should also be dismissed because the SEC lacks jurisdiction to pursue them. None of the alleged misrepresentations were made in connection with the purchase or sale of securities. Instead, as alleged, they relate to the characteristics of Archegos' portfolio, and were allegedly made in connection with efforts by the credit departments of Archegos' counterparties to evaluate the creditworthiness of Archegos, i.e., whether to extend Archegos additional trading capacity or change Archegos' margin rates. The Supreme Court and Second Circuit have made clear that fraud claims are outside the scope of the federal securities laws unless they relate to the value of securities traded or consideration received in connection with those trades.

For the foregoing reasons, the Court should enter an order dismissing all of the SEC's claims with prejudice.

## STATEMENT OF FACTS[1]

*The Archegos Family Office.* Defendant ACM is the investment manager for the Archegos family office. Compl. ¶ 15. Archegos had no outside investors or clients. It invested only funds that derived from Sung Kook (Bill) Hwang's family's personal wealth, and all of Archegos' investments were directed by its founder and principal, Mr. Hwang. Compl. ¶¶ 15-

---

[1] On a motion to dismiss, the Court can consider matters of public record, including court filings, securities prices, news articles and press releases. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *In re Citigroup, Inc.*, 2011 WL 744745, at *5 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012).

16.[2]  Mr. Hwang was a seasoned investor, having been a portfolio manager for more than 20 years.[3]  Archegos had a research department that, as the SEC alleges, formulated target prices that were based on "analytical support."  Compl. ¶ 75.  As a family office managing only Mr. Hwang's money, however, Archegos was not an "investment adviser" and had no legal obligation to have a reasonable basis or objective support for its investment decisions.  Patrick Halligan served as the Chief Financial Officer of ACM, William Tomita served as its Head Trader, and Scott Becker was the Chief Risk Officer.  Compl. ¶¶ 17-19.

Under the rules promulgated by the SEC after the passage of the Dodd-Frank Act, family offices, such as Archegos, were not required to register as an investment adviser.  Compl. ¶ 15.  This means that Archegos was not required to make public disclosures about, among other things, its investments and operations in annual filings with the SEC, and was exempt from inspection and books and records requirements imposed on registered advisers through the Investment Advisers Act of 1940.  Although the Complaint attempts to draw negative inferences from the structure and function of Archegos, it is telling that the SEC does not question Archegos' status as a family office or allege that Archegos failed to make any required disclosures or filings.

*Archegos' Investments.*  Archegos' investments were primarily made in equity shares (i.e., stock) and in total return security-based swaps ("swaps").  Like many investors, Archegos purchased both equity shares and swaps "on margin."  Compl. ¶ 28.  That is, Archegos borrowed

[2] The family office was formed after Mr. Hwang and two entities founded by Mr. Hwang, Tiger Asia Management, LLC and Tiger Asia Partners, LLC, settled claims of insider trading and attempted market manipulation brought by the SEC in 2012.  Compl. ¶¶ 20-21.  In connection with the settlement, Mr. Hwang neither admitted nor denied the SEC's claims.  *See* June 28, 2022 Declaration of Eric A. Hirsch ("Hirsch Decl."), Ex. 1 (January 22, 2013 Order in *In re Sung Kook Hwang* § II).

[3] *See* Hirsch Decl. Ex. 2 (May 24, 2012 Tiger Asia Form ADV).

money from its counterparties, using the securities in its brokerage accounts as collateral.[4] Archegos' swaps were private contractually-based arrangements with individual bank counterparties. Archegos entered into swaps with about a dozen counterparties, some of which it retained as prime brokers. Compl. ¶ 32. The practice of using multiple counterparties is not at all unusual, and is a practice employed lawfully by hedge funds across Wall Street.[5]

Typically, when Archegos' holdings in the equity shares of a company approached 5% of shares outstanding, Archegos would use swaps to increase its economic exposure to the company. Compl. ¶ 30. Section 13(d) of the Exchange Act requires investors to publicly disclose any holdings of an issuer representing more than 5% of the issuers' shares outstanding. The SEC does not allege that Archegos was required to disclose its swaps holdings under the Exchange Act.[6]

The majority of Archegos' investment activity was swaps transactions based on contractual arrangements between Archegos and a counterparty bank. When Archegos and a counterparty bank – one of Archegos' prime brokers or another large financial institution – entered into a swap, they agreed to exchange cash flows depending on the price of the referenced security. Compl. ¶¶ 32, 34. In other words, if Archegos entered into a swap for ViacomCBS,

---

[4] *See* Hirsch Decl. Ex. 3 (U.S. Securities & Exchange Commission, *Investor Bulletin: Understanding Margin Accounts* (last modified June 11, 2021)).

[5] *See* Hirsch Decl. Ex. 4 (Form ADVs of Hudson Bay Capital Mgmt. disclosing 11 custodians, including 8 prime brokers; Paloma Partners, disclosing 24 custodians, including 17 prime brokers, and Samlyn Capital, disclosing 13 custodians, including 6 prime brokers).

[6] There are legitimate reasons for portfolio managers to keep their positions confidential. Registered investment advisers that are required to make disclosures of their positions through Form 13F filings can, under certain circumstances, request confidential treatment of their positions for a limited amount of time. One study reviewed the performance of positions where such confidential treatment was requested and found "evidence suggesting that hedge fund managers seek confidential treatment in order to avoid the costs of front-running by outside investors who anticipate a fund's trades and then trade against the fund." George O. Aragon, Michael Hertzel & Zhen Shi, *Why Do Hedge Funds Avoid Disclosure? Evidence from Confidential 13F Filings*, 48 J. Fin. & Quantitative Analysis 1499, 1517 (2013).

the parties would then use ViacomCBS stock as the reference asset. Thereafter, if the value of ViacomCBS stock increased, Archegos would receive payments from its counterparty based on the increase in value of that share of ViacomCBS stock. If the value of ViacomCBS stock subsequently decreased, Archegos would pay its counterparty. The swaps were derivative securities and represented synthetic exposure to an underlying equity security – they did not represent actual purchases of shares in the underlying company. In other words, they did not represent direct market activity on the part of Archegos. Compl. ¶¶ 33-34. There was no rule or regulation that required Archegos to disclose its swaps transactions.

Whether or not the market price of the reference security was impacted by any Archegos swap transaction depended not on Archegos but entirely on the counterparty's discretionary risk management judgment – i.e., whether a counterparty chose to hedge its exposure on the swaps by purchasing the underlying security at issue and by how much. Significantly, the SEC has not alleged that Archegos' counterparties managed that risk by always purchasing the underlying securities referenced by Archegos' swaps. *See* Compl. ¶ 37 (alleging that Archegos' counterparties would purchase shares "to the extent necessary to hedge" their swaps exposure). It is well-known in the industry that there are other commonly-used ways that a bank can hedge its swap exposure – beyond purchasing the underlying shares – that would have no impact on the market prices of the equity shares at issue, including by entering into offsetting swap contracts with another customer.[7]

---

[7] *See* Hirsch Decl. Ex. 5 (July 29, 2021 Credit Suisse Group Special Committee of the Board of Directors Report on Archegos Capital Management, pp. 38-39); Ex. 6 (Brief of Amici Curiae International Swaps and Derivatives Association, Inc. and Securities Industry and Financial Markets Association at 10-11, *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.*, No. 1:08 Civ. 2764 (LAK) (S.D.N.Y. June 2, 2008), ECF No. 80 (summarizing testimony)); Ex. 7 (Financial Services Authority, Consultation Paper, Disclosure of Contracts for Difference Annex 4: Survey on Contracts for Difference by PricewaterhouseCoopers LLP for the Financial Services Authority, p. 16 (November 2007)), Ex. 8 (Matt Levine, *Take the Swaps Off the Balance Sheet*, Bloomberg, May 24, 2022 at 2-3).

*Archegos' Portfolio.* Between March 2020 and March 2021, Archegos' family office grew from a fund with approximately $1.6 billion in net capital to approximately $36 billion in net capital. Compl. ¶¶ 49, 52. Archegos engaged in a long/short investment strategy. Compl. ¶ 27. This is an investment strategy that takes long positions in securities that are expected to appreciate, and short positions in securities that are expected to decline.[8] Archegos' portfolio was also significantly concentrated in its top long positions. Compl. ¶ 28. Before the onset of the COVID-19 pandemic, Archegos' top investments were mega-cap technology companies such as Amazon and Microsoft. Compl. ¶ 54. In the wake of the equities market crash in March 2020, Archegos transitioned its top investments to smaller companies that were well-positioned to succeed in the changed environment. Those companies included U.S. and China-based media companies with streaming services (ViacomCBS Inc., two share classes of Discovery, Inc., Tencent Music Entertainment Group, and iQiyi Inc.), a China-based online education company (GSX Techedu Inc.), e-commerce companies (Vipshop Holdings Ltd., Farfetch Ltd., and Shopify, Inc.) and China's largest internet and artificial intelligence company (Baidu, Inc.). Compl. ¶ 55. These issuers comprised Archegos' top long positions in individual companies ("Archegos' Top 10 Holdings") after the pandemic.

Between March 20, 2020 and March 19, 2021, the market rebounded, and both the S&P 500 and the Dow Jones Industrial Average increased by 70%.[9]

---

[8] *See* James Chen, *Long-Short Equity*, Investopedia (updated Dec. 28, 2020), available at https://www.investopedia.com/terms/l/long-shortequity.asp.

[9] *See* Hirsch Decl. Exs. 9, 10 (March 20, 2020 – March 19, 2021 closing prices for the S&P 500 and Dow Jones Industrial Average, respectively).



During this period, Archegos took advantage of the depressed market conditions by continuously adding to the size of its investments in its top companies, with the view that although their prices were temporarily suppressed by the pandemic, they would eventually rise again. The SEC does not allege that in doing so, Archegos violated any rules or regulations governing concentration limits or exposure, and there are none that are applicable to a family office such as Archegos. Archegos' combined equity share and swaps exposure to certain issuers was significant, reaching the equivalent, for example, of over 70% of the outstanding shares of GSX and over 50% of the outstanding shares of Viacom. Compl. ¶ 58.

As Archegos accumulated its positions, Archegos traded and entered into swaps transactions in the pre-market (Compl. ¶ 77), "throughout the day" (Compl. ¶ 82) and "during the last 30 minutes of the trading day" (Compl. ¶ 79). The SEC strains to draw negative inferences from Archegos' investment activity by adding its own interpretations of Archegos' communications and characterizing the activity as "setting the tone" or "marking the close." But the SEC cannot contest that making investment decisions to trade during these times of day is

entirely lawful.  With respect to end of the day trading, just before the pandemic *The Wall Street Journal* reported that, "[f]rom the start of this year [2020] through [March 6, 2020], about 23% of trading volume in the 3,000 largest stocks by market value has taken place after 3:30 p.m., according to data from Pragma LLC.  That's compared with about 4% from 12:30 p.m. to 1 p.m."[10]

*The Alleged Misrepresentations*.  The SEC also alleges that certain Archegos employees made misrepresentations to Archegos' counterparties in connection with the counterparties' evaluation of Archegos' credit risk.  According to the Complaint, these inquiries were made by the counterparties to evaluate "whether and how much to increase capacity limits, or to change margin levels."  Compl. ¶ 91.[11]  These alleged misrepresentations concerned the size of Archegos' largest position (Compl. ¶ 98), the liquidity of Archegos' portfolio (Compl. ¶ 103), whether the positions held by one counterparty were unique (Compl. ¶ 97), the composition of the portfolio (Compl. ¶ 111), whether Archegos had any combined positions – including both equity shares and swaps – that exceeded certain thresholds (Compl. ¶¶ 114, 146), and Archegos' cash position and the reasons why Archegos was calling back excess margin during the week of March 22, 2021 (Compl. ¶¶ 156, 161).  None of these alleged misrepresentations concerned the value of any security or the consideration received by the counterparties in any transaction.

*Archegos' Collapse.*  Several significant events occurred in short sequence in March 2021 that contributed to the downfall of Archegos.  After market close on March 22, 2021,

---

[10]  Hirsch Decl. Ex. 11 (Gunjan Benerji, *The 30 Minutes That Can Make or Break the Trading Day: Late-day moves in the stock market have been a staple, creating swoons—and surges—right before the closing bell*, The Wall Street Journal (March 11, 2020)).

[11]  Archegos' counterparties had the ability to adjust their margin rates and trading capacity with Archegos.  Compl. ¶ 91.  Trading capacity is the limit imposed by a counterparty on the amount of securities Archegos could trade with that counterparty in any given name.

ViacomCBS announced a $3 billion secondary offering, which was not well-received by the market. Compl. ¶ 148. On Wednesday morning, March 24, 2021, ViacomCBS announced that it had priced its secondary offering at $85 a share (well below its March 22 closing price of $100.34).[12] Also that same day, the SEC announced new reporting requirements for Chinese companies flowing from the Holding Foreign Companies Accountable Act, and press reports indicated that the Chinese government was going to apply increased scrutiny to China-based technology companies.[13] Following these announcements, the natural forces of supply and demand led to a sell-off in the market, and Archegos' top positions experienced significant losses.[14] Compl. ¶¶ 152-54. The value of Archegos' positions continued to deteriorate over the course of the week. After market close on Thursday, March 25, 2021, Archegos' end capital had decreased to $9.2 billion. Compl. ¶ 162.

Ultimately, because Archegos was unable to satisfy margin calls, its counterparties delivered default notices and unwound or sold off Archegos' investments and any related hedging positions, some – as revealed in their SEC filings – hastily in the course of a few weeks.[15] Compl. ¶ 165. Immediately after Archegos' collapse, the SEC launched an

[12] *See* Hirsch Decl. Ex. 12 (Top 10 Holdings Closing Prices the Week of March 22), Ex. 13 (ViacomCBS Press Release, *ViacomCBS Prices Offerings of Class B Common Stock and Mandatory Convertible Preferred Stock* (March 24, 2021)).

[13] *See* Hirsch Decl. Ex. 14 (Lulu Yilun Chen, *China Considers Creating State-Backed Company to Oversee Tech Data*, Bloomberg (March 24, 2021)), Ex. 15 (SEC Press Release, *SEC Issues Amendments, Seeks Public Comments on Holding Foreign Companies Accountable Act* (No. 2021-53) (March 24, 2021)).

[14] Hirsch Decl. Ex. 12 (Top 10 Holdings Closing Prices the Week of March 22, 2021).

[15] *See* Hirsch Decl. Ex. 16 (Nomura Holdings, Inc. Form 6-K at 8 (April 27, 2021) (disclosing that 97% of Archegos-related positions had been exited by April 27, 2021)), Ex. 17 (UBS Group AG/UBS AG Form 6-K at 8 (April 27, 2021) (disclosing that all Archegos-related positions had been exited by April 27, 2021)).

investigation into its circumstances, requesting and subpoenaing voluminous records from Archegos in connection with its investigation.[16]  Just over a year later, the SEC filed this action.

*The Government Actions.*  On April 27, 2022, Mr. Hwang and Mr. Halligan were indicted by the U.S. Attorney's Office for the Southern District of New York ("SDNY") for violations of RICO and the securities laws based on the same alleged conduct charged by the SEC in its Complaint.  Both have pled not guilty to the Government's charges.[17]

Also on April 27, 2022, in coordination with the SDNY and CFTC, the SEC filed this action against ACM, Mr. Hwang, Mr. Halligan, Mr. Tomita, and Mr. Becker.[18]  The Complaint alleges that ACM violated Sections 17(a) of the Securities Act and Sections 9(a)(2) and 10(b) of the Exchange Act (i) through open-market trading that constituted market manipulation, and (ii) based on allegations that certain ACM employees made misrepresentations to Archegos' counterparties concerning the characteristics of Archegos' portfolio.  On May 18, 2022 and May 31, 2022, this Court entered final judgments against Mr. Becker and Mr. Tomita, respectively, to which both defendants consented.[19]

---

[16]  Hirsch Decl. Ex. 18 (Dave Michaels, *SEC Probes Trading by Archegos That Rattled Stock Market*, The Wall Street Journal, March 31, 2021), Ex. 19 (Heather Perlberg, Matt Robinson, and Sridhar Natarajan, *SEC Investigating Archegos for Potential Market Manipulation*, Bloomberg, October 8, 2021).

[17]  Hirsch Decl. Ex. 20 (reports of proceedings reflecting Mr. Hwang's and Mr. Halligan's not guilty pleas in *United States v. Hwang & Halligan*).  Mr. Tomita and Mr. Becker pled guilty to charges of securities fraud, wire fraud, and violations of the federal RICO statute.  *See* Consent of Defendant Scott Becker (Dkt # 18-1) Ex. A (Becker Plea Proceedings Trans.); Consent of Defendant William Tomita (Dkt # 28-1) Ex. A (Tomita Plea Proceedings Trans.).

[18]  The Commodity Futures Trading Commission ("CFTC") filed a civil action against ACM and Mr. Halligan on April 27, 2022 that included charges based on alleged misrepresentations to counterparties.  ACM and Mr. Halligan intend to move to dismiss the CFTC Complaint.

[19]  Consent of Defendant Scott Becker (filed May 4, 2022) (Dkt # 18-1); Amended Judgment as to Defendant Scott Becker (so ordered May 18, 2022) (Dkt. #26A); Consent of Defendant William Tomita (Dkt # 28-1); Judgment as to Defendant William Tomita (so ordered May 31, 2022) (Dkt. #29).

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a court should assume the truth of factual allegations that are "well-pleaded," it should not accept as true any "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678-79. Complaints containing only "conclusory, vague, or general allegations," supported by only "speculation and conjecture," "cannot withstand a motion to dismiss." *Gallop v. Cheney*, 642 F.3d 364, 368-69 (2d Cir. 2011); *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (on a motion to dismiss, court "need not accord legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness").

Because the SEC's claims are based on fraud, they must also satisfy Rule 9(b) of the Federal Rules of Civil Procedure. *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 129 (2d Cir. 2011) ("'because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b).'") (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*, 493 F.3d 87, 101 (2d Cir. 2007)). Accordingly, the SEC must "specify what manipulative acts were performed, which defendant performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 401 (S.D.N.Y. 2013); *Gurfein v. Ameritrade, Inc.*, 411 F. Supp. 2d 416, 425 (S.D.N.Y. 2006) (quoting *SEC v. U.S. Envtl. Inc.*, 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000)).

I.    **The SEC Has Failed to State a Market Manipulation Claim**

A.    **The SEC's Market Manipulation Theory Is Not Viable**

1.    *There Is No Liability For Open-Market Trading Without*
      *A False Signal to the Market or An Artificial Price Impact*

The SEC alleges that over the course of seven months, by large, unspecified purchases before, during, and after market hours, Archegos came to dominate the market in certain securities. Compl. ¶¶ 3-4. They further allege that Archegos' economic exposure to these securities – through swaps – was equivalent to owning a significant amount of the outstanding equity shares of the companies at issue. Compl. ¶ 58.

Absent from the Complaint, however, is any allegation that Archegos' transactions – in equity shares or swaps – were not "real," that is, actual purchases of securities that Archegos wanted to own and for which Archegos bore economic risk. And, ultimately, when those natural market forces turned against Archegos, it experienced tens of billions of dollars of losses. There is also no allegation that Archegos engaged in some manipulative device (such as matched orders or wash sales) that negated the risk on these transactions, or that Archegos engaged in these transactions to generate some external gain or benefit outside of its investments in the securities at issue. Allegations based on large open-market transactions and the accumulation of significant economic exposure are not enough to state a manipulation claim – the SEC must allege, at a bare minimum, that a false signal or artificial price was sent to the market. There are no such factually supported allegations here. Instead, the SEC alleges that real trades, entered into by lawful means, somehow caused "a number of the Top 10 Holdings [to] experience[] price

---

[20]   ACM incorporates by reference, as if fully set forth herein, all arguments made in the briefs in support of the motions to dismiss filed by Patrick Halligan and Sung Kook (Bill) Hwang (the "Individuals' Briefs"). Citations and quotations are omitted in case quotations throughout.

spikes during the Relevant Period, increasing [their share prices] to artificial levels…." Compl. ¶ 69.

In order to state a market manipulation claim under Rule 10b–5, 17 C.F.R. § 240.10b–5, the SEC must allege that the defendant "(1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter." *SEC v. Fiore*, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019). With respect to Section 17(a), "[t]he elements of a claim under § 17(a) of the Securities Act … are essentially the same as the elements of claims under § 10(b) and Rule 10b-5." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016); *Fiore*, 416 F. Supp. 2d at 319 (citing same). To state a claim under Section 9(a)(2) of the Exchange Act, the SEC must show "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, and (3) for the purpose of inducing the security's sale or purchase by others." *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992).

Neither §§ 10(b) nor 9(a)(2) expressly define the concept of "manipulation." The Supreme Court has explained, however, that "[t]he language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception… Thus the claim… states a cause of action under any part of Rule 10b-5 only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473-74 (1977). Therefore, to state a market manipulation claim, the SEC must allege deceptive conduct leading to an "artificial" market price. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (requiring a showing of "intentional or willful conduct designed to deceive or defraud investors by controlling *or artificially affecting* the price of securities.") (emphasis added).

The Second Circuit has held that to state a Rule 10b-5 market manipulation claim, trading must either send a "false signal" to the market or directly cause an "artificial price." *ATSI,* 493 F.3d at 100-01.  To be actionable as a manipulative act, the alleged conduct must give "a false impression of how market participants value a security" and thereby disrupt "the natural interplay of supply and demand." *Id.* at 100-02.  In other words, the "gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, [and] not rigged by manipulators." *Wilson,* 671 F.3d at 130 (quoting *Gurary v. Winehouse*, 190 F.3d 37, 34 (2d Cir. 1999)).

As with Rule 10b-5, deception is the critical component of any market manipulation claim under § 9(a)(2).  *See Sullivan & Long Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (holding that the essence of an action under section 9(a)(2) is "creating 'a false impression of supply or demand ….'").  Liability under § 9(a)(2) does not depend on whether a trade actually caused a price impact.  The "central purpose" of 9(a) "is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price." *Trane Co. v. O' Connor Securities*, 561 F. Supp. 301, 304 (S.D.N.Y. 1983) (denying preliminary injunction based on § 9(a)(2) claim).  Put simply, it is the deceptive false signal to the market, not the price impact of the trade, that renders a trade manipulative.  For this reason, the Second Circuit has held that where a plaintiff pursues a claim of open-market manipulation "'[c]ase law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security.'"  *Wilson*, 671 F.3d at 130 (quoting *ATSI*, 493 F.3d at 100); *see also Set Capital LLC v.*

*Credit Suisse Gr. AG*, 996 F.3d 64, 76-77 (2d Cir. 2021) ("some misrepresentation or nondisclosure is required" in order to proceed on an open-market manipulation claim).

This is consistent with the Seventh Circuit's approach in *Sullivan & Long*. There, the court rejected claims where a defendant engaged in a massive amount of short sales on the Chicago Stock Exchange and the plaintiff failed to allege that any false information was conveyed to the market. Judge Posner explained that the "essence" of a violation of § 9(a)(2) is "creating a false impression of supply or demand …." and the plaintiffs could not state a claim where, "[o]n the other side of all of the [defendant's] transactions were real buyers, betting against [the defendant], however foolishly, that the price of LTV stock would rise." *Sullivan & Long*, 47 F.3d at 864. The same circumstances are present here – notwithstanding the size of Archegos' transactions, in each case there was a real counterparty willing to enter into the position on the other side of Archegos' swap transactions or equity share trades and a real counterparty on the opposite side of any hedge purchased by the swap counterparty. Archegos took on, and ultimately suffered, the full risk of these transactions. These transactions were bona fide investments, not false signals, and therefore they did not generate artificial prices.

### 2. *Archegos' Swaps Transactions Were Not Trades in the Market*

The SEC's theory of liability here is unique in that it relies for its manipulation mechanics almost exclusively on discretionary trades made by third parties Archegos did not direct or control. Many of Archegos' investments were transactions with counterparties in private swaps contracts. Compl. ¶ 29. The Complaint acknowledges this, but disregards that this necessarily means that the majority of Archegos' transactions were not actual market trades at all, they were transactions based on private contracts with bank counterparties. Compl. ¶¶ 33-34. These swaps provided Archegos with economic exposure to the underlying equity shares, but there was no exchange of the underlying equity shares and no ownership of those equity shares

passed to Archegos under the terms of the swap transactions. Although the counterparties may have decided to hedge the swaps to some extent with the underlying equity shares, the SEC does not quantify these counterparty purchases, does not allege that the counterparties maintained these hedges for the duration of the manipulation period, or allege that these counterparty purchases were required by the contracts governing the swaps between Archegos and its counterparties.[21] The SEC also does not allege that Archegos had control over when, whether, and in what amount the counterparties would hedge by purchasing the referenced equity shares or when, whether, and in what amount the counterparties might dispose of those equity shares in favor of an alternative hedge. Nor does the Complaint allege that Archegos received any reporting from its counterparties about their hedging practices. Because Archegos had no control over its counterparties' hedging activities, it had no way to predict whether and to what extent any swap it entered into would impact the market price of the underlying shares.

In other words, where the counterparties purchased the equity shares referenced in the swaps as a result of Archegos' orders, the counterparties did so at their sole discretion, based on their overall portfolio hedging needs which were unknown to Archegos. Compl. ¶ 37. Although the SEC alleges that the counterparties would ensure their exposure was fully hedged (Compl. ¶ 37), they quite conspicuously have not alleged that each swap share purchase resulted in a corresponding purchase by the counterparty of the referenced security. Thus, the SEC's theory is that Archegos somehow manipulated the market in an indirect and attenuated manner by parties it did not control.

---

[21] Indeed, as the CFTC alleges in the related matter *CFTC v. Archegos Capital Management & Pat Halligan*, 1:22-cv-03401, the swaps contracts, "do not transfer title to the underlying assets or require that either party actually own them." CFTC Compl. ¶ 25 (Hirsch Decl. Ex. 21).

The swap hedging issue arose in *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.*, No. 1:08-cv-02764-LAK (S.D.N.Y. June 2, 2008), where the court was considering whether the holder of a total return swap was the "beneficial owner" of the underlying equity shares referenced by the swap. In *CSX*, the Head of Citigroup's "Prime Swap" group testified that an equity swap hedge can be effected through different methods, including option combinations, short positions, or acquiring equity shares directly, and there were times when Citigroup chose not to hedge positions on a one-to-one basis.[22] This is consistent with a 2007 survey by PricewaterhouseCoopers conducted for the UK Financial Services Authority. The survey asked how market participants hedged their exposure to "contracts for difference," (an instrument that is functionally the same as the swaps at issue here) and "85% said they sometimes hedge with the underlying asset, 46% with offsetting positions and 15% in some other way."[23]

It is also consistent with public statements made by one of Archegos' counterparties in this very matter. On July 29, 2021, Credit Suisse filed a Form 6-K with the SEC that included as an exhibit an internal investigative report concerning its relationship with Archegos (the "Credit Suisse Report"). In that report, Credit Suisse indicated that although its traders might initially purchase the underlying equity shares to hedge a total return swap, "[u]ltimately, the traders might seek to enter a TRS in the opposite direction (i.e., with a client who wants exposure to any decrease in the value of the stock)." The Credit Suisse Report went on to explain that such a

---

[22] Hirsch Decl. Ex. 6 (Brief of Amici Curiae International Swaps and Derivatives Association, Inc. and Securities Industry and Financial Markets Association at 10, *CSX Corp. v. The Children's Inv. Fund Mgmt. (UK) L.L.P.*, No. 1:08-cv-02764-LAK (S.D.N.Y. June 2, 2008), ECF No. 80 (summarizing testimony)).

[23] Hirsch Decl. Ex. 7 (Financial Services Authority, Consultation Paper, Disclosure of Contracts for Difference Annex 4: Survey on Contracts for Difference by PricewaterhouseCoopers LLP for the Financial Services Authority, p. 16 (November 2007). A contract for difference is "a derivative product that gives the holder an economic exposure, which can be long or short, to the change in price of a specific share over the life of the contract.... Nor, since the contract is normally cash-settled, does it usually create any right to take delivery of the shares in place of cash settlement." *Id.* at p. 11.

hedge was preferable to purchasing the underlying shares: "Using an offsetting TRS would mean that the synthetic client position would now be offset with a synthetic hedge position, which is more efficient from a balance sheet and/or funding perspective."[24]

Here, Archegos' swaps transactions did not send a "false signal" to the market because they were not market trades. The SEC's Complaint is fatally flawed because it relies on the assumption that Archegos' counterparties purchased and held the equity shares referenced in the swaps to the extent necessary to cover the synthetic exposure, but does not allege that (a) Archegos had knowledge of, directed, or controlled what trades the counterparties actually made; or (b) the extent to which Archegos' counterparties did in fact purchase and hold those underlying shares. Compl. ¶ 37. It is not plausible that Archegos would embark on a seven-month, multi-billion dollar market manipulation scheme in multiple securities that depended on its counterparties' decisions – over which Archegos had no input, no control, and no ability to predict – about when and whether to enter the market to purchase the referenced equity shares for hedging purposes and whether and how long to maintain those equity shares as hedges.

B. **The Complaint Fails to State a Claim Even Under an Open-Market Trading Theory**

None of the SEC's allegations substantiate a claim that there was ever a "false signal" to the market or an "artificial price" through Archegos' transactions. *ATSI*, 493 F.3d at 100. Instead, the SEC's allegations amount to an attack on a very well-funded and exuberant, but genuine, market speculator. Specifically, the SEC alleges that Archegos used "multiple deceptive tactics" in its trading activities (Compl. ¶ 42), pointing to Archegos' large purchases in significant concentrated investments from September 2020 to March 2021 leading to "massive exposure," in certain names, daily trading volume, and the timing of Archegos' trades (in the

---

[24] *See* Hirsch Decl. Ex. 5 (Credit Suisse Report, pp. 38-39).

pre-market, during the trading day, and in the last 30 minutes of the trading day). Compl. ¶¶ 43-46, 56. The SEC cites no rule or regulation, however, (i) limiting the size of swaps positions or economic exposure in a single name that can be held by a single investor, (ii) limiting the number of times an investor can make swaps purchases to increase the size of their position, (iii) defining the appropriate time during the trading day to execute a swap or to trade (premarket, during the market, or near the close), or (iv) providing any limit on the amount of swaps that can be purchased on any one day. That's because there are none. Nor does the SEC present any specific examples of transactions Archegos engaged in that in some way deceived investors or improperly impacted the prices of any particular security. If the legitimate practices described in the Complaint are found to be "manipulative," market participants will face great uncertainty concerning whether their legitimate investments, strategy, and execution thereof could subject them to allegations of improper manipulation.

### 1. Allegations of Large Trades With a Price Impact Are Insufficient To Show Manipulation

The SEC alleges Archegos added "staggering levels of exposure day-over-day" in its top positions (Compl. ¶ 44), but fails to explain how this conduct is different from that of an investor who has the economic resources to back his strong conviction in the future performance of a company. If there is some threshold past which investors should not invest, or some number of days in a row after which investors should take a "time out," from entering into swaps contracts referencing a favored security, the market is certainly not aware of it.[25] Our free markets enable participants to invest limited only by the amount of their available capital. The Second Circuit has held that "[t]he securities laws do not proscribe all buying or selling which tends to raise or

---

[25] With respect to the size of Archegos' positions, the SEC also pointedly avoids the fact that the great majority of Archegos' positions do not represent actual ownership of issuer shares.

lower the price of a security…. So long as the investor's motive in buying or selling a security is not to create an artificial demand for, or supply of, the security, illegal market manipulation is not established." *Chris-Craft Indus. Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 383 (2d Cir. 1973) (dismissing § 9(a)(2) claim where plaintiff alleged Chris-Craft worked in concert with mutual funds to encourage investments in its stock in order to inflate its stock price for the purposes of making an exchange offer for Piper Aircraft).

In the equity shares market, purchasing large amounts in a manner that causes price movement is not market manipulation. This was the conclusion reached by the court in *Trane v. O'Connor Securities*, 561 F. Supp. 301 (S.D.N.Y. 1983). There, the court denied a preliminary injunction based on Section 9(a)(2) and 10(b) claims where defendants purchased 15% of a company's outstanding equity shares in a nine-month period, concluding "[i]f what defendants did constituted manipulation within the meaning of Section 9(a), most large scale transactions in a single security would be prohibited." *Trane,* 561 F. Supp. at 304.

In reaching this result, the court considered the statutory language of Section 9(a) and the defendant's purchases, and acknowledged that "[t]his level of trading activity undoubtedly affected the price of the stock and induced purchases by others." The court concluded, however, that the defendants' purpose "was not to create an artificial demand for Trane stock nor to induce public investment to its detriment. Defendants simply engaged in these Trane transactions in the expectation of a profit." *Id.* at 304-05; *see also U.S. v. Mulheren*, 938 F. 2d 368 (2d Cir. 1991) (when a transaction is effected for an investment purpose, even if an increase or diminution in price was a foreseeable consequence of the investment, it is not manipulative).

The Seventh Circuit also rejected a similar claim in *Sullivan & Long*. As Judge Posner wrote, "[Plaintiffs] say that [defendant] prevented the price from rising (and thereby discouraged

buy-ins by making them unprofitable) by selling short more and more stock. That is just to say that [defendant], like a bluffer in a poker game, kept redoubling its bet until the other players lost heart. But so what?" *Sullivan & Long*, 47 F.3d at 861. As such, trading large volumes – without more – cannot state a claim for market manipulation.

        2.     *The SEC's Daily Trading Volume Allegations Fail*

The SEC alleges that during the period of September 2020 to March 2021 (and particularly from January to March 2021), Archegos dominated the market in its Top 10 Holdings, with trading that "frequently exceeded 20%, often reached 30%, and even surpassed 40% of certain issuers' daily trading volume." Compl. ¶ 63. These allegations – that Archegos' trading was "frequently exceeding," or "often reached," certain daily volume levels of trading over a seven-month period do not describe with the required specificity improper "market domination" that can support a manipulation claim. It is not unusual for well-funded investors to aggressively build large positions. As Berkshire Hathaway's Charlie Munger explained with respect to his firm's Coca-Cola investment during an interview with the BBC:

> Well at the time we bought it, it was succeeding mightily on multiple fronts and it was cheap in relation to what was plainly going to happen. That was a valuable insight: there are times when even a company as big as Coca-Cola is too cheaply priced by the market considering what it's going to do for the shareholder. And there are times when we can figure that out, and there are times when we can't. And the times where we can figure it out we tend to go in heavily. For many-many months, we were buying as much Coca-Cola as we could buy – **roughly a third of the volume trading. Every day, for months.** So we were very aggressive in buying into Coca-Cola.[26]

In making its allegations of "market dominance" the SEC disregards seven of the Top 10 Holdings and cites to just three examples of alleged dominance based on trading volume (involving Discovery Class A, Discovery Class C, and Farfetch). Each example is based,

---

[26] Billionaire Philosophy, *Charlie Munger Interview, Investment Methods to Get You Rich*, BBC, 2012, available at https://www.youtube.com/watch?v=fp7U-_mmTJI (emphasis added).

without explanation, on a different cherry-picked time period – a subset of the Relevant Period – which presents a distorted picture of Archegos' trading activity. Compl. ¶¶ 64-66. Even for these three examples, the Complaint fails to allege the daily trading volumes during the entirety of the selected time period, and nowhere in the Complaint does the SEC cite some daily trading volume level that has been found to be per se manipulative. *See In re College Bound Consol. Litig.,* No. 93 Civ. 2348 (MBM), No. 94 Civ. 3033 (MBM), 1995 WL 450486, at *6 (S.D.N.Y. Jul. 31, 1995) ("for market domination to be an indicium of manipulation, the domination must be alleged either over a long period, such as a year, or over a short period in tandem with other fraudulent actions.")

The circumstances here are even more attenuated because the majority of Archegos' purchases were in swaps. Compl. ¶ 29. The SEC does not allege what proportion of Archegos' trades on the high-volume days described in the Complaint were swaps purchases, and what portion of those swaps purchases resulted in corresponding purchases of the underlying equity shares by counterparties for hedging purposes, the only possible market nexus. Absent those counterparty purchases – of which the SEC, based on its extensive investigation, is certainly aware – there would be no impact on the trading price of any of these securities as a result of Archegos' private swaps transactions. To continually refer to Archegos' activity generically as "trading" is inaccurate and insufficient, given the distinction between the type of activity and its relevance to the legal analysis.

Even disregarding this defect, the SEC's claims are insufficient. In *Mulheren*, the Second Circuit considered the government's argument that the trades at issue were manipulative because they "comprised 70 percent of the trading in G&W common stock during the period between the opening of the market and 11:10 a.m," but found this evidence alone insufficient. *Mulheren*, 938

F. 2d at 371. In rejecting the argument, the Second Circuit considered two prior criminal actions that upheld claims based in part on the defendants' market domination in the securities at issue, *U.S. v. Gilbert*, 668 F.2d 94 (2d Cir. 1981) and *U.S. v. Stein*, 456 F.2d 844 (2d Cir. 1972). By comparison to both of those actions, the SEC's allegations here also come up short.

In *Gilbert* "over a *one-year period*, the defendant's trading constituted more than 50 percent of the overall trading," in the security at issue. *Mulheren*, 938 F.2d at 371 (emphasis in the original). In addition, *Gilbert* was a traditional market manipulation case, involving deceptive devices not present here. The scheme in *Gilbert* consisted of "an elaborate series of wash sales and matched orders" including trading through more than 90 accounts at 19 different brokerage firms, with more than 40 of the accounts being directly controlled by the defendant. *Gilbert*, 668 F.2d at 95.

*Stein* concerned trading in 28.8 percent of the daily volume of a security over a four-month period. *Stein*, 456 F.2d at 846. As in *Gilbert*, there were other indicia of manipulation – in the form of patently deceptive conduct – that are not present here. The defendant plotted with brokers to "purchase small amounts [of Buckeye stock] through different brokers and in different names," and also offered the brokers "secret compensation to induce them to promote sales of Buckeye" in the form of stock or cash, in some instances mailed to the brokers directly by Stein. *Id.* at 845-46. The defendant also told a witness to "conceal from the SEC Stein's orders in a nominee's name," and that a related criminal case "'would probably never go to trial,' and that they should stick to their stories." *Id.* at 847.

Here, the SEC has not alleged the volumes at issue in *Gilbert*, or the sustained four months of dominance at issue in *Stein*. Instead, the SEC is relying on allegations describing trading activity during select portions – but not the entirety of – their so-called Relevant Period.

Compl. ¶¶ 63 – 66.  For example, the SEC cites Archegos' trading in DISCA between November 16, 2020 and January 4, 2021 when Archegos' daily trading volume "reached or breached approximately 25%" on 17 of 33 trading days (Compl. ¶ 64), but alleges nothing about Archegos' trading during the entirety of the Relevant Period.  The SEC also does not allege what Archegos' average trading volume was in this security over the entirety of the shorter 33 trading day period – clearly, it was less than 25%, and therefore less than the trading volumes at issue in *Gilbert* (50% over a one-year period) and *Stein* (28% over a four month period).

The SEC's allegations concerning DISCK fail for the same reasons.  The SEC alleges that Archegos' trading in DISCK "reached or breached" 25% of the daily trading volume on "29 of 54" trading days between January 6, 2021 and March 24, 2021.  Compl. ¶ 65.  The SEC does not explain the significance of this selected period.  This allegation does not represent sustained trading activity – even the total 54-day period cited is less than the four month period in *Stein*.  As with their DISCA allegations, the SEC makes no effort to allege the average daily volume of Archegos' transactions in this security over either the entireties of the cited period or the Relevant Period.[27]

Narrowing the window of scrutiny even further, the SEC alleges that Archegos' trading in Farfetch represented 20% of Farfetch's trading volume in 14 of the 16 trading days between March 2, 2021 to March 23, 2021, including three days where the trading exceeded 40%.  Compl. ¶ 66.  These allegations concerning a 16-day period – devoid of any suggestion that that particular time period had any special significance – do nothing to support the SEC's claim of

---

[27] These SEC's allegations based on trading volume also fail to account for positive developments during the time period alleged that support an investment-based reason for Archegos' increased trading.  For example, on February 22, 2021, Discovery Inc. announced favorable results for its Q4 2020, including EPS of $0.042. per share, and that it had surpassed 11 million paying subscribers for the new streaming service it launched in January 2021.  *See* Hirsch Decl. Ex. 22 (Discovery Inc., Q4 2020 Earnings Release (February 22, 2021)).

sustained dominance in ten securities over the course of a seven-month period. That is particularly the case where there are seven other securities in the "Top 10" where the SEC makes no allegations at all about Archegos' so-called market dominance. And the events of the week of March 22, 2021, when the natural forces of supply and demand caused the prices of several of Archegos' top holdings to decline rapidly, contradict the SEC's theory that Archegos dominated and controlled the market for those securities.

As the Second Circuit made clear in *Mulheren,* "[t]he percent of domination must be viewed in light of the time period involved and other indicia of manipulation." *Mulheren*, 938 F.2d at 371. The Complaint fails on this point as it vaguely argues that Archegos dominated the market for months (Compl. ¶ 63) and states that the trading volume "applied upward pressure on those issuers' share prices," absent any details on the specific trades, percentages, and dates that would support a causal connection that the SEC assumes only in conclusory fashion. Compl. ¶ 67. The Complaint also does not tie any indicia of manipulation to the market dominance allegation. In *College Bound*, the court dismissed a market dominance claim based on similar allegations. There, plaintiffs only presented allegations of market dominance for some time ranges within the alleged manipulation period. The court dismissed the claim, holding that "plaintiffs have not alleged sufficient daily market domination over an extended period to sustain a claim of manipulation". *College Bound,* 1995 WL 450486, at *7.

Finally, the SEC tries to shore up its allegations of market dominance by alleging that the prices of several of Archegos' key holdings plummeted in April 2021 (Compl. ¶¶ 71-73), implying that those stock declines are the result of Archegos no longer trading in the market. This ignores the fact – reported in SEC filings – that after Archegos' collapse, Archegos' largest counterparties quickly unwound their Archegos-related positions, which necessarily included the

sale into the market of any underlying shares used to hedge Archegos' swaps positions. Compl. ¶ 165.[28] As the SEC acknowledges in its Complaint, significant transactions in a name tend to have a price impact.

### 3. The SEC's Trade Timing Allegations Fail

The SEC also broadly condemns the timing of Archegos' transactions, alleging that Archegos engaged in premarket trading and swaps orders to "set the tone," transacted during the day "by bidding up prices," and transacted "in the last 30 minutes of the trading day" to "mark the close". Compl. ¶ 46. These allegations seem to presume manipulative intent can be inferred based on trades conducted at any time of day, an untenable position. What is clear is that allegations based on the timing of trading activity, without more, are insufficient to demonstrate market manipulation. As the court acknowledged in *SEC v. Masri*, "It should be stated clearly that stock transactions made at the close of the day are not prohibited. Indeed, studies have shown that trading in organized securities is heaviest just before the market closes, as traders monitor activity and their positions throughout the day before conducting their trades." *SEC v. Masri*, 523 F. Supp. 2d 361, 370 (S.D.N.Y. 2007); *see also* Hirsch Decl. Ex. 11 (in 2020, "23% of trading volume in the 3,000 largest stocks by market value has taken place after 3:30 p.m.").

---

[28] *See* Hirsch Decl. Ex. 16, Nomura Holdings Inc. Form 6-K at 8 (April 27, 2021) ("On March 29, 2021, Nomura Holdings, Inc. announced that an event had occurred at its subsidiaries, including US subsidiary Nomura Global Financial Products Inc., which could subject the firm to a significant loss arising from transactions with a US client… Nomura has unwound over 97% of its outstanding positions related to this event."), Ex. 17, UBS Group AG/UBS AG Form 6-K at 8 (April 27, 2021) ("Operating income in the first quarter of 2021 included a loss of USD 774 million on a default by a US-based client of our prime brokerage business, presented within Other net income from financial instruments measured at fair value through profit or loss…The loss was recognized within the Financing business in the Investment Bank, which provided prime brokerage services to the client, and arose as a result of closing out a significant portfolio of swaps with the client following the default, and the unwinding of related hedges. We have exited all remaining exposures in April 2021, with related losses recognized in the second quarter of 2021 which are immaterial for the Group."), Ex. 23, Credit Suisse Press Release, *Credit Suisse posts CET1 ratio of 13.7% and pre-tax income of CHF 813 mm in 2Q21*, at 3 (July 29, 2021) ("All of the remaining long and short positions in Archegos were exited in early June and Credit Suisse took appropriate HR-related actions, including terminations and monetary penalties.").

Here, there are no specific allegations in the Complaint that describe how an Archegos transaction – whether by private swap or equity share purchase in the market – at any particular time had an inappropriate influence on the market price of a security. The SEC just assumes that if Archegos is transacting, there must be an artificial market effect, which is plainly insufficient.

Where courts have found "marking the close" allegations are sufficient to state a claim, they are generally based on high-volume trading much closer to the end of the trading day than what the SEC alleges here. For example, in *Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015), the D.C. Circuit upheld an SEC administrative order where the defendant placed outsized trades in the "last four minutes," "last five minutes," and last "one-and-a-half minutes" before the market closed. 793 F.3d at 153-154. Here, in contrast, the SEC has alleged a much broader window (the last 30 minutes of the trading day).

It is also not enough to allege, as the SEC does here, that Archegos traded Baidu in the last 30 minutes of the trading day on the "majority" of the days during some sub-set of the Relevant Period (Compl. ¶ 80) or that Archegos "did substantial trading" in Tencent Music during some other sub-set of the Relevant Period (Compl. ¶ 81). Despite their conclusory allegation that trades were made at "strategically important moments" (Compl. ¶ 46) – the SEC has not included any allegations explaining why those moments were "strategically important," and has not specified the particular transactions (in equity shares or swaps), amounts, and alleged price movements caused by the "strategically" timed activity (sidestepping again the important distinction between equity share purchases in the market and private swap transactions). *See Koch*, 793 F.3d at 152 (describing trades largely made in the last four minutes of a particular day that allegedly "pushed the stock's closing price to $23.50 per share.").

Moreover, the SEC has included no allegations based on contemporaneous communications that support the claim that Archegos was timing its transactions to impact market prices. *Id.* ("In addition, Koch emailed Christanell on September 30 and told him to 'move last [High County] trade right before 3 pm up to as near $25 as possible *without appearing manipulative.*'") (emphasis in original). Like their other trading allegations, the SEC's allegations concerning timed trades fail under Rule 9(b) and do not support their market manipulation claim.

### 4. The SEC Has Failed To Specify Examples of Manipulative Trades

The SEC alleges that Archegos asserted a dominant market position over its "Top 10 Holdings" for a period of seven months, but it does not point to any specific trades and allege their effect on the market price of any of the subject securities. Comp. ¶¶ 63-68. Like any other civil plaintiff, the SEC must comply with Rule 9(b), and state its claims of fraud with particularity. Unlike a private plaintiff, through its investigation of Archegos, the SEC has had full transparency into Archegos' trading activity and the trades of its counterparties during the relevant period. Despite that investigation, the SEC makes only two allegations with some level of detail concerning trades Archegos made on two particular days. Those allegations concern Archegos' trading in Farfetch in December 2020 and in Discovery C in March 2021, and do not support the SEC's claims that Archegos' trading was manipulative. Compl. ¶¶ 84-85.

With respect to Farfetch, the SEC alleges that on an unspecified day in December 2020, Mr. Tomita told Mr. Hwang that "someone came and hit FTCH down fifty cents to $55.00. Not huge volume but we stepped it up." Compl. ¶ 84. Although the SEC does not explain what this means, it appears to be an allegation that Archegos purchased Farfetch when the price went down. This allegation describes lawful and expected behavior of an investor that has a long-

term positive conviction in the prospects of Farfetch. The SEC alleges that at the end of that trading day, Archegos had an economic exposure to Farfetch equivalent to over 27 million shares, but does not allege (a) what Archegos' opening position was that day; (b) whether Archegos purchased equity shares or engaged in a swap transaction, or the amount of any shares or swaps purchased that day; (c) what Archegos' bids were and how those bids related to the market price; (d) what impact, if any, Archegos' bids had on the market price, and (e) how any impact was artificial. Compl. ¶ 84. The SEC's allegations fall far short of pleading with particularity that Archegos' transactions sent a "false signal" to the market or caused an "artificial price."

The other example the SEC provides – and the only time the SEC alleges what Archegos' bids were on a particular trading day – does not support a manipulation theory. The SEC alleges that on an (again unspecified) day in March 2021, Discovery C opened at $61.68, and Mr. Hwang approved a recommendation by an Archegos trader to enter orders of "60.00-61.00 and be aggressive below 60.00". Compl. ¶ 85. Putting aside that, once again, the SEC skips any precision regarding whether Archegos engaged in a swap transaction or purchased equity shares, the SEC provides no explanation as to why, if Archegos' scheme was to pump up the price of Discovery C, it was making bids below the opening price. With respect to the instruction to "be aggressive" in the event Discovery C dropped below $60.00, the most plausible reading is that Archegos viewed purchasing Discovery C shares at $1.68 below the opening price as an investment opportunity. In any event, the SEC does not allege – on whatever day this is – that Discovery C's share price ever dropped below $60.00.

Where courts in this circuit have upheld the sufficiency of complaints bringing market manipulation claims, the complaints have included at least some examples of allegedly

manipulative trades executed on specific dates. *See Fiore*, 416 F. Supp. at 316-317 (stating that the SEC "listed examples" in the complaint of each of the manipulative devices used by the defendant); *SEC v. U.S. Envtl.*, *Inc.*, 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000) (complaint included "detailed descriptions of a few sample trades"); *see also Masri*, 523 F. Supp. 2d 361 (summary judgment denied where the claims concerned the purchase of TZA stock on a specific date and time). The Complaint falls well short of that standard and should be dismissed under Rule 9(b) for this reason alone.

### 5. The SEC Has Not Sufficiently Alleged Scienter in Connection with Its Market Manipulation Claim

To plead scienter, a plaintiff must allege facts either "(1) showing the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI,* 493 F.3d at 99; *SEC v. Parnes*, No. 01 Civ. 0763 (LLS) (THK), 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001) ("the Second Circuit … requires the SEC to 'allege facts giving rise to a strong inference of fraudulent intent.'"); *U.S. Envtl.*, 82 F. Supp. 2d at 241. Scienter is a required element of the SEC's §§ 10(b), 9(a)(2) and 17(a)(1) market manipulation claims.[29] The SEC does not make any allegations concerning a motive to commit fraud, and as a result, the strength of any circumstantial allegations of scienter "must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

The SEC's Complaint is replete with conclusory allegations that Archegos' trading relied on "multiple deceptive tactics" (Compl. ¶ 42), but there are no facts alleged supporting the claim that Archegos' trades were intended to artificially increase the prices of the underlying securities.

---

[29] While negligence-based claims can be brought under §§ 17(a)(2) and (3), as the Second Circuit held in *Wilson*, market manipulation claims are fraud-based. *Wilson*, 671 F.3d at 129. Accordingly, the SEC's market manipulation claim falls under § 17(a)(1) and, like their § 10(b) claim, requires allegations of scienter.

Rather, the SEC appears to be suggesting negative inferences be drawn from Archegos' trading volume in those names on certain days, the total exposure in certain issuers accumulated by Archegos, and the fact that Archegos was trading in these names in the premarket, during the day, and in the last 30 minutes of the trading day. Compl. ¶¶ 43-46. Those trading allegations are addressed above, and none represent conduct that is improper or illegal. To the contrary, they are consistent with the activity of an investor who wants to build large, concentrated positions in certain securities – which is not inherently wrongful or illegal – and who has the capital to make those investments. *See ATSI*, 493 F.3d at 104 (rejecting scienter allegation based on allegations that "a legitimate investment vehicle, such as the convertible preferred stock at issue here, creates an opportunity for profit through manipulation"). The SEC provides no allegations that explain how Archegos crossed the line when it engaged in these everyday lawful trading practices.

Typically, when bringing a market manipulation action, the SEC supports its allegations of scienter by referring to internal communications that indicate an intent to deceive or defraud. The SEC's inability to do so here is telling. This is not a circumstance where a civil plaintiff filed a complaint without the benefit of discovery. The SEC has been investigating this matter for more than a year. Hirsch Decl. Exs. 18, 19. With the benefit of that investigation, the only contemporaneous communication described in the Complaint related to the market manipulation claim is a single text message from June 2020 (Compl. ¶ 59), months before the "Relevant Period" of September 2020 – March 2021 (Compl. ¶ 3). When sent a text asking if ViacomCBS's stock price improvement on a particular day was a sign of strength, Mr. Hwang responded, "No. It is a sign of me buying," which was "followed by a 'tears of joy' or laughing emoji." Compl. ¶ 59. The SEC could have reproduced the image of this emoji, which would

have made clear that this comment was in jest, but it did not. As the court noted in *Mulheren*, "the meaning of this cryptic comment is, at best, ambiguous." *Mulheren*, 938 F.2d at 369. Mr. Hwang did not say in his response that he intended to impact the price of ViacomCBS. Read fairly and objectively, the text is a comment on the effect of Archegos' purchases that day, not some broad pronouncement on Archegos' "sheer buying power" (Compl. ¶ 59). *See also Trane*, 561 F. Supp. at 304 (acknowledging that Section 9(a) does not prohibit large scale transactions in a single security). As the SEC well knows, every market action has some effect on price. The critical point that is missing from the Complaint – despite the SEC's year-long investigation – is an allegation, supported by contemporaneous facts, that Mr. Hwang directed that any trade be made for the purpose of impacting the price. *Chris-Craft*, 480 F.2d at 383 ("The securities laws do not proscribe all buying or selling which tends to raise or lower the price of a security."). And as important as the counterparty hedges seem to be to the SEC's allegations, the SEC cites to no contemporaneous communications involving anyone at Archegos related to counterparty hedging. If, as the SEC implies, Archegos depended so heavily on a counterparty's hedging activity as an instrument of a multi-billion dollar scheme, logic would suggest there would be communications about that topic. The SEC cites none.

In conclusory fashion, the SEC contends that Archegos' trading activity was not "based on a principled view of the true value of a particular issuer." Compl. ¶ 75. But alleging that Mr. Hwang "essentially sidelined his research operation" and "ignored their stock price targets" (Compl. ¶ 75) is not enough to support a claim that Archegos' trades lacked an investment purpose or were not based on a genuine belief in the value of the security. To begin with, although the SEC asserts Mr. Hwang's view of price targets was "outsized" (Compl. ¶ 75), it articulates no basis to assume that research analysts' target prices were the only correct or

reasonable values, and does not even attempt to allege what it believes the true value of the securities were during the Relevant Period. At most, the SEC's allegations suggest a difference of views (as to which securities and by how much, the Complaint does not allege) between members of the research analyst team (none of whom are alleged to have had portfolio manager experience) and Mr. Hwang. As the principal of a family office, investing his own money and not recommending securities to outside investors, Mr. Hwang (a seasoned portfolio manager with decades of success) had no obligation to accept the price targets of his research department over his own personal views, intuition and experience. Moreover, the SEC does not allege that the research department's analyses and price targets failed to support Archegos' purchases. As the SEC well knows from its investigation and only briefly alludes to in the Complaint, the "research operation" compiled "analytical support" for the companies in Archegos' portfolio. Compl. ¶ 75. There is no factually supported allegation in the Complaint that Mr. Hwang did not intend for Archegos to own the cash shares or swaps for the long term, or did not believe that the securities Archegos purchased were undervalued relative to their market prices or the target prices of the research analyst team.

It is not unlawful for an investor – just like Berkshire Hathaway with its Coca-Cola investment – to aggressively build exposure to a company where the investor believes that company is undervalued. None of the facts alleged in the Complaint are inconsistent with the following premise: Archegos made each of the investments during the so-called Relevant Period because it believed in the fundamentals of the companies it invested in, directly through equity shares or indirectly through swaps. Despite its year-long investigation, the SEC makes no allegation, based on contemporaneous communications or other evidence, that Mr. Hwang did not genuinely believe in the future success of the relevant companies or that he did not genuinely

believe that their shares were underpriced. The absence of any such allegations critically undermines any inference of scienter here, let alone the strong inference of scienter that the SEC is required to plead. *Parnes*, 2001 WL 1658275, at *5.

Archegos fully expects – although not pled in the Complaint – that the SEC will attempt to buttress its allegations with the allocution of former Archegos trader William Tomita, who pled guilty to a market manipulation scheme.[30] But Mr. Tomita's allocution is insufficient to save the SEC's poorly plead scienter allegations. The specific trading conduct Mr. Tomita describes in his allocution – "buying large amounts of stock when the price dropped in response to negative news or trading premarket when I knew the fund's activity would have a greater impact on price" – amounts to, like the allegations in the Complaint, descriptions of legal trading activity coupled with an awareness that trading can have an impact on prices. And Mr. Tomita's statement that he "traded to increase the prices" of securities in which Archegos invested is conclusory and unspecific. Further, although Mr. Tomita's allocution addressed his personal intent, the SEC has alleged that Mr. Tomita's intent is irrelevant with respect to Archegos' trading decisions. Compl. ¶ 16 ("Hwang … was solely responsible for all investment decisions made by Archegos or on its behalf."); Compl. ¶ 18 ("Tomita had no investment discretion himself."). Put simply, Mr. Tomita has no basis upon which to explain the reasons for Archegos' trades, and the SEC does not allege anything to the contrary. Therefore, his statements concerning the reasons for any of Archegos' investments are not relevant to the question of Archegos' intent.

---

[30] *See* Hirsch Decl. Ex. 24 (Consent of Defendant William Tomita (Dkt # 28-1) Exhibit A (Plea Proceedings Transcripts of Will Tomita)).

Given the lack of viable scienter allegations, the SEC's market manipulation claims with respect to Section 17(a)(1) of the Securities Act, and Sections 10(b) and 9(a)(2) of the Exchange Act should be dismissed.

6.    *The SEC's Theory of Liability Makes No Economic Sense*

The SEC's allegations of the fraudulent scheme are also implausible in economic terms. The SEC alleges that Archegos was engaging in either private swap transactions or purchases of equity shares in large and consistent volumes to drive up the prices of the securities it owned. But the SEC does not allege how Archegos would supposedly capture the benefits of this alleged scheme. Most schemes to defraud involve a wrongdoer profiting at the expense of others, or – at the very least – are alleged to have been undertaken with some ultimate profit in mind. In *Mulheren*, the Second Circuit reviewed the sufficiency of evidence supporting a criminal conviction for market manipulation. There, it explained, "[o]ne of the hallmarks of manipulation is some profit or personal gain inuring to the alleged manipulator." *Mulheren*, 908 F.2d at 370. In throwing out the conviction, what the Second Circuit found "most telling" was the fact that the defendant's investment bank "lost over $64,000" on the transactions at issue, which is "hardly the result a market manipulator seeks to achieve." *Id*.

Here, despite a year-long pre-suit investigation, the SEC does not allege that Mr. Hwang or any other Archegos executive profited from this purported scheme, or what – accepting their allegations as true – the ultimate alleged outcome of this purported scheme was supposed to be. Like the defendant in *Mulheren*, Archegos lost money as a result of the trading at issue. *See* Compl. ¶¶ 52, 162 (alleging that Archegos' capital decreased from $36 billon on March 22, 2021 to $9.2 billion on March 25, 2021).

As the D.C. Circuit explained in *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001), "[p]urely 'trade-based' manipulation schemes, in which the manipulator simply buys a security in order to induce higher prices and then sells to take advantage of the price change, are likely to fail" because it is "difficult to sell subsequently at a price high enough to cover both purchase costs and transaction costs … [I]f an actor's purchases are such as to give the market a material upward thrust, his later sales may equivalently drive it down." *Id.* at 528.[31] One commentator explained:

> Naked manipulation is difficult because as the trader tries to buy low, her purchases will, in theory, increase the price of the asset. Likewise, as she tries to sell at the increased price, her sales will decrease the price. To be successful in a naked manipulation scheme, the trader must have some way of preventing the price from increasing as she purchases, decreasing as she sells, or both.

Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 Duke L.J. 479, 503 (2018).

The Complaint contains no allegations that Archegos had any ability to prevent price increases as it purchased – to the contrary, the Complaint alleges that Archegos' trading was the cause of price increases. Compl. ¶ 2. Nor does the Complaint explain how – in the event Archegos planned on exiting its positions – it would be able to sell off those positions in a manner to prevent the prices from decreasing as it sold. The court in *College Bound* rejected a claim based on a similarly unreasonable allegations where, as here, the defendant retained the risk of economic loss on its open market purchases. *College Bound*, 1995 WL 450486, at * 7 ("Whatever potential gain [defendant] could reap from commissions could not offset the risk of buying large quantities of College Bound stock in the open market at full price."); *see also*

---

[31] *Markowski* did not involve a manipulation scheme that, as alleged here, centered exclusively on raising the price of securities (presumably to sell them at a profit). In *Markowski*, the SEC alleged that the defendants, who operated a broker-dealer, traded to maintain or increase the prices of securities of companies whose IPOs they had underwritten to make it appear that the broker-dealer was a successful underwriter. *Markowski*, 247 F.3d at 529.

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (securities fraud claim that "defies economic reason … does not yield a reasonable inference of fraudulent intent."). Similarly, the SEC's allegations here are no more plausible in economic terms than the reality that Archegos believed in its investments.

The SEC's market manipulation claims – based on either the attenuated private swaps transactions or equity share purchases – are unsupported by allegations that Archegos engaged in deceptive activity accompanying the transactions that sent a "false signal" to the market or caused an "artificial price," and accordingly the SEC has failed to state a valid claim.[32]

### C. The Alleged Misrepresentations Do Not Support the Market Manipulation Claim

Counts I and III of the Complaint include claims under § 17(a) of the Securities Act and § 10(b) of the Exchange Act based on allegations that two ACM employees – Mr. Tomita and Mr. Becker – made misrepresentations to counterparties in order to obtain additional capacity to transact and more favorable margin rates. Compl. ¶ 2. None of the alleged misrepresentations distorted information available to the market about the securities that were the subject of Archegos' transactions or sent a false signal to the market concerning Archegos' transactions or their prices. The alleged misrepresentations involve the characteristics of Archegos' portfolio – the size of its largest position, the liquidity of Archegos' portfolio, whether the positions traded with a particular counterparty were unique to that counterparty, the composition of the portfolio, whether Archegos' total exposure to a single name (in equity shares plus swaps) was greater than a set percentage of the outstanding shares in that name, and Archegos' cash position and the

---

[32] For the same reasons, any attempt by the SEC to pursue a "scheme liability" claim here also fails – they have failed to allege any trading that was deceptive or manipulative. *See SEC v. Way*, 246 F. Supp. 3d 894, 917 (S.D.N.Y. 2017) ("[c]laims for scheme liability hinge" on the commission of a "deceptive act that is distinct from an alleged misstatement.")

reasons why Archegos was calling back excess margin during the week of March 22, 2021.[33] These were not statements about the value of the securities being traded, consideration for the transaction, or statements that injected a "false pricing signal" into the market or deceived the market about any particular transaction.

The Second Circuit has held that a "manipulative act," occurs when "the transaction or series of transactions sends a false pricing signal to the market or otherwise distorts estimates of the underlying economic value of the securities traded." *Set Capital*, 996 F.3d at 76. In *Set Capital*, holders of Credit Suisse notes alleged that Credit Suisse engaged in manipulative conduct that caused the value of the notes to plummet. The conduct that led the Second Circuit to permit the manipulation claim to survive a motion to dismiss consisted of hedging trades that coincided with the purposeful issuance of an amount of securities that would increase the likelihood that the hedging activity would have a manipulative effect by "collapsing the market for the notes." *Id.* at 77 (finding Credit Suisse's hedging and notes issuances caused a liquidity squeeze that was an "undisclosed scheme to profit at their investors' expense").

This is consistent with the court's prior holding in *U.S. v. Regan*, 937 F.2d 823 (2d Cir.), *amended by*, 946 F.2d 188 (2d Cir. 1991), which affirmed a criminal conviction under Section 10(b). The court found that a Drexel Burnham bond trader engaged in market manipulation by secretly arranging with a trader at another firm (Princeton Newport) to short sell shares to

---

[33] *See* Compl. ¶¶ 98, 100, 106, 108, 110, 112, 124, 113, 138, 139, 141 (alleged representations concerning position size); ¶¶ 111, 113, 121, 131, 135, 137 (alleged representations concerning portfolio composition, generally and at other counterparties); ¶ 97 (alleged representations concerning the uniqueness of a counterparty's portfolio); ¶¶ 103, 124, 128, 138, 139, 141 (alleged representations concerning liquidity); ¶¶ 114-115, 143-145 (alleged representations concerning total exposure); ¶¶ 156, 161 (alleged representations concerning Archegos' cash position and explanation for calling back excess margin). With respect to the allegations concerning the total exposure representations in certain trading confirmations and a counterparty agreement, as is addressed more fully in the Individuals' Briefs, the SEC has not alleged that Mr. Hwang or Mr. Halligan, when they signed the confirmations and agreement at issue, were aware of the representations in those documents (Compl. ¶¶ 114-115, 143-145).

another broker-dealer "without disclosing to the dealer that PN was the seller or that Drexel was the moving party behind the entire deal." *Id.* at 829.  In *Regan*, the false signal to the market was the identity of the party behind the trade and their undisclosed nefarious motive.  Here, in contrast, the alleged misrepresentations were not associated with trade execution at all – they were made in the context of discussions with counterparties concerning the terms upon which they would extend margin or provide trading services to Archegos.  *See* Compl. ¶ 91 ("Counterparties frequently asked questions about Archegos's concentration levels and portfolio makeup in order for the Counterparties to evaluate whether and how much to increase capacity limits, or to change margin levels.")

With respect to the transactions at issue, there were no false signals to the market.  For each Archegos transaction – in swaps or equity shares – the market had precisely the information that the SEC mandated it have.  Family offices like Archegos that engaged in private swaps transactions were under no obligation to make disclosures to the market about their portfolio, holdings, or positions when entering into those contracts.  Judge Winter's landmark concurrence in *CSX v. Children's Inv. Fund Mgmt. (UK) LLP,* 654 F.3d 276 (2d Cir. 2011) concluded that "cash-settled total return equity swaps do not, without more, render the long party a 'beneficial owner' of such shares with a potential disclosure obligation under Section 13(d)."  *Id.* at 288.  As the Second Circuit has made clear, absent some deception of investors as to the prices at which they are trading, or some "false signal" to the market, there is no market manipulation claim.  *Set Capital*, 996 F.3d at 76; *Wilson*, 671 F.2d at 130.  The alleged misrepresentations here are independent of the private swaps transactions and equity trades and therefore have no bearing on the market manipulation claim.

## II. The SEC Does Not Have Jurisdiction Over The Alleged Misrepresentations to Archegos' Counterparties

Not only do the alleged misrepresentations to Archegos' counterparties fail to add anything to the SEC's unprecedented open-market manipulation claims, they fall outside the scope of the federal securities laws. As explained above, all of the alleged misrepresentations concerned the characteristics of Archegos' portfolio, and were purportedly made in an effort to obtain better margin rates or trading capacity with a counterparty. Compl. ¶ 91. None of the alleged misrepresentations relate to the characteristics of the securities involved in the transactions or the consideration provided in those transactions, and for this reason, the SEC's claims should be dismissed.

To pursue a claim under Section 17(a) of the Securities Act, the SEC must allege a fraud or deceit "in the offer or sale of any securities … or any security-based swap agreement …." 15 U.S.C. § 77q(a). Under Section 10(b) of the Exchange Act, the SEC must allege a manipulative or deceptive device "in connection with the purchase or sale of any security … or any securities-based swap agreement …." 15 U.S.C. § 78j(b). The Second Circuit has declined to assign any substantive import to the choice of slightly different language in the two statutes, so the requirement is presumed to be the same for both. *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 941-42 (2d Cir. 1984) ("Although arguably 'in connection with' has a somewhat broader sweep than 'in', it may be just as true that the 'in connection with' phraseology simply fit better with the rest of § 10(b)."); *see also United States v. Naftalin*, 441 U.S. 768, 773 n.4 (1979) (noting that both Congress and the Court "have on occasion used the terms" in and in connection with "interchangeably").

Although the Supreme Court has stated that Section 10(b) "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes,'" it has also

cautioned that it "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *SEC v. Zandford*, 535 U.S. 813, 820 (2002). In other words, "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security . . . .'" *Morrison v. Nat'l Australia Bank Ltd*., 561 U.S. 247, 266–67 (2010). "Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to 'regulate' . . . ." *Id*. at 266–67. Most recently, in *Chadbourne & Park LLP v. Troice,* 571 U.S. 377 (2014), the Court explained: "a fraudulent misrepresentation or omission is not made in connection with such a purchase or sale of a covered security unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a covered security." *Id.* at 387.

The Second Circuit's decision in *Chemical Bank* is instructive. There, certain banks agreed to provide loans to Frigitemp Corporation and its wholly owned subsidiary, Elsters, Inc. The loan to Elsters was guaranteed by Frigitemp and secured by 100% of Elsters' common stock. After Frigitemp filed for bankruptcy, the banks sued Frigitemp's outside auditor under Section 17(a) and Section 10(b), alleging that Frigitemp's financial statements were false and misleading, and had induced the banks to extend the loans to Frigitemp and Elsters. *Chemical Bank*, 726 F.2d at 933. The Second Circuit explained:

> The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Id.* at 943; *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (same). Based on that reasoning, the court dismissed the Section 17(a) and Section 10(b) claims because the defendant's misrepresentations concerning Frigitemp's financials were made in connection

with obtaining the loans, not the pledge of Elsters stock. *Chemical Bank*, 726 F.2d at 945; *see also Sarafianos v. Shandong Tada Auto-Parking Co. Ltd.*, No. 13–cv–3895 (SAS), 2014 WL 7238339, at * 4 (S.D.N.Y. Dec. 19, 2014) ("courts in this Circuit routinely reject attempts to transform putative fraud or breach of contract claims into section 10(b) claims.").

It is not sufficient to allege – as the SEC does here – that the alleged misrepresentations were used to obtain margin loans and trading capacity to "fuel" Archegos' transactions. Compl. ¶ 5. Claiming that the securities transactions would not have occurred absent the alleged misrepresentations does not satisfy the "in connection with" element. The Second Circuit considered – and rejected – this argument in *Chemical Bank*, holding "'but for' causation is not enough. [Section 10(b) and Rule 10b-5] impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which a pledge of security is a part." *Chemical Bank*, 726 F.2d at 943; *see also Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) ("purported misrepresentations as to the authority of the [bank] representatives to loan money in excess of the bank's lending requirements … do not pertain to the purchase or sale of a security."). Here, like the plaintiffs in *Chemical Bank*, Archegos' counterparties chose to make loans (i.e., extend margin) based on certain representations. These claims – like the claims in *Chemical Bank* – are not securities law violations because they are claims that the alleged misrepresentations induced margin loans and trading capacity, not claims that counterparties were deceived about the value of the securities involved or consideration for the transactions.

The SEC does not allege that after Archegos was extended trading capacity, or received certain margin rates, it made misrepresentations to its counterparties in connection with the characteristics of the securities it purchased or consideration it paid. Even accepted as true, the

SEC's allegations confirm that Archegos' transactions "constituted no relevant part of the fraud but were rather incidental to it."  *Chadbourne & Park*, 571 U.S. at 391; *see also Citibank*, *N.A. v. K-H Corp.*, 745 F. Supp. 899, 903 (S.D.N.Y. 1990) ("To satisfy the 'in connection with' requirement, plaintiff may not allege fraudulent acts which merely happened to involve [securities] in some way.").  Second Circuit authority mandates the dismissal of such claims.  *See Charles Schwab*, 883 F.3d at 96 ("[a] claim fails where the plaintiff does 'not allege that [a defendant] misled him concerning the value of securities he sold or the consideration he received in return.'") (quoting *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 108 (2d Cir. 1986) and citing *Chemical Bank*, 883 F.3d at 96); *Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 403 (S.D.N.Y. 2013) ("courts have drawn a line separating fraud claims that impact the fundamental valuation of the securities at issue, and the operation of securities markets, as distinguished from those that do not."); *Production Res. Grp., L.L.C. v. Stonebridge Partners Equity Fund*, 6 F. Supp. 2d 236, 239 (S.D.N.Y. 1998) ("Numerous decisions in this district have applied *Chemical Bank* to dismiss securities fraud claims when the alleged misrepresentations did not pertain to the 'fundamental nature' of the securities…."); *Levitin v. Paine Webber Inc.*, 933 F. Supp. 325, 329 (S.D.N.Y. 1996), *aff'd on other grounds*, 159 F.3d 698 (2d Cir. 1998) (dismissing § 10(b) claim alleging broker misappropriated customer assets to earn interest payments, concluding the claim "pertains not to the sale of the securities or the value of the securities themselves, but to the terms of the relationship between the broker and the customer.").

Accordingly, because the SEC's misrepresentations-based claims against ACM are not alleged to be in connection with the purchase or sale of a security, they should be dismissed.

## CONCLUSION

For the reasons set forth above, ACM respectfully requests that the Court enter an order dismissing the Complaint as to ACM in its entirety, with prejudice.

Dated: New York, New York
        June 28, 2022                    KING & SPALDING LLP


                                         By: _/s/ Carmen J. Lawrence_____
                                         Carmen J. Lawrence
                                         William F. Johnson
                                         Russell W. Johnston
                                         Eric A. Hirsch
                                         1185 Avenue of the Americas
                                         New York, NY 10036-4003
                                         Tel: (212) 556-2100
                                         Email: clawrence@kslaw.com

                                         _Attorneys for Defendant_
                                         _Archegos Capital Management, LP_