## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.

SUNG KOOK (BILL) HWANG, PATRICK
HALLIGAN, WILLIAM TOMITA, SCOTT
BECKER, AND ARCHEGOS CAPITAL
MANAGEMENT, LP,

        Defendants.

Civil Action No. 22-03402 (JPO)

*Document Electronically Filed*

---

## DEFENDANT SUNG KOOK (BILL) HWANG'S
## MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS

---

Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
*Attorneys for Defendant*
*Sung Kook (Bill) Hwang*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

STATEMENT OF FACTS ....................................................................................... 2

      A.     Summary of the Manipulative Trading Allegations Against Mr. Hwang. ...................................................................................... 2

      B.     Summary of the Misrepresentation Allegations Against Mr. Hwang. ...................................................................................... 5

ARGUMENT ........................................................................................................... 6

I.     THE COMPLAINT FAILS TO PROVIDE MR. HWANG WITH ADEQUATE NOTICE OF THE CLAIMS AGAINST HIM. ........................... 9

II.    THE COMPLAINT FAILS TO ALLEGE SECURITIES FRAUD AGAINST MR. HWANG WITH THE SPECIFICITY REQUIRED. ............. 10

III.   THE COMPLAINT FAILS TO STATE A SECURITIES FRAUD CLAIM AGAINST MR. HWANG BASED ON MISREPRESENTATIONS TO SWAP COUNTERPARTIES. ........................ 13

      A.     The Complaint Does Not Allege Any Misrepresentations by Mr. Hwang or Any Basis to Hold Him Liable for Misrepresentations Made by Others. ........................................................................... 14

      B.     The SEC's Alleged Misrepresentations Were Not Made "In Connection With" The Purchase Or Sale Of Securities. ................... 16

IV.   THE COMPLAINT FAILS TO STATE A MARKET MANIPULATION CLAIM. ............................................................................................................. 19

      A.     Market Manipulation Claims Based On Open-Market Trading Without Deceptive Conduct Are Not Recognized In This Circuit. ...... 20

      B.     The SEC's "Indicia of Manipulation" Do Not Indicate Deception By Mr. Hwang. ....................................................................... 26

            1.    Large volume trading. ................................................. 28

            2.    Timing of trading. ...................................................... 29

            3.    Other purported indicia. .............................................. 31

CONCLUSION ........................................................................................................ 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
   544 F. Supp. 2d 199 (S.D.N.Y. 2008).........................................................................................8

*Abuhamdan v. Blyth, Inc.*,
   9 F. Supp. 3d 175 (D. Conn. 2014)...........................................................................................13

*Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*,
   No. 96 CIV. 2549 RWS, 1997 WL 97837 (S.D.N.Y. Mar. 6, 1997).......................................18

*In re Allianz Global Invs. U.S. LLC Alpha Series Litig.*,
   No. 20-CV-5615 (KPF), 2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021) ...............................23

*In re Ames Dep't Stores Inc. Stock Litig.*,
   991 F.2d 953 (2d Cir. 1993).....................................................................................................18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)............................................................................................. *passim*

*Barclays Capital Inc. v. Theflyonthewall.com*, Inc.,
   650 F.3d 876 (2d Cir. 2011).....................................................................................................30

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
   126 F. Supp. 3d 342 (S.D.N.Y. 2015)......................................................................................30

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988).................................................................................................................15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................................6, 7

*Blank v. TriPoint Global Equities, LLC*,
   338 F. Supp. 3d 194 (S.D.N.Y. 2018)......................................................................................15

*Chadbourne & Parke LLP v. Troice*,
   571 U.S. 377 (2014).................................................................................................................17

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018).......................................................................................................18

*Chem. Bank v. Arthur Andersen & Co.*,
   726 F.2d 930 (2d Cir. 1984)...............................................................................................17, 18

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) .......................................................................16

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y.2010) ........................................................................20

*Conley v. Gibson*,
    355 U.S. 41 (1957) .......................................................................................................9

*Crummere v. Smith Barney, Harris Upham & Co.*,
    624 F. Supp. 751 (S.D.N.Y. 1985) ............................................................................18

*DealTime.com Ltd. v. McNulty*,
    123 F. Supp. 2d 750 (S.D.N.Y. 2000) ........................................................................14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .....................................................................................................9

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ........................................................................................10

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ..............................................................................................8, 20

*Flickinger v. Harold C. Brown & Co., Inc.*,
    947 F.2d 595 (2d Cir. 1991) ........................................................................................17

*Footbridge Ltd. Trust v. Countrywide Home Loans*,
    No. 9-CV-4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) .................................33

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
    843 F.3d 1257 (11th Cir. 2016) ..................................................................................24

*In re Gentiva Sec. Litig.*,
    971 F. Supp. 2d 305 (E.D.N.Y. 2013) .......................................................................33

*GFL Advantage Fund, Ltd. v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001) ........................................................................................24

*Gibbons v. Malone*,
    703 F.3d 595 (2d Cir. 2013) ..........................................................................................7

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ......................................................................................14

*Good Luck Prod. Co. v. Crystal Cove Seafood Corp.*,
    60 F. Supp. 3d 365 (E.D.N.Y. 2014) .........................................................................11

*Gurary v. Winehouse*,
  190 F.3d 37 (2d Cir. 1999).....................................................................................21

*Gurfein v. Ameritrade, Inc.*,
  411 F. Supp. 2d 416 (S.D.N.Y. 2006)......................................................................12

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*,
  No. 3:10CV371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) ...........................16

*Ho v. Duoyuan Global Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)......................................................................15

*Hunt v. Enzo Biochem, Inc.*,
  530 F. Supp. 2d 580 (S.D.N.Y. 2008)......................................................................11

*IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)......................................................................................9

*ILKB, LLC v. Singh*,
  No. 20-CV-4201 (ARR) (SJB), 2021 WL 3565719 (E.D.N.Y. Aug. 12, 2021).....11

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011).......................................................................................... *passim*

*Johnson v. Priceline.com, Inc.*,
  711 F.3d 271 (2d Cir. 2013).................................................................................6, 9

*Koch v. S.E.C.*,
  793 F.3d 147 (D.C. Cir. 2015).................................................................................30

*Kolbeck v. LIT Am., Inc.*,
  923 F. Supp. 557 (S.D.N.Y. 1996) ..........................................................................16

*Manufacturers Hanover Tr. Co. v. Smith Barney, Harris Upham & Co.*,
  770 F. Supp. 176 (S.D.N.Y. 1991) ..........................................................................18

*Markowski v. SEC*,
  274 F.3d 525 (D.C. Cir. 2001).................................................................................25

*In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*,
  No. 19-CV-6002 (LJL), 2021 WL 827190 (S.D.N.Y. Mar. 4, 2021)......................19

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993)....................................................................................10

*Noto v. 22nd Century Grp. Inc.*,
  35 F.4th 95 (2d Cir. 2022) .......................................................................................20

iv

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
　　591 F. Supp. 2d 586 (S.D.N.Y. 2008) .......................................................................30

*PetEdge, Inc. v. Garg*,
　　234 F. Supp. 3d 477 (S.D.N.Y. 2017) ........................................................................15

*Production Resource Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*,
　　6 F. Supp. 2d 236 (S.D.N.Y. 1998) ...........................................................................19

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
　　573 F.3d 98 (2d Cir. 2009) .........................................................................................15

*S.E.C. v. Lauer*,
　　No. 3-CV-80612 (KAM), 2008 WL 4372896 (S.D. Fla. Sept. 24, 2008) ...............31

*S.E.C. v. Markusen*,
　　143 F. Supp. 3d 877 (D. Minn. 2015) .......................................................................30

*Salahuddin v. Cuomo*,
　　861 F.2d 40 (2d Cir. 1988) ...........................................................................................9

*Santa Fe Indus., Inc. v. Green*,
　　430 U.S. 462 (1977) ..............................................................................................20, 24

*Saxe v. E.F. Hutton & Co.*,
　　789 F.2d 105 (2d Cir. 1986) .......................................................................................18

*Schreiber v. Burlington Northern, Inc.*,
　　472 U.S. 1 (1985) .......................................................................................................20

*SEC v. Fiore*,
　　416 F. Supp. 3d 306 (S.D.N.Y. 2019) ....................................................................7, 10

*SEC v. Lek Sec. Corp., et. al.*,
　　Case No. 17-CV-1789 (S.D.N.Y. March 10, 2017) ...................................................23

*SEC v. Malenfant*,
　　784 F. Supp. 141 (S.D.N.Y. 1992) ............................................................................21

*SEC v. Masri*,
　　523 F. Supp. 2d 361 (S.D.N.Y. 2007) ............................................................21, 26, 31

*SEC v. Vali Mgmt. Partners, et. al.*,
　　No. 21-CV-453, 2022 WL 2155094 (2d Cir. June 15, 2022) ....................................23

*SEC v. Wey*,
　　246 F. Supp. 3d 894 (S.D.N.Y. 2017) .........................................................................8

*SEC v. Yorkville Advisors, LLC*,
   305 F. Supp.3d 486 (S.D.N.Y. 2018)..................................................................................7, 9

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*,
   No. 3-CV-3120 (LTS)(THK), 2009 WL 1492196 (S.D.N.Y. May 27, 2009)........................29

*Sendar Co. v. Megaware Inc.*,
   705 F. Supp. 159 (S.D.N.Y. 1989) .......................................................................................11

*Set Capital LLC v. Credit Suisse Group*,
   996 F.3d 64 (2d Cir. 2021)...................................................................................................23

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994).................................................................................................10

*SIPC v. BDO Seidman, LLP.*,
   222 F.3d 63 (2d Cir. 2000).....................................................................................................6

*Stratte-Mcclure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)...................................................................................................15

*Sullivan & Long Inc. v. Scattered Corp.*,
   47 F.3d 857 (7th Cir. 1995) ...........................................................................................24, 25

*Taylor v. Westor Capital Group*,
   943 F. Supp. 2d 397 (S.D.N.Y. 2013)...............................................................................12, 13

*Trane Co. v. O'Connor Sec.*,
   561 F. Supp. 301 (S.D.N.Y. 1983) .......................................................................................21

*United States v. Gilbertson*,
   970 F.3d 939 (8th Cir. 2020) ...............................................................................................24

*United States v. Hall*,
   48 F. Supp. 2d 386 (S.D.N.Y. 1999).....................................................................................25

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991)...................................................................................... *passim*

*Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*,
   149 F. Supp. 3d 376 (E.D.N.Y. 2016) ..................................................................................13

*Williams v. Affinion Grp., LLC*,
   889 F.3d 116 (2d Cir. 2018).................................................................................................11

*Wilson v. Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011).............................................................................................12, 20

vi

## Statutes

15 U.S.C. § 77q(a), Securities Act, § 17(a) ........................................................... *passim*

15 U.S.C. § 78i(a)(2), Exchange Act, § 9(a)(2) ...............................................2, 7, 19, 20

15 U.S.C. § 78j(b), Exchange Act, § 10(b) ........................................................... *passim*

15 U.S.C. § 78m(d), Exchange Act, § 13(d) .....................................................................3

## Regulations

17 C.F.R. § 240.10b-5 ........................................................................................... *passim*

17 CFR § 240.13d-1 ..............................................................................................................3

17 CFR § 275.202(a)(11)(G)-1(b) ......................................................................................2

## Rules

Fed. R Civ. P. 8 ...........................................................................................................7, 9, 10

Fed. R Civ. P. 9(b) ................................................................................................. *passim*

Fed. R Civ. P. 12(b)(6) ........................................................................................... *passim*

## Treatises

5 C. Wright & A. Miller, Federal Practice and Procedure § 1281 (1969) .....................................9

## Other Authorities

Daniel R. Fischel and David J. Ross, *Should the Law Prohibit 'Manipulation' in Financial Markets?*, 105 Harv. L. Rev. 503 (1991) ...............................................21

Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 Duke L.J. 479 (2018) ...............................................21, 25

SEC Proposed Rule 10B-1 and SEC Rel. No. 34-93784 (available at https://www.sec.gov/rules/proposed/2021/34-93784.pdf) .......................................31

Thomas R. Millar & Paul J. Pantano, Jr., *Open Market Manipulation: The Dangers of Policing Thought*, 39 No. 10 Futures & Derivatives L. Rep. NL 2 (2019) ................................................22, 25

## PRELIMINARY STATEMENT

The Complaint in this matter is extraordinary: paragraph after paragraph alleges entirely lawful trading on the open market, but then concludes that the trades at issue—real trades subjecting defendant Bill Hwang to real economic risk, and devoid of any deceptive actions—was somehow unlawful.  In particular, the Complaint finds manipulation in defendant Bill Hwang's conduct in trading large volumes of securities, trading which the SEC second-guesses, in hindsight, was "non-economic," *i.e.*, lacked a legitimate economic basis.  Along the way, the SEC declares to be unlawful a number of practices that have long been accepted as entirely legitimate, including trading one's own money through a family office that has limited reporting requirements, trading on margin or through security-based swaps rather than in the securities themselves, or trading before or at the end of the trading day.  The result is a Complaint that is not only unprecedented in its expansion of the notion of "open-market manipulation," already a questionable theory, but one that would, if sustained, threaten the very existence of markets by allowing regulators to judge, in retrospect, the economic value of trading, and by equating manipulative intent with mere knowledge of the truism that trading, and especially large trades, affects price.  No trader could have known that these kinds of actions would someday—because Mr. Hwang's trading failed in the short term, costing him, but no other investors, billions of dollar of losses—be deemed unlawful, rendering this Complaint not only wrong, but fundamentally unfair and an obvious attempt to rewrite the law and then apply it retroactively.

Mindful of its inability to allege any kind of deceit or fraudulent trading conduct, the SEC alleges that swap counterparties were the victims of misstatements that caused them to extend credit to Mr. Hwang's fund, Archegos.  But these misstatements were not, even as alleged, those of Mr. Hwang but of others; the SEC seeks to attribute them to Mr. Hwang only by arguing that he "set the tone" for them.  This allegation is deficient, as a matter of law, not only because the statements were not Mr. Hwang's, but also because they were not, even as charged, "in connection

1

with" the purchase or sale of securities, but were for the purpose of borrowing money.  Nor, in any event, are these allegations set forth with even close to the particularity demanded by the Rules, so vague are they in their ultimate charges and so unspecific in the specific allegations.

For all of these reasons, as set forth in detail below, the Complaint in this matter should be dismissed as against Mr. Hwang.

## STATEMENT OF FACTS

The SEC brings this Complaint, alleging a "fraudulent scheme" of "interlocking deceptive acts and misconduct" carried out through "manipulative trading" and "misrepresentations to Counterparties" (ECF 1 ("Compl.") ¶¶ 1, 41-85, 86-166) against four individuals and Archegos Capital Management, LP ("Archegos").  Archegos was the family office[1] of individual defendant Sung Kook (Bill) Hwang until March 2021, when the value of its fund collapsed (*id.* ¶¶ 15-16, 20, 148-166).  The other individual defendants are Patrick Halligan (the former Chief Financial Officer of Archegos), William Tomita (the former head trader), and Scott Becker (the former Chief Risk Officer) (*id.* ¶¶ 17-19).  With respect to Mr. Hwang, the Complaint alleges violations of three securities fraud statutes: (1) Section 17(a) of the Securities Act of 1933 (*id.* ¶¶ 167-69) (Count I), (2) Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (*id.* ¶¶ 173-75) (Count III), and (3) Section 9(a)(2) of the Securities Exchange Act of 1943 (*id.* ¶¶ 182-84) (Count VI).  The Complaint incorporates every allegation about manipulative trading and misrepresentations into each of these three separate counts.

### A.    Summary of the Manipulative Trading Allegations Against Mr. Hwang.

The Complaint alleges that although Archegos had been in existence for many years, and was worth around $4 billion, it commenced a manipulative trading scheme in September 2020 and continued it through the fund's collapse in March 2021 (the "Relevant Period") (*id.* ¶¶ 1, 3).

---

[1] A family office is "a company . . . that (1) Has no clients other than family clients . . . (2) Is wholly owned by family clients and is exclusively controlled (directly or indirectly) by one or more family members and/or family entities; and (3) Does not hold itself out to the public as an investment adviser."  17 CFR § 275.202(a)(11)(G)-1(b).

According to the Complaint, during this entire six-month period "[n]one of [Archegos's] trading was based on a principled view of the true value of a particular issuer and instead was intended to artificially inflate share prices" of its top 10 swap positions (*id.* ¶ 74).

Mr. Hwang, as head of the Archegos family office, had the sole discretion to invest his own money, which he did using a long/short equity strategy that involved taking highly leveraged and highly concentrated positions, mostly by entering derivative contract-based swap transactions with multiple Counterparties (*id.* ¶¶ 15, 20, 23-24, 27-28). Swaps were utilized to "limit the visibility" into the "extent of Archegos's aggregate holdings" by avoiding the 5% direct ownership reporting threshold under Section 13(d) of the Exchange Act (*id.* ¶¶ 29-30).[2] The various swap Counterparties would "ensure any corollary synthetic exposure" created by the swap contract was "fully hedged," sometimes by purchasing shares of the swap's referenced issuers in the market "to the extent necessary" (*id.* ¶ 37).

The scheme allegedly began with the "onset of the Covid-19 pandemic" in March 2020 when, at Mr. Hwang's direction, Archegos's fund moved its swap positions from "highly-liquid, larger cap issuers" towards "less liquid, China-based issuers, as well as relatively smaller cap U.S. media and technology companies" (*id.* ¶¶ 49, 53). This included shifts away from swaps in companies such as Amazon and Microsoft to swaps in companies like ViacomCBS, Discovery, and China-based issuers Baidu and GSX (*id.* ¶¶ 54-56). The SEC asserts that the "exponential growth" (*id.* ¶ 49) experienced by Archegos thereafter was "driven by Archegos's build-up of exposures"—to "staggering levels" through "trading at volumes that demonstrated the goal to artificially impact the market" and Mr. Hwang's intention to "artificially inflate" the share price of Archegos's top 10 holdings (*id.* ¶¶ 44, 56).

---

[2] Sections 13(d) of the Exchange Act and 17 CFR § 240.13d-1 require holders of securities to file a Schedule 13D form after acquiring more than a 5% beneficial ownership of a registered class of voting equity securities. Typically, the long party to a cash-settled equity derivative does not have "beneficial ownership" of the reference securities because the derivative instrument does not confer voting or investment power—the two hallmarks of beneficial ownership under Rule 13d-3. The SEC does not assert that Archegos failed to make any required Schedule 13D filing.

The SEC premises its manipulative trading claims on the following allegations: *First*, the SEC points to the large amount of swap trading in a highly concentrated number of companies as indicative of market dominance, which allowed Archegos's trading to affect a stock's price (*id.* ¶¶ 57-73). Specifically, Archegos held very sizeable swap positions in its top 10 holdings, in some cases positions that "equated" to as much as 70% of the outstanding shares of an issuer (*id. ¶* 58). Accordingly, Mr. Hwang could "impact markets [in the securities underlying the swaps] through the exercise of its sheer buying power" (*id.* ¶ 59). Some swap transactions "frequently exceeded 20%, often reached 30%, and even surpassed 40% of certain issuers' daily trading volume" (*id.* ¶¶ 63-66.). That volume of trading "applied upward pressure on those issuers' share prices" (*id.* ¶ 67).

*Second*, Archegos engaged in trading that the SEC characterizes as "non-economic," though it does not define this term (*id.* ¶¶ 46, 74-85). Alleged non-economic trading included:

- Trading in the "pre-market" to "induce" others to "observe active trading . . . and upward price movement" and thus buy (or sell) shares; for example, the fund traded large volumes of Viacom stock in the pre-market nineteen times between January and March 2021 (*id.* ¶¶ 77-78).

- Trading "during the last 30 minutes" of the day, for example in Baidu Inc. and Tencent during January through March 2021 (*id. ¶¶* 79-80), in order to "mark the close" and push up prices, with the goal of increasing excess margin (*id.*).

- Trading "throughout the day" in a "manner that served to increase" the share price of Archegos's holdings by using successive rising "limit orders" in an "attempt to increase" a stock's price and thereby induce others to buy (*id.* ¶ 82) or to "counteract selling pressure" (*id.* ¶¶ 83-85).

*Third*, the SEC alleges that certain additional (non-trading) factors support its market manipulation claims. For example, the SEC claims that the price of stocks like Viacom, Discovery, and Vipshop were "artificial" during the Relevant Period because they rose in "dissimilar fashion to the general market" as measured by NASDAQ indices (*id.* ¶ 73). And, the Complaint alleges, after Archegos's fund collapsed in March 2021, those share prices have not recovered (*id.* ¶¶ 69-

4

72).[3]  The SEC also asserts that Mr. Hwang sometimes rejected his analysts' recommended price targets in favor of his own "outsized" price targets with "little or no analytical support" (*id.* ¶ 75). And the SEC points to certain communications by Mr. Hwang in the form of text messages or Bloomberg chats telling traders like Tomita to get "aggressive" by "add[ing]  exposures quickly and at large volumes" (*id.* ¶ 60), or commenting to an Archegos analyst that his buying activity on a certain day caused an increase in a stock's price (*id.* ¶ 59).

      **B.**     **Summary of the Misrepresentation Allegations Against Mr. Hwang.**

In addition to its allegations of market manipulation, the SEC alleges that Archegos made "misrepresentations to Counterparties [that] fueled its manipulative trading" (*id.* ¶ 5 and Section IV).  All of the misrepresentations are in the nature of "false assurances concerning [Archegos's] portfolio composition, its concentrated exposure, and its liquidity profile" (*id.* ¶ 6).  In particular, the SEC asserts that misrepresentations were made to eight unnamed Counterparties ("CP1" through "CP8") by Tomita and Becker (*id.* ¶¶ 97-161).  For example, the Complaint alleges that:

- Becker "falsely claimed several times that Archegos's largest single position was only 35% of Archegos's net asset value ('NAV')" and that Archegos could "liquidate its entire portfolio within two weeks by trading at 15% of average daily trading volume ('ADV')" (*id.* ¶¶ 98, 108, 124, 128).

- Becker "misled CP3 into thinking that Amazon—a mega-cap stock—was one of Archegos's top 5 holdings" and comprised "30% of its capital" (*id.* ¶ 111).

- Tomita "initially attempted to deflect questions" from CP4 about Archegos's concentration levels and then "misled the individual [from CP4] into believing" that holdings from other entities, and not Archegos, had caused other counterparties to file certain 13(d) beneficial ownership reports (*id.* ¶¶ 119-121).

- Becker "provided false information [to CP7] about Archegos's portfolio concentration" (*id.* ¶ 138).

---

[3] When the market value of several of Mr. Hwang's top holdings substantially declined throughout the week of March 22, 2021—virtually simultaneously and at least in part due to external market forces such as a Viacom secondary offering and negative regulatory pronouncements concerning certain China-based issuers (*id.* ¶¶ 148-153)—the fund could not cover successive margin calls, resulting in the insolvency of the fund and billions of dollars of losses to Mr. Hwang and some of the Counterparties (*id.* ¶¶ 52, 159, 162-66).

- Becker spoke with CP8 personnel on March 24, 2021 and "misled CP8 materially concerning the extent of [Archegos's] liquidity concentrations" (*id.* ¶ 141).

The SEC alleges that these misrepresentations by Tomita and Becker were made "to enable Archegos to gain additional capacity for their long [swaps], to gain more favorable margin rates, and during the week of its collapse in March 2021, to attempt to satisfy margin calls" (*id.* ¶ 94). In this way, the SEC asserts, these representations "served as the fuel" for Archegos's "manipulative trading." (*Id.* ¶ 5).

The SEC does not allege that Mr. Hwang made any misrepresentations to any Counterparty. Instead, it alleges that Mr. Hwang "set the tone" for the discussions with the Counterparties (*id.* ¶ 92); that he "mandated" that certain information not be provided to Counterparties (*id.* ¶ 93); and that he put "intense pressure" on Tomita and Becker to seek additional trading capacity from banks (*id.* ¶ 94). The Complaint thus asserts that Mr. Hwang "directly and indirectly" misled Counterparties, and "knew or was reckless in not knowing" that additional capacity would not have been given to Archegos "without providing false or misleading information" to them (*id.* ¶ 95). Few specific facts about this are alleged: in one instance, the SEC asserts that, at Mr. Hwang's "direction," "Tomita embellished a story to CP6 that Archegos was constrained from transferring its concentrated positions away from CP6 for tax reasons" (*id.* ¶ 131). The only other specific allegation is that Mr. Hwang signed an amendment to a Portfolio Swaps Annex with CP8 that allegedly contained inaccurate statements about Archegos's total percentage of ownership of outstanding shares and swaps in a given position (*id.* ¶¶ 142-145).

## ARGUMENT

A court must grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when the allegations, even if true, would not entitle the plaintiff to the relief requested. *SIPC v. BDO Seidman, LLP.*, 222 F.3d 63, 68 (2d Cir. 2000). Put another way, "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

6

While the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the plaintiff, *see Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013), the Court must not accept bald assertions, untenable inferences, or legal conclusions disguised as factual allegations, *see Twombly*, 550 U.S. at 555–57.

The three counts brought against Mr. Hwang claim violations of Section 17 of the Securities Act, Section 10b of the Exchange Act and Rule 10b-5 thereunder, and Section 9(a) of the Exchange Act.[4]   They each fail to satisfy the requisite standards for multiple reasons, mandating dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

*First,* the SEC does not delineate which conduct by Mr. Hwang allegedly violated which securities statutes.  This is a critical and fundamental requirement of Rule 8 of the Federal Rules of Civil Procedure, yet the Complaint instead incorporates all the factual allegations into all the counts and provides no notice as to which sections of any statute Mr. Hwang has allegedly violated. The SEC must do more under the basic standards of notice pleading.  *See Point I.*

*Second,* the Complaint lacks the specificity demanded by Federal Rule of Civil Procedure 9(b), which requires that the SEC identify the particulars of any alleged fraudulent conduct by Mr. Hwang and plead facts sufficient to support those allegations.  The Complaint fails to do so with respect to either the misrepresentation or the manipulation claims.  *See Point II.*

---

[4] Count I (Section 17(a), 15 U.S.C. § 77q(a)) and Count III (Section 10(b), 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5) contain "essentially the same elements" and the courts in this district have analyzed them as such.  *SEC v. Yorkville Advisors, LLC*, 305 F. Supp.3d 486, 510 (S.D.N.Y. 2018).  Section 17(a) forbids: "(1) the direct or indirect use of any device, scheme, or artifice to defraud; (2) obtaining money or property through misstatements or omissions of material facts; and (3) any transaction or course of business that operates as a fraud or deceit upon a purchaser of securities."  *Id.*  Section 10(b) makes it "unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud"; "(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading"; or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" all "in connection with the purchase or sale of securities."  *Id.*  The final count against Mr. Hwang, Count VI, alleges a violation of Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2), proscribing engaging in a series of transactions in a security creating actual or apparent trading in that security (or raising or depressing the price of that security) for the purpose of inducing the security's sale or purchase by others.  *SEC v. Fiore*, 416 F. Supp. 3d 306, 325 (S.D.N.Y. 2019).

7

*Third,* in its misrepresentation claims, the Complaint seeks to hold Mr. Hwang responsible for statements that Tomita and Becker made to the Counterparties, but it fails to allege any sufficient legal or factual basis for doing so.  Mr. Hwang is not alleged to have made those statements or ordered them, and conclusory allegations that he somehow "set the tone" or "pressured" others do not suffice to make him legally responsible for others' conduct.  The Complaint also fails because all of the alleged misrepresentations were about Archegos in order to obtain credit from the Counterparties, rather than "in connection with" the purchase or sale of securities, as the relevant statutes require.  *See* Point III.

*Fourth*, with respect to the market manipulation claims, the Complaint alleges only actual trading activity that exposed Archegos to real economic risk, and fails to allege any deceptive conduct, such as "spoofing" or publishing false information.  The SEC thus relies upon a version of the so-called "open-market manipulation" theory, under which legal trading is made actionable based solely upon an allegation that the defendant intended to impact prices.  But this theory has been rejected by nearly every court to have considered it and has been disapproved in this Circuit— for good reasons, discussed below.  And while the Complaint characterizes some of Archegos's trading activity as "indicia" of manipulation, none of it is or could be claimed to be illegal in itself, and all of it is entirely consistent with the legitimate economic goal of acquiring the security at issue.  As such, it is insufficient to plead a market manipulation claim.  *See* Point IV.[5]

---

[5] In addition to the arguments set forth in Points I-IV, Mr. Hwang adopts all legal arguments made by moving defendants Archegos and Halligan in their separate briefs, to the extent those arguments are directed at Counts I, III and VI of the Complaint.  Those include, *inter alia,* Archegos's arguments demonstrating that, because the trading alleged here was done primarily through swaps, such conduct is too attenuated to satisfy the necessary elements of the SEC's market manipulation claims, and the arguments that the SEC fails to plead facts against any moving defendant that raise the requisite strong inference of fraud or an intent to manipulate the market.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (scienter is "a mental state embracing intent to deceive, manipulate, or defraud.").  None of the conduct alleged about Mr. Hwang supports any such inference; as discussed in Point IV below, all of his alleged actions are wholly consistent with non-manipulative conduct.  *SEC v. Wey*, 246 F. Supp. 3d 894, 912, 916 (S.D.N.Y. 2017) (explaining that allegations of scienter must create a "strong inference" of fraudulent intent); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008) ("A complaint adequately pleads scienter only if a reasonable person would deem the inference of scienter both 'cogent' and 'at least as likely as any plausible opposing inference.'") (internal citations and quotations omitted).

## I.   THE COMPLAINT FAILS TO PROVIDE MR. HWANG WITH ADEQUATE NOTICE OF THE CLAIMS AGAINST HIM.

Federal Rule of Civil Procedure 8(a) requires that a party be given adequate notice of the claims against him and requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 thus requires the plaintiff to not only plead a sufficient factual basis to make any claim for relief plausible, *Johnson*, 711 F.3d at 275, but more fundamentally requires the pleading to enable the defendant to discern the conduct in which he is alleged to have engaged and the claimed legal basis for liability stemming from such conduct.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005) (dismissing securities fraud class action for failure to comply with Rule 8(a), as plaintiffs failed to provide the defendants "with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation") (*citing Conley v. Gibson*, 355 U.S. 41, 47 (1957) (a "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests")); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (a non-compliant complaint "places an unjustified burden on the court and the part[ies] who must respond to it because they are forced to select the relevant material from a mass of verbiage") (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)).

For example, Counts I and III allege violations, respectively, of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.  Those statutes largely mirror each other in their elements.  *See supra* note 4.  But the Complaint does not provide even the barest indication of which subsections of those statutes Mr. Hwang allegedly violated, or whether any alleged violations of those provisions are based on alleged misrepresentations to counterparties, alleged market manipulation (which is also cognizable under those statutes), or both.  For example, subsections (a) and (c) of Rule 10b-5 require pleading a manipulative or deceptive act in furtherance of the alleged scheme to defraud in connection with the purchase or sale of securities.  *Yorkville Advisors, LLC,* 305 F. Supp. 3d at 510.  Rule 10b-5(b), by contrast, requires pleading a

9

material misrepresentation (or material omission as to which the defendant had a duty to speak) in connection with the purchase or sale of securities.  *Fiore*, 416 F. Supp. 3d at 319.  Is Count III against Mr. Hwang directed only to the provisions of Rule 10b-5(a) or (c), or also 10b-5(b)?  And if the SEC means to allege a violation of all subsections of Rule 10b-5, including 10b-5(b), what misrepresentations (or omissions) were allegedly made by Mr. Hwang in violation of that provision?  Because the SEC impermissibly lumps, in its charging counts, multiple possible claims, the Complaint violates the basic tenets of Rule 8(a) and must result in the dismissal of the claims asserted against Mr. Hwang, pursuant to Fed. R. Civ. P. 12(b)(6).

## II.   THE COMPLAINT FAILS TO ALLEGE SECURITIES FRAUD AGAINST MR. HWANG WITH THE SPECIFICITY REQUIRED.

Because both the misrepresentation and market manipulation claims against Mr. Hwang are pled as securities fraud, all of the counts in the SEC's Complaint are subject to the heightened pleading requirements set forth in Fed. R. Civ. P. 9(b), which by its terms requires that "in alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . ."  *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  For a misrepresentation claim, the SEC must identify, at a minimum, what false statements were made, who made them, and when and where they were made, and also "explain why the statements were fraudulent."  *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28  (2d Cir. 1994) ("[A] complaint [alleging a securities fraud claim] must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Here, the Complaint does not satisfy the requirements of Rule 9(b) because it does not identify any specific misrepresentations or omissions by Mr. Hwang, or specific deceptive conduct in support of a manipulation claim.

10

Leaving aside that the Complaint in this case never identifies the Counterparties, instead identifying them as "CP1" through "CP8" (Compl. ¶¶ 91-147), its more fundamental defect is that it does not give Mr. Hwang notice regarding what he did or said to make him responsible for any specific false statements by Tomita or Becker.  To be sure, the SEC identifies some (but apparently not all) statements allegedly made by defendants Tomita or Becker about Archegos's "portfolio composition, its concentrated exposure, and its liquidity profile" (*id. ¶* 6), and says Mr. Hwang should be liable for them because he purportedly "set the tone" for such discussions (*id.* ¶ 92); "mandated" that certain information not be provided to Counterparties (*id.* ¶ 93); and put "intense pressure" on Tomita and Becker to seek additional trading capacity from banks (*id.* ¶ 94).  But there are no particularized allegations concerning what Mr. Hwang purportedly said to either Tomita or Becker with regard to any particular alleged misstatement.  In this regard, the allegations of the Complaint fall far short of satisfying Rule 9(b).  *See, e.g., Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125-26 (2d Cir. 2018) (plaintiffs failed to plead with requisite particularity mail and wire fraud claim, despite their contention that they were "duped," where the complaint did not identify any specific misrepresentations that tricked them); *ILKB, LLC v. Singh*, No. 20-CV-4201 (ARR) (SJB), 2021 WL 3565719, at *7, 9 (E.D.N.Y. Aug. 12, 2021) (dismissing fraud claims where counter-plaintiff "failed to plead with particularity when and where the alleged misrepresentations were made"); *Good Luck Prod. Co. v. Crystal Cove Seafood Corp.*, 60 F. Supp. 3d 365, 378 (E.D.N.Y. 2014) (plaintiff failed to plead with particularity a fraud claim, based on defendants' alleged misrepresentations to banks, where plaintiff did not "identify the exact statements" made or "explain when they were made"); *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 601 (S.D.N.Y. 2008) (plaintiff failed to plead common law fraud claims with particularity where complaint failed to include the content of the misrepresentations); *Sendar Co. v. Megaware Inc.*, 705 F. Supp. 159, 161 (S.D.N.Y. 1989) ("The allegations fail to specify the date on which

fraudulent statements were made, merely alleging that statements were made some time during a two month period.").

The market manipulation allegations, which are also subject to Rule 9(b), fare no better. *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 129 (2d Cir. 2011) (market manipulation claims must be pled with particularity under Rule 9(b)). In that section of the Complaint (¶¶ 41-85), the SEC generally describes extensive legal conduct related to trading and proclaims it all "manipulative" during the Relevant Period (*id. ¶¶* 41, 74). But the specific instances of manipulative trading activity at issue are not identified, as Rule 9(b) requires. To survive a Rule 12(b)(6) motion, the SEC must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 102 (2d Cir. 2007) (quotation omitted)*; see also Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 401 (S.D.N.Y. 2013) (same) (citing *Gurfein v. Ameritrade, Inc.*, 411 F. Supp. 2d 416, 425 (S.D.N.Y. 2006)).

Even when a few examples of supposedly "manipulative" conduct are provided, there are no particularized allegations. (*See* Compl. ¶¶ 77-78 (alleging that in pre-market trading, Mr. Hwang "set the tone" to "induce" others to "observe active trading in and upward price movement" of the shares, such as when the fund traded in large volumes of Viacom stock in the pre-market nineteen times between January and March 2021, but failing to specify the nineteen times at issue)). Allegations about the actual days on which such trading occurred, exactly what "volume" was traded, when it was traded, and how it impacted any other investors in the market are completely absent. Even more fundamentally, left unspecified is what false information was conveyed to the market by virtue of each of these trades so as to render them "manipulative," including how the price of any such stock on those days was affected and in what regard it was "artificial," as well as who was "induced" to buy or sell based upon it. This too violates Federal

12

Rule of Civil Procedure 9(b) and these claims accordingly must also be dismissed. *See, e.g., Taylor*, 943 F.Supp.2d at 404 (dismissing manipulation claim because the complaint contained "virtually no details about [the] alleged scheme: it is impossible to tell what manipulative acts were performed, . . . [and] when they were performed"); *see also Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 387 (E.D.N.Y. 2016) ("[T]he Plaintiff's threadbare statement does not make clear the circumstances of the Defendants' alleged manipulative acts— such as, which Defendants performed them; when the manipulative acts were performed; and what effect the scheme had on the market for the securities at issue.  Rather, the Plaintiff's allegations of market manipulation rely on abject speculation, which courts have repeatedly held cannot form the basis of a securities fraud claim under the Exchange Act and Rule 10b–5."); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 210 (D. Conn. 2014) (plaintiffs  failed to plead that company engaged in deceptive scheme to purchase a  company, as required for securities fraud claim under Rule 10b–5(a) and (c), where the complaint "offer[ed] only conclusory allegations regarding any deceptive and manipulative act rather than the 'specific facts' necessary to satisfy Rule 9(b)").

## III.  THE COMPLAINT FAILS TO STATE A SECURITIES FRAUD CLAIM AGAINST MR.  HWANG  BASED  ON  MISREPRESENTATIONS  TO  SWAP COUNTERPARTIES.

As noted above, the Complaint alleges numerous misstatements to unnamed counterparties for the alleged purpose of obtaining favorable credit terms for Archegos (Compl. ¶¶ 5, 86-166). As alleged, these purportedly false statements were made by defendants Tomita and Becker, not by Mr. Hwang.  Nor does the Complaint allege that Mr. Hwang directed them to make these false statements or even that Mr. Hwang knew about any of the statements when they were made.[6]

---

[6] The Complaint alleges only two instances where Mr. Hwang had any involvement with counterparty discussions. The first is that, "Based on Hwang's direction, Tomita embellished a story to CP6 that Archegos was constrained from transferring its concentrated positions away from CP6 for tax reasons" (Compl. ¶¶ 129-132.).  Not only does that allegation lack the specificity required by Rule 9(b), but on its face it has nothing to do with obtaining capacity or improved margin rates, which the Complaint alleges to be the purpose of the misrepresentations at issue. *Id.* ¶ 94. The second is that an Amended Portfolio Swap Annex ("PSA") with CP8 was signed by Hwang in 2015 and 2020 and contained "false statements" that the Archegos fund's overall share concentration in any single position was, respectively, below 5% or 20% (*id.* ¶¶ 143-146).  But absent allegations that Mr. Hwang knew of that provision, that

Because the Complaint fails to allege any facts that would support holding Mr. Hwang liable for statements made by others, it fails to state an actionable claim against him.  Moreover, because the false statements described in the Complaint were about Archegos's portfolio rather than the nature or value of any securities, and were allegedly made to obtain increased capacity and/or better margin rates—in other words, to obtain credit—they were  not made "in connection with" the purchase or sale of securities, as the applicable statute requires and thus they do not support a claim of securities fraud.   Accordingly, any claims of misrepresentations to counterparties should be dismissed as against Mr. Hwang.

### A.    The Complaint Does Not Allege Any Misrepresentations by Mr. Hwang or Any Basis to Hold Him Liable for Misrepresentations Made by Others.

Nowhere does the Complaint assert any misrepresentation purportedly made by Mr. Hwang.  Instead, the SEC sets forth a litany of supposedly false statements made by Tomita and Becker and seeks to hold Mr. Hwang liable for them.  But the Supreme Court has held that in order to be liable under Rule 10b-5(b), a defendant "must have 'made' the material misstatements" at issue.  *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011).  Thus, in *Janus*, the Supreme Court dismissed securities fraud claims against third parties who had drafted certain allegedly false statements in a prospectus, concluding that the statement's "maker" was really the company ultimately responsible for publishing it.  The Court explained, "even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit—or blame—for what is ultimately said."  *Id.* at 143; s*ee Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 424–25 (7th Cir. 2015) (jury instruction that defendants could be liable if they "made, approved, or furnished information to be included in a false statement" was error because it went "well beyond the narrow interpretation adopted in

---

it was false, and thereby intended to defraud CP8, at most such an allegation would be a simple breach of contract claim, and not securities fraud.  *See DealTime.com Ltd. v. McNulty*, 123 F. Supp. 2d 750, 761 (S.D.N.Y. 2000) ("[T]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract, not federal securities fraud." (internal citation and quotation omitted)).

*Janus*"); *Blank v. TriPoint Global Equities, LLC*, 338 F. Supp. 3d 194, 211 (S.D.N.Y. 2018) (co-founder/president/COO could not be liable for CEO's oral statements); *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) (CFO not liable for CEO's oral statements).

Of course, a person can be liable for a false statement made by another if the person forced them to make it, *Janus*, 564 U.S. at 141, but the SEC does not claim that Mr. Hwang forced Tomita or Becker to make any false statement, or that he was even aware of what they were saying. Instead, it alleges that Mr. Hwang "set the tone" by telling Archegos employees not to disclose certain information about the fund (Compl. ¶¶ 92-94). But a failure to disclose information, absent any duty to do so (which is not alleged here), cannot be the basis of a fraud claim, and thus cannot make Mr. Hwang liable for Tomita and Becker's lies. *See Stratte-Mcclure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.") (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).

Nor is the SEC's allegation that Mr. Hwang pressured Tomita and Becker to obtain more capacity from counterparties, and "knew or was reckless in not knowing" that they could not do so without making false statements (*id*. ¶¶ 94-95), nearly sufficient. While "recklessness" can satisfy the scienter requirement for a fraud claim, what is required is "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted). Thus, to meet its pleading requirement the SEC needs to allege particularized facts showing that Mr. Hwang knew Tomita and Becker could only obtain more capacity or better margin terms by committing fraud. The Complaint comes nowhere close to doing so. Indeed, the Complaint includes no factual allegations providing any basis whatsoever to infer that Mr. Hwang had such knowledge. *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (dismissing fraud claim against CEO and ruling that conclusory allegations that fraudulent acts by employees

15

were undertaken "with [the CEO's] knowledge and approval" could not to satisfy Rule 9(b) absent specific factual allegations that the CEO meaningfully participated in directing or making the allegedly false statements).

Moreover, the *Janus* standard is not met as against an employer, as a matter of law, by allegations that he pressured employees to perform; demanding results is not equivalent to ordering fraud.  *See Hawaii Ironworkers Annuity Tr. Fund v. Cole*, No. 3:10CV371, 2011 WL 3862206, at *4–5 (N.D. Ohio Sept. 1, 2011), as amended (Sept. 7, 2011) (corporate officials not liable for misrepresentations made by subordinates who allegedly felt pressured by management directive to show profit margin increase); *see also Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) (SEC cannot satisfy Rule 9(b) with "conclusory assertions that one defendant controlled another"); *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374-75 (S.D.N.Y. 2012) (an executive "cannot be held liable based on what [subordinates] said in their oral remarks," notwithstanding allegation that CEO "had 'ultimate authority' over" company's statements").  Because the Complaint does not provide any basis to hold Mr. Hwang liable for the false statements alleged, the securities fraud claims must be dismissed for failure to state a claim upon which relief can be granted.

### B. The SEC's Alleged Misrepresentations Were Not Made "In Connection With" The Purchase Or Sale Of Securities.

The Counterparty misrepresentation claims also must be dismissed because they were not made "in connection with" the purchase or sale of securities, as is required to support a securities fraud claim under Sections 17(a) and 10(b).  The Complaint alleges that Tomita and Becker's misrepresentations were all made "in order to obtain increased trading capacity" or to "gain more favorable margin rates" (Compl. ¶¶ 5, 94), which purportedly "fueled" Mr. Hwang's trading (*id.* ¶¶ 5, 86-95).  But even if true, these allegations establish that the alleged misrepresentations were not acts of securities fraud, any more than using the proceeds of a bank robbery to buy stock would

be.  The reason is simple: not every bad act that may facilitate the purchase or sale of a security is made "in connection with" that purchase or sale.

Section 17(a) of the Securities Act makes it unlawful to commit fraud "in the offer or sale of any securities."  15 U.S.C. § 77q(a).  Section 10(b) of the Exchange Act makes it unlawful to use deceit "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).  As the Supreme Court has made clear, this language limits securities fraud claims under those provisions to misrepresentations that have a nexus to the purchase or sale of a security; in particular, the misrepresentation must be material to another's purchase or sale.[7]  *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security.'"); *see also Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 598 (2d Cir. 1991) (to satisfy the requirement, "the fraud must have been integral to the plaintiff's purchase or sale of the security"); *Chem. Bank*, 726 F.2d at 943 (explaining that the purpose of Section 10(b) "is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be").

Here, the SEC alleges that Tomita and Becker made misrepresentations to counterparties about the stability and risk profile of Archegos' portfolio—not to induce them to buy or sell any security, but to obtain credit for Archegos, that is, "to obtain increased trading capacity" and "favorable margin rates."  (Compl. ¶¶ 5, 94).  That Archegos may have used the credit to buy or

---

[7] The nexus requirement is the same for both statutes.  *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 941–42 (2d Cir. 1984) ("Although arguably 'in connection with' has a somewhat broader sweep than 'in', it may be just as true that the 'in connection with' phraseology simply fits better with the rest of § 10(b).").

sell securities does not make the alleged misrepresentations ones "in connection with" the purchase or sale of securities.  *See Chem. Bank*, 726 F.2d at 943 (holding that the "in connection with" requirement was not met by an allegation that bank was defrauded into making lending decisions based upon misrepresentations relating to certain stock pledged as collateral for the loan); *Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*, No. 96 CIV. 2549 RWS, 1997 WL 97837, at *6 (S.D.N.Y. Mar. 6, 1997) (dismissing claim where misrepresentations "pertain[ed] not to the securities themselves, but to the status of [the investor's] credit and the availability of funds in his account"); *see also Crummere v. Smith Barney, Harris Upham & Co.*, 624 F. Supp. 751, 755 (S.D.N.Y. 1985) ("The Second Circuit court has stated that the misrepresentation must relate to the securities alleged to satisfy the purchase and sale requirement, and not just to the transaction in its entirety.").  In sum, the fraud underlying the SEC's claims does not amount to securities fraud under Sections 17(a) and 10(b).

The "in connection with" requirement is also not satisfied here because the alleged misrepresentations were not about the underlying value or characteristics of any security.[8]  That is, courts in this Circuit have held that "[m]isrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves cannot form the basis of a violation of Section 10(b) or Rule 10b-5."  *Manufacturers Hanover Tr. Co. v. Smith Barney, Harris Upham & Co.*, 770 F. Supp. 176, 181 (S.D.N.Y. 1991).  And "[t]ypically, a plaintiff satisfies the 'in connection with' requirement when 'the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value.'"  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (quoting *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir. 1993)); *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 108  (2d Cir. 1986) (claim fails where

---

[8] For example, the SEC's allegations about misstatements during the week of March 22, 2021, which is a focus of the Complaint, are not about securities at all.  The Complaint alleges that Becker made misrepresentations to CP5 and CP7 on March 24, but it does not allege any securities transactions with those Counterparties during this period (Compl. ¶¶ 155-56, 161).  On the flip side, the Complaint does allege that Archegos executed a block trade through CP6, but there is no misrepresentation alleged as to that counterparty that week.  *See id.* ¶ 163.

plaintiff does "not allege that [a defendant] misled him concerning the value of the securities he sold or the consideration he received in return"); *Production Resource Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*, 6 F. Supp. 2d 236, 240 (S.D.N.Y. 1998) (misrepresentations are not made "'in connection with' the purchase or sale of securities [when they do] not pertain to the value, nature or investment characteristics of the securities at issue"). Here, Tomita and Becker's alleged misrepresentations were all about Archegos and the composition and liquidity of its portfolio, and not about the value or characteristics of any swap or stock. For this reason too, they do not satisfy the "in connection with" requirement and any Counterparty misrepresentation claims against Mr. Hwang in the Complaint must accordingly be dismissed.

## IV.     THE COMPLAINT FAILS TO STATE A MARKET MANIPULATION CLAIM.

The SEC also alleges market manipulation claims against Mr. Hwang in purported violation of Section 17(a) of the Securities Act (Claim I), Section 10(b) of the Exchange Act and Rule 10b-5 (Claim III), and Section 9(a)(2) of the Exchange Act (Claim VI). Typically, a claim of market manipulation is based upon allegations that the defendant engaged in deceptive conduct to artificially affect a stock's price, such as spoofing or publishing false information about the value of the security at issue.[9] The SEC alleges none of that here. Instead, it alleges manipulation based solely upon actual, completed trades by Archegos, without any allegations of inherently deceptive acts; it relies upon a novel "open-market manipulation" theory that, the SEC contends, can be satisfied entirely on the basis of the volume and timing of actual trades and their impact upon the price of the stocks at issue, because the defendants allegedly intended such an impact. The Court should reject this unprecedented theory and dismiss the manipulation claims for failure to state a claim under Rule 12(b)(6).

---

[9] Spoofing is the practice of placing an order and cancelling it before the transaction is effected, with no intent to ever execute it, solely to create a false impression of market demand. *See In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, No. 19-CV-6002 (LJL), 2021 WL 827190, at *2 (S.D.N.Y. Mar. 4, 2021).

### A.   Market Manipulation Claims Based On Open-Market Trading Without Deceptive Conduct Are Not Recognized In This Circuit.

The Supreme Court has characterized "manipulation" as a "term of art" in securities law. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).  It therefore has held that a securities law violation for "market manipulation" requires a showing of "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976); *see also Santa Fe Indus.*, 430 U.S. at 476 (explaining that "manipulative" practices are those "such as wash sales, matched orders, or rigged prices" because they give only the illusion of free-market buying and selling).[10] Similarly, the Court has held that to be actionable a manipulation scheme must have a deceptive element.  *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 7-8 (1985).

The deception requirement is met under Second Circuit law only by conduct that gives "a false impression of how market participants value a security" and disrupts "the natural interplay of supply and demand."  *ATSI*, 493 F.3d at 100-01 (allegations centering on "(1) high-volume selling of ATSI's stock with coinciding drops in the stock price, (2) trading patterns around conversion time, (3) the stock's negative reaction to positive news, and (4) the volume of trades in excess of settlement during a 10-day period in 2003" held insufficient to allege market manipulation); *see also Noto v. 22nd Century Grp. Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) (affirming dismissal of market manipulation claim against defendants based on alleged misstatements in outside third-party promotional articles and noting that the "critical question is what activity 'artificially' affects a security's price in a deceptive manner"); *Wilson*, 671 F.3d at 130 (the "gravamen of manipulation is deception of investors into believing that prices at which they

---

[10] *See also Cohen v. Stevanovich,* 722 F. Supp. 2d 416, 424 (S.D.N.Y.2010) ("Plaintiffs' broad and conclusory allegations of naked short selling do not state a claim for market manipulation.  The [Amended Complaint] contains no allegations of wash transactions, matched orders or other similar activity, and does not assert that the parties to the alleged short sales were anything other than bona fide buyers and sellers trading at the reported price of the transaction. The fact that the seller was allegedly unable to deliver the security on the settlement date—three days after the transaction—does not transform that legitimate sale into unlawful market manipulation.").

purchase and sell securities are determined by the natural interplay of supply and demand, [and] not rigged by manipulators") (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)); *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (proof of deception is essential element of market manipulation under Section 9(a) because the "central purpose" of 9(a) "is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price") (quoting *Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301, 304 (S.D.N.Y. 1983)).

While the SEC asserts that Archegos employed "multiple deceptive tactics" and points to "several indicia of manipulation" (Compl. ¶ 42), it does not actually allege any purported deceptive acts that could have created "a false impression of how market participants value a security," *ATSI*, 493 F.3d at 101, but only alleges real trades that reflected how Mr. Hwang valued securities and that exposed Archegos and Mr. Hwang to real economic risk. There are no allegations of the kinds of deceptive trading recognized as creating an artificial market and price. *See SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (explaining that conduct such as wash sales, matched orders, or rigged prices are by design meant to mislead investors by artificially affecting market activity). Instead, the SEC's truly radical theory is that Mr. Hwang engaged in a broad market manipulation scheme over the entire six month "Relevant Period" because his trading was so highly concentrated and so voluminous that it created a market price that was somehow "artificial," which he allegedly recognized and, on unspecified occasions, even intended. (Compl. ¶¶ 43-44, alleging that "Archegos exercised domination" over the market for certain issuers and traded "at volumes that demonstrated the goal" of manipulation). This theory of "open-market manipulation" has been debated by legal scholars, [11] but it has never been the basis for a cognizable cause of action in the Second Circuit or indeed in most other Circuits.

---

[11] *See, e.g.,* Daniel R. Fischel and David J. Ross, *Should the Law Prohibit 'Manipulation' in Financial Markets?*, 105 HARV. L. REV. 503, 553 (1991) (finding "no compelling reason" to prohibit open-market manipulation based on a trader's "bad intent"); Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market*

The leading case on the subject in this Circuit is *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991).  In *Mulheren*, the Court criticized the government's open-market manipulation theory and reversed a criminal conviction based upon it.  *Id.* at 368-69, 372.  Specifically, the government alleged that the defendant bought stock with the sole intent of driving up its price as a favor to Ivan Boesky, who wanted to sell his shares of the same stock back to the company when the stock hit a certain price.  *Id*. at 365.  Allegations and proof that Boesky told Mulheren that "it would be great if it traded" at the desired price, along with Mulheren's use of a broker he did not regularly use (to allegedly conceal his trading activity), and that Mulheren's purchases comprised 70% of the trading in that security between the opening of the market and 11:10 a.m. were, even taken together, insufficient to sustain a conviction for market manipulation. *Id.* at 370-72.  The Court noted that all the evidence presented against Mulheren was at least as consistent with innocent behavior—buying stock because he wanted to own it—as with manipulation.  *Id.* at 372.

Although the Court found that the evidence against the defendant in *Mulheren* was insufficient to support the charges—and thus did not have to reach the question of whether an open-market manipulation claim could ever be viable—the Court stated at the outset of its analysis that it "harbor[ed] doubt" about the government's theory, and that it had "misgivings about the government's view of the law."  *Id.* at 366, 368.  That "view of the law" was that violations of Section 10(b) and Rule 10b-5 could be based on allegations that the trader "engage[d] in securities transactions in the open market with the sole intent to affect the price of the security."  *Id.* at 368. Since *Mulheren*, the Second Circuit has never allowed an open-market theory to proceed based

---

*Manipulation*, 68 DUKE L.J. 479, 486, 501 (2018) (noting that recent "intent-centric approaches" by the government to "open-market manipulation" claims are a "significant departure from the traditional conception of market manipulation" and "lack[] a coherent basis for [imposing] liability," and arguing that claims by the SEC focused "exclusively on intent" have resulted in "significant confusion and discord in the markets, as participants try to determine what constitutes open-market manipulation"); Thomas R. Millar & Paul J. Pantano, Jr., *Open Market Manipulation: The Dangers of Policing Thought*, 39 No. 10 FUTURES & DERIVATIVES L. REP. NL 2 (2019) (arguing that even if courts allow "open market" manipulation claims to proceed they should require proof of "manipulative or deceptive conduct" and not focus on "intent alone").

only on real market transactions, even when coupled with allegations that the trader's sole intent was to impact the price of the stock.

In the recent case of *Set Capital LLC v. Credit Suisse Group*, for example, the Second Circuit allowed what it called an "open-market manipulation" allegation to proceed to discovery. 996 F.3d 64, 87 (2d Cir. 2021).  But the Court made very clear that the allegation of deceptive acts related to the trading was essential to its decision in that case: "[w]hile a defendant may manipulate the market through open-market transactions, some misrepresentation or nondisclosure is required" in connection with the trading for it to violate the law.  *Id.* at 77.  Indeed, the facts alleged in *Set Capital* included that Credit Suisse deliberately destroyed the value of a security so that it could massively profit from coordinated hedging activity and then declare an "Acceleration Event" allowing it to lock in the profit, all while simultaneously making misleading public statements regarding the expected impact of its trading and covering up the basis for declaring the Acceleration Event.  *Id.* at 69.  Thus, the Court in *Set Capital* did not endorse an open-market manipulation theory like the one the SEC alleges here, which is based solely on allegations of real trading activity coupled with a trader's alleged intent to affect the price of a security.  *See also In re Allianz Global Invs. U.S. LLC Alpha Series Litig.*, No. 20-CV-5615 (KPF), 2021 WL 4481215, at *31 (S.D.N.Y. Sept. 30, 2021) (noting that *Set Capital* involved a CEO's "potentially false or misleading statement[s]" as an indicia of manipulation).[12]

---

[12] A recent non-precedential order by the Second Circuit, *SEC v. Vali Mgmt. Partners, et. al.,* No. 21-CV-453, 2022 WL 2155094, at *1–2 (2d Cir. June 15, 2022) (summary order), cites to *Set Capital* when affirming a jury instruction in a market manipulation case, "in the context of the jury charge as a whole," to the effect that "in some cases … a defendant's intent to manipulate the securities market, is all that distinguishes legitimate trading from manipulative trading."  That broad language from *Set Capital* does not, however, endorse the type of open-market manipulation scheme alleged here, which involves no alleged deceptive conduct like the coordinated hedging activity and misstatements present in *Set Capital*, as described above or, indeed, in *Vali* itself, where the SEC's complaint alleged "layering," a form of "spoofing."  *See* Complaint ¶¶ 3-4, 35 filed in *SEC v. Lek Sec. Corp., et. al.*, Case No. 17-CV-1789 (S.D.N.Y. March 10, 2017) (Cote, J.).  Indeed, unlike in *Set Capital or Vali*, there is no remotely deceptive conduct alleged here that would constitute manipulation, though such conduct remains the "gravamen of a claim for market manipulation."  *Set Capital,* 996 F.3d at 77.  Nor do any allegations show that Mr. Hwang had any "motive and opportunity to commit the fraud" or constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI,* 493 F.3d at 99.  To the contrary, the "indicia of manipulation" alleged by the SEC, as discussed in detail *infra* at Point VI.B,  are wholly consistent with Mr. Hwang intending to take large, concentrated positions in

Like the Second Circuit, the Third, Seventh, Eighth, and Eleventh Circuits have all rejected legal theories of open-market manipulation based on legal trading behavior alone, without some independent evidence of deception by the alleged manipulator.  *See, e.g., GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 205 (3d Cir. 2001) (holding that a manipulator must have "injected 'inaccurate information' into the market or created a false impression of market activity" so as to "distinguish between legitimate trading strategies"); *United States v. Gilbertson,* 970 F.3d 939, 949 (8th Cir. 2020) (adopting *GFL*'s standard when evaluating a manipulation claim and upholding conviction only where defendant "took multiple acts to manipulate prices and distort market forces on both the buy and sell side" including buying stock in a different name and lying about his control over the shares he was trading); *In re Galectin Therapeutics, Inc. Sec. Litig.,* 843 F.3d 1257, 1273 (11th Cir. 2016) (holding that manipulation requires "engag[ing] in any kind of simulated market activity or transactions designed to 'create an unnatural and unwarranted appearance of market activity'") (quoting *Santa Fe Indus.*, 430 U.S. at 476-77).

For example, in *Sullivan & Long Inc. v. Scattered Corp.*, Judge Posner underscored the point that allegations of merely impacting the price of a stock through trading—even if that is what one intends to do—are insufficient to state a market manipulation claim: "[Plaintiffs] say that [defendant] prevented the price from rising (and thereby discouraged buy-ins by making them unprofitable) by selling short more and more stock.  That is just to say that [defendant], like a bluffer in a poker game, kept redoubling its bet until the other players lost heart.  But so what?" 47 F.3d 857, 861 (7th Cir. 1995).  The Seventh Circuit upheld the dismissal of Section 9(a)(2) and 10(b) manipulation claims notwithstanding the allegations of large volume trading and its alleged intended impact on market prices, because there simply was no "false impression of supply or demand . . . . On the other side of all of the [defendant's short sale] transactions were real buyers,

---

securities, which is neither illegal nor wrongful.  *See ATSI*, 493 F.3d at 104 (rejecting scienter allegation based on assertion that "a legitimate investment vehicle, such as the convertible preferred stock at issue here, creates an opportunity for profit through manipulation").

betting . . . however foolishly, that the price of LTV stock would rise." *Id.* at 864.[13]  That, of course, is precisely the case here.

Requiring deceptive conduct to sustain a manipulation claim serves a critical purpose: it allows markets to function without fear that legitimate, lawful trading activity will be deemed inappropriate and be punished based on an after-the-fact allegation that the investor secretly harbored the wrong intent.  "Grounding claims of manipulation solely on intent, particularly when the proof is circumstantial, may deter traders from engaging in beneficial market activity out of a fear of liability."  Fletcher, *supra* n.11, at 517.  Indeed, allowing market manipulation claims to proceed based solely on legal trading activity coupled with an alleged intent to affect a stock's price would allow the SEC to bring enforcement actions based purely on what it believes was in the trader's mind:

> Congress did not mandate the regulators to be Thought Police.  According to the plain language of the statutes and Supreme Court precedent, each regulator's mandate is limited to policing deceptive or manipulative *conduct*. . . . Requiring proof of deceptive or manipulative conduct is important because open market bids and offers do not by themselves communicate false information to the market.  In addition, they typically do not create an artificial price.

Millar & Pantano, Jr., *supra* n.11.  For these reasons, this Court should adhere to the overwhelming weight of authority, both judicial and scholarly, and hold that an open-market manipulation theory, based solely on real trading activity and  coupled with nothing but an alleged intent to impact price, is not actionable market manipulation.  *See also United States v. Hall*, 48 F. Supp. 2d 386, 387

---

[13] Only the D.C. Circuit has allowed an open-market manipulation theory to proceed based on real trading activity coupled only with allegations of a trader's "intent" to affect price.  *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001).  But even in that case, the Court acknowledged that "[i]t may be hard to separate a 'manipulative' investor from one who is simply over-enthusiastic, a true believer in the object of investment."  *Id.* at 528.  Moreover, the allegation in *Markowski* – obviously absent here – was that the real purpose of the trading was not to buy stocks based on genuine investment interest in the stocks themselves, but rather to promote the underwriting and brokerage business of the defendants by making it appear (falsely) that the stocks underwritten by the firm were good investments.  *Id.* at 527-28.  Thus, even *Markowski* concerned deceitful conduct akin to misrepresentations to potential investors.  Obviously, there is no similar allegation here (nor even are there "investors," insofar as Mr. Hwang was trading only on his own account).

(S.D.N.Y. 1999) (Chin, J.) (explaining that conduct intended to increase a stock price cannot lead to an artificial price if the conduct is not deceptive).

### B.   The SEC's "Indicia of Manipulation" Do Not Indicate Deception By Mr. Hwang.

The SEC here alleges a host of entirely real and legal trading activity that it nevertheless claims establishes an actionable manipulation scheme, characterizing the conduct as "involv[ing] multiple deceptive tactics including several indicia of manipulation."  (Compl. ¶ 42).  To be sure, courts sometimes point to certain "indicia" of a transaction to either satisfy the deceptive conduct requirement or to establish scienter where those indicia serve to belie any legitimate economic motive for a transition.  *See, e.g.*, *Masri*, 523 F. Supp. 2d at 372 ("The Court concludes, therefore, that if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, *and not for any legitimate economic reason*, it can constitute market manipulation.") (emphasis added).  But only conduct that evidences an intent to manipulate by sending a false signal to the market about the value of a security can satisfy the statute, *see ATSI*, 493 F.3d at 100-01 (dismissing allegations of "manipulative" short-selling because plaintiff did not show how short-sellers engaged in trading that "create[d] a false impression" of price as opposed to simply trading based on their belief in the true economic value of the security), and therefore only such conduct can truly constitute "indicia" of unlawful manipulation, *see Mulheren*, 938 F.2d at 372 (reversing conviction where the conduct alleged to be manipulation was consistent with a legitimate desire to own the stock).

None of the "indicia" to which the SEC points come close to satisfying that standard, as each is entirely consistent with the basic legitimate economic rationale that Mr. Hwang wanted to acquire the security.[14]  In particular, the Complaint points to the following trading activity—all of

---

[14] Although the SEC alleges that Tomita and Becker's misrepresentations to the Counterparties were such indicia, in that they were somehow "interlocking" with the manipulation (Compl. ¶¶ 1, 41-85, 86-166), those misrepresentations to banks did not provide any information to the market, let alone false information.

which is absolutely legal—as purportedly deceptive conduct: first, that Mr. Hwang "added staggering levels of exposure" in order to create market dominance in Archegos's top 10 swap holdings and then traded "at volumes that demonstrated the goal to artificially impact prices" of the issuer's stocks underlying those swap holdings (*id.* ¶ 44); second, that the timing of his trading was deceptive, first to "set the tone" in the premarket, then to "bid[] up prices" during the day, and finally to "mark the close" at the end of the day (*id.* ¶ 46); third, that Mr. Hwang used swaps to "limit the visibility of market participants and Counterparties into the extent of Archegos's aggregate holdings" (*id.* ¶ 29); fourth, that he changed the types of companies Archegos invested in to less liquid and mid-to-smaller cap holdings (*id.* ¶ 53) and sometimes rejected his analysts' price targets "in favor of his own outsized price targets" with "little or no analytical support" (*id.* ¶ 75); and fifth, that the price of some stocks in which Archegos had swap positions, like Viacom, Discovery, and Vipshop, were "artificial" during the Relevant Period because they rose in "dissimilar fashion to the general market" as measured by NASDAQ indices (*id.* ¶ 73), and did not rebound to previous high levels after Archegos's fund collapsed in March 2021 (*id.* ¶¶ 69-72).

      As is discussed in detail below, none of these allegations can, even if true, possibly support a claim of manipulative trading by Mr. Hwang.  Nothing in the Complaint, other than the most conclusory of characterizations (Compl. ¶¶ 74, 83-85), suggests the lack of a legitimate economic basis for any of Mr. Hwang's purchasing or selling securities in his own account.  Fundamentally, it is undisputed that all of Mr. Hwang's trading was real, that Archegos's money was always at risk, and that market participants who engaged in the trades did so only at the actual prices that Mr. Hwang was willing to pay (and did pay), not any artificial price created by deceptive conduct. Indeed, there is no allegation that Mr. Hwang took any action whatsoever that "deceived" anybody with his trading activity.  He simply bought large amounts of swaps with exposure to exchange traded securities of large public companies.

<h4>1.  Large volume trading.</h4>

The SEC alleges that at times, Mr. Hwang would "add exposure quickly and at large volumes" (*id. ¶* 60) and sometimes traded swaps on a given day that "equated" to a large percentage (25% or more) of the trading volume, on selected days, of the outstanding shares in the underlying securities (*id. ¶¶* 58, 64-69).  According to the SEC, the amount of shares and the trading done by Mr. Hwang gave Archegos "domination over the market" in certain stocks (*id. ¶* 43) which somehow—inexplicably—made his trading "artificial." (*id*. ¶ 44).

But "market dominance" and large volume trading is not, and could not in our market system, be itself actionable, and it certainly is not in itself the type of deceptive conduct that can support a manipulation claim.  *See ATSI*, 493 F.3d at 100-02 (rejecting market manipulation claim based on allegations of "high-volume selling" with coinciding drops in the stock price and excess "volume" trades during a 10-day period).  To be sure, sometimes large volume trading can be associated with manipulative conduct because it shows opportunity, in that the defendant had the power to manipulate the market.  But allegations of dominance "cannot be viewed in a vacuum . . . . The percent of domination must be viewed in light of the time period involved and other indicia of manipulation."  *Mulheren*, 938 F.2d at 371.

In any event, the SEC's allegations about Mr. Hwang's trading come nowhere close to alleging the type of "market dominance" that could support a manipulation claim.  Not only do these allegations fail to suggest deceptive conduct, but the SEC's allegations are themselves deceptive, spinning a narrative that depends upon unfair cherry-picking of various time periods and different securities.  As just one example, the SEC alleges that Archegos's trading of Discovery Class A shares reached 25% of daily trading volume on 17 of 33 trading days from "November 24, 2020 to January 4, 2021."  (*id*. ¶ 64).  But, by its own terms, that statement is utterly meaningless.  Looking at the entire 33 day timeframe would show Archegos trading a far lower percentage of "daily trading volume."  And that 33-day period is itself wholly arbitrary,

28

since Discovery Class A shares were part of the Archegos portfolio for far longer, at least since July 2020 (*id.* ¶ 55).  These allegations are insufficient as a matter of law and fail to show that which the SEC claims they do.

Indeed, the allegations here are similar to the kind found inadequate in *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 3-CV-3120 (LTS)(THK), 2009 WL 1492196 (S.D.N.Y. May 27, 2009).  There, the trader (Frankel) allegedly made 106 sale trades for 138,800 shares, the stock price fell, and he then performed an "after-hours cleanup trade" by purchasing 155,000 shares.  *Id.* at *7.  Similarly, on other days, Frankel sold shares during the day and, after the stock price dropped, purchased a similar volume of shares in an "after-hours cleanup trade purchase." *Id.*  In the months of October to December 2000, his trades accounted for about 30% of all the volume of the relevant shares.  *Id.*  Analyzing these allegations, the court concluded that "Plaintiff's allegations concerning Frankel fail to explain with any particularity how Frankel's actions deceived investors as to the intrinsic value of Sedona's shares.  The [Complaint] lacks any explanation as to how Frankel's ability to make a profit by selling high and buying low misled the market . . . .  The mere fact that Frankel effected such a large volume of trades in Sedona's stock is also not indicative of anything manipulative."  *Id.* (citing *ATSI*, 493 F.3d at 105).  Similarly here, the SEC's allegations about large trading volume on certain selected days over a six-month period are simply "not indicative of anything manipulative."

### 2.    Timing of trading.

The SEC also asserts that Mr. Hwang traded at various times that purportedly indicate manipulation.  More pointedly, the SEC asserts claims that in the pre-market, Archegos traded to "set the tone" when liquidity was low; it traded during the day to "bid[] up prices" with limit orders; and it traded late in the day to "mark the close" (*id.* ¶ 46).

If, as the SEC claims, Archegos' trading at the start of the day, during the course of the day, and at the end of the day are all indicative of manipulation, it is unclear when trading may

29

take place without giving rise to manipulation claims.  But of course, none of these timing allegations are indicative of any manipulation.  Pre-market trading is perfectly legal.  *See Barclays Capital Inc. v. Theflyonthewall.com*, *Inc*., 650 F.3d 876, 881 n.5 (2d Cir. 2011).  And if purchases in the pre-market drive up a stock's price to a level that is "too high," sellers will undoubtedly come in to sell when the market opens.  No inference of manipulation can be drawn from the SEC's pre-market allegations, and the claim that Mr. Hwang "set the tone"—even if it "induced" anyone to buy stock—cannot be viewed as an indicia of manipulation.

Similarly, allegations that limit orders were placed in the market until the total amount of such order was filled is simply an allegation of routine trading activity.  *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 352 (S.D.N.Y. 2015) (noting that limit orders are a common trading practice under which traders are permitted "to buy or sell a stock below or above a particular price").  Indeed, placing a limit order, far from artificially *increasing* a price, is meant to *limit* the price at which a trader purchases shares.  And there is nothing nefarious or non-economic about increasing a limit order as the price of the stock moves up.  The SEC's allegations support only the inference that Mr. Hwang wanted to buy the stock.

Finally, the type of "marking the close" allegations that can, in some cases, be part of a manipulative scheme requires more than just trading at the end of the day.  When courts have found marking the close to be actionable as part of a manipulative scheme, there has always been some related deceptive conduct to which it was linked.  For example, a hedge fund (or other investment fund) might mark the close at the end of the month to temporarily make its investment portfolio appear more profitable before a reporting event, and thus induce people to invest with the fund or not redeem, or to increase the fund's fees.  *See, e.g.*, *Koch v. S.E.C.*, 793 F.3d 147, 152-54 (D.C. Cir. 2015); *S.E.C. v. Markusen*, 143 F. Supp. 3d 877, 885-86 (D. Minn. 2015); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 591 F. Supp. 2d 586, 587

(S.D.N.Y. 2008); *S.E.C. v. Lauer*, No. 3-CV-80612 (KAM), 2008 WL 4372896, at *12-13 (S.D. Fla. Sept. 24, 2008). No such conduct is alleged here.

In fact, there is nothing about the allegations of late-day trading at Archegos that suggests anything other than Mr. Hwang's desire to buy more stock.[15] Courts have noted that trading at the end of the day is a common practice because there is typically increased liquidity at that time. As the court explained in *Masri*, "stock transactions made at the close of the day are not prohibited. Indeed, studies have shown that trading in organized securities is heaviest just before the market closes . . . ." 523 F. Supp. 2d at 370–71 (further noting that the theory that manipulation liability can be based on "'marking the close' alone" has "not been endorsed by any Article III court"). Like the other allegations about the timing of trades, there is nothing inherently deceptive or non-economic, and no allegations of deception or non-economic conduct, about Archegos's late-day trading.

### 3. Other purported indicia.

The SEC's non-trading "indicia" of manipulation also do not support their claim. They allege that Mr. Hwang used swaps to "limit the visibility of market participants and Counterparties into the extent of Archegos's aggregate holdings" (*id.* ¶ 29), but that is not illegal, and of course there is no current regulatory prohibition on using swaps to keep market investments private.[16] Nor is there any prohibition on, or even anything remarkable about, Mr. Hwang's changing certain portfolio holdings on the heels of a pandemic that created new market conditions and opportunities (*id.* ¶ 53). And Mr. Hwang, an experienced trader who was trading his own money (*id.* ¶ 16, 20),

---

[15] The SEC makes a conclusory assertion that end-of-day trading benefited Archegos's "margin," (Compl. ¶ 79) but nothing is alleged about how margin is even calculated under any specific agreement, much less how such an agreement constituted deceptive conduct in the way that the prohibition on manipulation is meant to prevent.

[16] Recent proposed Rulemaking by the SEC demonstrates that new rules would be required to make holders of swap disclose their positions. *See* SEC Proposed Rule 10B-1 and SEC Rel. No. 34-93784, at 62 (noting that the "Commission has not previously proposed rules using its authority under Section 10B with respect to either position limits or reporting of large positions in security-based swaps.") (available at https://www.sec.gov/rules/proposed/2021/34-93784.pdf).

certainly was free to reject his employees' price targets in favor of his own, notwithstanding the SEC's disagreement with his targets as "outsized" (*id.* ¶ 75).  To the contrary, as in *Mulheren*, Mr. Hwang's conduct was at least as—and really far more—consistent with his belief in the undervalued nature of the companies in which he was investing than it is suggestive of any illicit scheme.  *See* 938 F.2d at 372.

The SEC also notes that the price of some stocks in which Archegos had swap positions, like Viacom, Discovery, and Vipshop, were at one point trading higher than certain NASDAQ indices but have not recovered from a steep price drop after Archegos's fund collapsed (*id.* ¶¶ 69-73).  But of course it was the drop in these very same stocks that created the conditions for Archegos's collapse in the first place, so this allegation is inconsistent with the theory that Archegos was controlling the market price of these securities.  In fact, the SEC notes in the Complaint that a ViacomCBS "secondary offering" (*id.* ¶¶ 148, 152) coupled with the announcement of certain amendments "implementing the Holding Foreign Companies Accountable Act" put pressure on "the price of American Depositary Receipts of China-based issuers, which comprised the balance of Archegos's concentrated positions" (*id.* ¶ 153).  In light of the SEC's own allegations and recognition of external market forces on these securities, it is difficult to understand how the price of any of them, following the Archegos fund collapse, is any "indicia" of manipulative conduct by Archegos.  And given the extreme downturn in the markets since that time, that these securities have not bounced back can hardly be a surprise, or provide a basis for an SEC enforcement action.

Finally, it bears emphasis that there is at least one "indicia" of fraud that Courts have cited but that is wholly absent from the Complaint, and which tends to show that there was no manipulation here at all.  In *Mulheren* the Second Circuit found "most telling" the fact that the defendant had actually "lost over $64,000" on the transactions at issue, "hardly the result a market manipulator seeks to achieve."  938 F.2d at 370.  That is because "[o]ne of the hallmarks of

manipulation is some profit or personal gain inuring to the alleged manipulator." *Id*. In this case, by contrast, the Complaint does not allege that Mr. Hwang ever closed out of any of the positions at issue at the purportedly artificially inflated prices, or even that he had a plan to do so before Archegos collapsed. Nor does it allege that he profited whatsoever from his alleged manipulation scheme; to the contrary, it acknowledges that the entire value of Archegos was lost, and along with it, $36 billion in the "personal funds" of Mr. Hwang. (Compl. ¶¶ 1, 7, 20).[17]

In any event, it is not the presence or absence of any such indicia that dooms the manipulation claims in the Complaint. Rather, they must be dismissed because the Complaint fails to allege the type of deceptive conduct that is required to state a claim for market manipulation.

---

[17] One "indicia" that the SEC apparently wants the Court to draw inferences from is litigation regarding Mr. Hwang's closed hedge fund, Tiger Asia, more than a decade ago, which the SEC gratuitously and improperly references in the Complaint (*id*. ¶ 21) as having involved "insider trading" and "attempted stock manipulation." There is no legitimate reason to include that prejudicial allegation in this Complaint, of course, other than to try to improperly color this Court's view with respect to the facts alleged, and if the Complaint were not subject to dismissal in its entirety those references should be stricken. *See, e.g.*, *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 322 (E.D.N.Y. 2013) (refusing to consider facts from an earlier complaint against defendant to establish any pattern of fraud); *Footbridge Ltd. Trust v. Countrywide Home Loans*, No. 9-CV-4050 (PKC), 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (granting motion to strike allegations "based on pleadings and settlements in other cases and government investigations"). In any event, the details of that conduct are irrelevant to assessing any of the SEC's allegations here.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant Sung Kook (Bill) Hwang respectfully requests that the Court enter an Order granting his motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Dated:  June 28, 2022

Respectfully submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

34