# Exhibit A

(Multicurrency — Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of **December 15, 2020** .........................................

**Credit Suisse International**   and   **Archegos Fund LP**

......…….…….…….….….…..…..…….. and …………..……………......…………………….........

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

1. **Interpretation**

(a)   **Definitions**. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)   **Inconsistency**.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)   **Single Agreement**.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2. **Obligations**

(a)   **General Conditions**.

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

Archegos-SDNY-00073207
SDNY_P001_0000129131

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073208
SDNY_P001_0000129132

    (ii)   *Liability*. If: —

        (1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

        (2)  X does not so deduct or withhold; and

        (3)  a liability resulting from such Tax is assessed directly against X,

    then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest*; *Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.**    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

    (i)   *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)   *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)   *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)   *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

Confidential Treatment Requested by King & Spalding      Archegos-SDNY-00073209
SDNY_P001_0000129133

(b)      *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)      any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)    any other documents specified in the Schedule or any Confirmation; and

    (iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073210
SDNY_P001_0000129134

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.**      **Events of Default and Termination Events**

(a)      *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

    (i)      *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)      *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)      *Credit Support Default*.

        (1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

    (iv)      *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v)      *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (vi)      *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

Confidential Treatment Requested by King & Spalding          Archegos-SDNY-00073211
SDNY_P001_0000129135

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) **Termination Events**. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Confidential Treatment Requested by King & Spalding                    Archegos-SDNY-00073212
                                                                      SDNY_P001_0000129136

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    **Illegality**. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    **Tax Event**. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    **Tax Event Upon Merger**. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    **Credit Event Upon Merger**. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    **Additional Termination Event**. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    **Event of Default and Illegality**. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073213
SDNY_P001_0000129137

**6.     Early Termination**

(a)     *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     *Right to Terminate Following Termination Event*.

(i)     *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)     *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)     *Right to Terminate*. If: —

(1)  a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)  an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073214
SDNY_P001_0000129138

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) **Effect of Designation.**

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) **Calculations.**

(i) **Statement**. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) **Payment Date**. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) **Payments on Early Termination**. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) **Events of Default**. If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Confidential Treatment Requested by King & Spalding

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*.  If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073216
SDNY_P001_0000129140

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    ***Payment in the Contractual Currency***. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    ***Judgments***. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    ***Separate Indemnities***. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    ***Evidence of Loss***. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

Confidential Treatment Requested by King & Spalding                    Archegos-SDNY-00073217
SDNY_P001_0000129141

DocuSign Envelope ID: AF0E4FE2-1470-42B0-B5B7-501D8795469D

**9.      Miscellaneous**

(a)      *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)      *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)      *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)      *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)      *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)      *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.      Offices; Multibranch Parties**

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)      Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)      If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.      Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

Confidential Treatment Requested by King & Spalding                    Archegos-SDNY-00073218
                                                                                                SDNY_P001_0000129142

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    ***Effectiveness***. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    ***Change of Addresses***. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    ***Governing Law***. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    ***Jurisdiction***. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    ***Service of Process***. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

Confidential Treatment Requested by King & Spalding                     Archegos-SDNY-00073219
                                                                        SDNY_P001_0000129143

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)      *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

Confidential Treatment Requested by King & Spalding

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15

**ISDA® 1992**

Confidential Treatment Requested by King & Spalding

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

Confidential Treatment Requested by King & Spalding                     Archegos-SDNY-00073222
SDNY_P001_0000129146

***"Specified Indebtedness"*** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

***"Specified Transaction"*** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

***"Stamp Tax"*** means any stamp, registration, documentation or similar tax.

***"Tax"*** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

***"Tax Event"*** has the meaning specified in Section 5(b).

***"Tax Event Upon Merger"*** has the meaning specified in Section 5(b).

***"Terminated Transactions"*** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

***"Termination Currency"*** has the meaning specified in the Schedule.

***"Termination Currency Equivalent"*** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

***"Termination Event"*** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

***"Termination Rate"*** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

***"Unpaid Amounts"*** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

**ISDA® 1992**

Confidential Treatment Requested by King & Spalding                    Archegos-SDNY-00073224
SDNY_P001_0000129148

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**CREDIT SUISSE INTERNATIONAL**                    **ARCHEGOS FUND, LP**

By:

Name:  Steven J Reis

Title:   Authorized Signatory

Date:   December 16, 2020

By:

Name:  Erica Hryniuk

Title:   Authorized Signatory

Date:   December 16, 2020

By:

Name:  Sung Kook Hwang

Title:   Managing Member of the General Partner

Date:   December 15, 2020

CSI / Archegos Fund, LP
ISDA Master Agreement

**Schedule**
to the
**ISDA 1992 Master Agreement**

dated as of  <u>December 15</u> , 2020

between

| **Credit Suisse International** | and | **Archegos Fund, LP** |
|:---:|:---:|:---:|
| An unlimited company incorporated under the laws of England and Wales | | a limited partnership organised and existing under the laws of the State of Delaware |
| **("Party A")** | | **("Party B")** |

**Part 1**
**Termination Provisions**

In this Agreement:

**(a) Specified Entity.** "Specified Entity" means

    (i)  in relation to Party A for the purpose of:

        Section 5(a)(v), Affiliates

        Section 5(a)(vi), not applicable

        Section 5(a)(vii), not applicable

        Section 5(b)(iv), not applicable

    (ii)  and in relation to Party B for the purpose of:

        Section 5(a)(v), not applicable

        Section 5(a)(vi), not applicable

        Section 5(a)(vii), not applicable

        Section 5(b)(iv), not applicable

**(b) Specified Transaction.** Specified Transaction will have the meaning specified in Section 14 and shall also include Equity Swap Transactions as defined in the Portfolio Swaps (Standard Terms) Annex attached hereto, if any.

**(c) Cross Default.** The "Cross Default" provision (Section 5(a)(vi)) will apply to Party A and Party B amended as follows:

    (i)  On the seventh (7th) line thereof, in regard to defaults, event of default or other similar conditions or events other than those related to payment and/or delivery failures (where delivery failures include, but are not limited to, collateral deliveries) the words "or becoming capable at such time of being declared," shall be deleted.

19

89383409_12

Confidential Treatment Requested by King & Spalding

(ii)    The following words shall be added at the end of Section 5(a)(vi):

"Provided, the occurrence of a payment and/or delivery related event that would otherwise constitute an Event of Default hereunder shall not be considered an Event of Default if the Defaulting Party can demonstrate to the reasonable satisfaction of the Non-defaulting Party that (i) such occurrence is attributable solely to an error or omission of an administrative or operational nature; (ii) funds were available to the Defaulting Party to enable it to have made the relevant payment when due; and (iii) such default is remedied within two (2) Local Business Days following the Defaulting Party's receipt of notice of the occurrence of such event."

(iii)   Specified Indebtedness:  Instead of the definition in Section 14 of this Agreement, "Specified Indebtedness" shall mean any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) (a) in respect of borrowed money, and/or (b) in respect of any Specified Transaction (except that, for this purpose only, the words "and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party)" where they appear in the definition of Specified Transaction will be replaced with the words "and any other entity".

(iv)   Threshold Amount: With respect to Party A, the lesser of three percent (3%) of the shareholders' equity of Party A, as shown in the most recent audited financial statements of Party A, or USD25,000,000 including the United States Dollar equivalent of obligations stated in any other currency or currency unit), and with respect to Party B, the lesser of three percent (3%) of the Net Asset Value of Party B, as shown in the most recent audited financial statements of Party B, or USD 25,000,000 (including the United States Dollar equivalent of obligations stated in any other currency or currency unit).

**(d)  Credit Event Upon Merger.**  The "Credit Event Upon Merger" provision (Section 5(b)(iv)) will apply to Party A and Party B restated as follows:

""Credit Event Upon Merger" means that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) of this Agreement but the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:

(i)    X consolidates or amalgamates with or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the date of this Agreement) to, or reorganises, reconstitutes into or as, another entity;

(ii)   any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(iii)  X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into, or

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073227
SDNY_P001_0000129151

exchangeable for, debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest."

(e) **Automatic Early Termination.** The "Automatic Early Termination" provision of Section 6(a) of this Agreement will not apply to Party A and will not apply to Party B.

(f) **Payments on Early Termination.** For the purpose of Section 6(e), Second Method and Market Quotation will apply.

(g) **Termination Currency.** "Termination Currency" means United States Dollars.

(h) **Additional Termination Event.** The following Additional Termination Event(s) will apply:

(i) **Net Asset Value Decline.**

As of the last Local Business Day of any calendar month, the Net Asset Value of Party B declines by (1) twenty percent (20%) or more from the Net Asset Value of Party B (<u>exclusive</u> of withdrawals, redemptions, subscriptions, contributions and distributions) as of the immediately preceding calendar month-end; (2) thirty percent (30%) or more from the Net Asset Value of Party B (<u>exclusive</u> of withdrawals, redemptions, subscriptions, contributions and distributions) as of the third preceding calendar month-end; or (3) by forty percent (40%) or more from the Net Asset Value of Party B (<u>exclusive</u> of withdrawals, subscriptions, contributions and distributions) as of the twelfth preceding calendar month-end;

***"Net Asset Value"***, means, as of any day, the total value of assets less the total value of liabilities of Party B on such day as calculated and determined in accordance with generally accepted accounting principles in the United States of America with appropriate adjustments being made to reflect fairly the effect of all off-balance sheet assets and liabilities not required to be reflected on the balance sheet in accordance with generally accepted accounting principles.

(ii) **Key Person.** One year from the date that Sung Kook Hwang is incapacitated, dies, or ceases to be a full-time employee of Party B or ceases to work or be employed on a full-time basis with at least the duties and responsibilities delegated to him as of the date of this Agreement and has not been promptly replaced by another investment advisor reasonably acceptable by Party A, provided, however that during such year, Party B may not enter into additional Transactions that would increase its exposure under the Agreement.

(iii) **Manager.** Archegos Capital Management, LP (the "**Investment Manager**") or any affiliate of the Investment Manager ceases to act at any time as investment manager on behalf of Party B in the same or similar capacity as on the date of this Agreement and a replacement investment manager reasonably acceptable to Party has not been named, which acceptance shall not be unreasonably withheld.

(iv) **Financials.** Party B shall fail to deliver within two (2) Local Business Days of Party A's notice to Party B of Party B's failure, any financial statements or financial information due annually or monthly pursuant to Part 3 hereof.

(v) **Event of Default under any of the Prime Broker Agreements.** The occurrence at any time, in respect of Party B, of an event specified as an Event of Default, default, potential default, termination event or similar event (however characterized) as defined in the relevant Prime Broker Agreement whether now existing or hereafter entered into.

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073228
SDNY_P001_0000129152

For purposes of this Additional Termination Event, the term Prime Broker Agreement shall mean any of the following, as amended from time to time:

a.      the Customer Agreement (together with any and all annexes attached thereto) between Credit Suisse Securities (USA) LLC ("**CSSU**") and Party B.

Party B, in each such instance, shall be the sole Affected Party, and all Transactions shall be Affected Transactions.

**(i)**   **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is amended by deleting "third" in the last line thereof and replacing it with "first".

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073229
SDNY_P001_0000129153

**Part 2**
**Tax Representations**

**(a) Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B each makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e)of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on:

(i)   The accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement;

(ii)  The satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii) The satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement;

Except it will not be a breach of this representation where reliance is placed on clause (ii) above, and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

**(b) Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement:

(i)   Party A makes the following Payee Tax Representations:

   (1)   Party A is a "foreign person" (as that term is used in section 1.6041-4(a)(4) of the United States Treasury Regulations) for United States federal income tax purposes.

   (2)   Party A is a "non-U.S. branch of a foreign person" (as that term is used in section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations) for United States federal income tax purposes and no payment received or to be received by it under such Transaction will be effectively connected with its conduct of a trade or business in the United States.

   (3)   Party A has been approved as a Withholding Foreign Partnership by the United States Internal Revenue Service.   Party A's Withholding Foreign Partnership Employer Identification Number is 98-0330001.

   (4)   Party A is a "qualified derivatives dealer" within the meaning of section 1.1441-1(e)(6) of the United States Treasury Regulations for purposes of Sections 871 and 1441 of the Code and the United States Treasury Regulations promulgated thereunder ("QDD") and its Qualified Intermediary Employer Identification Number ("QI-EIN") is 98-0235072.

   (5)   Party A is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Dividends" provision, the "Interest" provision or the "Other Income" provision, if any, of the Specified Treaty with respect to any payment described in such provisions and received or to be received by it in

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073230
SDNY_P001_0000129154

connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

"Specified Treaty" means the income tax treaty between the United Kingdom and the United States of America, if any.

"Specified Jurisdiction" means with respect to Party A, the United States of America.

(ii) Party B makes the following Payee Tax Representations:

(1)     Party B is a "US person" (as that term is used in Section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073231
SDNY_P001_0000129155

**Part 3**
**Agreement to Deliver Documents**

Each party agrees to deliver the following documents as applicable:

**(a)**  For the purpose of Section 4(a)(i) of this Agreement, tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party A & Party B | Any document required or reasonably requested to allow the other party to make payments under this Agreement without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate, including but not limited to an IRS form e.g. W-8BEN-E, W-8IMY, W-9, as applicable. | (i) Before or upon execution of this Agreement and (ii) promptly upon reasonable demand by the other party. |

**(b)**  For the purpose of Section 4(a)(ii) of this Agreement, other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A & Party B | Evidence reasonably satisfactory to the other party as to the names, true signatures and authority of the officers or officials signing this Agreement or any Confirmation on its behalf and the Credit Support Document referred to in Part 4(f) of this Schedule. | Upon execution of this Agreement and, if requested upon execution of any Confirmation. | Yes |
| Party A | A copy of the annual report for such party containing audited financial statements for the most recently ended financial year. | Upon request, as soon as publicly available. | Yes |
| Party B | A copy of the Investment Advisory or other agency agreement pursuant to which Party B authorises another party to act on its behalf in relation to this Agreement | Upon execution of this Agreement. | Yes |
| Party B | A copy of Party B's constitutive documents (certificate of incorporation, memorandum and articles of association, by-laws, statutes, commercial registration documents or other analogous document(s)). | Upon execution of this Agreement. | No |

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073232
SDNY_P001_0000129156

| | | | |
|---|---|---|---|
| Party A & Party B | A duly signed copy of the Credit Support Document(s) referred to in Part 4(f) of this Schedule. | Upon execution of this Agreement. | Yes |

Additionally Party B agrees to deliver to Party A, c/o Credit Suisse Securities (USA) LLC, One Madison Avenue, New York, New York, 10010,   Attention: Hedge Funds - Credit Risk Management; email: hf.credit@creditsuisse.com

| | | | |
|---|---|---|---|
| (i) | A copy of its monthly financial statement (including as a minimum its closing Net Asset Value and monthly trading performance). | Within 20 calendar days after the end of each calendar month. | Yes |
| (ii) | A copy of its annual report containing audited or certified financial statements for the most recently ended financial year. | Upon request, as soon as made available, and in any event within 120 days after the relevant fiscal year end. | Yes |

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073233
SDNY_P001_0000129157

**Part 4**
**Miscellaneous**

(a) **Addresses for Notices.**  For the purpose of Section 12(a) of this Agreement:

Notwithstanding Section 12(a) of the Agreement all notices including those to be given under Section 5 or 6 may be given by facsimile transmission.

(i)   Address for notices or communications to Party A:

| | |
|---|---|
| Address: | Credit Suisse International |
| | One Cabot Square |
| | London E14 4QJ |
| | England |
| Attention: | (A)  Head of Credit Risk Management; and |
| | (B)  Global Head of OTC Operations - Operations Department; and |
| | (C)  Head of Client Management Team, General Counsel Division |
| Swift: | Credit Suisse International **Redacted - Privacy** |
| Facsimile: | +44 (0) 207888 2686 |
| Attention: | Head of Client Management Team, General Counsel Division |

Telephone number for oral confirmation of receipt of facsimile in legible form under this Agreement:  +44 (0) 207888 2055.  Designated responsible employee for the purposes of Section 12(a)(iii):  Senior Legal Secretary.

With a copy to:

| | |
|---|---|
| Facsimile: | +44 (0) 207888 3715 |
| Attention: | Head of Credit Risk Management |

With a copy to:

| | |
|---|---|
| Facsimile: | +44 (0) 207888 9503 |
| Attention: | Global Head of OTC Operations - Operations Department. |

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073234
SDNY_P001_0000129158

    (ii)  Address for notices or communications to Party B:

        (1)  Address for notices or communications to Party B:

| | |
|---|---|
| Address: | Archegos Fund, LP |
| | 888 Seventh Avenue, 38th Floor |
| | New York, NY 10018 |
| Attention: | Patrick Halligan, Chief Financial Officer |
| Telephone: | (212) 984-2561 |
| Email: | phalligan@archegoscapital.com |

With a copy to: Scott Becker
Telephone: (212) 984-2012
Email:     sbecker@archegoscapital.com

**(b)  Process Agent.**  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Credit Suisse Securities (USA) LLC, at Eleven Madison Avenue, New York, NY10010, United States of America (Attention:- General Counsel, General Counsel Division).

Party B appoints as its Process Agent: Not applicable.

Section 13(c) shall be amended by deleting the second sentence in its entirety and replacing it with the following:

"If for any reason any party's Process Agent is unable to act as such or such appointment is due to expire or terminate at any time on or prior to the Termination Date (as defined in the 2006 Definitions) of any Transaction, such party will promptly notify and renew that appointment or appoint a substitute process agent acceptable to the other at least 60 days prior to the expiration or termination of such appointment.  Written evidence of such appointment and renewal shall be provided, upon request, to the other party."

Party B agrees that service upon itself or this Process Agent by registered first class mail or air courier constitutes effective service as if personally served pursuant to Section 311 of the New York Civil Practice Law and Rules or Rule 4 of the U.S. Federal Rules of Civil Procedure, or any successor section thereof.  Party B waives any right to contest the effectiveness of the service if done in accordance with the previous sentence.

**(c)  Offices.**  The provisions of Section 10(a) will apply to this Agreement.

**(d)  Multibranch Party.**  For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

**(e)  Calculation Agent.**

The Calculation Agent is Party A unless otherwise agreed in a Confirmation in relation to the relevant Transaction.

In the case of an Event of Default with respect to Party A which has occurred and is continuing, Party B

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073235
SDNY_P001_0000129159

DocuSign Envelope ID: AF0E4FE2-1470-42B0-B5B7-501D8795460D

shall be entitled to appoint a substitute Calculation Agent. In such event, Party B shall give written notice to Party A, detailing the relevant Event of Default, indicating its reliance on this Part 4(e) to appoint a substitute Calculation Agent and nominating three (3) Leading Dealers as a potential substitute Calculation Agent (the "**Substitute Calculation Agent Notice**"). Party A shall either remedy the Event of Default or select one (1) of the three (3) Leading Dealers nominated by Party B as the substitute Calculation Agent, within five (5) Local Business Days of Party A's receipt of the Substitute Calculation Agent Notice; provided that if Party A fails to choose a Leading Dealer by the end of such period then Party B shall choose the Leading Dealer from the three (3) Leading Dealers identified by Party B in the Substitute Calculation Agent Notice. If Party A cures the relevant Event of Default before Party B designates an Early Termination Date in accordance with Section 6(a) of this Agreement, and no other Event of Default has occurred (and not been cured) by such time, then Party A shall recommence acting as the Calculation Agent provided that nothing herein shall affect any calculations already produced by any substitute Calculation Agent duly appointed in accordance with this provision. The parties shall bear equally all costs and expenses in appointing a Leading Dealer for these purposes. All calculations or determinations made by the Calculation Agent shall be made in good faith and in a commercially reasonable manner.

If a party, acting in good faith, (the "**Disputing Party**") disputes the Calculation Agent's calculations with respect to a Liquid Transaction on a commercially reasonable basis, it shall deliver its written objection (the "**Dispute Notice**") to the Calculation Agent not later than the close of business on the Local Business Day following receipt of the Calculation Agent's calculation, specifying in reasonable detail (i) its objection, together with supporting calculations, (ii) its proposed calculation and (iii) the amount, if any, which is not in dispute (the "**Undisputed Amount**"). The parties, acting in good faith and in a commercially reasonable manner shall use commercially reasonable efforts to resolve such dispute by the close of business on the Local Business Day following the Calculation Agent's receipt of the Dispute Notice (the "**Informal Resolution Period**"). If the parties are unable to agree on a particular calculation during the Informal Resolution Period then by 10:00 a.m. in the city of the Calculation Agent on the following Local Business Day (the "**Dealer Identification Cut-off**"), the Disputing Party shall provide the Calculation Agent with the names of three (3) Leading Dealers and the Calculation Agent will select one (1) of such three (3) Leading Dealers by the close of business on such Local Business Day (the "**Leading Dealer Selection Date**") to opine on the commercial reasonableness of the relevant calculation; provided that (i) if the Disputing Party fails to identify three (3) Leading Dealers prior to the Dealer Identification Cut-off, the original calculation of the Calculation Agent shall be binding on the parties and the dispute will be deemed to have been resolved and (ii) if the Calculation Agent fails to choose a Leading Dealer prior to the expiration of the Leading Dealer Selection Date, then the Disputing Party shall choose the Leading Dealer from the three (3) Leading Dealers originally provided.

If the chosen Leading Dealer concludes that the Calculation Agent's calculation was commercially reasonable when made, then the Calculation Agent's calculation shall be used for purposes of the relevant Transaction and the dispute will be deemed to have been resolved. If the Leading Dealer concludes that the Calculation Agent's calculation was not commercially reasonable then such Leading Dealer shall (a) provide the basis for such conclusion and (b) provide its own calculation, which calculation shall be binding on the parties for purposes of the relevant Transaction, absent manifest error. Such Leading Dealer will have until close of business on the Local Business Day following the Leading Dealer Selection Date to opine on the commercial reasonability of the Calculation Agent's calculation and, if applicable, provide its own calculation. If the Leading Dealer fails to do so within such period then the Calculation Agent's original calculation shall be used for purposes of the relevant Transaction and the dispute will be deemed to have been resolved. The Disputing Party shall bear all

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073236
SDNY_P001_0000129160

costs and expenses in appointing the Leading Dealer for these purposes.

Notwithstanding a dispute, any Undisputed Amount shall be paid on the scheduled due date. Any amount due as a result of the resolution of a dispute shall be payable prior to the close of business on the first Local Business Day after such resolution.

For purposes of this clause:

"Leading Dealer" means Bank of America, Citigroup, Deutsche Bank, Goldman Sachs, JP Morgan Chase, Morgan Stanley, Barclays Capital and UBS or any principal affiliate entity of such entities; provided that such entity is not an affiliate of Party A or Party B, does not act as Party B's prime broker or custodian and is a leading dealer in the relevant market.

"Liquid Transaction" means plain vanilla interest rate Transactions denominated in the currencies of the G7 countries, plain vanilla F/X Transactions denominated in the currencies of the G7 countries, plain vanilla "Covered Equity Transactions", and "Auction Settled CDS".

Where:

"Auction Settled CDS" shall mean a Credit Derivatives Transaction for which "Auction Settlement" has been specified as the Settlement Method as such term is defined in the 2003 ISDA Credit Derivatives Definitions as supplemented by the 2009 ISDA Credit Determinations Committees, Auction Settlement and Restructuring Supplement to the 2003 ISDA Credit Derivatives Definitions (published on July 14, 2009) or any such successor definitions published by the International Swaps and Derivatives Association, Inc.

"Covered Equity Transaction" means any Transaction that is an Equity Index Transaction or Equity Share Transaction, as such terms are defined below:

"Equity Index Transaction" means any Index Swap Transaction or Index Option Transaction that references one of the following indices: S&P 500, NASDAQ 100, FTSE 100, CAC 40, Dow Jones Eurostoxx 50, NIKKEI 225, or SMI.

"Equity Share Transaction" means any Share Forward Transaction or Share Swap Transaction on a share (excluding American Depository Receipts and Global Depository Receipts) issued by an Issuer of shares and not a fund or similar collective investment scheme. Such share must be publicly quoted, traded or listed on the following exchanges: NASDAQ National Market System, New York Stock Exchange, and American Stock Exchange LLC.

For the avoidance of doubt, the term "Liquid Transaction" does not include (i) Transactions involving or referencing collateralized debt obligations, synthetic or otherwise ("**CDOs**") or any index which references CDOs, mortgage backed securities including without limitation, asset backed securities, commercial mortgage backed securities or any index referencing such securities or (ii) any other type of Transaction not expressly listed in the definition of Liquid Transaction.

**(f)  Credit Support Document.**  Details of any Credit Support Document:

| In relation to Party A and Party B: | The ISDA Credit Support Annex attached hereto and made an integral part hereof. |

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073237
SDNY_P001_0000129161

(g) **Credit Support Provider.**  Credit Support Provider means:

In relation to Party A:  *Not Applicable.*

In relation to Party B:  *Not applicable.*

(h) **Governing Law and Jurisdiction.**  This Agreement and, to the fullest extent permitted by applicable law, all matters arising out of or relating in any way to this Agreement will be governed by and construed in accordance with the laws of the State of New York.  Section 13(b) of this Agreement is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word, "non-"; (ii) adding in the third line before the comma, "and each party irrevocably agrees to designate any Proceedings brought in the courts of the State of New York as 'commercial' on the Request for Judicial Intervention seeking assignment to the Commercial Division of the Supreme Court"; and (iii) inserting "in order to enforce any judgment obtained in any Proceedings referred to in the preceding sentence" immediately after the word, "jurisdiction," the first time it appears in the second sentence and deleting the remainder.

(i) **Netting of Payments.**  Section 2(c)(ii) of this Agreement will apply to any Transactions from the date of this Agreement.  Nevertheless, to reduce settlement risk and operational costs, the parties agree that they will endeavour to net across as many Transactions as practicable wherever the parties can administratively do so.

(j) **Affiliate.**  Affiliate will have the meaning specified in Section 14 of this Agreement; provided however that Party B will be deemed to have no Affiliates.

*[Continued on next page]*

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073238
SDNY_P001_0000129162

**Part 5**
**Other Provisions**

(a) **Scope of Agreement.**  Any Specified Transaction (whether now existing or hereafter entered into) between the parties, the confirmation of which fails by its terms expressly to exclude application of this Agreement, shall be governed by and be subject to this Agreement.  Any such confirmation shall be a "Confirmation", and any such Specified Transaction shall be a "Transaction", for all purposes of this Agreement.

(b) **Definitions.**  Unless otherwise specified in a Confirmation, each Transaction between the parties shall be subject to the 2006 ISDA Definitions (the "2006 Definitions") and the 1998 FX and Currency Options Definitions (including Annex A thereto), each as published by the International Swaps and Derivatives Association, Inc.  (collectively, the "Definitions"), and will be governed in all relevant respects by the provisions of the Definitions.  The provisions of the Definitions are incorporated by reference in and shall be deemed a part of this Agreement except that references in the 2006 Definitions to a "Swap Transaction" shall be deemed references to a "Transaction" for purposes of this Agreement.

(c) **Confirmations.**  Each Confirmation shall be substantially in the form of one of the Exhibits to the 2006 Definitions or in any other form which is published by the International Swaps and Derivatives Association, Inc. or in such other form as the parties may agree.

(d) **Additional Representation** will apply.  For the purpose of Section 3 of this Agreement, the following will constitute Additional Representations and marked as a new subsections (g) and (h).

"(g) **Relationship Between the Parties.**  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

1. *Non-Reliance.*  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation  to enter into that Transaction, it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

2. *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

32

89383409_12

Archegos-SDNY-00073239
SDNY_P001_0000129163

    3.    *Status of Parties.*  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

    4.    *No Agency.*  It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity."

"**(h)**    **Private Placement Representations.**  Party B will be deemed to represent to Party A on each date on which a Transaction is entered into which constitutes the sale of any Security or Securities (as defined in the United States Securities Act of 1933 (the "**Securities Act**")) to Party B by Party A:

    1.    Party B is acquiring such Securities for its own account as principal, for investment purposes only, and not with a view to, or for, resale, distribution or fractionalization thereof, in whole or in part, and no other person has a direct or indirect beneficial interest in any such Securities acquired by Party B.

    2.    Party B understands that the offer and sale by Party A of such Securities are intended to be exempt from registration under the Securities Act, by virtue of Section 4(a)(2) thereof.  In furtherance thereof, Party B represents and warrants that (i) it has the financial ability to bear the economic risk of its investment and has adequate means of providing for its current needs and other contingencies, (ii) it is experienced in investing in options and similar instruments and has determined that such securities are a suitable investment for it, and (iii) it is an institution that qualifies as an "accredited investor" as that term is defined in Regulation D under the Securities Act.

    3.    Party B has been given the opportunity to ask questions of, and receive answers from, Party A concerning the terms and conditions of such Securities and concerning the financial condition and business operations of Party A and has been given the opportunity to obtain such additional information necessary in order for Party B to evaluate the merits and risks of purchase of such Securities to the extent Party A possesses such information or can acquire it without unreasonable effort or expense.

Party B acknowledges that it understands and agrees that disposition of any such Securities is restricted under the Agreement, the Securities Act and state securities law. For example, such Securities have not been registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they have been registered under the Securities Act and under the applicable laws of such states or an exemption from such registration is available."

**(e)**  **Recording of Conversation.**  Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction and (ii) agrees that the recordings may be submitted in evidence in any Proceedings to the extent  permitted by and subject to applicable law.

**(f)**  **Change of Account.**  Section 2(b) of this Agreement is hereby amended by the addition of the following after the word "delivery" in the first line thereof:

"to another account in the same legal and tax jurisdiction as the original account"

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073240
SDNY_P001_0000129164

DocuSign Envelope ID: AF0E4FE2-1470-42B0-B5B7-501D8795469D

**(g) Set-off.** Section 6 of this Agreement is amended by addition of the following new subsection:-

"**(f)** *Set-off*. Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim; provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to set-off, counterclaim, or otherwise withhold payment) under applicable law:

the Non-defaulting Party or the party that is not the Affected Party (in either case, "**X**") may, without prior notice to any person, set off any sum or obligation (whether or not arising under this Agreement, whether matured unmatured or contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by the Defaulting Party or Affected Party (in either case, "**Y**") to X or to any Affiliate of X, against any sum or obligation (whether or not arising under this Agreement, whether matured unmatured or contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by X or any Affiliate of X to Y, and, for this purpose, may convert one currency into another. If any sum or obligation is unascertained, X may in good faith estimate that sum or obligation and set off in respect of that estimate, subject to X or Y, as the case may be, accounting to the other party when such sum or obligation is ascertained.

Nothing in Section 6(f) shall be effective or deemed to create any charge or other security interest."

**(h) Transfer and Restructuring.** Notwithstanding any provisions of this Agreement to the contrary, the parties hereby agree that:

(i) Consent by Party B shall not be required in connection with the transfer by Party A of all its interests and obligations under any Transaction entered into pursuant to this Agreement to any Affiliate of Party A, and of any further such transfer by any such Affiliate (the "**Transferring Affiliate**") to any other Affiliate of Party A, so long as (x) the transferee (A) confirms that all of the transferor's covenants and representations under Sections 3(e), 3(f), 4(a)(i) and 4(a)(iii) of this Agreement are true and applicable as to the transferee, or (B) enters into new covenants and representations that are agreed to by Party B and (y) the Transaction is at the time of such transfer the legal, valid and binding obligations of the Affiliate or Transferring Affiliate;

(ii) If, as a matter of law, Party B's consent is required for the purposes of perfecting any transfer contemplated in (i) above by Party A, Party B shall give its consent to the transfer;

(iii) In the event of any transfer contemplated in (i) above by Party A, Party B will execute upon the demand of Party A the necessary documentation prepared by Party A;

(iv) Consent by Party B shall not be required in the event Party A requires a restructuring of any Transaction that will ensure the same economic effect for Party B by subdividing such Transaction into two or more parts (each a Transaction); and

(v) Party B will execute such revised documentation as Party A shall require to evidence any restructuring contemplated in (iv) above.

**(i) Incorporation of ISDA 2012 FATCA Protocol.** The parties to this Agreement agree that the amendments set out in the Attachment to the ISDA 2012 FATCA Protocol published by ISDA on

34

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073241
SDNY_P001_0000129165

August 15, 2012 and available on the ISDA website (www.isda.org) shall apply to this Agreement. The parties further agree that this Agreement will be deemed to be a Covered Master Agreement and that the Implementation Date shall be the effective date of this Agreement as amended by the parties for the purposes of such Protocol amendments regardless of the definitions of such terms in the Protocol.

**(j)** **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise) it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow. In this case deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements.

**(k)** **Commodity Exchange Act.** The following representations are made on and as of the date hereof and will be deemed to be made on each date on which a Transaction is entered into:

(i)    Such party is an "eligible contract participant" as defined in the U.S. Commodity Exchange Act, as amended (the "**CEA**").

**(l)** **Waiver of Right to Trial by Jury.** Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable by, among other things, the mutual waivers and certifications in this Section.

**(m)** **Credit Suisse Securities (USA) LLC as Agent.** If Party A with respect to any Transaction hereunder, is relying on Rule 15a-6 ("**Rule 15a-6**") under the Securities Exchange Act of 1934 (the "**Exchange Act**") the following terms and conditions shall apply to such Transaction:

(i)    Credit Suisse Securities (USA) LLC, as a broker-dealer registered with the U.S. Securities and Exchange Commission ("**SEC**"), will arrange such Transaction as facilitating agent for each of the parties and will be responsible to the extent required under Rule 15a-6, for (a) effecting such Transaction, on behalf of Party A, (b) issuing all required confirmations and statements to Party A and Party B, (c) maintaining books and records relating to such Transaction as required by Rules 17a-3 and 17a-4 under the Exchange Act, and (d) if requested by Party A or Party B receiving, delivering and safeguarding such party's funds and securities in connection with such Transaction in compliance with Rule 15c3-3 under the Exchange Act. Notwithstanding the foregoing, the parties agree that Credit Suisse Securities (USA) LLC shall not be deemed by virtue of its role as facilitating agent hereunder to be holding any Securities on behalf of either party.

89383409_12

Confidential Treatment Requested by King & Spalding

(ii) Regardless of whether Party A is relying on Rule 15a-6 with respect to any Transaction hereunder, Credit Suisse Securities (USA) LLC is participating in such Transaction solely as facilitating agent for the parties. Credit Suisse Securities (USA) LLC shall have no responsibility or personal liability to either party arising from any failure by a party to pay or perform any obligations hereunder, or to monitor or enforce compliance by a party with any obligation hereunder, including, without limitation, any obligation to maintain margin.  Each party agrees to proceed solely against the other to collect or recover any securities or moneys owing to it in connection with or as a result of such Transaction or otherwise hereunder.  Credit Suisse Securities (USA) LLC shall otherwise have no liability in respect of this Agreement or such Transaction except for its gross negligence or wilful misconduct, or its failure to comply with applicable U.S. securities laws and regulations, in performing its duties as facilitating agent hereunder.

(n) **Amendment and Restatement of Prior Agreement.**  This Agreement hereby amends, restates and supersedes the ISDA Master Agreement dated as of 4th February 2005 between the parties (the "Prior Agreement").  Every "Transaction" and/or "Swap Transaction" governed by the Prior Agreement will be deemed a Transaction, and the confirmations thereto a Confirmation, for the purposes of this Agreement and will be governed by this Agreement.  Notwithstanding the above, where there is inconsistency between the terms of any confirmation under the Prior Agreement and the terms of this Agreement, the terms of such confirmation will apply to the extent of any such inconsistency.

(o) **ERISA Representations and Agreements by Party B.**  Party B represents that it is not and will not be a Benefit Plan which, for the purposes of this Agreement, means (1) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), (2) a 'Plan' within the meaning of Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "**Code**"), (3) an entity the underlying assets of which constitute assets of employee benefit plans or plans as a result of investments by such plans in the entity pursuant to Section 3(42) of ERISA or (4) assets of a governmental plan or other plan subject to restrictions similar or analogous to those contained in ERISA or the Code.

(p) **Investment Manager as Agent.**  Party B represents and warrants (and such representation and warranty shall be deemed to have been repeated on each date that a Transaction is entered into) that Archegos Capital Management LP (the "Investment Manager") has the full power and authority to commit Party B to Transactions and conclude such Transactions on Party B's behalf on such terms and conditions as the Investment Manager may determine in its absolute discretion.  Unless previously notified in writing by Party B, Party A may rely on all representations and warranties of and actions by the Investment Manager in relation to any such Transactions.  For these purposes, Party B agrees to fully and unconditionally indemnify Party A for any and all losses, damages, costs and expenses directly sustained by Party A (including those incurred in unwinding any relevant hedging transactions) by reason of (i) its *bona fide* reliance on the appointment by Party B of the Investment Manager as Party B's agent to enter into Transactions on its behalf, irrespective of the invalidity, unenforceability, termination or revocation of such appointment (unless previously notified in writing by Party B) or breach by the Investment Manager of its terms or (ii) as a direct result of Party A's *bona fide* reliance upon the instructions, actions or ostensible authority of the Investment Manager.

(q) **Additional Agreements.**  Section 4 of the Agreement is hereby amended in respect of Party B only by the addition of the following agreements:

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073243
SDNY_P001_0000129167

DocuSign Envelope ID: AF0E4FE2-1470-42B0-B5B7-501D8795469D

"(f) Within seven (7) days of the entry into or other effectuation by Party B of any material amendment, alteration, modification or other change to any of its Core Documents, Party B shall provide Party A with a copy of the current version of such Core Document marked to show all changes from the prior version.  For the purposes of this provision, "Core Documents" shall include, without limitation, organizational documents (including, without limitation, articles of incorporation, partnership agreements, limited partnership agreements, and limited liability company agreements), investment management agreements, investor agreements, shareholder agreements, subscription agreements and disclosure documents (including, without limitation, offering circulars, private placement memoranda and prospectuses)."

**(r)  ISDA 2013 EMIR Portfolio Reconciliation, Dispute Resolution and Disclosure Protocol**

(i)  Subject to the below, the parties hereby agree that the provisions set out in Parts I to III of the Attachment to the ISDA 2013 EMIR Portfolio Reconciliation, Dispute Resolution and Disclosure Protocol (the "**PDD Protocol**") as published by the International Swaps and Derivatives Association, Inc. on 19 July 2013 are incorporated herein as if set out in full in this Agreement but with the following amendments:

a.  References:

References therein to:

(1)  the "Adherence Letter" shall be deemed to be references to this Part 5(r) of this Agreement;

(2)  the "Implementation Date" shall be deemed to be references to the date of this Agreement;

(3)  the "Protocol Covered Agreement" and "any ISDA Master Agreement" shall be deemed to be this Agreement; and

(4)  the definition of "Protocol" shall be deleted.

b.  For the purposes of the foregoing:

(1)  Portfolio reconciliation process status:

Party A shall be a Portfolio Data Sending Entity
Party B shall be a Portfolio Data Receiving Entity

(2)  Local Business Days:

Party A specifies the following places for the purpose of the definition of Local Business Day as it applies to it:  London

Party B specifies the following place(s) for the purposes of the definition of Local Business Day as it applies to it:  New York

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073244
SDNY_P001_0000129168

(3)   Contact details for Dispute Notices, Portfolio Data, and discrepancy notices:

Notices to Party A:

The following items may be delivered to Party A at the contact details shown below:

Portfolio Data: portfolio.recon@credit-suisse.com
Notice of a discrepancy: portfolio.recon@credit-suisse.com
Dispute Notice: portfolio.recon@credit-suisse.com

Notices to Party B:

The following items may be delivered to Party B at the contact details shown below:

Portfolio Data: operationsarchegos@archegoscapital.com
Notice of a discrepancy: operationsarchegos@archegoscapital.com
Dispute Notice: operationsarchegos@archegoscapital.com

Any notice given by email in accordance with this Part 5(r), will be deemed effective on the date it is delivered unless the date of that delivery (or attempted delivery) is not a Local Business Day (in respect of the receiving party) or, subject to Part I(1)(a)(iv) of the Attachment to the PDD Protocol, that notice is delivered (or attempted) after the close of business on a Local Business Day (in respect of the receiving party), in which case that notice will be deemed given and effective on the first following day that is a Local Business Day (in respect of the receiving party).

c.   Party A and Party B may use a Third Party Service Provider.

**(s)   Confirmation of EMIR Classification Status**

(i)   Party B confirms that as of the date of this Agreement, it is a Third Country Entity and would be a Financial Counterparty if it were established in the European Union.

For purposes of the foregoing:

"***Financial Counterparty***" means an investment firm authorized in accordance with Directive 2014/65/EU of the European Parliament and of the Council; a credit institution authorised in accordance with Directive 2013/36/EU of the European Parliament and of the Council; an insurance undertaking or reinsurance undertaking authorised in accordance with Directive 2009/138/EC of the European Parliament and of the Council; a UCITS and, where relevant, its management company, authorised in accordance with Directive 2009/65/EC, unless that UCITS is set up exclusively for the purpose of serving one or more employee share purchase plans; an institution for occupational retirement provision, as defined in point (1) of Article 6 of Directive (EU) 2016/2341 of the European Parliament and of the Council; an alternative investment fund ("***AIF***") as defined in point (a) of Article 4(1) of Directive 2011/61/EU, which is either established in the European Union or managed by an alternative investment fund manager ("***AIFM***") authorised or registered in accordance with that

38

89383409_12

Confidential Treatment Requested by King & Spalding

Directive, unless that AIF is set up exclusively for the purpose of serving one or more employee share purchase plans, or unless that AIF is a securitisation special purpose entity as referred to in point (g) of Article 2(3) of Directive 2011/61/EU, and, where relevant, its AIFM established in the European Union; and a central securities depository authorised in accordance with Regulation (EU) No 909/2014 of the European Parliament and of the Council.

"***Third Country Entity***" means an entity which is not established in the European Union and which is not a Financial Counterparty.

(t) **Incorporation of the ISDA 2016 Bail-In Art 55 BRRD Protocol (Dutch/ French/ German/ Irish/ Italian/ Luxembourg/ Spanish/ UK entity-in-resolution version).** The parties to this Agreement agree that the terms of the ISDA 2016 Bail-In Article 55 BRRD Protocol (Dutch/ French/ German/ Irish/ Italian/ Luxembourg/ Spanish/ UK entity-in-resolution version) (the "**ISDA Bail-In Protocol**"), as published by ISDA on July 14, 2016 and available on the ISDA website (www.isda.org), are incorporated into and form part of this Agreement. The parties further agree that this Agreement shall be deemed to be a "Covered ISDA Master Agreement" and that the "Implementation Date" shall be the effective date of this Agreement, each for the purposes of such ISDA Bail-In Protocol, regardless of the definitions of such terms in such ISDA Bail-In Protocol. In the event of any inconsistencies between this Agreement and the ISDA Bail-In Protocol, the ISDA Bail-In Protocol will prevail.

(u) **ISDA UK (PRA Rule) Jurisdictional Module.** The parties to this Agreement agree that the terms of the ISDA UK (PRA Rule) Jurisdictional Module to the ISDA Resolution Stay Jurisdictional Modular Protocol (the "**UK Jurisdictional Module**"), as published by ISDA on May 3, 2016 and available on the ISDA website (www.isda.org), are incorporated into and form part of this Agreement. The parties further agree that this Agreement will be deemed to be a "Covered Agreement" and that the "Implementation Date" shall be the effective date of this Agreement. For the purposes of such UK Jurisdictional Module, Party B will be treated as a "Module Adhering Party" and Party A will be treated as a "Regulated Entity Counterparty" with respect to Party B as a Module Adhering Party. In the event of any inconsistencies between this Agreement and the UK Jurisdictional Module, the UK Jurisdictional Module will prevail.

(v) **Limitation of Liability.** Notwithstanding anything to the contrary contained in this Agreement or any Schedule, addendum, Confirmation, or other document issued or delivered in connection with any Transaction entered into under this Agreement, any amounts owed or liabilities incurred by Party B, in respect of any Transaction entered into under this Agreement, may be satisfied solely from the assets of Party B. Without limiting the generality of the foregoing, in no event shall Party A have recourse, whether by set-off or otherwise, with respect to any such amounts owed or liabilities incurred, to or against (a) any assets of any person or entity (including without limitation, any person or entity whose account is under the management of the investment manager of Party B) other than Party B, (b) any assets of any affiliate of Party B (other than a Credit Support Provider), (c) any assets of the investment manager of Party B or any affiliate of such investment manager. Notwithstanding the foregoing, nothing herein shall limit Party A's rights arising under applicable laws relating to fraudulent transfers or voidable preferences.

(w) **Limitation on Rights to Withhold Performance.** If a party ("**X**") (A), exercises its rights pursuant to Section 2(a)(iii)(1) of this Agreement and elects not to make any payment or delivery specified in a

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073246
SDNY_P001_0000129170

Confirmation to be made by it for 30 calendar days, (B) X does not designate an Early Termination Date in connection with such condition precedent, and (C) Y has satisfied in full all of its payment, delivery and transfer obligations to X under this Agreement then due and owing (or such payment, delivery and transfer obligations could be fully satisfied by netting such obligations against the payments or delivery X has elected not to make), then Y shall have the right to, by not less than five Business Day's written notice (delivered to X in accordance with this Agreement) but not more than twenty Business Day's written notice (delivered to X in accordance with this Agreement), designate an Early Termination Date in connection with this Agreement upon mutual agreement between the parties with Y as the Defaulting Party. For the avoidance of doubt, as a result of this clause, X does not waive any of its rights under Section 5 or 6 of this Agreement or Paragraph 8 of the Credit Support Annex.

**(x)** **Form of Agreement.**  The parties hereby agree that the text of the body of the Agreement is intended to be the printed form of 1992 ISDA Master Agreement as published and copyrighted by the International Swaps and Derivatives Association, Inc.

**(y)** **Portfolio Swaps Standard Terms.**  Attached hereto as **Exhibit I** and made a part hereof is the "Portfolio Swaps (Standard Terms) Annex."

**(z)** **PRC Transactions.**  Attached hereto and made a part hereof is **Addendum 1** for any PRC Transactions as defined therein and entered into hereunder.

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073247
SDNY_P001_0000129171

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**CREDIT SUISSE INTERNATIONAL**                    **ARCHEGOS FUND, LP**

By:                                          By:
Name:  Steven J Reis                                Name:  Sung Kook Hwang
Title:   Authorized Signatory                       Title:   Managing Member of the General Partner
Date:   December 16, 2020                            Date:   December 15, 2020

By:
Name:  Erica Hryniuk
Title:   Authorized Signatory
Date:   December 16, 2020

CSI / Archegos Fund, LP
Schedule to the ISDA Master Agreement

**Addendum 1**

**PRC QFII ADDENDUM**

1.    **Definitions**

The following terms are added to Section 14 of the Agreement in the appropriate alphabetical position:

"**A Shares**" means A-shares (A股) listed in PRC's stock exchanges.

"**Cut Off Date**" means the date which falls 7 years after the final valuation date of the relevant PRC Transaction or the PRC Property Transaction or where the relevant PRC Transaction is terminated early, 7 years after the early termination date).

"**Final Reference Level**" means the price in settlement currency (being the RMB price divided by the exchange rate between RMB and the settlement currency) used by Party A in computing the payout under a PRC Property Transaction.

"**Final RMB Reference Level**" means the RMB price used by Party A in computing the payout under a PRC Property Transaction.

"**Initial Reference Level**" means the price in settlement currency (being the RMB Price divided by the exchange rate between RMB and the settlement currency) used by Party A in pricing a PRC Property Transaction at the time that PRC Property Transaction was entered into.

"**Initial RMB Reference Level**" means the RMB price used by Party A in pricing a PRC Property Transaction at the time that PRC Property Transaction was entered into.

"**Legal Persons Registered in the PRC**" means an entity incorporated or organised in the PRC (excluding Hong Kong, Macau and Taiwan) and excludes foreign entities incorporated or organised in other jurisdictions even though they may have an office (i.e. branch) in the PRC.

"**PRC**" means The People's Republic of China.

"**PRC Citizen**" means any person holding a resident identification card of the PRC (excluding Hong Kong, Macau and Taiwan).

"**PRC Property Security**" means in respect of a PRC Property Transaction, a constituent stock of the SSE Real Estate Index (Bloomberg ticker "SHPROP") at the time of determination of the payout upon the termination of such PRC Property Transaction.

"**PRC Property Transaction**" means a PRC Transaction which is linked to a PRC Property Security.

"**PRC Securities**" means any shares, bonds, warrants or other securities listed on any stock exchange in the PRC (excluding Hong Kong, Macau and Taiwan), securities investment funds quoted in Renminbi or any other financial instruments in which a Qualified Foreign Institutional Investor may from time to time invest under the laws and regulations of the PRC (excluding Hong Kong, Macau and Taiwan).

42

89383409_12

"**PRC Transactions**" means any Transaction the payment/payments under which is/are linked to the performance of one or more PRC Securities.

"**Renminbi**" means the lawful currency of the PRC.

"**Qualified Foreign Institutional Investor**" means Qualified Foreign Institutional Investor (合格境外机构投资者) as defined in the Measures on the Administration of Domestic Securities Investments by Qualified Foreign Institutional Investors (合格境外机构投资者境内证券投资管理办法), as may be amended and supplemented from time to time.

"**trust**" includes a trust fund or any similar arrangement where the legal title to the trust assets are held by a trustee or legal representative but the beneficial interests in the trust assets are held by beneficiaries; and "**trustee**" shall be construed accordingly.

2.        **Representations**

Section 3 of the Agreement is amended by the addition of the following representations with respect to Party B. Accordingly, Party B makes the following representations to Party A that as at the date of this Addendum (which representations will be deemed to be repeated by Party B to Party A on each date on which a PRC Transaction is entered into):

(a)    it is not (1) a PRC Citizen resident in the PRC (excluding Hong Kong, Macau and Taiwan), (2) a PRC Citizen resident outside the PRC who is not a permanent resident of another country or a permanent resident of Hong Kong, Macau or Taiwan, or (3) a Legal Person Registered in the PRC, (each a "**Domestic Investor**");

(b)    in the case where the Transaction is entered into by Party B as trustee for a trust, interests in the trust are not majority-owned by, and the management decision over the trust is not controlled by, one or more Domestic Investor(s).  For the avoidance of doubt, in the case only where a trust's investments are being managed on a discretionary basis by an investment manager, such investment manager shall not be deemed to control such entity for the purposes of this representation by reason only of it being able to control the decision-making in relation to the entity's financial, investment and/or operating policies; and

(c)    to the best of its knowledge and belief after enquiries that it reasonably deems necessary, all amounts paid or to be paid by it under the Transaction did not and will not involve moneys financed by or sourced from any Domestic Investor in contravention of the laws and regulations of the PRC.

(d)    To the extent that the Party B is incorporated, domiciled or resident in Taiwan or is owned or controlled by a person(s) or entity(ies), incorporated, domiciled or resident in Taiwan (collectively, a "**Taiwan Related Party**"), Party B:.

(i)        confirms that it (x) is not prohibited by any applicable Taiwan law, regulation, self regulatory guideline or policy applicable to dealings by Taiwan Related Parties with Mainland China ("**Cross Straits Rules**") from entering into the relevant PRC Transactions and (y) will, in entering such PRC Transaction, be in full compliance with any limitations under the Cross Straits Rules or otherwise on the amount, scope or nature of investments

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073250
SDNY_P001_0000129174

by him/her/it in PRC Transactions;

(ii)    confirms that it is not entering into the PRC Transactions for the purpose of gaining or exercising control or influence, directly or indirectly, over the management of any company incorporated in the PRC; and

(iii)    acknowledges and understands that it is Party B's sole responsibility to determine, based on his/her/its own evaluation and advice from his/her/its professional advisors, that the entering by him/her/it of PRC Transactions complies with the Cross Straits Rules and that it/he/she shall place no reliance whatsoever on Party A in such regard.

(e)    It is aware and acknowledges that:

(i)    under the relevant PRC regulations, Domestic Investors are not permitted to purchase or acquire, whether directly or indirectly, actually or synthetically, inter alia, A Shares through any Qualified Foreign Institutional Investors in PRC;

(ii)    the State Administration of Tax of PRC may at any time, even subsequent to a PRC Transaction maturing or being terminated, impose withholding or other taxes on investments held, purchased, acquired, whether directly or indirectly, actually or synthetically, through a Qualified Foreign Institutional Investor with respect to such PRC Transaction ("**PRC Tax Liability**"), and the parties to a PRC Transaction may be affected as a result; and

(f)    Party A is not in any way responsible for determining, and will not determine, whether any Transaction (including but not limited to PRC Transaction) is appropriate or suitable for Party B, or is fully consistent with and does not breach, any of Party B's investment or other internal guidelines, investment restrictions, investment objectives, financial circumstances, or constitutional or other restrictions (even if Party A has been advised of these or even if the same may be apparent from Party B's trading history or documents provided by Party B); Party B hereby confirms that entering into any PRC Transaction by Party B (i) will not contravene any law, regulation, self regulatory guideline or regulatory policy applicable to Party B or any applicable law or regulation of the PRC; (ii) will not breach any of Party B's investment guidelines, restrictions, objectives or strategies; and (iii) is not for purposes of gaining or exercising control or influence over the management of the issuer of the relevant PRC Securities, and Party B fully understands that Party A relies on this confirmation to enter into any PRC Transaction with Party B.

**3.**    **Agreements**

Section 4 of the ISDA Master Agreement is amended by the addition of the following Party B agreements and undertakings. Accordingly, Party B agrees that, so long as it has any obligation under the Agreement or under any Credit Support Document to which it is a party:

(a)    Party B acknowledges that Party A and/or any of its affiliates may be required to disclose information relating to, among other things, the identities of any party having a legal or beneficial interest in any PRC Transaction as may be required by any relevant governmental or

89383409_12

44

Archegos-SDNY-00073251
SDNY_P001_0000129175

DocuSign Envelope ID: AF0E4FE2-1470-42B0-B5B7-501D8795469D

regulatory authorities or as may be required under any law, regulation, orders or other lawful request, Party B agrees to all such related disclosure and hereby waives confidentiality with regard thereto.

(b)   Party B agrees to promptly provide Party A and the relevant regulators with such additional information that Party A or its affiliates (as the case may be) may require in order to comply with regulations or requests of the relevant regulator from time to time; Where Party B is not able to provide this information to Party A or any of its affiliates, it will provide this directly to the relevant regulator, where permitted by such regulator, and confirm to Party A that the requested information has been provided.

(c)   Party B agrees that where such information is maintained by any third party on behalf of Party B, it shall ensure that appropriate procedures are implemented with such third party to enable the prompt disclosure of such information to Party A, its nominated affiliate and/or the relevant regulator upon request.

(d)   notwithstanding anything to the contrary in the Agreement, it will not transfer, novate or assign any PRC Transaction or any of its interest therein (including any amounts payable on or with respect to such interest and any other rights associated with such interest) to another party without the prior written consent of Party A.  To the extent such PRC Transaction or any of its interest therein (including any amounts payable on or with respect to such interest and any other rights associated with such interest) is transferred, novated or assigned by Party B in accordance with the terms of the Agreement, Party B undertakes to ensure that the transferee (i) is not a Domestic Investor, (ii) in the case where the Transaction is entered into by Party B as trustee for a trust, interests in the trust are not majority-owned by, and the management decision over the trust is not controlled by, one or more Domestic Investor(s) (in accordance with paragraph 2(b)), (iii) to the extent that the transferee is a Taiwan Related Party, provides such confirmations and acknowledgements as set out in paragraph 2(d) above , and (iv) is not, to the best of its knowledge and belief after enquiries that it reasonably deems necessary, financing all or any part of the PRC Transaction from PRC sources.

(e)   in the event that a PRC Tax Liability is imposed before the Cut-Off Date in respect of any PRC Transaction with Party B, whether or not such PRC Transaction has previously matured or been terminated, it agrees that it shall indemnify Party A and its nominated affiliate and keep them indemnified against any and all losses, claims, payments and expenses caused by or arising from such PRC Tax Liability suffered or incurred by Party A or its nominated affiliate to the extent attributable to the period before the Cut Off Date and arising from a hedge position of Party A in respect of the PRC Transaction with Party B.

(f)   Party B agrees that it will indemnify and hold harmless Party A and its affiliates, directors and officers against any and all losses, liabilities, claims, charges, expenses, actions or demands (including, but not limited to, all costs, charges and expenses (including legal costs) paid or incurred in disputing or defending any of the foregoing) that any of them may incur or that reasonably may be made against any of them arising out of, or relating to: (i) any breach by Party B of any of the representations, agreements or undertakings contained in clauses 2 and 3 of this Addendum; or (ii) Party A investigating, responding to or defending any allegation, claim, investigation, enquiry, or request from, or commencement of proceeding by, any relevant governmental or regulatory authority with respect to any of the matters or circumstances

45

89383409_12

referred to in the representations, agreements or undertakings of Party B contained in clauses 2 and 3 of this Addendum, provided that this sub-clause 3(f) shall not apply to any such losses, liabilities, claims, charges, expenses, actions or demands that arise as a result of the wilful default of Party A.

4.    **Additional Termination Event**

If a representation contained in this Addendum proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated; or if Party B fails to comply with or perform any agreement or obligation undertaken by it in this Addendum, it shall be an Additional Termination Event with all PRC Transactions being the sole Affected Transactions, and with Party B being the sole Affected Party.

89383409_12

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00073253
SDNY_P001_0000129177