**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>          **-against-**<br><br>**SUNG KOOK (BILL) HWANG, PATRICK HALLIGAN, WILLIAM TOMITA, SCOTT BECKER, and ARCHEGOS CAPITAL MANAGEMENT, LP,**<br><br>                    **Defendants.** | **AMENDED COMPLAINT**<br><br>**22 Civ. 3402-JPO**<br><br>**ECF CASE**<br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Amended Complaint against Defendants Sung Kook (Bill) Hwang ("Hwang"), Patrick Halligan ("Halligan"), William Tomita ("Tomita"), Scott Becker ("Becker"), and Archegos Capital Management, LP ("Archegos") (collectively, "Defendants"),[1] alleges as follows:

## SUMMARY

1.      This case involves a fraudulent scheme by Defendants – two of whom have pled guilty to crimes concerning the facts alleged in this Amended Complaint – that included interlocking deceptive acts and misconduct, through false and misleading statements to security-based swap ("SBS") counterparties and prime brokers (collectively, "Counterparties") and manipulative trading designed to artificially move the market, which, in tandem, allowed Archegos to increase its assets under management from around $4 billion to over $36 billion in

---

[1]      Defendants Tomita and Becker have consented to the entry of partial judgments imposing certain injunctive relief against them and leaving certain potential additional relief for further resolution. (DE 26, 29.)

just under six months.  Indeed, one Defendant, Archegos's head trader William Tomita, stated that he "agreed with [Hwang] and others to carry out the business of Archegos through a pattern of manipulating the prices of securities and deceiving counterparties."

2.      From March 2020 until its collapse in March 2021, Archegos, at Hwang's direction, underwent a period of rapid and exponential growth, achieved largely through the entry into SBSs with about a dozen Counterparties, which subjected Archegos to significant exposure to rising and falling share prices of the issuers referenced in its SBSs.  Archegos's growth thus presented the firm with a predicament.  To continue growing, and otherwise maintain the gains it had achieved through its ramp-up of exposures, Archegos needed to ensure that (1) the value of those exposures would continue to appreciate, and (2) its Counterparties would continue to extend credit margin and trading capacity necessary for Archegos to enter into even more SBSs.

3.      To attempt to overcome this predicament, Archegos chose not to rely on ordinary market forces.  Instead, from at least September 2020 through March 2021 ("Relevant Period"), Archegos engaged in a brazen scheme to manipulate the market for the securities of the issuers that represented Archegos's top 10 holdings ("Top 10 Holdings"), both through trading of the issuers' securities and entry into SBSs referencing those issuers, which functionally equaled trading the issuers' securities.

4.      Archegos, through Hwang and Tomita, effected this scheme by dominating the market for its Top 10 Holdings.  In addition, as it established dominant market share of the Top 10 Holdings, Archegos used tactics such as "setting the tone" (as Hwang put it) by engaging in large pre-market trading; bidding up prices by entering incrementally higher limit orders throughout the trading day; trading at the close or "marking the close" by engaging in large

trading at the end of the trading day; and by other non-economic trading, all with the goal of artificially inflating the share prices of its Top 10 Holdings.

5.      The margin and capacity extended by Archegos's Counterparties served as the fuel for its manipulative trading.  However, Archegos could not rely on its Counterparties to provide it with ever greater margin and capacity unabated, particularly given Archegos's propensity to stretch its available trading capacity with Counterparties to its limits.  Indeed, as of the beginning of the Relevant Period, certain of Archegos's Counterparties already had begun asking Archegos questions to evaluate its risk profile, which, had Archegos answered them truthfully, would have led Archegos to exhaust the finite trading resource that its Counterparties provided.  To avoid this result – despite varying degrees and quality of risk management and proactive questioning of Archegos by its Counterparties – Archegos, through Hwang, Halligan, Tomita, and Becker, deliberately misled many of Archegos's Counterparties during the Relevant Period in order to obtain increased trading capacity to further its manipulative trading and ever-increasing ramp-up of exposures.

6.      As part of the scheme, Archegos knowingly provided these Counterparties with false assurances concerning its portfolio composition, its concentrated exposure, and its liquidity profile.  As Archegos intended, these deceptions fraudulently convinced its Counterparties that Archegos's overall positioning was less concentrated and more liquid than it actually was.  These deceptions induced Archegos's Counterparties to continue to transact with it and extend leverage beyond what the Counterparties' risk tolerance would have otherwise permitted had they known the truth – thus allowing Archegos to continue to grow its positions and, thereby, drive up and sustain the stock prices of the Top 10 Holdings.

7.     Eventually, the weight of Defendants' fraudulent and manipulative scheme was too much for Archegos to bear, and over the course of less than a week in late March 2021, the house of cards collapsed.  Price declines in some of Archegos's Top 10 Holdings triggered significant margin calls that Archegos was unable to meet.  In turn, without its trading activity to artificially inflate the prices of the Top 10 Holdings, those stock prices collapsed.  And, Archegos's subsequent default resulted in billions of dollars in credit losses among its Counterparties and significant losses to the market participants who invested in the stocks at inflated prices.

## VIOLATIONS

8.     By virtue of the foregoing conduct and as alleged further herein:

a.     Defendants Hwang, Tomita, and Archegos violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)];

b.     Defendants Halligan and Becker violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

c.     Defendant Halligan aided and abetted Defendant Becker's violations of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)];

d.     Defendant Hwang, as a control person of Archegos and Tomita under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], is liable for violations by Archegos and Tomita of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Amended Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.      The SEC brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

11.      The SEC seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Amended Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; (d) permanently prohibiting Defendants Hwang, Halligan, Tomita, and Becker from serving as officers or directors of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem appropriate or necessary.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce or of the mails or of any facility of any national securities exchange, and/or use of any means or instruments of transportation or communication in interstate commerce in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged herein occurred in this District, where Archegos had its offices during the Relevant Period.

### DEFENDANTS

15.     **Archegos Capital Management, LP** was a family office headquartered in New York, NY exempt from registration as an investment adviser under Rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940.  As of March 2021, Archegos managed over $36 billion in invested capital.  In late March 2021, Archegos defaulted on a number of significant margin calls, causing the family office's closure shortly thereafter, and it is not currently active.

16.      **Sung Kook (Bill) Hwang**, age 57, is a resident of Tenafly, NJ.  Hwang was the founder, 99% owner (Hwang's wife owned the remaining 1%), and manager of Archegos, and was solely responsible for all investment decisions made by Archegos or on its behalf.

17.     **Patrick Halligan**, age 45, is a resident of Syosset, NY.  Halligan served as the Chief Financial Officer of Archegos.

18.     **William Tomita**, age 38, is a resident of Palm Beach, FL.  Tomita served as the head trader of Archegos.  Tomita reported to Hwang and executed Hwang's trading instructions;

Tomita had no investment discretion himself.  Tomita pled guilty pursuant to an information to criminal law violations concerning the facts alleged in this Amended Complaint.

19.     **Scott Becker**, age 38, is a resident of Port Jervis, NY.  Becker served as the Director of Risk Management at Archegos.  Becker pled guilty pursuant to an information to criminal law violations concerning the facts alleged in this Amended Complaint.

## FACTS

### I.  Background

20.     Archegos was a family office that invested the personal funds of Hwang, the founder of Tiger Asia Management, LLC and Tiger Asia Partners, LLC (collectively, "Tiger Asia"), formerly investment managers to two unregistered hedge funds.

21.     In 2012, Hwang, on behalf of Tiger Asia, pled guilty to criminal insider trading charges, and Hwang and Tiger Asia settled civil charges brought by the SEC for insider trading and attempted stock manipulation.

22.     The guilty plea and settlement resulted in the closure of the hedge funds.  Hwang returned investor capital and converted Tiger Asia into Archegos by approximately 2013.

23.     At all times, Hwang made all investment decisions on Archegos's behalf.

24.     Tomita, Hwang's head trader, executed Hwang's instructions, but had no investment discretion, and was Archegos's primary point of contact with trading desks at Archegos's Counterparties.

25.     Halligan and Becker managed back office functions and operations, and over time were Archegos's primary points of contact for the credit and risk review functions at Archegos's Counterparties.

26.     Halligan, Tomita, and Becker each elected to have a substantial portion of their compensation deferred, with the ultimate payouts tied to the performance of Archegos.  At the end of 2020, Halligan, Becker, and Tomita received bonuses based on their performance for that year.

## II.     Archegos's Investment Strategy and Counterparty Relationships

27.     Generally, over time, Archegos pursued a long/short equity strategy, generally taking long exposures in single name issuers, and hedging those long exposures largely through short exposures to exchange-traded funds and custom baskets, with some limited short exposures to single name issuers, as well.

28.     Its long positions tended to be both highly leveraged and highly concentrated. Archegos traded on margin extended by its Counterparties, maintaining leverage ratios of between 400% and 700%, and sometimes as high as 1000% (meaning if it invested $100 in capital, it had $1000 in exposure).  It took long positions in only about 100 issuers, with typically between a third and half of its overall gross exposure concentrated in just its ten largest positions.

29.     The vast majority of Archegos's long exposure was synthetic, a deliberate strategy Hwang implemented to limit the visibility of market participants, including Counterparties, into the extent of Archegos's aggregate holdings.

30.     To avoid reporting thresholds under Section 13(d) of the Exchange Act, when Archegos approached stock holdings representing 5% of the shares outstanding of any particular issuer, it would generally shift from purchasing cash equity positions in that issuer to purchasing synthetic exposure to the issuer through SBSs.

31.     Becker circulated to Hwang, Halligan, and others internally a daily report that tracked Archegos's cash equity positions in each issuer it held relative to the issuer's outstanding shares to ensure that Archegos never exceeded the 5% beneficial ownership disclosure threshold.

32.     Archegos executed agreements with about a dozen Counterparties to facilitate its SBS executions, retaining some of them as prime brokers.

33.     Archegos predominantly used total return SBSs to obtain its long exposures (and leverage).  These SBSs would reference a single issuer and generally carry a two-year term (*i.e.*, they would not reset periodically over the term of the SBS).

34.     Under the terms of the SBSs, Archegos and its Counterparties agreed to exchange cash flows dependent on the price of the referenced security:  If the price of the referenced security depreciated, the Counterparty was entitled to call on Archegos to post variation margin to cover the mark-to-market loss; if the price of the referenced security appreciated, Archegos was entitled to call on its Counterparty to post variation margin to cover its mark-to-market gain.

35.     Although Archegos was entitled to call any variation margin achieved through price gains in the underlying shares at any time, it was not obligated to do so.  It could, and often did, choose to leave uncalled variation margin ("excess margin") at its Counterparties – for instance, as a buffer to cover margin calls from subsequent price declines.

36.     Its Counterparties generally executed these SBSs through risk-neutral financing desks, often referred to as Delta One or Delta Neutral desks.

37.     As Defendants understood, and consistent with industry standards, Archegos's Counterparties would ensure any corollary synthetic exposure created by its execution of SBSs with Archegos was fully hedged; therefore, as they filled Archegos's SBS orders, Archegos's

Counterparties would purchase shares of referenced issuers in the market to the extent necessary to hedge any synthetic exposure created by the SBSs.

38.     Typically, therefore, as Defendants understood and expected, the Counterparties purchased one share of an issuer's stock for each share of Archegos's SBS exposure to that stock.  Thus, for example, if Archegos purchased exposure to GSX Techedu Inc. ("GSX") through a SBS, then the Counterparty would purchase a common share of GSX for each share of Archegos's exposure to GSX.  If the price of GSX went up $1, then it would owe Archegos $1 on the SBS, but the Counterparty's own share of GSX would also increase by $1, meaning the Counterparty was fully hedged to Archegos's SBS position in GSX.  Counterparties profited by charging a financing fee on the transaction.

39.     Hwang viewed Archegos's SBS contracts as if Archegos was trading the underlying securities, fully understanding that Archegos's purchase of the SBS meant that the Counterparty would purchase shares of the underlying issuer.  Indeed, as Archegos personnel knew, certain of the Counterparties would not finalize and price their SBS contracts with Archegos until they had first hedged the contracts by purchasing an equivalent number of shares of the underlying issuers.

40.     Each Counterparty established risk, margin, and capacity parameters that defined the extent of their trading relationship with Archegos.  Given its numerous Counterparties, Archegos was able to spread its positions across them.

41.     This practice and use of multiple Counterparties further limited transparency into the size of Archegos's portfolio and the extent to which it was concentrated.  Although each Counterparty could see what positions Archegos held with it, each had limited, and in some

cases no, visibility into Archegos's holdings elsewhere, relying upon Archegos to be truthful and accurate in whatever information it was willing to provide as to its aggregate holdings.

42.     As discussed further below, Archegos was not truthful and accurate in providing such information.

### III.    Archegos Engaged in Manipulative Trading

43.     Archegos, through Hwang's investment decisions and Tomita's trading to execute on those decisions, engaged in manipulative trading that impacted multiple securities during the Relevant Period.  As Archegos, through Hwang and Tomita, knew and intended, Archegos used the SBSs to gain exposure to Archegos's Top 10 Holdings while concealing the true state of Archegos's positions from the market and misleading Archegos's Counterparties about those positions.

44.     On April 22, 2022, Tomita pled guilty to criminal law violations concerning the facts alleged in this Amended Complaint.  *See U.S. v. Sung Kook (Bill) Hwang, et al.*, 22 Cr. 240 (S.D.N.Y.).

45.     For Tomita's first appearance and anticipated waiver of indictment and plea proceeding on April 22, 2022, when asked by the Court what makes him guilty of the crimes to which he was pleading, Tomita stated in part:

> "…I and others executed trades that allowed the fund to amass market power and certain securities traded on U.S. exchanges.  Archegos used security-based swaps to gain exposure to these securities while concealing the true size of the fund's positions from the market and our trading counterparties.
>         Once Archegos gained market power in these securities, I and others used this power to trade in such a way as to artificially manipulate the prices of the securities.
>         Acting at the direction of the head of the fund [Hwang], I traded to increase the prices of names in which Archegos held long positions and reduced the prices of securities in which the fund hel[d] short positions.  I did this by, for example, buying large amounts of a stock when the price dropped in response to

negative news or trading premarket when I knew the fund's activity would have a greater impact on price.

I manipulated the prices of these securities in order to influence others in the market to buy or sell the securities in ways that would benefit Archegos'[s] key positions and increase Archegos'[s] purchasing power through variation margin.

In addition to manipulating the prices of certain securities, I also made misrepresentations to Archegos'[s] trading counterparties. These counterparties were banks and brokers who extended the fund credit to trade on margin and entered into swap agreements with the fund.

I knew that the fund's counterparties considered Archegos'[s] portfolio and assets when setting margin rates and limits on swap capacity. In order to maintain favorable margin rates and gain additional swap capacity, I made false and misleading statements and omissions regarding the size and the composition of the fund's portfolio. I knew that doing so would mislead counterparties as to the true risks presented by the fund….

While engaged in the activities I described, I worked under the supervision of [Hwang]…. I agreed with [Hwang] and others to carry out the business of Archegos through a pattern of manipulating prices of securities and deceiving counterparties."

46.     Archegos's trading of its Top 10 Holdings during the Relevant Period, which Hwang directed, further confirms that Hwang intended his investment decisions and Archegos's trading through Tomita and others to artificially inflate the stock prices of Archegos's Top 10 Holdings.

47.     As described in greater detail below, Archegos exercised domination over the market of certain issuers' securities. When considering its cash equity and SBS positions cumulatively, Archegos held massive exposures to its Top 10 Holdings.

48.     During the Relevant Period, Archegos, at Hwang's direction, added staggering levels of exposure day-over-day, equating to a substantial number of shares, while entering orders providing for trading at volumes that demonstrated the goal to artificially impact the market.

49.     As Tomita described to the Court, Archegos, at Hwang's direction, also traded in other ways with the intent to inject false information into and manipulate the market in its largest

holdings.  In particular, Archegos purposefully engaged in series of transactions and trading activity (1) in the pre-market in order to "set the tone" where liquidity was low (as Hwang referred to this practice); (2) during the day, by bidding up prices; and (3) at the end of the trading day, when maximum impact could be achieved on closing price or to "mark the close." These efforts were intended to enhance the share price of the Top 10 Holdings at strategically important moments in order to induce others to purchase securities, to stave off price drops, or to enhance end of the day pricing including for margin purposes.

50.     Archegos also entered into other non-economic transactions, including, among others, transactions solely intended to maintain certain prices and to counteract selling pressure.

51.     Archegos and Hwang's purpose for these manipulative trading strategies was at least twofold: (1) to increase the stock prices of its Top 10 Holdings and, thus, allow Archegos to increase its market share of those holdings; and (2) to avoid stock price declines in its Top 10 Holdings that could result in Counterparty margin calls on Archegos's SBSs for those stocks that, in turn, would lead to further stock price declines (because Archegos would need to sell stock to meet those margin calls), resulting in a downward spiral of the market value of Archegos's Top 10 Holdings.

52.     Thus, during the Relevant Period, Defendants, at Hwang's direction, agreed to conduct Archegos's business through a continuous pattern of manipulating the market prices of Archegos's Top 10 Holdings and deceiving the Counterparties.  Hwang's central aim, which he directed the other Defendants to execute, was to control the market price and, thus, artificially increase the market value, of Archegos's Top 10 Holdings.

53.     During the Relevant Period, Archegos's false assurances to its Counterparties regarding its risk exposure to its Top 10 Holdings, and its manipulative trading in those stocks,

interrupted the natural interplay of supply and demand for those stocks – and distorted their underlying economic value for the Counterparties and other market participants – by causing at least two sets of false pricing signals in the market: (1) that the Top 10 Holdings stocks were held by a relatively broad range of market participants, reflecting a relatively broad supply and demand for those stocks – when, in fact, a single buyer (Archegos) was surreptitiously, and by fraudulent means, dominating the market for those stocks; and (2) that the prices of those stocks, both daily and over time, reflected normal market forces when, in fact, their steep climb (and ultimate precipitous fall) was due at least largely to Archegos's fraudulently dominating the market for, and engaging in manipulative trading of, those stocks.

### A. The Size of Archegos's Portfolio Exploded After March 2020

54.     At the onset of the Covid-19 pandemic in early 2020, Archegos's capital was down fairly substantially.

55.     Beginning after March 2020 and accelerating through the first quarter of 2021, Archegos's portfolio, at Hwang's direction, underwent rapid and exponential growth.

56.     As of March 31, 2020, Archegos had approximately $1.6 billion in invested capital, on gross exposures of approximately $10.2 billion.

57.     As of January 1, 2021, Archegos had approximately $7.7 billion in invested capital, on gross exposures of approximately $54 billion.

58.     And, as of March 22, 2021, Archegos had over $36 billion in invested capital, on over $160 billion in gross exposures.

### B. The Identity and Nature of Archegos's Top 10 Holdings Changed

59.     Beginning after March 2020 and accelerating through the first quarter of 2021, Archegos's portfolio, at Hwang's direction, shifted such that the issuers to which it held its

largest exposures were different, and often less liquid, than in the past. Specifically, Hwang directed Archegos's long exposures to be moved away from highly-liquid, larger cap issuers toward less liquid, China-based issuers, as well as relatively smaller cap U.S. media and technology companies.

60.     For example, in March 2020, Archegos's top 10 holdings included mega-cap issuers Amazon.com, Inc. ("Amazon") and Microsoft Corporation.

61.     By March 2021, those companies were replaced among Archegos's Top 10 Holdings by a number of China-based issuers, as well as ViacomCBS Inc. ("ViacomCBS") and two Discovery, Inc. ("Discovery") share classes, with the following distribution of exposure over time:

| Ticker | Number of Shares[2] (Market Value) | | | |
|---|---|---|---|---|
| | Jul. 1, 2020 | Oct. 1, 2020 | Jan. 1, 2021 | Mar. 22, 2021 |
| VIAC | 49.3M ($1.2B) | 123.0M ($3.4B) | 185M ($6.7B) | 286M ($28.6B) |
| BIDU-ADR | 11.2M ($1.4B) | 22.3M ($2.8B) | 31.6M ($6.6B) | 55M ($14.6B) |
| TME-ADR | 59.0M ($788M) | 118.0M ($1.8B) | 210M ($4B) | 326M ($10.0B) |
| GSX-ADR | 19.3M ($1.1B) | 38.8M ($3.6B) | 70M ($3.4B) | 101M ($8.5B) |
| VIPS-ADR | 36.4M ($759M) | 79.0M ($1.3B) | 115M ($3.2B) | 169M ($7.6B) |
| DISCA | 3.0M ($63M) | 3.0M ($65M) | 60M ($1.8B) | 100M ($7.5B) |
| IQ-ADR | 67.2M ($1.6B) | 105.3M ($2.4B) | 155M ($2.8B) | 225M ($6.3B) |
| DISCK | 1.3M ($25M) | 1.3M ($27M) | 1.3M ($34M) | 91M ($6.0B) |
| FTCH-ADR | 6.4M ($116M) | 18.4M ($500M) | 37M ($2.2B) | 92M ($5.7B) |
| SHOP-ADR | N/A | N/A | 970 ($1M) | 1.7M ($1.9B) |

62.     The increase of the portfolio's and Top 10 Holdings' values was driven by Archegos's build-up of exposures, which was intended by Hwang to artificially inflate the share prices of the Top 10 Holdings.

63.     As Archegos's positions grew into fall 2020 and early 2021, Hwang considered whether block trading – a privately negotiated sale of a large number of shares – would allow

---

[2]     Share count includes cash equity and derivative SBS positions cumulatively.

him to exit his largest positions without substantial losses that would trigger margin calls. Archegos personnel, at Hwang's direction, reached out to financial institutions to explore this possibility but learned that block sales would come at a steep discount to the then-market price of the security.  Archegos did not engage in block trading of its largest positions at this time.

64.     Thus, by late 2020 and early 2021, Archegos hit a point of no return – it could not sell its Top 10 Holdings without determinately impacting their stock price, and if it stopped purchasing its Top 10 Holdings, their stock prices could not remain at artificial heights.  So Archegos continued adding to its already concentrated positions.

### C. Archegos Asserted Dominance over the Market of Its Top 10 Holdings

65.     The size of Archegos's exposures to its Top 10 Holdings allowed Archegos to assert a dominant market position over the securities of these issuers, which was intended to artificially manipulate the value of those positions.  As Tomita described to the Court, "I and others executed trades that allowed the fund to amass market power and certain securities traded on U.S. exchanges....  Once Archegos gained market power in these securities, I and others used this power to trade in such a way as to artificially manipulate the prices of the securities."

66.     For example, by late March 2021, Archegos's cumulative cash equity and derivative SBS exposures to the following issuers equated to the following percentages of outstanding shares, based on Archegos's estimate of those issuers' floats:

- GSX Techedu Inc. ("GSX") – Over 70% of outstanding shares;

- Discovery Class A – Over 60% of outstanding shares;

- IQIYI Inc. – Over 50% of outstanding shares;

- ViacomCBS – Over 50% of outstanding shares;

- Tencent Music Entertainment Group ("Tencent") – Over 45% of outstanding shares; and

16

- Discovery Class C – Over 30% of outstanding shares.

67.     Hwang knew that Archegos could impact markets through the exercise of its sheer buying power.  For example, in June 2020, when asked in a text message by an Archegos analyst whether ViacomCBS's stock price improvement that day was "a sign of strength," Hwang responded, "No.  It is a sign of me buying," followed by a "tears of joy" or laughing emoji.  That day, Archegos' SBS long purchases equated to approximately 17.9% of all trading volume in ViacomCBS, and the stock price closed at $23.59, up over 7% from its $22 price at market open.

68.     Hwang's awareness of his ability to impact stock prices is also reflected in his statements to his traders.  At various times, Hwang would direct his traders to trade a particular name "without impact" or "no impact," meaning that for that particular transaction Hwang did not want his traders to move the stock price.  By late 2020 and early 2021, as Hwang sought to further artificially inflate stock prices, Hwang generally did not use this direction for the Top 10 Holdings and instead conveyed to his traders that he wanted them to impact stock prices.

69.     During the Relevant Period, and particularly from January through March 2021, Archegos, at Hwang's direction, often traded the equities of and SBSs referencing its Top 10 Holdings on numerous days and sometimes week-after-week, typically at large volumes.  Hwang frequently directed his traders, including Tomita, to get "aggressive," which meant for them to add exposures quickly and at large volumes.

70.     This approach was a marked departure from Archegos's typical manner of trading historically, when Hwang had instructed his traders to trade deliberately and discretely to avoid market impact, typically going days without adding to existing exposures and studiously avoiding trading volumes that could cause ripples in the market.

71.     When entering SBS orders, Archegos often could select the trading volume the Counterparty would use to purchase its stock hedges as a parameter for purposes of executing its SBSs or otherwise select an algorithm that generally aligned with certain trading volumes.

72.     During the Relevant Period, and particularly from January through March 2021, Archegos's trading of the equities of and SBSs referencing its Top 10 Holdings frequently exceeded 20%, often reached 30%, and even surpassed 40% of certain issuers' daily trading volume, which was intended to inflate the stock prices.

73.     For example, from November 16, 2020 to January 4, 2021, Archegos's trading of the equities of and SBSs referencing Discovery Class A shares reached or breached approximately 25% of Discovery Class A shares' daily trading volume on 17 of 33 trading days. And, from November 24, 2020 to January 4, 2021, Archegos's trading only dropped below 20% of Discovery Class A shares' daily trading volume on 7 of 27 trading days and was greater than 30% ten times, including a high of 40%.

74.     Further, from January 6, 2021 to March 24, 2021, Archegos's trading of the equities of and SBSs referencing Discovery Class C shares reached or breached approximately 25% of Discovery Class C shares' daily trading volume on 29 of 54 trading days.  And, from January 29, 2021 to March 11, 2021, Archegos's trading only dropped below approximately 20% of Discovery Class C shares' daily trading volume on 2 of 29 trading days and was greater than approximately 30% fourteen times, including a high of approximately 40%.

75.     From March 2, 2021 to March 23, 2021, Archegos's trading of the equities of and SBSs referencing Farfetch Ltd. ("Farfetch") reached or breached approximately 20% of Farfetch's daily trading volume on 14 of 16 trading days, including three days where trading

surpassed approximately 40% of daily trading volume, including a high of over 50% on March 18.

76.     As Hwang and Tomita knew and intended, such large trading volumes on a given day would and did create upward pressure on the share price and often result in the share price increasing.  Indeed, Hwang and Tomita generally understood that trading in volumes greater than 10-15% of the daily trading volume of a specific issuer would likely affect the market price in that issuer.

77.     In fact, the share prices of a number of the Top 10 Holdings experienced price spikes during the Relevant Period, increasing to artificial levels that were not sustained after Archegos's collapse in late March 2021.  As Archegos's percentage ownership of its Top 10 Holdings continued to increase during the Relevant Period, the available stock outstanding not owned by Archegos decreased, thereby compounding the market impact of Archegos's buying activity in these names.

78.     For example, ViacomCBS's share price rose to around $40 in early January 2021, to around $55 in late January 2021, and to around $70 in early March 2021.  Then, its share price rose to over $80 on March 10 and to over $94 just two days later on March 12, spiking all the way to $100 on March 22.  That is, ViacomCBS's share price increased approximately 150% in less than three months, with a lack of publicly available information that would support such a share price increase.

79.     Then, about one month later, on April 23, 2021, the share price for ViacomCBS closed at $41.71.



80.     Other of the Top 10 Holdings experienced similar share price spikes during the Relevant Period, including for example:

- Discovery Class A;



- Discovery Class C; and



- Vipshop Holdings Ltd.



81.     These price movements ran in dissimilar fashion to the general market at the time.

For example, the share price spikes of Discovery Class A and C shares and ViacomCBS are not

correlated with the price of the NASDAQ-100 index (as reflected in Invesco QQQ Trust, an exchange-traded fund that tracks that index), as illustrated below, with the y-axis reflecting the value of one dollar invested from the start of period:



**Relative Price Performance, 8/3/2020 – 4/30/2021**

### D. Archegos Traded in Other Manipulative and Non-Economic Ways to Impact the Markets of its Top 10 Holdings

82.     During the Relevant Period, and particularly from January to March 2021, Archegos, at Hwang's direction, employed numerous tactics intended to artificially impact the share prices of the Top 10 Holdings.  None of this trading was based on a principled view of the true value of a particular issuer and instead was intended to artificially inflate share prices.

83.     Indeed, Hwang essentially sidelined his in-house research team, ignoring their stock price targets in favor of his own outsized stock price targets, which were often orders of magnitude larger than what his research operation had determined on its own and, unlike his research operation, based on little or no analytical support.

84.     Archegos, as directed by Hwang, timed some of its trading to maximize market impact, engaging in both pre-open trading, as well as trading at the end of the trading day, particularly from January to March 2021.

85.     Archegos, as directed by Hwang, engaged in a series of transactions prior to market open with manipulative intent and for the purpose of "setting the tone" for the trading day, that is, pushing the share prices of certain issuers, in which Archegos held long exposures, upward.  Hwang's goal, executed by Tomita, was to induce other traders, such as short sellers or other market participants, to observe active trading in and upward price movement of the share prices of certain issuers and, as a result, purchase those issuers' securities during the day in response to the price momentum created by Archegos's pre-open trading.  As Tomita described to the Court, "[a]cting at the direction of [Hwang], I traded to increase the prices of names in which Archegos held long positions [] by, for example, [] trading premarket when I knew the fund's activity would have a greater impact on price."

86.     From January to March 2021, ViacomCBS was the issuer that was included in Archegos's Top 10 Holdings, in which Archegos did the largest amount of pre-open trading.  Specifically, Archegos traded ViacomCBS pre-open nineteen times, including two days when orders exceeded the equivalent of 1 million shares, and on every trading day but one, from March 5 to 19.

87.     From January 14, 2021 to January 22, 2021, Archegos traded GSX pre-open each day, with Tomita alerting Hwang, among others, at 8:11am on January 22:  "eyeing premarket for GSX [] just 12k shares traded and down -1.9%, I think it's good to think about getting involved premarket again today."  In other words, Archegos considered premarket trading in

order to counteract selling pressure on GSX or to otherwise maintain and inflate the GSX share price.

88.     Archegos also engaged in substantial trading during the end of the trading day – that is, "marking the close" – to again push the stock prices of certain issuers, in which Archegos held long exposures, upward.  The goal was that the upward movement in stock prices would lead to an increase in margin on Archegos's SBSs, which was based on end of day valuations, thereby providing Archegos with even more leverage to purchase more exposure to the same issuers the next day, among other reasons.

89.     From January to March 2021, Archegos did substantial trading in Baidu Inc. ("Baidu") during the last 30 minutes of the trading day.  Specifically, from January 25, 2021 to March 23, 2021, Archegos traded Baidu during the last 30 minutes during the majority of trading days, including 22 days when orders exceeded the equivalent of over 100,000 shares (with dollars exceeding $29 million on each of those days), and four days when orders exceeded the equivalent of over 500,000 shares (with dollars exceeding $136 million on each of those days).

90.     From January to March 2021, Archegos also did substantial trading in Tencent during the last 30 minutes of the trading day.  Specifically, from January 6, 2021 to March 23, 2021, Archegos traded Tencent during the last 30 minutes during the majority of trading days, including 34 days when orders exceeded the equivalent of over 100,000 shares (with dollars exceeding $2 million on all of those days), 15 days when orders exceeded the equivalent of over 500,000 shares (with dollars exceeding $12 million on all of those days), and five days when orders exceeded the equivalent of over 1,000,000 shares (with dollars exceeding $30 million on all of those days), including a high of over 1.76 million shares.

91.     Archegos also traded throughout the day in a manner that served to increase the share prices of the Top 10 Holdings.  In certain instances, when trading SBSs, Hwang would direct his traders to enter limit order instructions, incrementally increasing the limit throughout the trading day as SBS orders were filled, both in an attempt to increase the stock price and to induce others to purchase the stock.

92.     In addition, Archegos traded in other non-economic ways in response to intra-day price movements in the share price rather than, for example, changes in the fundamental outlook for the issuer.  As Tomita described to the Court, "[a]cting at the direction of [Hwang], I traded to increase the prices of names in which Archegos held long positions [] by, for example, buying large amounts of stock when the price dropped in response to negative news…."  The goal of this trading was simply to counteract selling pressure or to otherwise maintain share prices.

93.     One example of this sort of non-economic trading occurred in December 2020. Tomita messaged among others, Hwang, that "someone came and hit FTCH down fifty cents to $55.00.  Not huge volume but we stepped it up."  At the end of that trading day, Archegos had exposures equivalent to over 27 million shares of Farfetch, and, given the leverage of the position, a price decrease could have significantly increased the amount of margin that Archegos needed to post with Counterparties.

94.     Another example of Archegos's non-economic trading occurred in March 2021. An Archegos trader messaged among others, Hwang, that after Discovery Class C shares opened at $61.68, Archegos should enter orders of "60.00-61.00 and be aggressive below 60.00 because some short term people see whether the stock can keep 60.00 floor as psychological level." Hwang responded within seconds, writing "I LIKE THAT PLEASE GO AHEAD WITH $50 MIL."  Over the course of the trading, Hwang periodically sought status updates on trading to

gain greater exposure to Discovery Class C shares, often then increasing the size of the exposure to be added and incrementally walking up the limits orders, with a message late in the day writing "FIRM LIMIT TO 63" and including instructions to "LET'S BE AGGRESSIVE." Discovery Class C shares closed at $62.99 that day.

IV.   **Archegos's Misrepresentations to Counterparties Fueled Its Manipulative Trading**

95.     As Hwang understood, the only way for Archegos's manipulative trading strategy to succeed during the Relevant Period was for it to continue adding to its already concentrated positions.  By the second half of 2020, it was becoming more and more difficult to add to positions.  Archegos's growing position sizes began to bump up against the Counterparties' trading capacity limits – limits on the amount of SBSs that Counterparties would allow Archegos to hold in particular companies.

96.     In addition, as Archegos's positions grew and became more concentrated, Counterparties were increasing the amount of margin – cash deposited to serve as collateral for the SBSs – required of Archegos to add to existing positions (or to put on new positions).

97.     Thus, as Archegos's Top 10 Holdings grew and it became increasingly important to continue growing those positions, Hwang started to put on positions at increasing economic cost.  For example, many Counterparties began to increase margin requirements up to 100% collateral for certain SBSs, meaning that Hwang had to essentially fully purchase the position and could not purchase on margin.  The higher margin requirements meant that these positions had less profit potential than similar positions purchased with a lower margin requirement.

98.     The capacity limits and margin requirements were critical tools used by Counterparties to manage and mitigate risks associated with Archegos's positions, and those limits and requirements made it more difficult and expensive for Archegos to add to its positions.

26

99.     But Hwang was determined to obtain more exposure to his concentrated positions however he could find it.  In one instance, when one of Archegos's Counterparties had reached an internal cap on how much overall exposure the Counterparty was willing to have to GSX, Hwang personally reached out to an investment adviser to request it close its GSX positions at the Counterparty and then reestablish its GSX exposure at another Counterparty in order to free up capacity for Archegos at the first Counterparty.  The other adviser agreed and Hwang was able to add to Archegos's GSX position.  The movement of these positions between Counterparties assisted Hwang in ultimately owning the equivalent of 70% of the outstanding shares of GSX, which was not disclosed to any Counterparty.

100.    More broadly, in response to these constraints imposed by Counterparties and in order to continue buying the same positions, Archegos, at Hwang's direction, sought to onboard new Counterparties to obtain additional SBS capacity, and to engage existing Counterparties in discussions and negotiations in an effort to increase trading capacity limits and decrease margin requirements (or forestall margin increases).  Also at times, Counterparties, for risk management purposes, engaged with Archegos personnel as its portfolio and risk profile grew.

101.    In these discussions, Counterparties frequently asked questions about Archegos's concentration levels and portfolio makeup in order for the Counterparties to evaluate whether and how much to increase capacity limits, or to change margin levels.

102.    Becker and Tomita, who typically led these discussions, and Halligan and Hwang, who at times directed these discussions, understood based on their experiences and discussions amongst themselves that if Archegos provided truthful information to questions about concentration or portfolio construction, or refused to provide such information, then Counterparties would not, or likely would not, authorize an increase in capacity or provide more

favorable margin rates, and that the Counterparties might otherwise limit the ability to add to the Top 10 Holdings.

103.    But Hwang mandated that Archegos personnel not provide such information, which Counterparties would need to extend risk limits.  At the same time, Hwang directed Tomita and Becker on numerous occasions to secure capacity increases and obtain more favorable margin changes.

104.    As a result of the intense pressure to add capacity that came from Hwang and Hwang's directive not to provide full information to Counterparties, Archegos, through Halligan, Tomita, and Becker, knowingly or recklessly gave materially false information to Counterparties, or omitted material information, regarding the concentration and liquidity of its portfolio.  They gave this false information to enable Archegos to gain additional capacity to add to their long SBSs (which it did), to gain more favorable margin rates, and during the week of its collapse in March 2021, to attempt to satisfy margin calls.

105.    In addition, Hwang, directly and indirectly, misled Counterparties, and knew or was reckless in not knowing that Halligan, Tomita, and Becker could not have successfully obtained the capacity increases and margin changes without providing false or misleading information to Counterparties.  Thus, with the implicit and at times explicit permission and direction of Hwang, the other Defendants provided false and misleading information to Counterparties in an effort to conduct SBS transactions and obtain margin lending, all to facilitate Archegos's manipulative trading scheme.  As Tomita told the Court, "I agreed with [Hwang] and others to carry out the business of Archegos through a pattern of manipulating prices of securities and deceiving [C]ounterparties."

106.    On April 21, 2022, Becker pled guilty to criminal law violations concerning the

facts alleged in this Amended Complaint.  *See U.S. v. Sung Kook (Bill) Hwang, et al.*, 22 Cr. 240

(S.D.N.Y.).  For his allocution that day, Becker summarized for the Court his false statements to

Counterparties, which fueled Archegos's trading:

> "I understood that [Counterparties] would not open relationships with
> Archegos, extend Archegos trading capacity, or offer Archegos favorable
> margin rates without certain representations to them about the overall
> holdings within the Archegos portfolio.
>         In order to induce [Counterparties] to, among other things, extend
> Archegos the credit necessary to purchase equities or engage in swap
> transactions, on several occasions, in coordination with others at
> Archegos, I made false or misleading statements to the [Counterparties]
> about Archegos's portfolio….
>         I knew these statements to be untrue.  I made these and other
> similar misstatements to induce the [Counterparties] to continue extending
> Archegos trading capacity as well as to dissuade these [Counterparties]
> from liquidating positions held in Archegos's account or to take other
> action that might hurt Archegos's overall portfolio."

107.    Specific examples of how Archegos personnel misled Counterparties include the

following.

### A.  Misrepresentations to CP1

108.    In a September 2020 phone call, Tomita misled CP1 into thinking that Archegos's

position in GSX – one of its largest across its various Counterparties – was unique to CP1.  As a

result, CP1 continued to allow Archegos to add to its GSX exposure through SBSs.

109.    Later, in February 2021, in connection with Archegos's request for additional

trading capacity instigated by Hwang, Becker falsely claimed several times that Archegos's

largest single position was only 35% of Archegos's net asset value ("NAV"), or capital.  He also

claimed that Archegos could liquidate its entire portfolio within two weeks by trading at 15% of

average daily trading volume ("ADV").  These statements were false, as Becker knew.

110.     Becker learned from Halligan how to interact with, and in some instances mislead, Counterparties.  When Becker took over Halligan's role as the lead in interacting with Counterparty risk divisions in approximately 2018, Halligan knew that Counterparties asked about position size and at that time he instructed Becker to tell Counterparties that Archegos's largest position was 35% of NAV, regardless of whether that was true.  Halligan, Becker's supervisor, knew that Becker in his role regularly discussed position size with Counterparties and therefore knew, or was reckless in not knowing, that Becker would provide false information to Counterparties, as he had previously instructed.  Halligan also knew that on these calls the Counterparties would rely on the information Becker provided in determining whether to provide additional capacity to Archegos for its long SBSs, or to provide more favorable margin rates.  Becker did not question Halligan's instruction because he understood this type of deception to be part of Archegos's culture.

111.     Becker made similar misstatements in multiple calls to CP1 in March 2021.  For example, on March 8, 2021, Becker spoke with CP1's credit risk group concerning a request from Archegos for an additional $2 billion in trading capacity.  In response to inquiries from CP1, Becker stated, among other things, (1) Archegos's single largest positions at other Counterparties were in different, larger, and more liquid names than the largest positions it held at CP1, and (2) Archegos's single largest position totaled approximately 35% of Archegos's capital (the number previously provided by Halligan).

112.     Both representations were false.  As Becker knew, Archegos's largest long exposures at other Counterparties were in the same names as those it held with CP1, and Archegos's largest position at the time was substantially higher.

113.    Following this March 8 conversation, and before approving the request for increased trading capacity, CP1 requested additional information regarding how quickly Archegos would be able to close out its entire book in a distressed situation.

114.    Before responding, Becker conferred internally with Tomita and Halligan to formulate a response.  The three of them agreed to provide false and misleading information to CP1.  In particular, they agreed that Becker would falsely state that they could liquidate their entire book within thirty days at 10% to 15% of ADV.  Becker relayed this information to CP1.

115.    Halligan, Tomita, and Becker knew, or recklessly disregarded, that this representation was false.  According to internal analyses Archegos maintained at the time, and to which they all had access, it would take more than twice that long to liquidate the portfolio at 15% of ADV and the largest positions would take months to liquidate at that rate.

116.    In reliance on these assurances, CP1 approved the requests for increased capacity. Archegos immediately used the additional capacity, executing more SBSs with CP1 in the same concentrated names, which, in turn, resulted in CP1 purchasing additional shares of the referenced security to hedge its exposures.

### B.  Misrepresentations to CP2

117.    On January 28, 2021, as a result of significant single-day losses in Archegos's portfolio, CP2's risk management team reached out to Becker to get a better understanding of Archegos's risk profile and overall portfolio positioning.  Becker misrepresented to CP2 on this call that Archegos's top holdings were only 35% of Archegos's NAV (the number previously provided by Halligan).

118.    This was false:  Archegos's two largest positions were more than half of Archegos's NAV at the time.

119.   Likewise, in early March 2021, in connection with a routine due diligence credit call regarding Archegos's portfolio concentration, CP2's credit risk department asked Becker for updated information regarding Archegos's largest holdings.  Becker again misrepresented to CP2 that its largest holding was approximately 35% of its capital (the number previously provided by Halligan) and that its other top 10 holdings were approximately 30% of capital each.

120.   These statements were false and misled CP2 into thinking Archegos's exposures were much smaller than they actually were.  After each misrepresentation, CP2 continued to extend capacity and margin in reliance on those statements, and Archegos continued to add SBSs in its Top 10 Holdings with CP2.

## C.  Misrepresentations to CP3

121.   During an October 21, 2020 due diligence call with risk personnel from CP3, Becker represented falsely that Archegos's largest position was only 35% of Archegos's then total capital (the number previously provided by Halligan) when in fact Archegos's largest positions were 80% and 70% of capital.  Becker also falsely claimed that positions away from CP3 were "generally" cash equity positions.

122.   On a call two days later, on October 23, 2020, Becker also misled CP3 into thinking that Amazon – a mega-cap stock – was one of Archegos's top 5 holdings and that Archegos's Amazon position was approximately 30% of its capital, when in truth, Amazon was not one of Archegos's top 5 holdings and comprised only 11.5% of Archegos's portfolio.

123.   On a January 25, 2021 due diligence call with CP3, Becker likewise misrepresented the size of Archegos's largest position, claiming, again, that it was 35% of Archegos's capital (the number previously provided by Halligan) when in fact its largest position at the time (ViacomCBS) constituted over 60% of Archegos's capital.

124.     Moreover, Becker claimed on this call that Archegos's overall portfolio was concentrated in highly liquid tech stocks, citing Netflix Inc., Amazon, and Alphabet Inc.  But none of these names was among the Top 10 Holdings, and the largest (Amazon) represented only about 1.3% of Archegos's capital at the time.

125.     Additionally, under its ISDA Master Agreement with CP3, Archegos was required to return signed transaction confirmations upon the consummation of each SBS executed through CP3.  These confirmations contained the representation that, with respect to the transaction subject to the confirmation, "the aggregate amount of all Shares beneficially owned by [Archegos] for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative positions, is less than 5% of the outstanding shares."

126.     Halligan signed these confirmations attesting to the accuracy of the representations.  A number of the representations in these signed confirmations were false because Archegos owned more than 5% of the outstanding shares through the equities and SBSs.

127.     At the time Halligan signed the confirmations, based on his knowledge of Archegos's portfolio and his intent at the time to hide the true makeup of Archegos's portfolio from the Counterparties, Halligan knew or recklessly disregarded that they contained the above false statements.

### D.  Misrepresentations to CP4

128.     In February 2021, Archegos sought additional trading capacity in GSX, one of its most concentrated holdings.  Archegos's cumulative long exposure to GSX (inclusive of cash equity and derivative SBS exposures) grew in size that month, and by February 17, totaled

approximately 86 million shares, or about 59% of the GSX shares outstanding, spread across its various Counterparties.

129.    Based on the size of Archegos's position in GSX held with CP4, an employee from CP4 grew concerned about Archegos's overall concentration levels in the issuer, and on February 18, 2021, reached out to Tomita and asked for detail regarding the extent of its GSX exposure across its Counterparties.

130.    On the call, Tomita initially attempted to deflect the question by noting that Archegos was not a "disclosed holder" of GSX (*i.e.*, did not file Section 13(d) filings on that name).

131.    The CP4 employee observed that that response did not account for any derivative SBS positions Archegos might have with other Counterparties, and noted in particular that the disclosed holders in GSX were principally banks and other financial institutions – precisely the institutions that would be buying the underlying shares as a hedge if Archegos had executed SBSs with them.  The CP4 employee expressed concern that if Archegos held similarly-sized positions in GSX across its Counterparties as it did with CP4, then Archegos might cumulatively be the beneficial owner of almost 20% of GSX's outstanding shares.

132.    In response, Tomita misled the individual into believing that it must have been other entities' SBS positions that caused those reported positions, not Archegos, when in fact (as Tomita knew) it was Archegos, which at the time had exposure to about 59% of GSX's outstanding shares through SBSs.

133.    In reliance on these assurances, CP4 extended additional trading capacity in GSX to Archegos, when it would not have had it been informed of the true size of Archegos's holdings. Archegos then used this capacity to add to its already concentrated GSX position.

134.     Becker also provided false information to CP4 regarding the liquidity and concentration of Archegos's overall portfolio.

135.     As Archegos grew its portfolio with CP4 more aggressively, CP4's credit team implemented monthly due diligence check-ins with Becker to get updates on the portfolio composition and performance.  For instance, in February 2021, reporting on Archegos's portfolio as of month-end for January 2021, Becker told CP4 that Archegos's largest position was 35% of Archegos's capital (the number previously provided by Halligan), and that it could fully liquidate its portfolio within 2 weeks at 10% to 20% of ADV.

136.     As Becker knew, both representations were false:  As of January 2021, Archegos's largest position (ViacomCBS) was over 60% of its capital.  And it would take months, not weeks, to liquidate at 10% to 20% of ADV.

137.     Likewise, in March 2021, reporting on February month-end, Becker repeated the false statement that Archegos's largest position was only 35% of its capital, at a time when that position, in fact, represented over 70% of Archegos's capital.

**E.   Misrepresentations to CP5**

138.     In March 2021, Becker had a due diligence call with a credit officer from CP5, who sought additional information regarding Archegos's portfolio liquidity and composition.

139.     As he did with other Counterparties, Becker misled CP5 regarding Archegos's liquidity profile, claiming falsely that Archegos could liquidate its entire portfolio within one month at 20% of ADV.

**F.   Misrepresentations to CP6**

140.     In November 2020, CP6 had several discussions with Archegos about reducing the risk profile of the portfolio it held at CP6.  In connection with these discussions, CP6 sought

additional information from Archegos, requested that Archegos transfer some of its more concentrated positions to other Counterparties and replace them with more diversified holdings, and asked Archegos to post more margin.

141.    Tomita discussed CP6's requests with Hwang, and Hwang directed Tomita to inform CP6 that Archegos needed until year end before it could make any changes to the portfolio.

142.    Based on Hwang's direction, Tomita embellished a story to CP6 that Archegos was constrained from transferring its concentrated positions away from CP6 for tax reasons.

143.    As Tomita knew, this was misleading.  In truth, Archegos simply did not have capacity at other Counterparties that would allow a transfer of concentrated positions, and in fact Archegos was seeking to onboard new counterparties to be able to add even more exposure to the same positions.

144.     In addition, Tomita and Becker falsely represented to CP6 in a phone call that its largest position comprised only 30% of its capital; in actuality, at the time of the call, Archegos's ViacomCBS position was 98% of its capital, and six of its single-name positions were in excess of 40% of Archegos's capital.

### G.  Misrepresentations to CP7

145.    CP7 onboarded Archegos as a new prime brokerage client in November 2020.

146.    As CP7 was performing its due diligence and setting initial risk limits for the new account, Tomita, at Hwang's direction, misled CP7's risk division into thinking that the stocks Archegos intended to trade at CP7 would be new names to Archegos's portfolio, not additional exposure to existing names Archegos held elsewhere.  In particular, at Hwang's direction,

Tomita provided CP 7 decoy names when discussing Archegos's portfolio and investment interests in order to conceal Archegos's primary interest in GSX.

147.    Later, in or around January 2021, during a call with Becker and Tomita, CP7's risk division raised its observation that other dealers were disclosed as top holders in GSX, and asked if this was a result of Archegos trading GSX on SBSs with other Counterparties.

148.    As he did in his conversation with CP4, Tomita claimed falsely that these disclosed positions were likely the result of other entities trading in SBSs, and not Archegos. The result of these statements was to give CP7 the misleading impression that Archegos was less concentrated in GSX than it really was.

149.    In advance of this January 2021 call with CP7, Halligan recommended to Becker that Becker participate in calls Tomita was having with Counterparties concerning concentration risk to make sure that any misleading information provided to Counterparties regarding Archegos's portfolio positions was consistent.  Becker informed Halligan about the call with CP7, including the misleading messaging conveyed regarding Archegos's GSX positions, to which Halligan replied, in sum or substance, "if they only knew."  Becker interpreted this statement, a common refrain from Halligan, to mean that Halligan understood that Becker and Tomita were providing false and/or misleading information to Counterparties concerning Archegos's portfolio positions, and that Archegos's Counterparties would have taken risk-mitigating countermeasures – including refusing to extend Archegos additional trading capacity – had they known the truth.  In this manner, Halligan intentionally or recklessly encouraged and approved Becker to provide false and misleading information to Archegos's counterparties, including CP7.

150.    Additionally, on February 3, 2021, during a due diligence call with CP7's risk division, Becker provided false information about Archegos's portfolio concentration, knowingly misrepresenting that (1) Archegos's largest position was only 35% of Archegos's NAV (the number previously provided by Halligan), when it was, in actuality, more than 65%, and (2) Archegos's top positions held at other Counterparties were more liquid than the names it held with CP7.

### H.  Misrepresentations to CP8

151.    In or around December 2020 or January 2021, Becker participated in a due diligence call with CP8, during which he made numerous representations about Archegos's concentration and liquidity that were materially false, including (1) that Archegos could liquidate its positions in approximately two weeks, and (2) that its largest holding represented only 35% of NAV.

152.    Prior to making the statement, Becker specifically asked Halligan if he should use the 35% figure, and Halligan told Becker to continue to use it even though they both knew it was false.

153.    Also, on March 24, 2021, in the wake of the price deterioration in positions Archegos held at CP8, Becker held another call with CP8 personnel in which he again misled CP8 materially concerning the extent of its liquidity concentrations, falsely claiming (again) that Archegos's top position size represented only 35% of NAV, and that Archegos could get out of the entirety of its positions within four to five weeks.

154.    In addition, Archegos obtained SBSs from CP8 pursuant to an ISDA Master Agreement as amended and supplemented by other documents, including a Portfolio Swaps Annex ("PSA").

155.     In 2015, Archegos's PSA included a representation that "on the date the parties enter into any Transaction, the aggregate amount of all such Shares beneficially owned by it for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative position, is less than 5% of the outstanding Shares."

156.     In December 2020, the PSA was amended to increase the percentage of ownership to 20% of the outstanding shares.

157.     Hwang signed the PSAs from both 2015 and 2020.

158.     During the course of 2020, this ongoing representation was not true because Archegos, when including underlying long derivative SBS positions, owned greater than 5% of the outstanding shares of numerous issuers.  As Hwang knew at the time he signed the December 2020 PSA amendment, Archegos's combined exposure to several issuers far exceeded 20% of those companies' outstanding shares.  Particularly given the importance of Archegos's SBS agreements to Archegos's trading strategy, and Hwang's broader scheme to manipulate the stock price of Archegos's Top 10 Holdings, Hwang knew or recklessly disregarded at the time he signed the 2020 PSA amendment that the statement in paragraphs 155-156 above were false.

159.     In addition, Hwang continued directing Archegos's traders to add long SBS positions with CP8 in Archegos's most concentrated names, including, for example, GSX, ViacomCBS, and Discovery Class A shares – despite his knowledge that Archegos's cumulative cash equity and derivative SBS positions in these names were well in excess of 20% of their outstanding shares.

**V.     Additional Misrepresentations Made During the Week of Archegos's Collapse**

160.   After market close on Monday, March 22, 2021, ViacomCBS – Archegos's single largest long position – announced a $3 billion secondary offering of its shares, precipitating an approximately 10% drop in its share price the next trading day.

161.   Despite the market losses it faced that day, on March 23, Archegos, in an effort to prop up stock prices and avoid additional margin calls, put on an additional approximately $2.6 billion in trading positions – mostly purchases of SBSs that added to its long exposures in its most concentrated holdings.

162.   On March 23, Archegos saw its ending capital fall from $36.2 billion to $32.7 billion, and faced margin calls of $2.5 billion due the following day.

163.   Coupled with amounts due from its trading activity on March 23, Archegos had virtually exhausted whatever cash reserves it had previously held by market open on March 24.

164.   Furthermore, during the trading day on March 24, Archegos's most concentrated positions saw their prices continue to decline precipitously.  ViacomCBS announced that it had priced its secondary offering of common stock at only $85 per share, well below the $100.34 closing price the day prior – triggering further losses not only in ViacomCBS's stock, but also the correlated shares in Discovery, another of Archegos's concentrated positions.

165.   Compounding these declines, the announcement of the adoption of interim amendments implementing the Holding Foreign Companies Accountable Act put pressure on the price of American Depositary Receipts of China-based issuers, which comprised the balance of Archegos's concentrated positions.

166.    With its cash reserves nearly depleted, Halligan, Becker, and Tomita grew increasingly concerned about Archegos's ability to meet its outstanding margin calls due that day from the previous day's market moves.

167.    In an effort to meet the margin calls, they reached out to CP5 and asked to call back excess margin Archegos held there.  In response to the request at around 2:00 pm on March 24, a credit officer from CP5 spoke with Becker by phone to ask why Archegos was calling back its excess margin, especially in light of the day's market movements and the likelihood that CP5 would issue a margin call to Archegos the following day.

168.    Becker explained that Archegos held more excess margin at CP5 than it did at its other Counterparties, and the request was merely part of a rebalancing effort.  He represented that Archegos still had $9 billion in cash on hand, and that its withdrawal request was not the result of a "distress situation" or a "liquidity issue."

169.    These representations were false.  Archegos at the time had virtually no cash left on hand, which Becker knew.

170.    With Becker's assurances, CP5 approved Archegos's request and wired $248 million to Archegos that afternoon, enabling Archegos to meet the margin calls from its market losses the previous day.

171.    As a result of market moves on March 24, however, by the end of that trading day the value of Archegos's capital declined to $16.9 billion – a one-day loss of 48%.  Having virtually exhausted all its excess cash, Archegos began informing its Counterparties that evening that it would not be able to meet its anticipated margin calls of $10.7 billion the next day, and attempted to work out a proposed course of action to attempt to satisfy its margin obligations.

172.    Even during this period, Halligan and Becker continued to mislead Archegos's Counterparties.

173.    For instance, during a call they had with CP7 after market-close on March 24, CP7 representatives asked for Archegos's then-current capital levels in light of the day's market activities.  Over a Bloomberg chat, Halligan instructed Becker to falsely represent that Archegos still had about $20 billion in assets under management, a number both knew was materially inflated and inaccurate given how closely they were reviewing assets under management throughout that day.

174.    On or about March 24, 2021, Becker prepared talking points for his use in responding to questions and concerns from Archegos's Counterparties.  This call script, which was reviewed and approved by Halligan, contained numerous false and misleading statements, including that Becker lacked access to Archegos's trade blotter, to Archegos's excess cash balances, to Archegos's live portfolio, and to information about the extent of margin calls Archegos had received from other Counterparties.  With Halligan's understanding and approval, Becker used these talking points and relayed these misrepresentations to Archegos's Counterparties during his discussions with them in an effort to prevent default notices from issuing and/or the forced liquidation of Archegos's portfolio.

175.    Archegos's positions continued to deteriorate on Thursday, March 25.  By the end of that trading day, its capital had decreased to $9.2 billion, an additional 46% loss from the previous day, triggering a spate of additional margin calls.

176.    After market close on March 25, Archegos worked with CP6 to execute a block trade to obtain further liquidity to satisfy outstanding margin calls; the block's discount further added to Archegos's losses.

177.   Over the evening of March 25, Archegos organized a group call with its largest Counterparties in an attempt to prevent a large scale liquidation that might exacerbate price declines in its largest names.  The talks persisted through Friday and into the weekend, but ultimately proved fruitless.

178.   Its Counterparties ultimately delivered default notices and unwound Archegos's positions (including their hedge positions).

179.   Archegos's failure led to over billions of dollars in Counterparty credit losses across its various Counterparties.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(Hwang, Tomita, and Archegos)**

180.   The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 179.

181.   By engaging in the acts and conduct described in this Amended Complaint, Defendants Hwang, Tomita, and Archegos, directly or indirectly, singly or in concert with others, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) knowingly or recklessly employed devices schemes, and artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of such securities.

182.   By reason of the foregoing, Defendants Hwang, Tomita, and Archegos, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(1) & (3) of the Securities Act
### (Halligan and Becker)

183.   The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 179.

184.   By engaging in the acts and conduct described in this Amended Complaint, Defendants Halligan and Becker, directly or indirectly, singly or in concert with others, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) knowingly or recklessly employed devices schemes, and artifices to defraud; and/or (b) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of such securities.

185.   By reason of the foregoing, Defendants Halligan and Becker, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

## THIRD CLAIM FOR RELIEF
### Violations Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (All Defendants)

186.   The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 179.

187.   By engaging in the acts and conduct described in this Amended Complaint, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, or the mails,

or the facilities of a national securities exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to defraud; (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

188.   By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 17(a)(1) & (3) of the Securities Act
### (Halligan)

189.   The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 179.

190.   By engaging in the acts and conduct described in this Amended Complaint, Defendant Halligan, directly or indirectly, knowingly or recklessly provided substantial assistance to Defendant Becker, who, directly or indirectly, singly or in concert with others, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) knowingly or recklessly employed devices schemes, and artifices to defraud; and/or (b) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of such securities.

191.   By reason of the foregoing, Defendant Halligan is liable for aiding and abetting Defendant Becker's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C.

§ 77q(a)(1) and (3)] pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and, unless enjoined, Defendant Halligan will again aid and abet violations of these provisions.

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Thereunder**
**(Halligan)**

192.   The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 179.

193.   By engaging in the acts and conduct described in this Amended Complaint, Defendant Halligan, directly or indirectly, provided knowing and substantial assistance to Defendant Becker, who, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to defraud; (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

194.   By reason of the foregoing, Defendant Halligan is liable for aiding and abetting Defendant Becker's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] and, unless enjoined, Defendant Halligan will again aid and abet violations of these provisions.

**SIXTH CLAIM FOR RELIEF**
**Violations of Section 9(a)(2) of the Exchange Act**
**(Hwang, Tomita, and Archegos)**

195.   The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 179.

196.   By engaging in the acts and conduct described in this Amended Complaint, Hwang, Tomita, and Archegos, directly or indirectly, by the use of the mails or means or instrumentalities of interstate commerce, or of a facility of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities creating actual or apparent active trading in such securities, or raising or depressing the prices of such securities, for the purpose of inducing the purchase or sale of such securities by others.

197.   By reason of the foregoing, Defendants Hwang, Tomita, and Archegos, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

**SEVENTH CLAIM FOR RELIEF**
**Control Person Liability under Section 20(a) of the Exchange Act for Archegos's and Tomita's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Hwang)**

198.   The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 179.

199.   As alleged in the Third Claim for Relief above, Tomita and Archegos violated Exchange Act Section 10(b) and Rule 10b-5 thereunder. By engaging in the acts and conduct described in this Amended Complaint, Archegos and Tomita, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to

47

defraud; (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

200.   At all relevant times, as Archegos's owner, Hwang participated in, and exercised control over, the operations of Archegos, and also possessed the power and ability to control the acts constituting Archegos's violations of the securities laws alleged herein.

201.   At all relevant times, as Tomita's direct supervisor and employer, Hwang participated in, and exercised control over, the conduct of Tomita, and also possessed the power and ability to control the acts constituting Tomita's violations of the securities laws alleged herein.

202.   Hwang was a culpable participant in Tomita's and Archegos's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

203.   By reason of the foregoing, Hwang, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], is jointly and severally liable with, and to the same extent as, Archegos and Tomita for their violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder, as alleged herein

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendants and their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)];

## II.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

## III.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## IV.

Permanently prohibiting Defendants Hwang, Halligan, Tomita, and Becker from serving as officers or directors of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief that may be appropriate and necessary.

**<u>JURY DEMAND</u>**

The SEC demands a trial by jury.

Dated:  New York, New York
        August 26, 2022

Respectfully submitted,

_____
Andrew Dean
Jack Kaufman
Joshua Brodsky
David Zetlin-Jones
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0106 (Kaufman)
Email: KaufmanJa@sec.gov

<u>Of Counsel</u>
Osman Nawaz
C. Dabney O'Riordan