## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>        v.<br><br>SUNG KOOK (BILL) HWANG, PATRICK HALLIGAN, WILLIAM TOMITA, SCOTT BECKER, AND ARCHEGOS CAPITAL MANAGEMENT, LP,<br><br>                    Defendants. | Civil Action No. 22-03402 (JPO)<br><br>*Document Electronically Filed* |

---

## DEFENDANT SUNG KOOK (BILL) HWANG'S
## MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS
## THE AMENDED COMPLAINT

---

Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
Kevin R. Reich
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
*Attorneys for Defendant*
*Sung Kook (Bill) Hwang*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 2

      A.     Summary of the Manipulative Trading Allegations Against Mr.
Hwang. ........................................................................................................ 3

      B.     Summary of the Misrepresentation Allegations Against Mr.
Hwang. ........................................................................................................ 6

ARGUMENT ...................................................................................................................... 7

I.      THE AMENDED COMPLAINT FAILS TO PROVIDE MR. HWANG
WITH ADEQUATE NOTICE OF THE CLAIMS AGAINST HIM. ................... 9

II.     THE AMENDED COMPLAINT FAILS TO ALLEGE SECURITIES
FRAUD AGAINST MR. HWANG WITH THE SPECIFICITY
REQUIRED. ........................................................................................................ 11

III.    THE AMENDED COMPLAINT FAILS TO STATE A SECURITIES
FRAUD CLAIM AGAINST MR. HWANG BASED ON
MISREPRESENTATIONS TO SWAP COUNTERPARTIES. ........................... 14

      A.     The Amended Complaint Alleges No Misrepresentations By Mr.
Hwang. ........................................................................................................ 14

      B.     The SEC's Alleged Misrepresentations Were Not Made "In
Connection With" The Purchase Or Sale Of Securities. ............................. 17

IV.    THE AMENDED COMPLAINT FAILS TO STATE A MARKET
MANIPULATION CLAIM. ................................................................................. 19

      A.     Market Manipulation Claims Based On Open-Market Trading
Without Deceptive Conduct Are Not Recognized In This Circuit. ............. 20

      B.     The SEC Fails To Allege Deception By Mr. Hwang. ................................. 25

V.     THE AMENDED COMPLAINT FAILS TO STATE A CONTROL
PERSON CLAIM. ................................................................................................ 33

      A.     The SEC Fails To Allege A Primary Violation. ......................................... 34

      B.     The SEC Fails To Adequately Allege Mr. Hwang's Culpable
Participation. ............................................................................................... 34

CONCLUSION ................................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
   544 F. Supp. 2d 199 (S.D.N.Y. 2008)......................................................................................9

*Abuhamdan v. Blyth, Inc.*,
   9 F. Supp. 3d 175 (D. Conn. 2014)......................................................................................13

*Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*,
   No. 96 CIV. 2549 RWS, 1997 WL 97837 (S.D.N.Y. Mar. 6, 1997)......................................18

*In re Allianz Global Invs. U.S. LLC Alpha Series Litig.*,
   No. 20-CV-5615 (KPF), 2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021) ...............................23

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)....................................................................................8

*In re Ames Dep't Stores Inc. Stock Litig.*,
   991 F.2d 953 (2d Cir. 1993)................................................................................................18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)......................................................................................... *passim*

*Barclays Capital Inc. v. Theflyonthewall.com*, Inc.,
   650 F.3d 876 (2d Cir. 2011)................................................................................................30

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
   126 F. Supp. 3d 342 (S.D.N.Y. 2015)..................................................................................30

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988)............................................................................................................14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................................7

*In re Bernard L. Madoff Inv. Sec. LLC*,
   818 F. App'x 48 (2d Cir. 2020) ..........................................................................................34

*Blank v. TriPoint Global Equities, LLC*,
   338 F. Supp. 3d 194 (S.D.N.Y. 2018)..................................................................................15

*Chadbourne & Parke LLP v. Troice*,
   571 U.S. 377 (2014)............................................................................................................17

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) ................................................................................................... 18

*Chem. Bank v. Arthur Andersen & Co.*,
    726 F.2d 930 (2d Cir. 1984) ......................................................................................... 17, 18

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010) ................................................................................ 20

*Conley v. Gibson*,
    355 U.S. 41 (1957) .............................................................................................................. 10

*Crummere v. Smith Barney, Harris Upham & Co.*,
    624 F. Supp. 751 (S.D.N.Y. 1985) ..................................................................................... 18

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .............................................................................................................. 9

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ............................................................................................... 11

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) ................................................................................ 35

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ............................................................................................... 11

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ....................................................................................................... 9, 20

*Flickinger v. Harold C. Brown & Co., Inc.*,
    947 F.2d 595 (2d Cir. 1991) ............................................................................................... 17

*Footbridge Ltd. Trust v. Countrywide Home Loans*,
    No. 9-CV-4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ............................... 33

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
    843 F.3d 1257 (11th Cir. 2016) .......................................................................................... 24

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................................ 36

*In re Gentiva Sec. Litig.*,
    971 F. Supp. 2d 305 (E.D.N.Y. 2013) ................................................................................ 33

*GFL Advantage Fund, Ltd. v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001) ............................................................................................... 23

*Gibbons v. Malone,*
 703 F.3d 595 (2d Cir. 2013)..................................................................................7

*Good Luck Prod. Co. v. Crystal Cove Seafood Corp.,*
 60 F. Supp. 3d 365 (E.D.N.Y. 2014) ...................................................................12

*Gurary v. Winehouse,*
 190 F.3d 37 (2d Cir. 1999)..................................................................................21

*Hawaii Ironworkers Annuity Trust Fund v. Cole,*
 No. 10-CV-371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011)............................16

*Ho v. Duoyuan Global Water, Inc.,*
 887 F. Supp. 2d 547 (S.D.N.Y. 2012)...................................................................15

*Hunt v. Enzo Biochem, Inc.,*
 530 F. Supp. 2d 580 (S.D.N.Y. 2008)...................................................................12

*Janus Capital Group, Inc. v. First Derivative Traders,*
 564 U.S. 135 (2011) ............................................................................... *passim*

*Johnson v. Priceline.com, Inc.,*
 711 F.3d 271 (2d Cir. 2013)................................................................................7, 9

*Koch v. S.E.C.,*
 793 F.3d 147 (D.C. Cir. 2015) ............................................................................31

*Lou v. Belzberg,*
 728 F. Supp. 1010 (S.D.N.Y. 1990)......................................................................12

*Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co.,*
 770 F. Supp. 176 (S.D.N.Y. 1991) ........................................................................19

*Markowski v. SEC,*
 274 F.3d 525 (D.C. Cir. 2001) ............................................................................24

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC,*
 164 F. Supp. 3d 568 (S.D.N.Y. 2016)....................................................................8

*In re Merrill, BofA, & Morgan Stanley Spoofing Litig.,*
 No. 19-CV-6002 (LJL), 2021 WL 827190 (S.D.N.Y. Mar. 4, 2021).....................19

*Mills v. Polar Molecular Corp.,*
 12 F.3d 1170 (2d Cir. 1993)................................................................................11

*Noto v. 22nd Century Grp. Inc.,*
 35 F.4th 95 (2d Cir. 2022) ..................................................................................20

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    591 F. Supp. 2d 586 (S.D.N.Y. 2008) ..................................................................31

*PetEdge, Inc. v. Garg*,
    234 F. Supp. 3d 477 (S.D.N.Y. 2017) ..................................................................16

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) ..................................................................16

*Production Resource Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*,
    6 F. Supp. 2d 236 (S.D.N.Y. 1998) ...................................................................18

*Salahuddin v. Cuomo*,
    861 F.2d 40 (2d Cir. 1988) ................................................................................10

*Santa Fe Indus. Inc. v. Green*,
    430 U.S. 462 (1977) ...........................................................................8, 20, 24

*Saxe v. E.F. Hutton & Co.*,
    789 F.2d 105 (2d Cir. 1986) ..............................................................................18

*Schreiber v. Burlington Northern, Inc.*,
    472 U.S. 1 (1985) ..............................................................................................20

*Schwartz v. Sensei, LLC*,
    No. 17-4124, 2020 WL 5817010 (S.D.N.Y. Sept. 30, 2020) ................................34

*SEC v. Fiore*,
    416 F. Supp. 3d 306 (S.D.N.Y. 2019) ..............................................................8, 10

*S.E.C. v. Lauer*,
    No. 3-CV-80612 (KAM), 2008 WL 4372896 (S.D. Fla. Sept. 24, 2008) ..............31

*SEC v. Lek Sec. Corp., et. al.*,
    Case No. 17-CV-1789 (S.D.N.Y. March 10, 2017) ..............................................23

*SEC v. Malenfant*,
    784 F. Supp. 141 (S.D.N.Y. 1992) ...................................................................8, 21

*S.E.C. v. Markusen*,
    143 F. Supp. 3d 877 (D. Minn. 2015) ................................................................31

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007) ......................................................21, 26, 31

*SEC v. Rio Tinto PLC*,
    41 F.4th 47 (2d Cir 2022) ...............................................................................8, 16

*S.E.C. v. Sason*,
    433 F. Supp. 3d 496 (S.D.N.Y. 2020) .................................................................34

*SEC v. Vali Mgmt. Partners, et. al.*,
    No. 21-CV-453, 2022 WL 2155094 (2d Cir. June 15, 2022) .................................23

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) ...................................................................9

*SEC v. Yorkville Advisors, LLC*,
    305 F. Supp.3d 486 (S.D.N.Y. 2018) ..............................................................8, 10

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*,
    No. 3-CV-3120 (LTS)(THK), 2009 WL 1492196 (S.D.N.Y. May 27, 2009).......28

*Set Capital LLC v. Credit Suisse Group*,
    996 F.3d 64 (2d Cir. 2021) ...................................................................................23

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) .................................................................................11

*Simmons v. Abruzzo*,
    49 F.3d 83 (2d Cir. 1995) .....................................................................................11

*SIPC v. BDO Seidman, LLP*,
    222 F.3d 63 (2d Cir. 2000) .....................................................................................7

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014) ...................................................................35

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ...................................................................................14

*Sullivan & Long Inc. v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995) .................................................................................24

*Taylor v. Westor Capital Group*,
    943 F. Supp. 2d 397 (S.D.N.Y. 2013) .................................................................13

*United States v. Gilbertson*,
    970 F.3d 939 (8th Cir. 2020) ...............................................................................24

*United States v. Hall*,
    48 F. Supp. 2d 386 (S.D.N.Y. 1999) ...................................................................25

*United States v. Mulheren*,
    938 F.2d 364 (2d Cir. 1991) ..................................................................... *passim*

*Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*,
    149 F. Supp. 3d 376 (E.D.N.Y. 2016) ...................................................................13

*Williams v. Affinion Grp., LLC*,
    889 F.3d 116 (2d Cir. 2018)...................................................................................12

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011).............................................................................12, 21

**Statutes**

15 U.S.C. § 77q(a), Securities Act, § 17(a) ....................................................... *passim*

15 U.S.C. § 78i(a)(2), Exchange Act, § 9(a)(2).........................................3, 8, 19, 21

15 U.S.C. § 78j(b), Exchange Act, § 10(b)........................................................ *passim*

15 U.S.C. § 78m(d), Exchange Act, § 13(d) ...................................................................3

15 U.S.C. § 78t(a), Exchange Act, § 20(a) ....................................................... *passim*

**Rules**

Fed. R Civ. P. 8...............................................................................................8, 9, 10, 11

Fed. R Civ. P. 9(b) ............................................................................................. *passim*

Fed. R Civ. P. 12(b)(6).........................................................................................*passim*

**Regulations**

17 C.F.R. § 240.10b-5..........................................................................................*passim*

17 CFR § 240.13d-1................................................................................................3

17 CFR § 275.202(a)(11)(G)-1(b) ............................................................................2

**Treatises**

5 C. Wright & A. Miller, Federal Practice and Procedure § 1281 (1969) ...................10

**Other Authorities**

Antoine Gara, *Billionaire Bill Ackman Made 100-Fold Return On Coronavirus
    Hedge That Yielded $2.6 Billion*, Forbes, Mar. 25, 2020 .......................................32

Daniel R. Fischel & David J. Ross, *Should the Law Prohibit 'Manipulation' in
    Financial Markets?*, 105 HARV. L. REV. 503 (1991).................................................21

Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 DUKE L.J. 479 (2018) ............................................................22, 25

SEC Proposed Rule 10B-1 and SEC Rel. No. 34-93784, at 62 (available at https://www.sec.gov/rules/proposed/2021/34-93784.pdf)......................................................31

Thomas R. Millar & Paul J. Pantano, Jr., *Open Market Manipulation: The Dangers of Policing Thought*,
39 No. 10 FUTURES & DERIVS. L. REP. NL 2 (2019) ........................................................22, 25

## PRELIMINARY STATEMENT

The Amended Complaint is every bit as extraordinary as its predecessor: paragraph after paragraph alleges entirely lawful trading on the open market, but then concludes that the trading at issue—real trades exposing defendant Bill Hwang to real economic risk, and devoid of any deceptive action—was somehow unlawful.  In particular, the Amended Complaint finds manipulative Mr. Hwang's decision to trade a handful of securities in large volumes—trading that the SEC second-guesses, in hindsight, and labels "non-economic," suggesting that it was intended solely to "maintain share prices" or "counteract selling pressure."  Along the way, the SEC declares unlawful a number of practices that have long been accepted as entirely legitimate and commonplace in the market, including investing one's own money through a family office that is subject to limited reporting requirements, trading on margin and through security-based swaps rather than in the securities themselves, and trading before or at the end of the trading day.  The result is a pleading that is not only unprecedented in its expansion of the notion of "open-market manipulation," already a dubious theory, but one that would, if sustained, threaten the very existence of markets by allowing regulators to judge, in retrospect, the economic value of trading and by equating manipulative intent with mere knowledge of the truism that trading, and especially large trades, affect price.  No trader could have known that these kinds of actions would someday be deemed unlawful, simply because Mr. Hwang's trading backfired in the short term, costing him, but no other investors, billions of dollars in losses.  All of this renders this case not only legally unfounded, but also an obvious, and fundamentally unfair, attempt to rewrite the law and then apply it retroactively.

Mindful of its inability to allege any kind of deceit or fraudulent trading conduct, the SEC also alleges that swap counterparties were duped into extending credit to Mr. Hwang's fund, Archegos.  But this allegation is deficient, as a matter of law, not only because the supposed misstatements were not, even as alleged, Mr. Hwang's, but also because they were for the purpose of obtaining credit and thus not "in connection with" the purchase or sale of securities.  Nor, in

any event, are these allegations set forth with even close to the particularity demanded by the Federal Rules of Civil Procedure, so vague are they in their ultimate charges and so unspecific in the specific allegations. Relatedly, it goes almost without saying that, in the absence of a well-pleaded primary violation, the SEC's "control person" claim against Mr. Hwang, which it did not even see fit to include in its initial pleading, cannot survive.

For all of these reasons, as set forth in detail below, the Amended Complaint should be dismissed, with prejudice, as against Mr. Hwang.

## FACTUAL BACKGROUND

The SEC brings this Amended Complaint against four individuals and Archegos Capital Management, LP ("Archegos"), alleging a "fraudulent scheme" of "interlocking deceptive acts and misconduct" carried out through "manipulative trading" and "false and misleading statements" to bank counterparties (ECF 47 ("FAC" or "Amended Complaint") ¶ 1).[1] Archegos was the family office[2] of individual defendant Sung Kook (Bill) Hwang until March 2021, when the value of its fund collapsed (¶¶ 15-16, 177-78). The other individual defendants are former Archegos Chief Financial Officer Patrick Halligan, former head trader William Tomita, and former Director of Risk Management Scott Becker (¶¶ 17-19). Defendants Becker and Tomita are cooperating with the Government and pleaded guilty on April 21, 2022, and April 22, 2022, respectively, to criminal violations based upon the facts alleged in the FAC (¶¶ 18-19, 45, 106). The FAC, filed on August 26, 2022, in response to defendants' motions to dismiss, includes, for the first time, excerpted portions of their plea allocutions, though the pleas occurred before the SEC filed its original complaint on April 27, 2022.

Four of the seven claims for relief asserted in the FAC are brought against Mr. Hwang and allege violations of the following securities fraud statutes: Section 17(a) of the Securities Act

---

[1] References of the form "(¶ _)" are to the FAC.

[2] A family office is "a company . . . that (1) [h]as no clients other than family clients . . . ; (2) [i]s wholly owned by family clients and is exclusively controlled (directly or indirectly) by one or more family members and/or family entities; and (3) [d]oes not hold itself out to the public as an investment adviser." 17 CFR § 275.202(a)(11)(G)-1(b).

(¶¶ 180-82) (Count I), Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (¶¶ 186-88) (Count III), (3) Section 9(a)(2) of the Exchange Act (¶¶ 195-97) (Count VI), and Section 20(a) of the Exchange Act (¶¶ 198-203) (newly-asserted Count VII).  The FAC incorporates every allegation about manipulative trading and misrepresentations into each count.

### A.      Summary of the Manipulative Trading Allegations Against Mr. Hwang.

According to the FAC, although Archegos had been in existence for many years and was worth around $4 billion, in September 2020 it changed its operations and commenced a manipulative trading scheme that allegedly continued through the fund's collapse in March 2021 (the "Relevant Period") (¶¶ 1, 3).  During this entire seven-month period, the SEC alleges, "***[n]one*** of [Archegos's] trading was based on a principled view of the true value of a particular issuer and instead was intended to artificially inflate share prices" of its top 10 positions (¶ 82 (emphasis added))—that is, the allegation in the FAC is that not a single trade among the thousands that Archegos conducted "on numerous days and sometimes week-after-week, typically at large volumes" during the entire Relevant Period (¶ 69) was legitimate.

Mr. Hwang, as head of the Archegos family office, had the sole discretion as to how to invest his own money, which he did using a long/short equity strategy that involved taking highly leveraged and very concentrated positions, mostly by entering derivative contract-based swap transactions with multiple counterparties (¶¶ 23, 27-29).  Swaps were used to "limit the visibility" into the "extent of Archegos's aggregate holdings" by avoiding the 5% direct ownership reporting threshold under Section 13(d) of the Exchange Act (¶¶ 29-30).[3]  The various swap counterparties, in turn, would "ensure any corollary synthetic exposure" created by the swap contract was "fully hedged," including by in some unspecified times purchasing shares of the swap's referenced

---

[3] Section 13(d) of the Exchange Act and 17 CFR § 240.13d-1 require holders of securities to file Schedule 13D after acquiring more than 5% beneficial ownership of a registered class of voting equity securities.  Typically, the long party to a cash-settled equity derivative does not have "beneficial ownership" of the reference securities because the derivative instrument does not confer voting or investment power—the two hallmarks of beneficial ownership under Rule 13d-3.  The SEC does not assert that Archegos failed to make any required Schedule 13D filing.

issuers in the market "to the extent necessary" (¶ 37) and "[t]ypically," according to the FAC, on a one-to-one basis (¶ 38).

Although not alleged to have begun until September 2020, the scheme allegedly had its roots in the "onset of the Covid-19 pandemic" in March 2020 when, at Mr. Hwang's direction, Archegos moved its positions from "highly-liquid, larger cap issuers" towards "less liquid, China-based issuers, as well as relatively smaller cap U.S. media and technology companies" (¶¶ 54-55, 59).  This movement included shifts away from holdings in companies like Amazon and Microsoft to companies like ViacomCBS, Discovery, and Chinese companies Baidu and GSX (¶¶ 60-61).  The SEC asserts that the ensuing "exponential growth" experienced by Archegos (¶ 55) was "driven by Archegos's build-up of exposures" to "staggering levels" through "trading at volumes that demonstrated the goal to artificially impact the market" and Mr. Hwang's intention to "artificially inflate" the share prices of Archegos's top 10 holdings (¶¶ 48, 62).

The SEC premises its manipulative trading claims on the following allegations: *First*, the SEC points to the large amount of swap trading in a highly concentrated number of companies as indicative of market dominance, which allowed Archegos's trading to affect a stock's price (¶¶ 65-81).  Specifically, Archegos held very sizeable swap positions in its top 10 holdings, in some cases positions that "equated" to as much as 70% of the outstanding shares of an issuer (¶ 66).[4]  Accordingly, Mr. Hwang allegedly knew that Archegos could "impact markets [in the securities underlying the swaps] through the exercise of its sheer buying power" (¶ 67).  Some swap transactions "frequently exceeded 20%, often reached 30%, and even surpassed 40% of certain issuers' daily trading volume" (¶¶ 72-75).  That volume of trading "create[d] upward pressure on [those issuers'] share price and often result[ed] in the share price increasing" (¶ 76).

---

[4] Of course, "equating" the number of swap positions with the number of outstanding shares of a stock is misleading, since there is no limit to the number of swaps that can be created based upon a stock's performance, and since the SEC at least implicitly concedes that there were times when counterparties would not buy the underlying stock to hedge against the swap.

*Second*, Archegos engaged in trading that the SEC characterizes as "non-economic" in the sense that it was "solely intended to maintain certain prices and to counteract selling pressure" (¶¶ 50, 82-94).  This included certain common market practices, such as:

- Trading in the "pre-market" to "induce" others to "observe active trading . . . and upward price movement" and thus buy (or sell) shares; for example, Archegos traded large volumes of Viacom stock in the pre-market nineteen times between January and March 2021 (¶¶ 85-87).

- Trading "during the end of the trading day," for example in Baidu Inc. and Tencent Music from January to March 2021, in order to "mark the close" and push up prices, with the goal of increasing excess margin  (¶¶ 88-90).

- Trading "throughout the day" by using successive rising "limit orders" in an "attempt to increase" the share prices of Archegos's holdings and thereby induce others to buy (¶ 91) or to "counteract selling pressure" (¶¶ 91-94).

*Third*, the SEC alleges certain other (non-trading) factors in support of its manipulation claims.  For example, the SEC claims that the price of stocks like Viacom, Discovery, and Vipshop were "artificial" during the Relevant Period because they rose in "dissimilar fashion to the general market" as measured by NASDAQ indices (¶ 81).  In addition, the SEC alleges, after Archegos collapsed in March 2021, some of those share prices have not recovered (¶¶ 77-80).[5]  The SEC also asserts that Mr. Hwang sometimes rejected his analysts' recommended price targets in favor of his own "outsized" targets with "little or no analytical support" (¶ 83).  And the SEC points to certain communications by Mr. Hwang in the form of text messages or chats telling traders like Tomita to get "aggressive," which the SEC alleges meant "add[ing] exposures quickly and at large volumes" (¶ 69), or commenting to an Archegos analyst that his buying activity on a certain day caused an increase in a stock's price (¶ 67).  All of this was done, says the SEC, to "control the market price" of these shares (¶ 52).

---

[5] When the market value of several of Mr. Hwang's top holdings substantially declined throughout the week of March 22, 2021—virtually simultaneously and at least in part due to external market forces such as a Viacom secondary offering and negative regulatory pronouncements concerning certain China-based issuers (¶¶ 160-165)—Archegos could not cover successive margin calls, resulting in Archegos and its counterparties liquidating many positions, causing further downward pressure and eventually resulting in billions of dollars of losses to Mr. Hwang and some of its Wall Street counterparties (¶¶ 58, 171, 175-79).

**B.       Summary of the Misrepresentation Allegations Against Mr. Hwang.**

In addition to manipulating the market, the SEC claims that Archegos "deliberately misled many of [its] Counterparties during the Relevant Period in order to obtain increased trading capacity to further its manipulative trading" (¶ 5).  In particular, Tomita and Becker allegedly made "false assurances" to unnamed counterparties "CP1" through "CP8" "concerning [Archegos's] portfolio composition, its concentrated exposure, and its liquidity profile" (¶¶ 6, 108-59):

- Becker "falsely claimed several times that Archegos's largest single position was only 35% of Archegos's net asset value ('NAV')" and that Archegos could "liquidate its entire portfolio within two weeks by trading at 15% of average daily trading volume ('ADV')" (¶¶ 109, 119, 135, 150, 153).

- Becker "misled CP3 into thinking that Amazon—a mega-cap stock—was one of Archegos's top 5 holdings" and comprised "30% of its capital" (¶ 122).

- Tomita "initially attempted to deflect the question" from CP4 about Archegos's concentration levels and then "misled the individual [from CP4] into believing" that holdings from other entities, and not Archegos, had caused other counterparties to file certain 13(d) beneficial ownership reports (¶¶ 130-32).

These misrepresentations by Tomita and Becker allegedly "served as the fuel for [Archegos's] manipulative trading" (¶ 5), as they "enable[d] Archegos to gain additional capacity to add to [its] long [swaps], to gain more favorable margin rates, and during the week of its collapse in March 2021, to attempt to satisfy margin calls" (¶ 104).  Moreover, according to the SEC, they were made "with the implicit and at times explicit permission and direction of Hwang" (¶ 105).

The FAC, however, at no time pleads that Mr. Hwang made any false or misleading statements to counterparties.  It vaguely alleges that Mr. Hwang "at times directed" discussions that Tomita and Becker had with counterparties (¶ 102), although it conspicuously does not allege that he ever told them to misrepresent anything to anyone.  The FAC also alleges that Mr. Hwang "mandated" that certain information not be provided to counterparties (¶ 103) and put "intense pressure" on Tomita and Becker to secure increased trading capacity from counterparties (¶ 104).  From this the SEC concludes that Mr. Hwang "knew or was reckless in not knowing" that, "without

6

providing false or misleading information" to them, the counterparties would not have extended additional capacity to Archegos (¶ 105).  But again, the SEC does not allege that Mr. Hwang himself conveyed any such false or misleading information to any counterparty; rather, the sum total of the allegations regarding any specific thing that Mr. Hwang allegedly did in this regard is that he "instigated" a request for additional capacity (¶ 109); that, in two separate instances, he conferred with Tomita, who then "embellished a story to CP6" (¶¶ 141-42) and "provided CP7 decoy names" at a preliminary stage in their discussions regarding positions in which Archegos was interested (¶ 146); and that he signed, on behalf of Archegos, a swap agreement with CP8 containing a representation, which he is not alleged to have even seen, that proved to be inaccurate (¶¶ 157-59).

## ARGUMENT

A court must grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when the allegations, even if true, would not entitle the plaintiff to the relief requested.  *SIPC v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir. 2000).  Put another way, "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). While the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the light most favorable to the plaintiff, *see Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013), bald assertions, untenable inferences, and legal conclusions disguised as factual allegations do not suffice.  *See Twombly*, 550 U.S. at 555–57.

As a matter of law, none of the four counts asserted against Mr. Hwang in the FAC state a claim upon which relief can be granted, and, accordingly, they should all be dismissed under Rule 12(b)(6) for multiple reasons:[6]

---

[6] The allegations against Mr. Hwang are the following: Count I alleges a violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Count III alleges a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; these two counts address "essentially the same elements"— requiring proof of (a) a device, scheme, or artifice to defraud; (b) an untrue statement (or omission) of material fact; or (c) an act, practice, or course of business that would operate as a fraud or deceit upon any person, all in connection

*First,* the FAC does not delineate which conduct by Mr. Hwang allegedly violated which securities statutes, in contravention of Federal Rule of Civil Procedure 8.  Because the SEC incorporates all of its factual allegations into each of the counts, it provides inadequate notice as to which section(s) of any statute Mr. Hwang allegedly violated.  The SEC must do more under the basic standards of notice pleading.  *See* Point I.

*Second,* the FAC lacks the specificity demanded by Federal Rule of Civil Procedure 9(b), which requires the SEC to identify the particulars of any alleged fraudulent conduct by Mr. Hwang and plead facts sufficient to support those allegations.  The FAC fails to do so with respect to either the misrepresentation or the manipulation claims.  *See* Point II.

*Third,* as to the misrepresentation claims, the FAC also fails for the simple reason that it does not allege that Mr. Hwang made a single false or misleading statement to any counterparty.  Also problematic is that the misrepresentations (by others) that the SEC does allege were not "in connection with" the purchase or sale of securities, as the relevant statutes require, but rather were for the purpose of getting more capacity and better margin terms from counterparties.  *See* Point III.

---

with the purchase or sale of a security—and courts in this District have analyzed them as such.  *SEC v. Yorkville Advisors, LLC,* 305 F. Supp.3d 486, 510 (S.D.N.Y. 2018); *see also SEC v. Rio Tinto PLC,* 41 F.4th 47, 49 (2d Cir 2022) (setting forth the elements of Section 17(a) and Rule 10b-5 and noting that "Rule 10b-5 and Section 17(a), which largely mirror each other, both consist of a 'misstatement subsection' that is sandwiched between two 'scheme subsections'").  Both provisions require scienter and deceptive conduct in furtherance of the alleged scheme or fraud. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC,* 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (setting forth elements of 10b-5); *see also Santa Fe Indus. Inc. v. Green,* 430 U.S. 462, 473 (1977) ("The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception.").  The third count against Mr. Hwang, Count VI, alleges a violation of Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2), which likewise requires proof of scienter and deception and proscribes engaging in a series of transactions in a security creating actual or apparent trading in that security (or raising or depressing the price of that security) for the purpose of inducing the security's sale or purchase by others.  *SEC v. Fiore,* 416 F. Supp. 3d 306, 325 (S.D.N.Y. 2019) (setting forth elements of Section 9(a)); *SEC v. Malenfant,* 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (explaining that Section 9(a) does not "prohibit market transactions which raise or lower the price of securities" but rather is intended to ensure "an open and free market where the natural forces of supply and demand determine a security's price" (citation omitted)).  Finally, new Count VII seeks to hold Mr. Hwang liable as a control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which provides for joint and several liability against every person who controls any person liable for a violation of the Exchange Act or any rule or regulation thereunder.  *In re Alstom SA,* 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005).

*Fourth*, with respect to the market manipulation claims, the FAC alleges only actual trading activity that exposed Archegos to real economic risk and fails to allege any deceptive conduct, such as "spoofing" or publishing false information.  But the "open-market manipulation" theory on which the SEC relies has been disapproved in this Circuit and rejected by nearly every court to have considered it—for good reason, discussed below.  Moreover, because none of Archegos's trading activity is or could be claimed to be illegal in itself, and instead is entirely consistent with the legitimate economic goal of acquiring the securities at issue, it does not support a viable claim for market manipulation.  *See* Point IV.[7]

*Fifth*, the attempt to hold Mr. Hwang liable as a control person of Archegos and Tomita— asserted for the first time in the FAC, evidently after the SEC realized that its direct case against Mr. Hwang is paper-thin—fails because the FAC adequately alleges neither a primary violation nor Mr. Hwang's culpable participation.  *See* Point V.

## I.   THE AMENDED COMPLAINT FAILS TO PROVIDE MR. HWANG WITH ADEQUATE NOTICE OF THE CLAIMS AGAINST HIM.

Rule 8(a) requires that a party be given adequate notice of the claims against him and requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Not only must a plaintiff plead a sufficient factual basis to make any claim for relief plausible, *Johnson*, 711 F.3d at 275, but, more fundamentally, the pleading must enable the defendant to discern the conduct in which he is alleged to have engaged and the claimed legal basis for liability stemming from such conduct.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,

---

[7] In addition to the arguments set forth in Points I-V, Mr. Hwang adopts all legal arguments made by moving defendants Archegos and Halligan in their separate briefs, to the extent those arguments are directed at Counts I, III, VI, and VII of the FAC.  Those include, *inter alia,* Archegos's arguments demonstrating that, because the trading alleged here was done primarily through swaps, such conduct is too attenuated to satisfy the necessary elements of the SEC's market manipulation claims, and the arguments that the SEC fails to plead facts against any moving defendant that raise the requisite strong inference of fraud or an intent to manipulate the market.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (scienter is "a mental state embracing intent to deceive, manipulate, or defraud").  None of the conduct alleged about Mr. Hwang supports any such inference; as discussed in Points IV and V below, all of his alleged actions are wholly consistent with non-manipulative conduct.  *SEC v. Wey*, 246 F. Supp. 3d 894, 912, 916 (S.D.N.Y. 2017) (explaining that allegations of scienter must create a "strong inference" of fraudulent intent); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008) ("A complaint adequately pleads scienter only if a reasonable person would deem the inference of scienter both 'cogent' and 'at least as likely as any plausible opposing inference.'") (internal citations and quotations omitted).

346–47 (2005) (dismissing securities fraud class action for failure to comply with Rule 8(a), as plaintiffs failed to provide defendants "with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation") (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (a "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests")); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (a non-compliant complaint "places an unjustified burden on the court and the part[ies] who must respond to it because they are forced to select the relevant material from a mass of verbiage") (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)).  This the FAC fails to do.

        For example, Counts I and III allege violations, respectively, of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.  Those statutes largely mirror each other in their elements.  *See supra* note 6.  But the FAC does not provide even the barest indication of which subsections of those statutes Mr. Hwang allegedly violated, or whether any alleged violations of those provisions are based on alleged misrepresentations to counterparties, alleged market manipulation (which is also cognizable under those statutes), or both.  For example, subsections (a) and (c) of Rule 10b-5 require pleading a manipulative or deceptive act in furtherance of the alleged scheme to defraud in connection with the purchase or sale of securities. *Yorkville Advisors,* 305 F. Supp. 3d at 510.  Rule 10b-5(b), by contrast, requires pleading a material misrepresentation (or material omission as to which the defendant had a duty to speak) in connection with the purchase or sale of securities.  *Fiore*, 416 F. Supp. 3d at 319.  Is Count III against Mr. Hwang directed only to the provisions of Rule 10b-5(a) or (c), or also 10b-5(b)?  And if the SEC means to allege a violation of all subsections of Rule 10b-5, including 10b-5(b), what misrepresentations (or omissions) were allegedly made by Mr. Hwang in violation of that provision?  Because the SEC impermissibly combines, in its charging counts, multiple possible claims, the FAC violates the basic tenets of Rule 8(a), which must result in the dismissal of the

claims asserted against Mr. Hwang, pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) ("When a complaint fails to comply with [the] requirements [of Rule 8], the district court has the power, on motion or *sua sponte*, to dismiss the complaint . . . .").

## II.   THE AMENDED COMPLAINT FAILS TO ALLEGE SECURITIES FRAUD AGAINST MR. HWANG WITH THE SPECIFICITY REQUIRED.

Because both the misrepresentation and market manipulation claims against Mr. Hwang are pled as securities fraud, all of the counts in the FAC are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that "in alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . ."  *See, e.g., ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  For a misrepresentation claim, the SEC must identify, at a minimum, what false statements were made, who made them, and when and where they were made, and also "explain why the statements were fraudulent."  *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2d Cir. 1994) ("[A] complaint [alleging a securities fraud claim] must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Even given a second chance to do so by amending its complaint after seeing Mr. Hwang's initial motion to dismiss, the SEC does not identify any specific misrepresentations or omissions by Mr. Hwang or specific deceptive conduct in support of a manipulation claim.

Leaving aside that the FAC never names the counterparties, referring to them instead as "CP1" through "CP8" (¶¶ 108-59), its more fundamental defect is the failure to allege particular facts about what Mr. Hwang did or said to render him liable for false statements that defendants Tomita and Becker purportedly made.  To be sure, the SEC alleges that Tomita and Becker

11

misrepresented Archegos's "portfolio composition, its concentrated exposure, and its liquidity profile" to counterparties (¶ 6), and seeks to extend liability for these acts to Mr. Hwang on the basis that he "mandated" that certain information not be provided to counterparties (¶ 103) and put "intense pressure" on Tomita and Becker to obtain additional trading capacity from them (¶ 104). But merely alleging that "the *other* Defendants provided false and misleading information to Counterparties" and did so "with *the implicit and at times explicit permission and direction* of Hwang" (¶ 105 (emphasis added)) in no way specifically ties Mr. Hwang to any of these statements. Indeed, the failure to plead any misrepresentation by Mr. Hwang at all, much less any requisite detail about it, is fatal to the claim against him under Rule 9(b). *See, e.g., Good Luck Prod. Co. v. Crystal Cove Seafood Corp.*, 60 F. Supp. 3d 365, 378 (E.D.N.Y. 2014) (dismissing fraud claim, based on defendants' alleged misrepresentations to banks, on Rule 9(b) grounds, where plaintiff did not "identify the exact statements" made by the named defendants or "explain when they were made"); *see also Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125–26 (2d Cir. 2018) (plaintiffs, despite contending they were "duped," failed to plead mail and wire fraud with requisite particularity where complaint identified no specific misrepresentations made by defendants that tricked them); *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 601 (S.D.N.Y. 2008) (plaintiff failed to plead common law fraud claims with particularity where complaint failed to identify any specific statements made by a particular defendant); *Lou v. Belzberg*, 728 F. Supp. 1010, 1022 (S.D.N.Y. 1990) ("[W]hen more than one defendant is charged with fraud, the complaint must particularize each defendant's alleged participation in the fraud.").

The market manipulation allegations, which are also subject to Rule 9(b), fare no better. *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 129 (2d Cir. 2011) (market manipulation claims must be pled with particularity under Rule 9(b)). To survive a motion to dismiss, the SEC must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities

at issue." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (quotation omitted)*; accord Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 401 (S.D.N.Y. 2013).  The FAC, however, enumerates only wholly legal trading activity by Archegos and Mr. Hwang (¶¶ 43-94) and then broadly proclaims it all to be "manipulative" during the Relevant Period because the size of certain positions grew so large (¶¶ 43, 65, 72).  Rule 9(b) requires much more.

Even the few examples of supposedly "manipulative" conduct alleged in the FAC lack particularized facts.  (*See* ¶¶ 85-86 (alleging that in pre-market trading, Mr. Hwang "set the tone" to "induce" others "to observe active trading in and upward price movement" of the shares, such as when Archegos traded in large volumes of Viacom stock in the pre-market nineteen times between January and March 2021, but failing to specify the nineteen times at issue)).  Allegations about the actual days on which such trading occurred, precisely what "volume" was traded and when, and how it impacted other investors in the market are completely absent.  *See, e.g., Taylor*, 943 F. Supp. 2d at 404 (dismissing manipulation claim because complaint contained "virtually no details about alleged scheme: it is impossible to tell what manipulative acts were performed, . . . [and] when they were performed").  Even more fundamentally, left unspecified is what false information these trades conveyed to the market so as to render them "manipulative," including how the price of any such stock on those days was affected and in what regard it was "artificial," as well as who was unwittingly "induced" to buy or sell based upon it.  This too violates Rule 9(b) and thus mandates dismissal.  *See Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 387 (E.D.N.Y. 2016) ("[T]he Plaintiff's threadbare statement does not make clear the circumstances of the Defendants' alleged manipulative acts—such as, which Defendants performed them; when the manipulative acts were performed; and what effect the scheme had on the market for the securities at issue.  Rather, the Plaintiff's allegations of market manipulation rely on abject speculation, which courts have repeatedly held cannot form the basis of a securities fraud claim under the Exchange Act and Rule 10b–5."); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d

175, 210 (D. Conn. 2014) (plaintiffs failed to plead that company engaged in deceptive scheme to purchase a  company, as required for securities fraud claim under Rule 10b–5(a) and (c), where the complaint "offer[ed] only conclusory allegations regarding any deceptive and manipulative act rather than the 'specific facts' necessary to satisfy Rule 9(b)").

## III.   THE AMENDED COMPLAINT FAILS TO STATE A SECURITIES FRAUD CLAIM AGAINST MR. HWANG BASED ON MISREPRESENTATIONS TO SWAP COUNTERPARTIES.

As noted above, the FAC alleges numerous misstatements to unnamed counterparties for the alleged purpose of obtaining favorable credit terms for Archegos (¶¶ 5, 95-179).  But because the FAC does not allege a single misleading statement to any counterparty by Mr. Hwang, it fails to state an actionable claim against him.  Moreover, because the false statements identified in the FAC were allegedly made to procure increased capacity and/or better margin rates, and had nothing to do with the nature or value of any securities, they were not, as a matter of law, made "in connection with" the purchase or sale of securities, as the applicable statutes require, and thus do not support a claim of securities fraud.  Accordingly, any claims of misrepresentations to counterparties should be dismissed as against Mr. Hwang.

### A.   The Amended Complaint Alleges No Misrepresentations By Mr. Hwang.

Not once does the FAC allege that Mr. Hwang uttered a single false or misleading word to any of Archegos's counterparties.  That he is alleged instead—in totally unadorned fashion—to have "at times directed these discussions" (¶ 102) and instructed Archegos employees not to disclose certain information (¶¶ 103-04) is no substitute for the obligation to plead that Mr. Hwang *himself* made misstatements to counterparties.[8]  Indeed, as the Supreme Court has held, to be liable under Rule 10b-5(b) (and similarly under Section 17(a)(2)), a defendant "must have 'made' the material misstatements" at issue.  *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S.

---

[8] A failure to disclose information, absent any duty to do so (which is not alleged here), does not constitute securities fraud.  *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100–01 (2d Cir. 2015) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.") (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).

135, 141, 143 (2011) (dismissing securities fraud claims against drafters of allegedly misleading prospectus because "maker" of offending statements was company ultimately responsible for publishing it); *Blank v. TriPoint Global Equities, LLC*, 338 F. Supp. 3d 194, 211 (S.D.N.Y. 2018) (co-founder/president/COO not liable for CEO's oral statements); *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) (CFO not liable for CEO's oral statements).

That Mr. Hwang made no such misstatements is underscored by the absence of allegations in the FAC regarding his involvement with counterparty discussions. Among the seventy-two (72) paragraphs setting forth Archegos's purported misrepresentations to eight unnamed counterparties, including during the week of March 22, 2021 (¶¶ 108-179), Mr. Hwang is mentioned in only seven:

- The first allegation—that Mr. Hwang "instigated" a request for additional capacity (¶ 109)—is devoid of facts that Mr. Hwang communicated with the counterparty at all, let alone misled it.

- The FAC next alleges that "Hwang directed Tomita to inform CP6 that Archegos needed until year end before it could make any changes to the portfolio," based upon which "Tomita embellished a story to CP6 that Archegos was constrained from transferring its concentrated positions away from CP6 for tax reasons" (¶¶ 141-42). Again, the pleading is clear on its face that Tomita, and not Mr. Hwang, spoke to the counterparty and that what he conveyed, false or not, was different from what he discussed with Mr. Hwang.

- The third allegation—that "at Hwang's direction, Tomita provided CP7 'decoy' names when discussing Archegos's portfolio and investment interests in order to conceal Archegos's primary interest in GSX" (¶ 146)—once again features Tomita (not Mr. Hwang) as the speaker and suggests fraud where none exists, given that CP7 could always decline to enter into a given transaction.

- Finally, Mr. Hwang is alleged to have signed a Portfolio Swap Annex ("PSA") with CP8 in 2015 and in 2020, both of which contained a supposedly false representation that the fund's

overall concentration in any single position was below 5% or 20%, respectively.  (¶¶ 157-59.) Significantly, however, the FAC fails to allege that Mr. Hwang was ever aware of the existence of this representation, thus belying any intent on his part to defraud.  *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (dismissing Section 10(b) claim because "[t]he plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements").

Additionally, insofar as the FAC alleges (albeit insufficiently) that Tomita's and Becker's purported misrepresentations were born of "intense pressure to add capacity that came from Hwang" (¶ 104), under *Janus* demanding results is not equivalent to ordering securities fraud.  *See Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 10-CV-371, 2011 WL 3862206, at *4–5 (N.D. Ohio Sept. 1, 2011), *as amended*, Sept. 7, 2011 (corporate officials not liable for misrepresentations made by subordinates who allegedly felt pressured by management directive to increase profit margins).  Nor does the FAC plead particularized facts from which it can be plausibly inferred that Mr. Hwang "knew or was reckless in not knowing" that Tomita and Becker could only obtain more capacity and improved margin terms by committing fraud (¶ 105).  *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (dismissing fraud claim against CEO because conclusory allegations that fraudulent acts by employees were undertaken "with [CEO's] knowledge and approval" could not satisfy Rule 9(b) absent specific facts that CEO meaningfully participated in directing or making allegedly false statements).  In sum, because the FAC does not allege that Mr. Hwang made any false or misleading statement, the securities fraud claims against him should be dismissed.[9]

---

[9] The Second Circuit's opinion in *Rio Tinto*, which issued after the SEC commenced this action, makes clear, too, that "an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination."  41 F.4th at 49 (emphasis in original).  Because the FAC does not allege that Mr. Hwang disseminated any of the alleged misrepresentations made by Becker and Tomita, those misrepresentations cannot form the basis of a scheme liability claim under Section 17(a) or Rule 10b-5 against him.

**B.    The SEC's Alleged Misrepresentations Were Not Made "In Connection With" The Purchase Or Sale Of Securities.**

The claims premised on misrepresentations to counterparties also must be dismissed because they were not made "in connection with" the purchase or sale of securities, as is required under Sections 17(a) and 10(b).  The FAC alleges that Tomita's and Becker's misrepresentations were all made "in order to obtain increased trading capacity" or to "gain more favorable margin rates" (¶¶ 5, 104), which purportedly "fueled" Mr. Hwang's trading (¶¶ 5, 95-105).  But even if true, these allegations do not establish that the alleged misrepresentations were acts of securities fraud, any more than using the proceeds of a bank robbery to buy stock would be.  The reason is simple: not every bad act that may lead to or facilitate the purchase or sale of a security is made "in connection with" that purchase or sale.

Section 17(a) of the Securities Act makes it unlawful to commit fraud "in the offer or sale of any securities."  15 U.S.C. § 77q(a).  Section 10(b) of the Exchange Act makes it unlawful to use deceit "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).  This language, the Supreme Court has held, limits securities fraud claims under those provisions to misrepresentations that have a nexus to the purchase or sale of a security; in particular, the misrepresentation must be material to another's purchase or sale.[10]  *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security.'"); *see also Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 598 (2d Cir. 1991) (to satisfy the requirement, "the fraud must have been integral to the plaintiff's purchase or sale of the security"); *Chem. Bank*, 726 F.2d at 943 (explaining that the purpose of Section 10(b) "is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they

---

[10] The nexus requirement is the same for both Sections 10(b) and 17(a).  *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 941–42 (2d Cir. 1984) ("Although arguably 'in connection with' has a somewhat broader sweep than 'in', it may be just as true that the 'in connection with' phraseology simply fits better with the rest of § 10(b).").

think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be").

Here, the SEC alleges that Tomita and Becker made misrepresentations to counterparties about the stability and risk profile of Archegos's portfolio—not to induce them to buy or sell any security, but to get "increased trading capacity" and "favorable margin rates." (¶¶ 5, 104). That Archegos may have used this credit to buy or sell securities does not make the alleged misrepresentations ones "in connection with" the purchase or sale of securities. *See Chem. Bank*, 726 F.2d at 943 (holding that the "in connection with" requirement was not met by allegation that bank was defrauded into making lending decisions based upon misrepresentations relating to certain stock pledged as collateral for loan); *Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*, No. 96 CIV. 2549 RWS, 1997 WL 97837, at *6 (S.D.N.Y. Mar. 6, 1997) (dismissing claim where misrepresentations "pertain[ed] not to the securities themselves, but to the status of [the investor's] credit and the availability of funds in his account"); *see also Crummere v. Smith Barney, Harris Upham & Co.*, 624 F. Supp. 751, 755 (S.D.N.Y. 1985) ("The Second Circuit court has stated that the misrepresentation must relate to the securities alleged to satisfy the purchase and sale requirement, and not just to the transaction in its entirety.").

To put a finer point on it, "[t]ypically, a plaintiff satisfies the 'in connection with' requirement when 'the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (quoting *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir. 1993)); *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 108 (2d Cir. 1986) (claim fails where plaintiff does "not allege that [defendant] misled him concerning the value of the securities he sold or the consideration he received in return"); *Production Resource Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*, 6 F. Supp. 2d 236, 240 (S.D.N.Y. 1998) (misrepresentations are not made "'in connection

with' the purchase or sale of securities [when they do] not pertain to the value, nature or investment characteristics of the securities at issue").  In other words, "[m]isrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves cannot form the basis of a violation of Section 10(b) or Rule 10b-5." *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co.*, 770 F. Supp. 176, 181 (S.D.N.Y. 1991).  Such is this case where Tomita's and Becker's alleged misrepresentations were all about Archegos and the composition and liquidity of its assets, and not about the value or characteristics of any swap or stock.[11] Accordingly, they do not satisfy the "in connection with" requirement, one more reason why any claims against Mr. Hwang predicated on alleged misrepresentations to counterparties must be dismissed.

## IV.   THE AMENDED COMPLAINT FAILS TO STATE A MARKET MANIPULATION CLAIM.

The SEC also alleges market manipulation claims against Mr. Hwang in purported violation of Section 17(a) (Claim I), Section 10(b) and Rule 10b-5 (Claim III), and Section 9(a)(2) (Claim VI).  Typically, a claim of market manipulation is based upon allegations that the defendant engaged in deceptive conduct to artificially affect a stock's price, such as spoofing or publishing false information about the value of the security at issue.[12]  The SEC alleges nothing of the sort here.  Instead, it alleges manipulation based solely upon real, executed trades by Archegos devoid of inherently deceptive acts.  The Court should reject this unprecedented theory of "open-market manipulation" that, the SEC erroneously contends, can be satisfied entirely on the basis of the

---

[11] For example, the SEC's allegations about misstatements during the week of March 22, 2021, are not about securities at all.  The FAC alleges that Becker made misrepresentations to CP5 and CP7 on March 24, but it does not allege any securities transactions with those counterparties during this period (¶¶ 167-68, 173).  On the flip side, the FAC does allege that Archegos executed a block trade through CP6, but there is no misrepresentation alleged as to that counterparty that week.  (¶ 176.)

[12] Spoofing is the practice of placing an order and cancelling it before the transaction is effected, with no intent to ever execute it, solely to create a false impression of market demand.  *See In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, No. 19-CV-6002 (LJL), 2021 WL 827190, at *2 (S.D.N.Y. Mar. 4, 2021).

volume and timing of legitimate trades and their impact upon the price of the stocks at issue, and it should dismiss the manipulation claims for failure to state a claim under Rule 12(b)(6).

     **A.**    **Market Manipulation Claims Based On Open-Market Trading Without Deceptive Conduct Are Not Recognized In This Circuit.**

A securities law violation for "market manipulation" requires a showing of "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Hochfelder*, 425 U.S. at 199 (concluding that this interpretation of the term "manipulative" is required by the word's "commonly accepted meaning"); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (explaining that "manipulative" practices are those "such as wash sales, matched orders, or rigged prices" because they give only the illusion of free-market buying and selling); *Cohen v. Stevanovich,* 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010) (dismissing market manipulation claim where amended complaint "contains no allegations of wash transactions, matched orders or other similar activity, and does not assert that the parties to the alleged short sales were anything other than bona fide buyers and sellers trading at the reported price of the transaction"). Put simply, a manipulative scheme is actionable only if it includes an element of deception. *Schreiber v. Burlington Northern, Inc*., 472 U.S. 1, 7–8 (1985) (observing that the phrase "manipulative or deceptive," as used in Section 10(b), "require[s] misrepresentation" or a "failure[] to disclose" due to the "familiar principle of statutory construction that words grouped in a list should be given related meaning").

This deception requirement is met under Second Circuit law only by conduct that disrupts "the natural interplay of supply and demand" and gives "a false impression of how market participants value a security." *ATSI*, 493 F.3d at 100–01 (allegations centering on "(1) high-volume selling of ATSI's stock with coinciding drops in the stock price, (2) trading patterns around conversion time, (3) the stock's negative reaction to positive news, and (4) the volume of trades in excess of settlement during a 10-day period in 2003" held insufficient to allege market manipulation); *see also Noto v. 22nd Century Grp. Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) (affirming

dismissal of market manipulation claim and noting that the "critical question is what activity 'artificially' affects a security's price in a deceptive manner" and "whether a defendant injected inaccurate information into the marketplace"); *Wilson,* 671 F.3d at 130 (the "gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, [and] not rigged by manipulators") (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)); *Malenfant*, 784 F. Supp. at 144 (proof of deception is essential element of market manipulation under Section 9(a) because the "central purpose" of 9(a) "is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price") (quotation omitted).

Far from pleading deceptive acts that could have created "a false impression of how market participants value a security," *ATSI*, 493 F.3d at 101, the SEC alleges only real trades that reflected how Mr. Hwang valued securities and exposed Archegos to real economic risk.  There are no allegations of the kinds of deceptive trading recognized as creating an artificial market and price. *See SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (explaining that conduct such as wash sales, matched orders, or rigged prices are by design meant to mislead investors by artificially affecting market activity).  Instead, the SEC's truly radical theory is that Mr. Hwang engaged in a broad market manipulation scheme over the entire seven-month "Relevant Period" because his trading was so highly concentrated and so voluminous that it created a market price that was somehow "artificial," which he allegedly recognized and, on unspecified occasions, even intended (¶¶ 47-48 (alleging that "Archegos exercised domination" over the market for certain issuers and traded "at volumes that demonstrated the goal" of manipulation)).  This theory of "open-market manipulation" has been debated by legal scholars,[13] but it has never been the basis for a cognizable cause of action in the Second Circuit or indeed in most other Circuits.

---

[13] *See, e.g.,* Daniel R. Fischel & David J. Ross, *Should the Law Prohibit 'Manipulation' in Financial Markets?*, 105 HARV. L. REV. 503, 553 (1991) (finding "no compelling reason" to prohibit open-market manipulation based on a

The leading case in this Circuit is *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991), where the Court criticized the government's open-market manipulation theory and reversed a criminal conviction based upon it. *Id.* at 368–69, 372. Specifically, the government alleged that the defendant bought stock with the sole intent of driving up its price as a favor to Ivan Boesky, who wanted to sell his shares of the same stock back to the company when the stock hit a certain price. *Id.* at 365. Allegations and proof that Boesky told Mulheren that "it would be great if it traded" at the desired price, coupled with Mulheren's use of a broker he did not regularly use (allegedly to conceal his trading activity) and the fact that Mulheren's purchases comprised 70% of the trading in that security between market open and 11:10 A.M., were, even taken together, held insufficient to sustain a conviction for market manipulation. *Id.* at 370–72.

Although the Second Circuit found that the evidence against the defendant in *Mulheren* was insufficient to support the charges—because it was at least as consistent with innocent behavior (buying stock because the trader wanted to own it) as with manipulation, *id.* at 372—and thus did not have to reach the question of whether an open-market manipulation claim could ever be viable, it nevertheless stated that it "harbor[ed] doubt" about the government's theory and had "misgivings about the government's view of the law." *Id.* at 366, 368. That "view of the law" was that violations of Section 10(b) and Rule 10b-5 could be based upon allegations that the trader "engage[d] in securities transactions in the open market with the sole intent to affect the price of the security." *Id.* at 368. Since *Mulheren*, the Second Circuit has never allowed an open-market manipulation theory to proceed based on nothing more than real market transactions, even when combined with allegations that the trader's sole intent was to impact the price of the stock.

---

trader's "bad intent"); Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 DUKE L.J. 479, 486, 501 (2018) (noting that regulators' recent "intent-centric approaches" to "open-market manipulation" are a "significant departure from the traditional conception of market manipulation" and "lack[] a coherent basis for [imposing] liability," and arguing that SEC's focus "exclusively on intent" has resulted in "significant confusion and discord in the markets, as participants try to determine what constitutes open-market manipulation"); Thomas R. Millar & Paul J. Pantano, Jr., *Open Market Manipulation: The Dangers of Policing Thought*, 39 No. 10 FUTURES & DERIVS. L. REP. NL 2 (2019) (arguing that even if courts allow claims for open-market manipulation to proceed they must require proof of "manipulative or deceptive conduct" and not just "intent alone").

Nor is the recent case of *Set Capital LLC v. Credit Suisse Group*, 996 F.3d 64 (2d Cir. 2021), to the contrary.  There the Second Circuit permitted discovery on what it called an "open-market manipulation" allegation, *id.* at 87, but did so in light of several alleged deceptive acts related to the trading, holding that "[w]hile a defendant may manipulate the market through open-market transactions, some misrepresentation or nondisclosure is required" in connection with the trading for it to violate the law.  *Id.* at 77.  Indeed, among the facts alleged in *Set Capital* were that Credit Suisse deliberately destroyed the value of a security so that it could massively profit from coordinated hedging activity and then declare an "Acceleration Event" enabling it to lock in that profit, all while simultaneously making misleading public statements about the expected impact of its trading and covering up the basis for declaring the Event.  *Id.* at 69.  Thus, the Court in *Set Capital* neither confronted nor endorsed an open-market manipulation theory like the one alleged here, which is based solely on real trading activity coupled with a trader's alleged intent to affect the price of a security.  *See also In re Allianz Global Invs. U.S. LLC Alpha Series Litig.*, No. 20-CV-5615 (KPF), 2021 WL 4481215, at *31 (S.D.N.Y. Sept. 30, 2021) (noting that *Set Capital* involved CEO's "potentially false or misleading statement[s]" as indicia of manipulation).[14]

Like the Second Circuit, the Third, Seventh, Eighth, and Eleventh Circuits have all rejected legal theories of open-market manipulation based on legal trading behavior in the absence of evidence of deception by the alleged manipulator.  *See, e.g., GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) (holding that a manipulator must have "injected 'inaccurate

_____

[14] A recent non-precedential order by the Second Circuit, *SEC v. Vali Mgmt. Partners, et. al.,* No. 21-CV-453, 2022 WL 2155094, at *1–2 (2d Cir. June 15, 2022) (summary order), cited to *Set Capital* in affirming a jury instruction ("in the context of the jury charge as a whole") in a market manipulation case to the effect that "in some cases … a defendant's intent to manipulate the securities market, is all that distinguishes legitimate trading from manipulative trading."  That broad language from *Set Capital*, however, does not render actionable the type of open-market manipulation scheme alleged here, which involves no alleged deceptive conduct like the "layering" (a form of "spoofing") in *Vali*. *See* Compl. ¶¶ 3-4, 35 in *SEC v. Lek Sec. Corp., et. ali.*, Case No. 17-CV-1789 (S.D.N.Y. March 10, 2017) (Cote, J.).  Indeed, unlike in *Set Capital* and *Vali*, there is no deceptive conduct alleged here that constitutes the "gravamen of a claim for market manipulation." *Set Capital,* 996 F.3d at 77.  To the contrary, the indicia of manipulation alleged by the SEC, as discussed in detail *infra* at Point IV.B, are entirely consistent with Mr. Hwang intending to take large, concentrated positions in securities, a practice which is neither illegal nor wrongful. *See ATSI*, 493 F.3d at 104 (rejecting scienter allegation based on assertion that "a legitimate investment vehicle, such as the convertible preferred stock at issue here, creates an opportunity for profit through manipulation").

information' into the market or created a false impression of market activity" so as to "distinguish between legitimate trading strategies"); *United States v. Gilbertson*, 970 F.3d 939, 949 (8th Cir. 2020) (adopting *GFL*'s standard when evaluating a manipulation claim and upholding conviction only where defendant "took multiple acts to manipulate prices and distort market forces on both the buy and sell side" including buying stock in a different name and lying about his control over the shares he was trading); *In re Galectin Therapeutics, Inc. Sec. Litig.,* 843 F.3d 1257, 1273 (11th Cir. 2016) (holding that manipulation requires "engag[ing] in any kind of simulated market activity or transactions designed to 'create an unnatural and unwarranted appearance of market activity'") (quoting *Santa Fe Indus.*, 430 U.S. at 476–77).

In a particularly instructive decision, *Sullivan & Long Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995), Judge Posner drove home the point that allegations of merely impacting a stock's price through trading—even if that is what one intends to do—are insufficient to state a market manipulation claim: "[Plaintiffs] say that [defendant] prevented the price from rising (and thereby discouraged buy-ins by making them unprofitable) by selling short more and more stock.  That is just to say that [defendant], like a bluffer in a poker game, kept redoubling its bet until the other players lost heart.  But so what?"  *Id.* at 861.  The Seventh Circuit thus upheld the dismissal of Section 9(a)(2) and 10(b) manipulation claims, notwithstanding the allegations of large volume trading and its alleged intended impact on market prices, because there simply was no "false impression of supply or demand . . . .  On the other side of all of the [defendant's short sale] transactions were real buyers, betting . . . however foolishly, that the price of LTV stock would rise."  *Id*. at 864.[15]  That, of course, is precisely the case here, as every trade Mr. Hwang made had

---

[15] Only the D.C. Circuit has allowed an open-market manipulation theory to proceed based on real trading activity and a trader's alleged "intent" to affect price.  *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001).  But even in that case, the Court acknowledged that "[i]t may be hard to separate a 'manipulative' investor from one who is simply over-enthusiastic, a true believer in the object of investment."  *Id*. at 528.  Moreover, the allegation in *Markowski*— obviously absent here—was that the real purpose of the trading was not to buy stocks based on genuine investment interest in the stocks themselves, but rather to promote defendants' underwriting and brokerage business by making it appear (falsely) that the stocks underwritten by the firm were good investments.  *Id.* at 527–28.  Thus, even *Markowski* concerned deceitful conduct akin to misrepresentations to potential investors.  Obviously, there is no similar allegation here (nor even are there "investors," insofar as Mr. Hwang was trading only on his own account).

a willing buyer, a willing seller, and exposed Mr. Hwang to a genuine risk of (and ultimately actual) economic loss.

Requiring deceptive conduct to sustain a manipulation claim serves a critical purpose: it allows markets to function without fear that legitimate, lawful trading activity will be deemed inappropriate and punishable based on an after-the-fact allegation that the investor secretly harbored the wrong intent.  "Grounding claims of manipulation solely on intent, particularly when the proof is circumstantial, may deter traders from engaging in beneficial market activity out of a fear of liability."  Fletcher, *supra* n.13, at 517.  Indeed, allowing market manipulation claims to proceed based solely on legal trading activity, even if allegedly intended to affect a stock's price, would allow the SEC to bring enforcement actions based purely on what it believes was in the trader's mind, and yet

> Congress did not mandate the regulators to be Thought Police.  According to the plain language of the statutes and Supreme Court precedent, each regulator's mandate is limited to policing deceptive or manipulative *conduct*. . . .  Requiring proof of deceptive or manipulative conduct is important because open market bids and offers do not by themselves communicate false information to the market.  In addition, they typically do not create an artificial price.

Millar & Pantano, Jr., *supra* n.13.  For these reasons, this Court should follow the overwhelming weight of authority, both judicial and scholarly, and hold that an open-market manipulation theory, based solely on real trading activity and coupled with nothing but an alleged intent to impact price, is not actionable market manipulation.  *See also United States v. Hall*, 48 F. Supp. 2d 386, 387 (S.D.N.Y. 1999) (Chin, J.) (explaining that conduct intended to increase a stock price cannot lead to an artificial price if the conduct is not deceptive).

## B.      The SEC Fails To Allege Deception By Mr. Hwang.

The SEC here alleges a host of entirely real and legal trading activity that it nevertheless claims establishes an actionable manipulation scheme, characterizing the conduct as "a continuous pattern of manipulating the market prices of Archegos's Top 10 Holdings" (¶ 52).  To be sure,

courts at times rely on indicia of a transaction either to satisfy the deceptive conduct requirement or to establish scienter where those indicia belie any legitimate economic motive for a transaction. *See, e.g.*, *Masri*, 523 F. Supp. 2d at 372 ("The Court concludes, therefore, that if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, *and not for any legitimate economic reason*, it can constitute market manipulation.") (emphasis added).  But only conduct that evidences an intent to manipulate by sending a false signal to the market about the value of a security can satisfy the securities laws, *see ATSI*, 493 F.3d at 100–01 (dismissing allegations of "manipulative" short-selling because plaintiff did not show how short-sellers engaged in trading that "create[d] a false impression" of price as opposed to simply trading based on their belief in the true economic value of the security), and therefore only such conduct can constitute unlawful manipulation, *see Mulheren*, 938 F.2d at 372 (reversing conviction where alleged manipulation was consistent with a legitimate desire to own the stock).

None of the trading activity to which the SEC points comes close to satisfying that standard; it is all absolutely legal and entirely consistent with Mr. Hwang's valid economic desire to acquire the security at issue.[16]  In particular, the FAC alleges, *first*, that Mr. Hwang "added staggering levels of exposure" in order to create market dominance in Archegos's top 10 swap holdings and then traded "at volumes that demonstrated the goal to artificially impact prices" of issuers' shares underlying those swap holdings (¶ 48); *second*, that the timing of his trading was deceptive, first to "set the tone" in the premarket, then to "bid[] up prices" during the day, and finally to "mark the close" at the end of the day (¶ 49); *third*, that Mr. Hwang used swaps to "limit the visibility of market participants, including Counterparties, into the extent of Archegos's aggregate holdings" (¶ 29); *fourth*, that he changed the types of companies in which Archegos invested to less liquid and mid-to-smaller cap holdings (¶ 59) and sometimes rejected his analysts'

---

[16] Although the SEC alleges that Tomita and Becker's misrepresentations were somehow "interlocking" with the manipulation (¶ 1), those misrepresentations were made privately to *counterparties* and did not provide any information, let alone false information, to the *market*.

price targets "in favor of his own outsized stock price targets" with "little or no analytical support" (¶ 83); and *fifth*, that the price of some stocks in which Archegos had swap positions, like Viacom, Discovery, and Vipshop, were "artificial" during the Relevant Period because they rose in "dissimilar fashion to the general market" as measured by NASDAQ indices (¶ 81) and did not rebound to previous high levels after Archegos's fund collapsed in March 2021 (¶¶ 77-80).

As is discussed in detail below, none of these allegations, even if true, can possibly support a claim of manipulative trading by Mr. Hwang.  Nothing in the FAC suggests the lack of a legitimate economic basis for any of Mr. Hwang's purchases or sales of securities in his own account.  That is, it is undisputed that all of Mr. Hwang's trading was real, that Archegos's money was always at risk, and that market participants who engaged in the trades did so only at the actual prices that Mr. Hwang was willing to pay (and did pay), not at any artificial price created by deceptive conduct.  Indeed, there is no allegation that Mr. Hwang took any action whatsoever that "deceived" anybody with his trading activity.  He simply bought large amounts of swaps with exposure to exchange traded securities of large public companies.

### 1.     Large volume trading.

The SEC alleges that at times, Mr. Hwang would "add exposure quickly and at large volumes" (¶ 69) and sometimes traded swaps that "equated" to a large percentage (20% or more) of the trading volume, on selected days, of the outstanding shares in the underlying securities (¶¶ 73-75).  According to the SEC, the amount of shares and the trading done by Mr. Hwang gave Archegos "domination over the market" in certain stocks (¶ 47) which somehow—inexplicably— made his trading "artificial" (¶¶ 48, 52).

But "market dominance" and large volume trading is not, and could not be in our market system, itself actionable, and it certainly is not in itself the type of deceptive conduct that can support a manipulation claim.  *See ATSI*, 493 F.3d at 100–02 (rejecting market manipulation claim based on allegations of "high-volume selling" with coinciding drops in the stock price and excess

"volume" trades during a 10-day period).  To be sure, large volume trading can sometimes be associated with manipulative conduct because it shows that the defendant had the power to manipulate the market.  But allegations of dominance "cannot be viewed in a vacuum . . . . The percent of domination must be viewed in light of the time period involved *and other indicia of manipulation*."  *Mulheren*, 938 F.2d at 371 (emphasis added).

In any event, the SEC's allegations about Mr. Hwang's trading come nowhere close to alleging the type of "market dominance" that could support a manipulation claim.  Not only do they fail to suggest deceptive conduct, but the SEC's allegations are themselves deceptive, spinning a narrative that depends on unfair cherry-picking of various time periods and different securities.  As just one example, the SEC alleges that Archegos's trading of Discovery Class A shares reached 25% of daily trading volume on 17 of 33 trading days from "November 16, 2020 to January 4, 2021" (¶ 73).  But, by its own terms, that statement is meaningless: looking at the entire 33 day timeframe would show Archegos trading a much lower percentage of "daily trading volume."  And that 33-day period is itself wholly arbitrary, since Discovery Class A shares were part of the Archegos portfolio for far longer, at least since July 2020 (¶ 61).  These allegations are insufficient as a matter of law and fail to show that which the SEC claims they do.

Indeed, the allegations here are similar to the kind found inadequate in *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 3-CV-3120 (LTS)(THK), 2009 WL 1492196 (S.D.N.Y. May 27, 2009).  There, the trader (Frankel) allegedly made 106 sale trades for 138,800 shares, the stock price fell, and he then performed an "after-hours cleanup trade" by purchasing 155,000 shares.  *Id.* at *7.  Similarly, on other days, Frankel sold shares during the day and, after the stock price dropped, purchased a similar volume of shares in an "after-hours cleanup trade purchase." *Id.*  In the months of October to December 2000, his trades accounted for about 30% of all the volume of the relevant shares.  *Id.*  Analyzing these allegations, the court concluded that "Plaintiff's allegations concerning Frankel fail to explain with any particularity how Frankel's

actions deceived investors as to the intrinsic value of Sedona's shares.  The [Complaint] lacks any explanation as to how Frankel's ability to make a profit by selling high and buying low misled the market . . . .  The mere fact that Frankel effected such a large volume of trades in Sedona's stock is also not indicative of anything manipulative."  *Id.* (citing *ATSI*, 493 F.3d at 105).  So too here, the SEC's allegations about large trading volume on certain selected days over a six-month period are simply "not indicative of anything manipulative."

Nor, finally, do the newly-pled allegations in the FAC about Archegos's so-called "dominant market position" (¶ 65) save the manipulation claims.  First, the SEC points to a text message in June 2020—outside of the Relevant Period—in which Mr. Hwang stated, in response to a question whether Viacom's stock price improvement that day was a sign of strength, "No.  It is a sign of me buying," which was "followed by a 'tears of joy' or laughing emoji" (¶ 67).  Putting aside that the use of the emoji undermines the nefarious connotation that the SEC seeks to ascribe to this statement, it in no way indicates that Archegos's buying was *intended* to impact price, only that it in fact did so.  Similarly, the SEC also alleges that "[a]t various times, Hwang would direct his traders to trade a particular name 'without impact' or 'no impact'" but that by some unspecified time in late 2020 and early 2021 he had "generally" abandoned this practice (¶ 68).  This statement, too, indicates an understanding of the self-evident proposition that buying can affect price, but not of an intention to do so; indeed, this is an allegation that Mr. Hwang did *not* want to affect price.  In any event, these generalities about Mr. Hwang's supposed trading instructions are no substitute for pleading particularized directives to trade in a way designed to impact the price of specific names—an allegation which, though insufficient, as set forth above, remains conspicuously absent from the FAC and further undermines any claim of manipulation.

## 2.    Timing of trading.

The SEC also asserts that Mr. Hwang's trading at various times purportedly indicates manipulation.  More pointedly, the SEC asserts that in the pre-market, Archegos traded to "set the

29

tone" when liquidity was low; it traded during the day to "bid[] up prices" with limit orders; and it traded late in the day to "mark the close" (¶ 49).

If, as the SEC claims, Archegos's trading at the start of the day, during the course of the day, and at the end of the day are all indicative of manipulation, it is unclear when trading may take place without giving rise to manipulation claims.  But of course, none of these timing allegations are indicative of any manipulation.  Pre-market trading is perfectly legal.  *See Barclays Capital Inc. v. Theflyonthewall.com*, *Inc*., 650 F.3d 876, 881 n.5 (2d Cir. 2011).  And if purchases in the pre-market drive up a stock's price to a level that is "too high," sellers will undoubtedly come in to sell when the market opens.  No inference of manipulation can be drawn from the SEC's pre-market allegations, and the claim that Mr. Hwang "set the tone"—even if it "induced" anyone to buy stock—cannot be viewed as manipulative.

Similarly, allegations that limit orders were placed in the market until the total amount of such orders was filled bespeak nothing but routine and legal trading activity.  *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 352 (S.D.N.Y. 2015) (noting that limit orders are a common trading practice under which traders are permitted "to buy or sell a stock below or above a particular price").  Indeed, placing a limit order, far from artificially *increasing* a price, is meant to *limit* the price at which a trader purchases shares.  And there is nothing nefarious or non-economic about increasing a limit order as the price of the stock moves up.  The SEC's allegations support only the inference that Mr. Hwang wanted to buy the stock.

Finally, the type of "marking the close" allegations that can, in some cases, be part of a manipulative scheme require more than just trading at the end of the day.  When courts have found marking the close to be actionable as part of a manipulative scheme, there has always been some related deceptive conduct to which it was linked.  For example, a hedge fund (or other investment fund) might mark the close at the end of the month to temporarily make its investment portfolio appear more profitable before a reporting event, thereby inducing people to invest with the fund

30

or not redeem, or to justify an increase in the fund's fees.  *See, e.g.*, *Koch v. S.E.C.*, 793 F.3d 147, 152–54 (D.C. Cir. 2015); *S.E.C. v. Markusen*, 143 F. Supp. 3d 877, 885–86 (D. Minn. 2015); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 591 F. Supp. 3d 586, 587 (S.D.N.Y. 2008); *S.E.C. v. Lauer*, No. 3-CV-80612 (KAM), 2008 WL 4372896, at *12–13 (S.D. Fla. Sept. 24, 2008).  No such conduct is alleged here.

In fact, nothing about the allegations of late-day trading at Archegos suggests anything other than Mr. Hwang's desire to buy more stock.[17]  Courts have noted that trading at the end of the day is a common practice because there is typically increased liquidity (that is, more buyers and sellers) at that time.  As the court explained in *Masri*, "stock transactions made at the close of the day are not prohibited. Indeed, studies have shown that trading in organized securities is heaviest just before the market closes . . . ."  523 F. Supp. 2d at 370–71 (notion that manipulation can be based on "'marking the close' alone" has "not been endorsed by any Article III court").  Like the other allegations about the timing of trades, there is nothing deceptive or non-economic, and certainly nothing illegal, about Archegos's late-day trading.

### 3.    Other purported indicia of manipulation.

The SEC's attempts to demonize other aspects of Archegos's trading also do not support their claim.  The FAC alleges that Mr. Hwang used swaps to "limit the visibility of market participants and Counterparties into the extent of Archegos's aggregate holdings" (¶ 29), but that is not illegal, and of course there is no current regulatory prohibition on using swaps to keep market investments private.[18]  Nor is there any prohibition on, or even anything remarkable about, Mr.

---

[17] The SEC broadly asserts that end-of-day trading benefited Archegos's "margin" (¶ 88).  It is not clear what this means.  Nothing is alleged about how margin is even calculated under any specific agreement, much less how such an agreement sent a false signal to the market or constituted deceptive conduct in the way that the prohibition on manipulation is meant to prevent.

[18] Recent proposed Rulemaking by the SEC demonstrates that new rules would be required to make holders of swaps disclose their positions. *See* SEC Proposed Rule 10B-1 and SEC Rel. No. 34-93784, at 62 (noting that the "Commission has not previously proposed rules using its authority under Section 10B with respect to either position limits or reporting of large positions in security-based swaps") (available at https://www.sec.gov/rules/proposed/2021/34-93784.pdf).

Hwang's changing certain portfolio holdings on the heels of a pandemic that created new market conditions and opportunities (¶ 59) that other prominent investors also seized upon. *See* Antoine Gara, *Billionaire Bill Ackman Made 100-Fold Return On Coronavirus Hedge That Yielded $2.6 Billion*, Forbes, Mar. 25, 2020 (reporting on March 2020 letter to investors in which Ackman wrote that fund was "redeploying our capital in companies we love at bargain prices that are built to withstand this crisis, and which we believe will flourish long term"). And Mr. Hwang, an experienced trader who was trading his own money (¶¶ 16, 20), certainly was free to reject his employees' price targets in favor of his own, notwithstanding the SEC's disagreement with his targets as "outsized" (¶ 83). To the contrary, as in *Mulheren*, Mr. Hwang's conduct was at least as—and really far more—consistent with his belief in the undervalued nature of the companies' shares he was trading than it is suggestive of any illicit scheme. *See* 938 F.2d at 372.

The SEC also alleges that the price of some stocks in which Archegos had swap positions, like Viacom, Discovery, and Vipshop, were at one point trading higher than certain NASDAQ indices but have not recovered from a steep price drop after Archegos's fund collapsed (¶¶ 77-80). But of course it was the drop in these very same stocks that created the conditions for Archegos's collapse, completely undermining the theory that Archegos was controlling the market price of these securities. In fact, the SEC acknowledges in the FAC that a Viacom/CBS "secondary offering" (¶¶ 160, 164), coupled with the announcement of certain amendments "implementing the Holding Foreign Companies Accountable Act," put pressure on "the price of American Depositary Receipts of China-based issuers, which comprised the balance of Archegos's concentrated positions" (¶ 165). In light of the SEC's own allegations and recognition of external market forces on these securities, it is difficult to understand how the price of any of them, following Archegos's collapse, is indicative of manipulative conduct by Archegos. Further, given the extreme downturn in the markets since that time, that some of these securities have not bounced back can hardly be a surprise, let alone provide a basis for an SEC enforcement action.

32

Finally, it bears emphasis that there is at least one indicium of fraud that courts have cited but that is wholly absent from the FAC, and which tends to show that there was no manipulation here at all.  In *Mulheren* the Second Circuit found "most telling" the fact that the defendant had actually "lost over $64,000" on the transactions at issue, "hardly the result a market manipulator seeks to achieve."  938 F.2d at 370.  That is because "[o]ne of the hallmarks of manipulation is some profit or personal gain inuring to the alleged manipulator."  *Id.*  In this case, by contrast, the FAC does not allege that Mr. Hwang ever closed out of any of the positions at issue at the purportedly artificially inflated prices, or even that he had a plan to do so before Archegos collapsed.  Nor does it allege that he profited whatsoever from his alleged manipulation scheme; to the contrary, it acknowledges that the entire value of Archegos was lost, and along with it, $36 billion of Mr. Hwang's "personal funds."  (¶¶ 1, 20.)[19]

In any event, it is not the presence or absence of any such indicia that dooms the manipulation claims in the FAC.  Rather, they must be dismissed because the FAC fails to allege the type of deceptive conduct that is required to state a claim for market manipulation.

## V.    THE AMENDED COMPLAINT FAILS TO STATE A CONTROL PERSON CLAIM.

New Count VII of the FAC, a tacit admission by the SEC that the direct claims against him are fatally flawed, now seeks to hold Mr. Hwang liable for the acts of others as a control person of Archegos and Tomita under Section 20(a) of the Exchange Act.  "To establish a prima facie case

---

[19] One last marker from which the SEC apparently wants the Court to draw inferences is litigation regarding Mr. Hwang's closed hedge fund, Tiger Asia, more than a decade ago, which the SEC gratuitously and improperly references in the FAC (¶ 21) as having involved "insider trading" and "attempted stock manipulation."  There is no legitimate reason to include that prejudicial allegation in this pleading, of course, other than to try to improperly color this Court's view with respect to the facts alleged, and, if the FAC is not dismissed in its entirety, those references should be stricken.  *See, e.g.*, *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 322 (E.D.N.Y. 2013) (refusing to consider facts from an earlier complaint against defendant to establish any pattern of fraud); *Footbridge Ltd. Trust v. Countrywide Home Loans*, No. 9-CV-4050 (PKC), 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (granting motion to strike allegations "based on pleadings and settlements in other cases and government investigations").  Regardless, that litigation is irrelevant to assessing any of the SEC's allegations here.  Indeed, the SEC fails to disclose that Mr. Hwang was not charged with any crime and he neither admitted nor denied the SEC's civil claims in connection with the settlement.  *See* Judgment [ECF No. 6] in *United States v. Tiger Asia Mgmt., LLC*, No. 12-cr-808 (D.N.J. Dec. 12, 2012); Final Judgment as to Defendant Sung Kook Hwang [ECF No. 6] in *SEC v. Tiger Asia Mgmt., LLC, et al.*, No. 12-cv-7601 (D.N.J. Dec. 14, 2012).

of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *In re Bernard L. Madoff Inv. Sec. LLC*, 818 F. App'x 48, 55 (2d Cir. 2020) (quoting *ATSI*, 493 F.3d at 108). Even assuming, for purposes of this motion, that Mr. Hwang wielded the requisite control, Count VII nevertheless should be dismissed because neither of the other two essential elements are adequately alleged.

### A.      The SEC Fails To Allege A Primary Violation.

*First*, no matter whether Count VII is premised on Section 10(b)'s scheme liability or material misstatement subparts (the SEC does not so specify, *see* ¶ 199), the FAC fails to assert an actionable primary violation of Section 10(b), as discussed above. In short, open-market trading absent deceptive conduct, like that in which Archegos and Tomita engaged, does not constitute a legally cognizable manipulation scheme. *See supra* Point IV. Similarly, the putative misrepresentations that Tomita and others at Archegos made to counterparties were, as Tomita admitted, to "maintain favorable margin rates and gain additional swap capacity" (¶ 45) and thus, as a matter of law, were not made "in connection with" the purchase or sale of any security, as subpart (b) of Section 10(b) requires. *See supra* Point III.B. Claims for control person liability are routinely dismissed on this ground—and should be here, too—because "it is impossible to state a claim for secondary liability under [Section] 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party." *E.g.*, *Schwartz v. Sensei, LLC*, No. 17-4124, 2020 WL 5817010, at *8 (S.D.N.Y. Sept. 30, 2020) (citation omitted).

### B.      The SEC Fails To Adequately Allege Mr. Hwang's Culpable Participation.

*Second*, notwithstanding the SEC's conclusory say-so (¶ 202), the FAC insufficiently pleads that Mr. Hwang was a culpable participant in Tomita's and Archegos's purported violations of Section 10(b). Akin to scienter, culpable participation requires pleading "particularized facts of the controlling person's conscious misbehavior or recklessness." *See S.E.C. v. Sason*, 433 F.

Supp. 3d 496, 514–15 (S.D.N.Y. 2020) (dismissing § 20(a) claim where allegations of defendant's culpability were deficient) (quoting *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014)).  More to the point, the SEC "must allege facts indicating that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct."  *Special Situations Fund*, 33 F. Supp. 3d at 439 (failure to allege specific facts indicating that defendant culpably participated in fraud necessitated dismissal of § 20(a) claim) (internal quotation marks and citation omitted).  No such particularized facts regarding Mr. Hwang's culpable participation in or knowledge of any fraudulent activity appear in the FAC.

Rather, and at best, the FAC alleges in only the most cursory way that the supposedly false and misleading information that Archegos and Tomita conveyed to counterparties was done "with the implicit and at times explicit permission and direction of Hwang" (¶ 105).  Undermining any conscious misbehavior or recklessness on the part of Mr. Hwang, there are no allegations about *what* he directed *whom* at Archegos to say to *which* counterparties *when* and nothing to indicate that Mr. Hwang knew the details of communications with counterparties, much less that those communications were in any way false and misleading.  *See Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231–32 (S.D.N.Y. 2008) (dismissing § 20(a) claim where defendant's culpability was alleged "in the most general of terms" and absent "facts that would give rise to a showing of recklessness or intention" by defendant controlling entity).  That the SEC still cannot present legally sufficient allegations, notwithstanding the cooperation of Tomita and Becker, speaks volumes.  For example, the FAC pleads that "Hwang intended his investment decisions and Archegos's trading through Tomita and others to artificially inflate the stock prices of Archegos's Top 10 holdings" (¶ 46).  But that overlooks that the trading strategies and vehicles that Archegos used were, as set forth above, wholly consistent with non-manipulative conduct designed to strategically amass positions in a handful of companies believed to be undervalued.

*See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 383, 390 (E.D.N.Y. 2013) (dismissal of § 20(a) claim required where, "while the inference of fraudulent intent is plausible, based upon the facts alleged, it is less cogent than other, nonculpable explanations for the Defendants' conduct").  The new Count VII should be dismissed for failure to state a claim against Mr. Hwang.

## CONCLUSION

For the foregoing reasons, defendant Sung Kook (Bill) Hwang respectfully requests that the Court enter an Order granting his motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, which dismissal should be with prejudice given that the SEC has already once amended the Complaint.

Dated:  October 25, 2022

Respectfully submitted,

 s/  Lawrence S. Lustberg

Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
Kevin R. Reich
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com