**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | **22 Civ. 3402 (JPO)** |
| -against- | |
| **SUNG KOOK (BILL) HWANG, PATRICK HALLIGAN, WILLIAM TOMITA, SCOTT BECKER, and ARCHEGOS CAPITAL MANAGEMENT, LP,** | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

Jessica T. Quinn
David Zetlin-Jones
Jack Kaufman
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0929 (Quinn)
quinnj@sec.gov
*Attorneys for Plaintiff*

December 23, 2022

**<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ........................................................................................................1

THE AMENDED COMPLAINT'S FACTUAL ALLEGATIONS .......................................................5

   I.   THE DEFENDANTS ............................................................................................................5

   II.   ARCHEGOS'S INVESTMENT STRATEGY AND COUNTERPARTY RELATIONSHIPS ...............................................................................................................6

   III.   ARCHEGOS'S MANIPULATIVE TRADING .................................................................10

   IV.   DEFENDANTS REPEATEDLY DECEIVED THEIR COUNTERPARTIES TO INDUCE THE TRADING CAPACITY AND MARGIN NECESSARY TO FUEL ARCHEGOS'S MANIPULATIVE TRADING .................................................................14

       A.  Hwang's Role in Deceiving Archegos's Counterparties .................................................18

       B.  Halligan's Role in Deceiving Archegos's Counterparties .............................................20

   V.   ARCHEGOS CONTINUED ITS MANIPULATION AND DECEPTION IN THE FACE OF ITS COLLAPSE.................................................................................................21

STANDARD OF REVIEW.............................................................................................................23

ARGUMENT..................................................................................................................................24

   I.   THE AMENDED COMPLAINT ADEQUATELY PLEADS OPEN MARKET MANIPULATION..............................................................................................................24

       A.  The General Market Manipulation Standard in the Second Circuit..............................24

       B.  Market Manipulation Involving Open Market Transactions is Actionable Securities Fraud in the Second Circuit ..........................................................................26

       C.  The Amended Complaint Adequately Alleges Open Market Manipulation................32

           1. Archegos's Manipulative Trading Strategies ......................................................34

           2. Archegos's Deliberate Use of Swaps and its Misrepresentations to Counterparties ...................................................................................................37

       D.  Archegos's and Hwang's Additional Arguments Concerning the Standard for Pleading Market Manipulation Are Without Merit.........................................................40

           1. The Manipulative Act Need Not Be a Trade in the Security That is the Target of the Alleged Manipulation ....................................................................40

        2. The SEC Need Not Allege That Archegos Profited From Its Manipulative Scheme...................................................................................................................43

II.   THE AMENDED COMPLAINT ADEQUATELY PLEADS ARCHEGOS'S AND HWANG'S SCIENTER AS TO THE MARKET MANIPULATION CLAIMS ................44

    A.  The Amended Complaint Adequately Alleges Archegos's Conscious Misbehavior or Recklessness regarding the Market Manipulation Scheme ...........................................45

    B.  The Amended Complaint Adequately Alleges Hwang's Conscious Misbehavior or Recklessness Regarding the Market Manipulation Scheme............................................47

III.  THE AMENDED COMPLAINT ADEQUATELY ALLEGES SEURITIES FRAUD CLAIMS BASED ON DEFENDANT'S MISREPRESENTATIONS.................................48

    A.  The Amended Complaint Adequately Alleges the Jurisdictional Nexus Between the Misrepresentations and the Offer, Purchase, or Sale of Securities..............................49

    B.  The Amended Complaint Adequately Alleges Hwang's Primary Liability for His Misrepresentations to One Counterparty ....................................................................59

    C.  The Amended Complaint Adequately Alleges Halligan's Primary Liability for His Misrepresentations to One Counterparty ....................................................................60

IV.  THE AMENDED COMPLAINT ADEQUATELY ALLEGES HALLIGAN'S AND HWANG'S PRIMARY LIABILITY FOR ARCHEGOS'S FRAUDULENT COUNTERPARTY DECEPTIONS..........................................................................62

    A.  The Amended Complaint Adequately Alleges Claims Against Halligan for Primary Violations of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c) ...........................63

    B.  The Amended Complaint Adequately Alleges Claims Against Hwang for Primary Violations of Sections 17(a)(1) and (3) and Rules 10b5-(a) and (c)..............................69

V.   THE AMENDED COMPLANT ADEQUATELY ALLEGES AIDING-AND-ABETTING CLAIMS AGAINST HALLIGAN ........................................................69

VI.  THE AMENDED COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY AGAINST HWANG ............................................................................71

VII. THE AMENDED COMPLAINT SATISFIES THE PLEADING REQUIREMENTS OF CIVIL RULES 8(A) and 9(B)................................................................................74

CONCLUSION...........................................................................................................79

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC,*
   446 U.S. 680 (1980) ................................................................................................................49

*Alex. Brown and Sons Inc. v. Marine Midland Banks Inc.,*
   No. 96-cv-2459 (RWS), 1997 WL 97837 (S.D.N.Y. Mar. 6, 1997) ....................................54

*In re Allianz Global Investors U.S. LLC Alpha Series Litig.,*
   No. 20-cv-5615, 2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021) ..........................................62

*In re Alstom SA,*
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................................66

*Angelastro v. Prudential-Bache Sec., Inc.,*
   764 F.2d 939 (3d Cir. 1985) ................................................................................................55

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   651 F.2d 615 (9th Cir. 1981) ................................................................................................55

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................................ 23, 33

*A.T. Brod & Co. v. Perlow,*
   375 F.2d 393 (2d Cir. 1967) ................................................................................................57

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007) .............................................................. 28, 29, 31, 34, 36

*Bai v. Tegs Mgmt., LLC,*
   No. 20CV4942 (DLC), 2022 WL 602711 (S.D.N.Y. Mar. 1, 2022) ....................................75

*Bangkok Crafts Corp. v. Capitolo di San Pietro,*
   No. 03 Civ. 0015, 2006 WL 1997628 (S.D.N.Y. July 18, 2006) ........................................76

*Barclays Cap. Inc. v. Theflyonthewall.com, Inc.,*
   650 F.3d 876, (2d Cir. 2011) ................................................................................................37

*In re Barclays Liquidity Cross & High Frequency Trading Litig.,*
   126 F. Supp. 3d 342 (S.D.N.Y. 2015) ................................................................................37

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................................23

*Bissell v. Merrill Lynch & Co.,*
   937 F. Supp. 237 (S.D.N.Y. 1996) ......................................................................................53

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ........................................................................44

*In re Blech Sec. Litig.*,
    928 F. Supp. 1279 (S.D.N.Y. 1996) ..........................................................................28

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998) ....................................................................................71

*Calderon Serra v. Banco Santander Puerto Rico*,
    747 F.3d 1 (1st Cir. 2014) .......................................................................................55

*Chemical Bank v. Arthur Anderson & Co.*,
    726 F. 2d 930 (2d Cir. 1984) ........................................................................52, 53, 54

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*,
    No. 18-cv-10330 (JPO), 2020 WL 2834857 (S.D.N.Y. June 1, 2020) ...............................62

*City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*,
    878 F.3d 36 (2d Cir. 2017) .....................................................................................41

*Cohen v. Koenig*,
    25 F.3d 1168 (2d Cir. 1994) ....................................................................................44

*In re College Bound Consol. Litig.*,
    No. 93 CIV. 2348 (MBM), 1995 WL 450486 (S.D.N.Y. July 31, 1995) ............................36

*Commodity Futures Trading Comm'n v. Gorman*,
    587 F. Supp. 3d 24 (S.D.N.Y. 2022) .....................................................................26, 31

*Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*,
    516 F.2d 811 (2d Cir. 1975) ....................................................................................55

*In re Complete Mgmt. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001) ......................................................................62

*Compudyne Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) ......................................................................72

*Connecticut Nat'l Bank v. Fluor Corp.*,
    808 F.2d 957 (2d Cir.1987) .....................................................................................44

*Cornwell v. Credit Suisse Grp.*,
    689 F. Supp. 2d 629 (S.D.N.Y. 2010) ......................................................................61

*Crummere v. Smith Barney, Harris Upham & Co.*,
    624 F. Supp. 751 (S.D.N.Y. 1985) ..........................................................................54

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP,*
    562 F. Supp. 2d 511 (S.D.N.Y. 2008) ................................................................42

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,*
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) ......................................................... 73, 74

*Edward J. Mawod & Co. v. SEC,*
    591 F.2d 588 (10th Cir. 1979) .......................................................................37

*In re Galectin Therapeutics, Inc. Sec. Litig.,*
    843 F.3d 1257 (11th Cir. 2016) .....................................................................31

*In re Gentiva Secs. Litig.,*
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ............................................................73

*GFL Advantage Fund, Ltd. v. Colkitt,*
    272 F.3d 189 (3d Cir. 2001) ..........................................................................30

*Gregory v. Daly,*
    243 F.3d 687 (2d Cir. 2001) ..........................................................................23

*Gurary v. Winehouse,*
    190 F.3d 37 (2d Cir. 1999) ............................................................................25

*Harnage v. Lightner,*
    916 F.3d 138 (2d Cir. 2019) ..........................................................................76

*Hawaii Ironworkers Annuity Trust Fund v. Cole,*
    No. 10-cv-371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) ...........................69

*In re Initial Pub. Offering Sec. Litig.,*
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................................26

*International Code Council, Inc. v. UpCodes Inc.,*
    43 F.4th 46 (2d Cir. 2022) ............................................................................23

*Internet Law Library v. Southridge Capital Mgmt., LLC,*
    223 F.Supp.2d 474 (S.D.N.Y.2002) ..............................................................78

*In re J. H. Goddard & Co., Inc.,*
    42 SEC 638, Rel. No. 34-7618, 1965 WL 87926 (June 4, 1965) .......................37

*Janus Capital Group, Inc. v. First Derivative Traders,*
    564 U.S. 135 (2011) .....................................................................................59

*Kaplan v. Lebanese Canadian Bank, SAL,*
    999 F.3d 842 (2d Cir. 2021) ..........................................................................34

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC,*
   10 F. Supp. 3d 504 (S.D.N.Y. 2014) ................................................................................ 68

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005) ................................................................................... 65, 66

*Levitin v. PaineWebber, Inc.,*
   933 F. Supp. 325 (S.D.N.Y. 1996) ................................................................................ 53

*Lorenzo v. SEC,*
   139 S. Ct. 1094, 1101, 1105 (2019) ........................................ 39, 48, 65, 67, 69

*Manufacturers' Hanover Trust Co. v. Smith Barney, Harris Upham & Co,*
   770 F. Supp. 176 (S.D.N.Y 1991) ................................................................................ 54

*Marbury Mgmt., Inc v. Kohn,*
   629 F.2d 705 (2d Cir. 1980) ......................................................................................... 57

*Markowski v. SEC,*
   274 F.3d 525 (D.C. Cir. 2001) ............................................................................... 32, 44

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
   547 U.S. 71 (2006) ......................................................................................................... 50

*Noto v. 22nd Century Group, Inc.,*
   35 F.4th 95 (2d Cir. 2022) ............................................................................................ 30

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000) .................................................................................. 44, 60

*In re OSI Pharma., Inc. Secs. Litig.,*
   No. 04-cv-5505 (JS) (WDW), 2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007) ................. 23

*In re Parmalat Sec. Litig.,*
   474 F. Supp. 2d 547 (S.D.N.Y. 2007) .......................................................................... 72

*Perez-Rubio v. Wycoff,*
   718 F. Supp. 217 (S.D.N.Y. 1989) ......................................................................... 54, 56

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.,*
   89 F. Supp. 3d 602 (S.D.N.Y. 2015) ...................................................................... 60, 61

*Press v. Chemical Inv. Servs. Corp.,*
   166 F.3d 529 (1999) ............................................................................................... 50, 56

*Production Res. Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.,*
   6 F. Supp. 2d 236 (S.D.N.Y. 1998) .............................................................................. 53

*SEC v. Resch-Cassin, Co.,*
  362 F. Supp. 964 (S.D.N.Y. 1973) ...................................................................... 37

*In re Reserve Fund Sec. and Deriv. Litig.,*
  Nos. 09 MD 2011(PGG), 09 Civ. 4346(PGG), 2010 WL 685013 (S.D.N.Y. Feb. 24, 2010) ......... 62

*Romano v. Kazacos,*
  609 F.3d 512 (2d Cir. 2010) ...................................................................... 50, 55

*Santa Fe Indus., Inc. v. Green,*
  430 U.S. 462 (1977) .............................................................................. 24, 41

*In re Scholastic Corp. Sec. Litig.,*
  252 F.3d 63 (2d Cir. 2001) .......................................................................... 44

*SEC v. Alternative Green Techs.,*
  No. 11 Civ. 9056, 2012 WL 4763094 (S.D.N.Y. Sept. 24, 2012) ........................... 44, 76, 77

*SEC v. Apuzzo,*
  689 F.3d 204 (2d Cir. 2012) ........................................................................ 70

*SEC v. Badian,*
  No. 06-cv-26212008 WL 3914872 (S.D.N.Y. Aug. 22, 2008) ................................. 24, 76, 79

*SEC v. Berlacher,*
  No. 07-cv-3800, 2010 WL 3566790 (E.D. Pa. Sept. 13, 2010) ................................... 60

*SEC v. Collins & Aikman Corp.,*
  524 F. Supp.2d 477 (S.D.N.Y. 2007) ......................................................... 65, 67, 69

*SEC v. Constantin,*
  939 F. Supp. 2d 288 (S.D.N.Y. 2013) ................................................................ 45

*SEC v. Czarnik,*
  No. 10-cv-745 (PKC), 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) ................................. 57

*SEC v. DiBella,*
  587 F.3d 553 (2d Cir. 2009) ........................................................................ 70

*SEC v. Drysdale Securities Corp.,*
  785 F.2d 38 (1986) ......................................................................... 52, 53, 58

*SEC v. Dunn,*
  587 F. Supp. 2d 486 (S.D.N.Y. 2008) ................................................................ 76

*SEC v. Fiore,*
  416 F. Supp. 3d 306 (S.D.N.Y. 2019) ............................................................ 43, 44

*SEC v. First Jersey Secs., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ...............................................................................71

*SEC v. Frohling*,
    851 F.3d 132 (2d Cir. 2016) ...........................................................................25, 48

*SEC v. Gold*,
    No. 05-cv-4713, 2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) ..............................62

*SEC v. Jakubowski*,
    150 F.3d 675 (7th Cir. 1998) ...............................................................................51

*SEC v. Jensen*,
    835 F.3d 1100 (9th Cir. 2016 ...............................................................................59

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ....................................................................66

*SEC v. Kinnucan*,
    9 F. Supp.3d 370 (S.D.N.Y. 2014) .........................................................................46

*SEC v. Kwak*,
    No. CIVA 304-CV-1331 JCH, 2008 WL 410427 (D. Conn. Feb. 12, 2008).............32, 37

*SEC v. Landberg*,
    836 F. Supp. 2d 148(S.D.N.Y. 2011) ......................................................................68

*SEC v. Lek Secs. Corp.*,
    276 F. Supp. 3d 49 (S.D.N.Y. 2017) .............................................................25, 41, 43

*SEC v. Maillard*,
    No. 13-cv-5299 (VEC), 2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014) .....................51

*SEC v. Malenfant*,
    784 F. Supp. 141 (S.D.N.Y. 1992)....................................................................25, 30

*SEC v. Martino*,
    255 F. Supp. 2d 268 (S.D.N.Y. 2003) ....................................................................43

*SEC v. Masri*,
    523 F. Supp. 2d 362 (S.D.N.Y. 2007) .........................................................28, 32, 36

*SEC v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999) .........................................................................48, 49

*SEC v. One or More Unknown Traders in Sec. of Fortress Inv. Grp., LLC*,
    No. 17-CV-01287, 2018 WL 4676043, at *13 (D.N.J. Sept. 27, 2018) ......................51

*SEC v. Pentagon Capital Mgmt. PLC,*
    725 F.3d 279 (2d Cir. 2013) ................................................................................67

*SEC v. Power,*
    525 F. Supp. 2d 415 (S.D.N.Y. 2007) ...................................................................76

*SEC v. Ramoil Mgmt., Ltd.,*
    No. 01-cv-9057, 2007 WL 3146943 (S.D.N.Y. Oct. 25, 2007) ..............................50

*SEC v. Rana Research, Inc.,*
    8 F.3d 1358 (9th Cir. 1993) ...............................................................................50

*SEC v. Rio Tinto plc,*
    41 F.4th 47 (2d Cir. 2022) ............................................................................ 65, 66

*SEC v. Sason,*
    433 F. Supp. 3d 496 (S.D.N.Y. 2020) ......................................................... 63, 67, 73

*SEC v. Sayid,*
    No. 17 CIV. 2630 (JFK), 2018 WL 357320 (S.D.N.Y. Jan. 10, 2018) ....................67

*SEC v. Shapiro,*
    No. 15-cv-7045 (RMB), 2018 WL 2561020 (S.D.N.Y. June 4, 2018) .....................45

*SEC v. Stoker,*
    865 F. Supp. 2d 457 (S.D.N.Y. 2012) ...................................................................49

*SEC v. Sugarman,*
    No. 19-cv-5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ....................... 63, 68

*SEC v. Suterwalla,*
    No. 06-cv-1446 DMS (LSP), 2008 WL 9371764 (S.D. Cal. Feb. 4, 2008) ...............51

*SEC v. U.S. Environmental, Inc.,*
    155 F.3d 107 (2d Cir. 1998) ......................................................................... 68, 69

*SEC v. Vali Mgmt. Partners,*
    No. 21-453, 2022 WL 2155094 (2d Cir. June 15, 2022) ................................... 24, 27

*SEC v. Wey,*
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) .................................................38, 44, 63, 68

*SEC v. Wyly,*
    788 F. Supp. 2d 92 (S.D.N.Y. 2011) ...................................................................51

*SEC v. Zandford,*
    535 U.S. 813 (2002) ................................................................................... 49, 56

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
    No. 03-CIV-3120 (LTS)(THK), 2009 WL 1492196 (S.D.N.Y. May 27, 2009) ................................ 36

*Set Capital LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) ........................................................................................................ *passim*

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ........................................................................................ 28, 32

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012) ............................................................................................ 59

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA Ltd.*,
    33 F.Supp.3d 401 (S.D.N.Y. 2014) ................................................................................................ 73

*Steamfitters Local 449 Pension Fund v. Alter*,
    No. 09-cv-4730, 2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ...................................................... 60

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) .............................................................................................................. 46

*Sullivan & Long Inc. v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995) ........................................................................................................ 31, 36

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................................................ 72

*Taylor v. Westor Capital Group*,
    937 F. Supp. 2d 397 (S.D.N.Y. 2013) ............................................................................................ 54

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ...................................................................................................... 45, 46

*Trane Co. v. O'Connor Secs.*,
    561 F. Supp. 301 (S.D.N.Y. 1983) ............................................................................................ 30, 36

*Uni-World Capital LP v. Preferred Fragrance, Inc.*,
    No. 19-cv-7204 (PAE), 2014 WL 3900565 (S.D.N.Y. Aug. 8, 2014) ............................................ 56

*United States v. Gilbert*,
    668 F.2d 94 (2d Cir. 1981) .............................................................................................................. 37

*U.S. v. Gilbertson*,
    970 F.3d 939 (8th Cir. 2020) .......................................................................................................... 31

*United States v. O'Hagan*,
    521 U.S. 642 (1997) ........................................................................................................................ 50

x

*United States v. Mulheren,*
   938 F.2d 364 (2d Cir. 1991) ..................................................................... 29, 36

*United States v. Naftalin,*
   441 U.S. 768 (1979) .......................................................................... 50, 54, 58

*United States v. Newman,*
   664 F.2d 12 (2d Cir. 1981) ...................................................................... 54

*United States v. Royer,*
   549 F.3d 886 (2d Cir. 2008) .................................................................... 41

*United States v. Stein,*
   456 F.2d 844 (2d Cir. 1972) .................................................................... 37

*United States v. Treacy,*
   No. 08 CR 0366(RLC), 2008 WL 4934051 (S.D.N.Y. Nov. 19, 2008) .......... 63

*Upton v. Tribilcock,*
   91 U.S. 45, 50 (1875) ............................................................................. 60

*Vaher v. Town of Orangetown, N.Y.,*
   916 F. Supp. 2d 404, 425 (S.D.N.Y. 2013) ............................................. 43

*VanCook v. SEC,*
   653 F.3d 130 (2d Cir. 2011) .................................................................... 67

*In re Vivendi Universal, S.A. Sec. Litig.,*
   765 F. Supp. 2d 512 (S.D.N.Y. 2011) .................................................... 46

*Weaver v. Marine Bank,*
   637 F.2d 157 (3d Cir. 1980) .................................................................... 52

*Wilson v. Merrill Lynch & Co., Inc.,*
   671 F.3d 120 (2d Cir. 2011) .................................................................... 30

## Statutes

15 U.S.C. § 77b(a)(1) .................................................................................. 51

15 U.S.C. § 77b(a)(17) ................................................................................ 51

15 U.S.C. § 78c(a)(10) ................................................................................ 51

15 U.S.C. § 78c(a)(68) ................................................................................ 51

15 U.S.C. § 78i(a)(2) ................................................................................... 25

xi

15 U.S.C. § 78j(b) ................................................................................................ 25, 50

15 U.S.C. § 77q(a) ................................................................................................ 25, 50

15 U.S.C. § 77q(a)(1) ........................................................................................... 49, 63

15 U.S.C. § 77q(a)(2) ...................................................................................................48

15 U.S.C. § 77q(a)(3) ........................................................................................... 49, 63

**Regulations**

17 C.F.R. § 240.10b-5 ...................................................................................................25

17 C.F.R. § 240.10b-5(a) .............................................................................................63

17 C.F.R. § 240.10b-5(c) .............................................................................................63

17 C.F.R. § 240.12b-2 ..................................................................................................72

17 C.F.R. § 275.202(a)(11)(G)-1 ...................................................................................7

**Rules**

Fed. R. Civ. P. 8(a) .............................................................................................. *passim*

Fed. R. Civ. P. 9(b) .............................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6) ...............................................................................................23

**Other Authorities**

*Prohibition Against Fraud, Manipulation, or Deception In Connection With Securities-Based Swaps*,
    Exch. Act Rel. No. 34-93784, 2021 WL 6755214 (Dec. 15, 2021)..........................................56

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this consolidated memorandum of law in opposition to three separate motions to dismiss the Amended Complaint (the "Motions to Dismiss") respectively filed by Defendant Archegos Capital Management, LP ("Archegos") (Dkt. No. 54), Defendant Sung Kook (Bill) Hwang ("Hwang") (Dkt. No. 57), and Defendant Patrick Halligan ("Halligan") (Dkt. No. 59) (together, the "Moving Defendants"). For the reasons set forth below, the Motions to Dismiss should be denied.[1]

## PRELIMINARY STATEMENT

The Amended Complaint's factual allegations detail Defendants' fraudulent scheme to artificially inflate certain stock prices by trading manipulatively and making material misrepresentations. Defendant Hwang founded, owned, and managed Defendant Archegos, a "family office" that invested Hwang's $1.6 billion personal fortune. During the Relevant Period, Hwang orchestrated the fraudulent scheme through Archegos to increase the price of Archegos's ten largest holdings (the "Top 10 Holdings"). Defendant Halligan, Archegos's Chief Financial Officer, knowingly (or at least recklessly) participated in the scheme. Halligan made material misrepresentations to one of Archegos's counterparties to a security-based swap ("Swap"), a type of securities transaction, to induce the counterparty to enter into Swaps with Archegos, and he directed his subordinate to do the same with the firm's counterparties to other Swaps (collectively, "Counterparties"). The resulting Swaps furthered Archegos's manipulative trading scheme.

---

[1]     Throughout this memorandum, "¶ __" without a preceding document refers to citations to the SEC's Amended Complaint, filed on August 26, 2022 (Dkt. No. 47). "Archegos Br.," "Hwang Br.," and "Halligan Br." respectively refer to the memoranda of law filed by Archegos, Hwang, and Halligan in support of their motions (Dkt. Nos. 55, 58, and 61, respectively). "Defendants" refers collectively to Moving Defendants and settled Defendants William Tomita ("Tomita") and Scott Becker ("Becker"). "Relevant Period" refers to the period September 2020 through March 2021.

Most complaints alleging market manipulation establish defendants' manipulative intent by pleading circumstantial facts, which suffice to plead intent and prove intent to a jury. The Amended Complaint pleads circumstantial facts but does not stop there: it quotes the allocutions of the two non-moving Defendants—the Moving Defendants' co-conspirators—who have pleaded guilty in a pending parallel criminal proceeding against Hwang and Halligan, to the same fraudulent scheme alleged here. As the Amended Complaint alleges, one of those co-conspirators, Defendant Tomita, acknowledged (among other things) that he "agreed with [Hwang] and others to carry out the business of Archegos through a pattern of manipulating the prices of securities."

The Amended Complaint further alleges the details of Defendants' fraudulent scheme, including Defendants' misrepresentations. At Hwang's direction, during the Relevant Period, Archegos deliberately traded in multiple ways—including by dominating the market for a particular stock, trading in high volumes, and trading before the market opened and just before it closed ("setting the tone" and "marking the close")—for the purpose of artificially inflating the share prices of Archegos's Top 10 Holdings. To further inflate these stock prices, Archegos entered into Swaps—which the federal securities laws expressly deem "securities"—with Counterparties. Each Swap referenced a particular stock, one of Archegos's Top 10 Holdings. To hedge their Swaps positions, the Counterparties typically bought the stocks referenced in the Swaps in a common industry practice, as Defendants knew. This drove up the stocks' prices further. To manage their own risk, the Counterparties required assurances from Archegos as to its exposure to these stocks. To secure larger and larger Swaps exposure, Hwang and Halligan—both directly and through others—misrepresented Archegos's exposure to the Counterparties. Thus, the Moving Defendants lied to the Counterparties to induce them to increase their Swaps exposure with Archegos. In the end, Defendants' fraud caused their Counterparties to lose billions of dollars and caused ordinary investors to suffer market losses, when the artificially inflated stock prices fell back to reality.

2

Defendants' Motions to Dismiss rest on misreadings of the applicable law, outlined below. In addition, the Motions rely on factual disputes about intent and other matters. Moving Defendants contradict the Amended Complaint's allegations—disputes that are not appropriate for resolution on motions to dismiss.[2]

*First*, Archegos and Hwang contend that the Amended Complaint's theory of so-called "open market" manipulation—market transactions that would otherwise be legal if not undertaken for the purpose of manipulating the stock price—is not actionable. They make two main arguments in support. They argue that Archegos's Swaps were not trades in the market and, therefore, could not have manipulated the market. And they argue that Archegos's Swaps and equities trading were "real" and therefore not manipulative because they respectively involved actual sales of Swaps by actual Counterparties and actual purchases of stock from actual stock sellers and thus amounted to "perfectly lawful investment activit[y]." Archegos and Hwang misconstrue the law. The United States Court of Appeals for the Second Circuit has repeatedly held that market transactions that are not inherently deceptive—and that may be legal if conducted for non-manipulative purposes—can constitute illegal manipulation when done with manipulative intent. The Amended Complaint therefore need only allege, as it does, that Hwang and Archegos orchestrated and conducted transactions for the manipulative purpose of artificially increasing the prices for certain stocks.

In addition, contrary to Archegos's and Hwang's assertions, Defendants' manipulative trading and false assurances to Counterparties *did* involve deception. That conduct sent a false signal to the market—buyers and sellers of the Top 10 Holdings stocks whose prices Defendants

---

[2]     Hwang and Halligan raise virtually identical arguments set forth in their respective Motions to Dismiss in their joint motion to dismiss the indictment for failure to charge an offense in the parallel criminal action against them, *United States v. Hwang, et al.*, 22-cr-240 (AKH) (S.D.N.Y.). That motion is pending before Judge Hellerstein.

manipulated—and disturbed the normal forces of supply and demand by making it seem like prices for those securities were higher, and demand for them greater, than was actually the case.

Moreover, there is no safe harbor for manipulative conduct executed through Swaps. Archegos and Hwang cite no case (and the SEC is unaware of any) that holds that a manipulative act must be a stock or other equity transaction to be illegal or that precludes a market manipulation claim based on the known and intended consequences of purchasing Swaps or other derivative securities. As courts have held, Congress intended the federal anti-fraud securities statutes to broadly prohibit all manner of fraud and deceptive devices, whether unique or commonplace.

*Second*, Moving Defendants argue that the alleged misrepresentations do not state a claim because they related to characteristics of Archegos's portfolio and Counterparties' decisions on whether to extend Archegos additional trading capacity through Swaps and therefore were not made "in connection with" the purchase or sale of securities. These arguments are equally meritless.

Contrary to Moving Defendants' constricted reading of the "in connection with" requirement, Supreme Court and Second Circuit precedent establish that an alleged fraudulent statement need only coincide with a securities transaction to satisfy this requirement. And, in any event, this precedent makes clear that misrepresentations that induce securities purchases or sales are "in connection with" such purchases or sales—as most fraudulent misrepresentations about securities are. This case is no different. Defendants' false statements to Archegos's Counterparties (including direct misrepresentations Hwang and Halligan each made) induced the Counterparties to execute Swaps by misleading the Counterparties into thinking Archegos was more financially secure than it was and that its stock and Swap positions were less concentrated and more liquid than they were. These facts were important to the Counterparties because a core risk in executing the Swaps was that Archegos might default on its obligations relating to a Swap. Indeed, just that scenario eventually came to pass: when Defendants' scheme unraveled, the relevant stock prices fell, and

4

Archegos defaulted on its obligations and left its Counterparties with billions of dollars of losses.

In addition, numerous courts have rejected Moving Defendants' argument that misrepresentations must bear on the value of the particular security at issue to be actionable. But, even if that argument were the law, the misrepresentations alleged here concerned both the Swaps' value and the consideration Counterparties understood they were receiving under the Swaps contracts. The Swaps' value and price rested on the risks the Counterparties were taking in entering into Swaps, and Defendants' misrepresentations concealed those risks.

*Third*, Hwang's and Halligan's arguments that they are too far removed from the alleged misrepresentations to be held primarily liable for them are baseless. The Amended Complaint details Hwang's and Halligan's respective orchestration and direction of Archegos's serial misstatements to Counterparties, their knowledge of the falsity of the misrepresentations, and the steps each took to assure their directives were followed. These allegations sufficiently establish Hwang's and Halligan's primary liability for their scheme to defraud Archegos's Counterparties.

*Finally*, Moving Defendants' additional arguments with respect to the aiding-and-abetting claim against Halligan and control person claim against Hwang are also meritless. As described in more detail below, the Amended Complaint adequately alleges facts to satisfy each element of those claims, including scienter.

In sum, the Amended Complaint more than adequately pleads Moving Defendants' liability for securities fraud. The Motions to Dismiss should be denied in their entirety.

## THE AMENDED COMPLAINT'S FACTUAL ALLEGATIONS

## I.      THE DEFENDANTS

Hwang founded Archegos in 2013 as a "family office" through which Hwang invested his personal funds. As a family office, Archegos was an investment manager, but exempt from registration with the SEC, because Archegos invested only Hwang's personal assets, and did not

manage any assets of outside investors. (¶¶ 15-16, 20-22.) Hwang established Archegos after pleading guilty to criminal insider trading charges on behalf of two hedge funds he founded, and settling related civil insider trading and attempted market manipulation charges, which had forced Hwang to close the two hedge funds and return investor capital. (¶¶ 22-23.) At all times, Hwang owned and managed Archegos and possessed ultimate authority over all of its investment decisions. (¶¶ 16, 23.)

Halligan was Archegos's Chief Financial Officer, responsible for all back office functions and operations of the investment manager and its related funds. (¶¶ 17, 25.) Becker, Archegos's Director of Risk Management, reported to Halligan and assisted with back office functions and operations. (¶¶ 19, 25.) Halligan and Becker also were Archegos's primary points of contact with its Counterparties' credit and risk review functions. (¶ 25.)

Tomita was Archegos's head trader, tasked with executing Hwang's investment directives, although Tomita had no investment discretion of his own. Tomita also served as Archegos's primary point of contact with Archegos's Counterparties' trading desks. (¶ 24.) Becker and Tomita have pled guilty to criminal violations based on the facts and conduct detailed in the Amended Complaint (¶¶ 18-19), and the Court has entered partial judgments against both of them. (Dkt. Nos. 26, 29.)

## II. ARCHEGOS'S INVESTMENT STRATEGY AND COUNTERPARTY RELATIONSHIPS

At Hwang's direction, Archegos pursued a long/short equity strategy, as described below, taking long positions in securities whose prices Hwang expected to rise and short positions in securities whose prices he expected to decrease (or to hedge Archegos's long exposures). (¶ 27.) In general, Archegos took long positions by buying stock (and Swaps referencing the stock) of individual companies, and it hedged those long positions primarily by establishing short positions in and referencing custom baskets of stock and exchange-traded funds. (*Id.*) Under Hwang's supervision, Archegos's long positions were usually highly leveraged, meaning they were purchased,

in significant part, with money that Archegos borrowed. (¶ 28.) Archegos traded on margin extended by its Counterparties, maintaining leverage ratios of between 400% and 700%, and sometimes as high as 1000%. (*Id.*) For example, a leverage ratio of 1000% means that Archegos's gross exposures were ten times its invested capital—*e.g.*, for every $10 Archegos had invested, only $1 was financed with Archegos's (and therefore Hwang's) own money, with the remainder financed through margin extended by its Counterparties. Archegos's long positions were also highly concentrated. It took long positions in only about 100 issuers, with typically 33%-50% of its long positions concentrated in the Top 10 Holdings. (*Id.*)

As an unregistered entity, Archegos could avoid certain public disclosure requirements. (¶ 15.) For example, Archegos was not required to—and did not—file periodic reports with the SEC or otherwise publicize its investments or operations; nor was it subject to routine regulatory examinations and inspections. (*Id.*; *see also* 17 C.F.R. § 275.202(a)(11)(G)-1.)

To further limit market visibility into its trading positions, Archegos used derivatives known as Swaps, described in more detail below, through which it avoided triggering certain regulatory reporting requirement thresholds. (¶¶ 29-30.) Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") generally requires investors to disclose their stock holdings publicly when their beneficial ownership exceeds 5% of the issuer's shares outstanding. (¶ 30.) Whenever Archegos approached this 5% reporting threshold, Hwang directed Archegos to shift its purchases of that issuer from equity shares to Swaps, thus avoiding this disclosure obligation. (*Id.*) Archegos employed Swaps to conceal the true size and composition of the fund's composite portfolio positions from the market and its trading partners. (¶¶ 29-30; *see also* ¶ 45.) Becker circulated to Hwang, Halligan, and others at Archegos a daily report that tracked Archegos's equity positions by each issuer whose stock Archegos held, relative to the issuer's outstanding shares, to ensure that Archegos never exceeded the 5% beneficial ownership disclosure threshold. (¶ 31.)

As a result, most of Archegos's portfolio's long exposure was in Swaps—contractual arrangements between Archegos and a Counterparty, under which the parties agreed to exchange cash flows dependent on the performance of the referenced security. (¶¶ 29, 33-34.) Archegos's typical Swap involved its deposit of initial cash collateral with the Counterparty, which the Counterparty required to execute the transaction ("initial margin"). (*See* ¶ 96.) The initial margin rate reflected the level of financing the Counterparty was willing to extend to Archegos to facilitate its investment. (*See* ¶¶ 96-97.) For example, an initial margin rate of 20% would mean that Archegos could purchase 80% of its investment on margin, or with capital borrowed from the Counterparty; by contrast, an initial margin rate of 100% would mean that Archegos financed the entirety of its investment, without any credit extended by the Counterparty. (*See* ¶ 97.)

The parties also exchanged "variation margin" to cover their exposures to price shifts in the referenced stock over the life of the transaction. (¶¶ 34-35.) Variation margin was calculated on a daily basis according to the end-of-day value of the referenced stock. (¶ 88.) If the closing price of the referenced stock increased, Archegos could ask its Counterparty to post variation margin (cash) on the stock's mark-to-market gain; if the closing price of the referenced stock decreased, the Counterparty could ask Archegos to post variation margin (cash) to cover the stock's mark-to-market loss. (¶¶ 34-35.) Put another way, Archegos stood to benefit if the stock price rose and to lose if the stock price sank—just as it would if it owned the stock. If the stock's price rose, Archegos could ask the Counterparty to provide it with funds to account for that gain, and if the stock's price fell, the Counterparty could ask Archegos to provide funds to cover that loss. (*Id.*)

Archegos executed Swaps with a dozen Counterparties. (¶ 32.) As Archegos and Hwang knew, its Counterparties generally took a risk-neutral posture, fully hedging their short exposures to the Swaps through a corresponding stock market trade so that the Counterparties did not bear the risk of the stock's price rising (which would require the Counterparty to pay Archegos). (¶¶ 36-37.)

8

As a seasoned and experienced derivatives investor, Hwang understood that the typical hedging practice for Archegos's Swaps entailed Counterparties purchasing the equivalent notional value of the underlying, referenced stock in the market. (¶¶ 37-39.) To take a simplified example, if the price of the security underlying a Swap increased by $1, the Counterparty would be required to post $1 per share in variation margin, but it would reap an equal and offsetting $1 per share gain through its direct ownership of the underlying stock.

Thus, as Hwang understood, based on common industry standards and practice, every share of exposure that Archegos purchased synthetically through a Swap typically resulted in its Counterparties' corresponding, equivalent purchase of stock in the same, referenced asset. (*See id.*) In other words, Archegos and Hwang knew that each share of stock in an issuer to which Archegos incurred exposure through a Swap would generally be purchased in the market and held by its Counterparty. (*Id.*) Hwang therefore understood that Archegos's Swaps functioned as though Archegos were purchasing the underlying securities. (¶ 39.) That is, Archegos was entitled to all profits (or losses) resulting from the underlying stock's performance. (*See* ¶¶ 38-39, 77.)

Archegos's Counterparties implemented controls to mitigate the credit, counterparty, and concentration risks associated with their Swaps with Archegos. (¶ 98.) Given the Counterparties' risk-neutral posture, the principal risk they faced was the likelihood of Archegos's default: that Archegos would lack the cash or assets to make good on a margin call should its Swap positions move against it when a referenced stock's price fell. The Counterparties transacting with Archegos safeguarded against these risks by imposing trading capacity limits—restrictions on the total, overall amount of Swaps Archegos could hold with them and/or limits on the amounts of Swaps that the Counterparties would allow Archegos to hold in a particular issuer. (¶ 95.) The Counterparties also used initial margin requirements—the amounts of cash Archegos was required to post as collateral for the Swaps to put on or add to positions—to manage these risks. (¶ 96.) These safeguards made it

more difficult and expensive for Archegos to add to its positions. (*See* ¶ 98.)

By engaging multiple Counterparties to execute Swaps, Archegos further obscured from the market the size and composition of its portfolio's exposure. (*See* ¶ 41.) Although each Counterparty could see its own positions with Archegos, each Counterparty had limited or no visibility into Archegos's other positions, including those with other Counterparties. (*Id.*) In establishing capacity and margin parameters, the Counterparties relied on Archegos personnel to be truthful and accurate as to whatever information Archegos provided concerning its aggregate holdings or positions across other financial institutions. (*Id.*)

## III.    ARCHEGOS'S MANIPULATIVE TRADING

During the Relevant Period, Hwang used Archegos as a vehicle to control and manipulate the prices of nearly a dozen stocks. (¶¶ 43-94.)

First, Hwang made significant adjustments to the composition of his most concentrated long positions. He moved the bulk of Archegos's long exposures from highly-liquid companies with enormous market capitalizations, or "mega-cap" stocks, like Amazon and Microsoft into less liquid companies with smaller market capitalizations. (¶¶ 59-61.) By late 2020, Archegos's Top 10 Holdings were comprised of mid-cap, Chinese-based internet and media, e-commerce, and online education companies and U.S.-based media and streaming companies.[3] (*Id.*)

Second, Hwang increased Archegos's exposures in these less-liquid, concentrated positions to staggering levels. In less than a year, between March 31, 2020, and March 22, 2021, Hwang expanded Archegos's invested capital by more than 3,000%, from $1.6 billion to over $36 billion.

---

[3]       The former category included Tencent Music Entertainment Group (TME-ADR), iQiyi Inc. (IQ-ADR), GSX Techedu Inc. (GSX-ADR), Vipshop Holdings Ltd. (VIPS-ADR), Farfetch Ltd. (FTCH-ADR) Shopify, Inc. (SHOP-ADR), and Baidu, Inc. (BIDU-ADR). (¶ 61.) The latter category included two classes of Discovery, Inc. (DISCA and DISCK), as well as ViacomCBS Inc. (VIAC), which became Archegos's single largest holding. (*Id.*)

(¶¶ 56-58.) Archegos's overall exposures—inclusive of capital it borrowed from Counterparties—grew from approximately $10 billion to over $160 billion, with most of the build-up occurring from the final quarter of 2020 through the first quarter of 2021. (¶ 58.) Hwang directed the bulk of this buying spree toward Archegos's Top 10 Holdings: between October 1, 2020, and March 2021, Archegos's total exposure to just these Top 10 Holdings grew by more than $80 billion, from approximately $15 billion to over $96 billion. (¶ 61.) Thus, in just a few months, Hwang plowed several billions of dollars of his capital—and many billions more borrowed from Counterparties—into the stocks of and Swaps referencing just a handful of less liquid companies. Hwang's intent, and the consequence of his massive Swaps purchases, was to cause the significant appreciation in the price of these companies' stocks, generating additional variation margin, which, in turn, Hwang deployed to buy even more leveraged Swaps exposures in these same stocks, inflating the stocks' prices (and his mark-to-market gains) further still. (¶¶ 4, 43-53.)

To sustain the growth of Archegos's portfolio, Hwang needed to ensure continued price appreciation in the stocks comprising Archegos's Top 10 Holdings. However, as Archegos's portfolio became increasingly concentrated—and its available capital and leverage became increasingly tied up in its Top 10 Holdings—Archegos's risk profile magnified, and its solvency became exceedingly vulnerable to market fluctuations. As Hwang knew, price declines in Archegos's Top 10 Holdings could trigger potentially ruinous Counterparty margin calls, which would require Archegos to sell its positions to meet the margin calls, which, in turn, risked further depressing the stocks' value, leading to additional margin calls in a potentially calamitous downward cycle. (¶¶ 51, 63-64.) In or around late 2020, Hwang explored potential exit strategies—including whether he could use private, off-market block sales to close out his positions without negative price impacts—but he was unable to identify any off-ramps that would not result in price collapse or the material impairment of his portfolio's value. (¶ 63.)

11

Thus, Hwang chose to keep driving up the price of Archegos's Top 10 Holdings through more and more buying. (¶ 64.) Accordingly, Hwang orchestrated a continuous pattern of Swaps purchases designed to control and artificially inflate the market values of Archegos's Top 10 Holdings. (¶ 43.) Hwang increased Archegos's exposures in these stocks exponentially over this period, accumulating dominant market positions in the securities of these issuers. (¶¶ 45-47, 65-79.) At its peak, Archegos's cumulative long exposures (inclusive of its stock and Swaps) totaled over half of all available shares of ViacomCBS and more than 70% of GSX, reducing the open-market availability of those stocks accordingly.[4] (¶ 66.) Because the vast majority of Archegos's purchases were synthetic (through Swaps), market participants were left in the dark as to the extent of Archegos's control of the market for these stocks and the extent to which Archegos's buying was responsible for these stocks' price increases. (*See* ¶¶ 29-30, 43.)

Hwang also exploited Archegos's dominant market position to drive up the market prices of Archegos's Top 10 Holdings, fundamentally altering Archegos's established trading practices in the process. Historically, Archegos had relied on fundamental research from its analytical team to take long-term positions in companies, typically built its stakes quietly, and typically accumulated positions only sporadically over time and in volumes calibrated carefully to avoid moving markets. (*See* ¶¶ 68-70, 83.) By contrast, over late 2020 and early 2021, Hwang operated without regard for his analysts' research, eschewed their recommendations, and overrode their price targets in favor of his own targets—unsupported by any analytical assessment and achievable, as he knew, only through the continued exercise of Archegos's buying power. (*See* ¶ 83.) Hwang directed Archegos to trade

---

[4]     Archegos's position size reduced the freely tradeable shares in the issuers it invested in regardless of whether the investment was a straightforward stock purchase (because Archegos held the shares directly) or a synthetic Swap transaction (because of the Counterparty's subsequent hedge). (*See* ¶ 77.)

stocks both intra-day and day-over-day in sizes, at volumes, and at times that Defendants knew would invariably pressure prices upward. (¶¶ 72-77, 82-94.)

As the Amended Complaint details at length, and with examples, during the Relevant Period, Hwang routinely directed the implementation of a series of trading strategies and tactics designed to prop up and stabilize the prices of Archegos's Top 10 Holdings, including:

- **High Volume Trading:** Having established market dominance over the issuers, Hwang was aware of "his ability to impact stock prices" and "frequently directed his traders…to add exposures quickly and at large volumes" in trading the equities of and Swaps referencing Archegos's Top 10 Holdings. (¶¶ 68-69; *see also* ¶¶ 73-75 (providing specific examples of such trading).) Hwang routinely put on long Swap positions day-over-day in excess of 30% and even up to 40% of the issuers' average daily trading volume—a level that Hwang and Archegos traders knew would generate positive price improvements. (¶¶ 71-76.) As Hwang "knew and intended, such large trading volumes on a given day would and did create upward pressure on the share price[s] of [the Top 10 Holdings] and often result in the share price[s] increasing." (¶ 76.)

- **Setting the Tone:** Archegos, at Hwang's direction, "engaged in a series of transactions prior to market open with manipulative intent and for the purpose of 'setting the tone' for the trading day, that is, pushing the share prices of certain issuers, in which Archegos held long exposures upward," the goal of which "was to induce other traders, such as short sellers or other market participants, to observe active trading in and upward price movement of the share prices of certain issuers and, as a result, purchase those issuers' securities during the day[.]" (¶ 85; *see also* ¶¶ 86-87 (providing examples of same).) As Tomita described, such pre-market trading, when volume was lower, would have disproportionate price impact. (¶ 45.)

- **Marking the Close:** Hwang also directed substantial trading in the securities of certain issuers in which Archegos held long exposures during the end of the trading day, in some instances during the majority of trading days of a particular issuer. (¶¶ 88-89.) This led to an increase in margin on Archegos's Swaps and provided it with even more leverage to purchase more exposure to the same issuers the following day. (¶ 88; *see also* ¶¶ 89-90 (providing examples of same).)

- **Bidding Up Securities:** Hwang additionally directed Archegos traders to enter incrementally increasing limit orders for the Top 10 Holdings as Swaps orders were filled in order to increase stock prices and induce others to purchase the stock. (¶¶ 91, 94.)

- **Trading Solely to Counteract Selling Pressure:** Archegos also traded solely to "counteract selling pressure or to otherwise maintain share prices," including, for example, by "buying large amounts of stock when the price dropped in response to negative news." (¶ 92 (internal quotations omitted); *see also* ¶¶ 93-94 (providing examples of non-economic trading).)

Hwang and Archegos engaged in these actions not for any legitimate economic reason but, rather, to create the false impression of broad market demand for the stocks of these issuers and thus to induce other market participants to enter into transactions based on that false information and to move the stocks' prices to artificial levels. (¶ 53.)

Tomita, the head trader whom Hwang tasked with implementing his scheme, confirmed that he and Hwang agreed to deploy these trading tactics for manipulative ends. In pleading guilty to criminal charges arising from this manipulative trading scheme, Tomita acknowledged in his allocution that he "agreed with [Hwang] and others to carry out the business of Archegos through a pattern of manipulating the prices of securities." (¶ 45.) Tomita further acknowledged that he "and others executed trades that allowed the fund to amass market power in certain securities" and that "[o]nce Archegos gained market power in these securities, [he] and others used this power to trade in such a way as to artificially manipulate the prices of the securities." (*Id.*) And Tomita confirmed that Archegos "manipulated the prices of these securities in order to influence others in the market to buy or sell the securities in ways that would benefit Archegos's key positions and increase Archegos's purchasing power through variation margin." (*Id.*)

Hwang's and Archegos's manipulation achieved its intended objective. During the Relevant Period, driven by Hwang's sustained and continuing outsized Swaps purchases, Archegos's Top 10 Holdings saw rapid price spikes. Upon Archegos's ultimate cessation of its artificial support, the stock prices of its Top 10 Holdings collapsed. (¶¶ 77-81.)

## IV.   DEFENDANTS REPEATEDLY DECEIVED THEIR COUNTERPARTIES TO INDUCE THE EXTENSION OF TRADING CAPACITY AND MARGIN NECESSARY TO FUEL ARCHEGOS'S MANIPULATIVE TRADING.

Hwang's and Archegos's manipulative trading strategy depended on Counterparties' continued willingness to transact with Archegos and to extend it credit for its leveraged positions. Yet, as Archegos's portfolio swelled in size and concentration, it increasingly approached or

breached its Counterparty risk and credit-control limits. Thus, Archegos repeatedly exhausted the trading capacity its Counterparties would extend it. In response, Archegos's Counterparties increasingly demanded more and more initial margin to put on trades. (¶¶ 95-97.) These margin requirements and capacity restrictions imposed severe constraints on Hwang's strategy which, at the time, was focused primarily on adding to Archegos's positions in its Top 10 Holdings. (¶¶ 95-99.)

Defendants therefore engaged in a coordinated pattern of deception to circumvent the Counterparties' risk management controls. Defendants lied directly and repeatedly to Archegos's multiple Counterparties: they deliberately downplayed the extent of Archegos's aggregate portfolio risks and provided knowingly false assurances regarding Archegos's concentration and liquidity profile. (¶¶ 95-159.)

Defendants intended to falsely convince Counterparties that Archegos's overall positioning was more diverse, more liquid, and less risky than it actually was—and Defendants succeeded. As Defendants intended, in reliance on these false assurances, the Counterparties permitted Archegos to continue to add exposures with them in Archegos's most concentrated positions, well beyond what these Counterparties otherwise would have allowed—thus assuming greater risk than they otherwise would have tolerated had they known the truth. (¶ 6.) Defendants thus fraudulently induced the Counterparties to continue trading with Archegos and to do so at more favorable margin rates and deterred the Counterparties from taking countermeasures adverse to Archegos's investment objectives (*e.g.*, ceasing trading with Archegos, terminating existing Swaps, or liquidating Archegos's portfolio). Through these deceptions, Archegos was able to continue to grow its concentrated positions and thereby prop up and maintain the stock prices of its Top 10 Holdings. (*Id.*)

Because Archegos spread its Swap exposures across twelve different Counterparties, Defendants knew that each Counterparty had visibility into only a fraction of Archegos's composite

holdings. (¶ 41.) Defendants exploited this informational asymmetry by serially providing false information to Counterparties about the composition of the positions and assets Archegos held outside of transactions with that Counterparty. (¶¶ 95-159.) The purpose and effect of these lies was to convince the Counterparty that the portion of Archegos's portfolio that the Counterparty could not see (because it was held at other institutions) was different and safer than the portion it could see. (¶¶ 5-6.) Defendants thereby lulled the Counterparties into the false sense that the risks to Archegos's composite, *overall* positioning were managed sufficiently for the Counterparty to justify allowing Archegos to continue adding to its long exposures. (¶ 6.) Though varied by Counterparty, Defendants' misrepresentations generally fell within two broad categories.

*First*, Defendants misrepresented Archegos's overall portfolio concentration. Defendants typically did so through false and misleading statements to a Counterparty that (1) Archegos's single largest long position was only approximately 35% of Archegos's net asset value or capital (¶¶ 109, 111, 117, 119, 121, 123, 135, 137, 144, 150, 151); (2) Archegos did not have exposure totaling more than a certain percentage (*e.g.,* 5% or 20%) of an issuer's outstanding shares (¶¶ 125-26, 132, 155-56); and/or (3) Archegos's Swaps at other Counterparties referenced different stocks and assets than those held with the Counterparty at issue (¶¶ 132, 142, 146, 148). In actuality, as Defendants knew, (1) Archegos's single largest position far exceeded 35% of Archegos's net asset value and frequently exceeded 60% and at times even over 90% of Archegos's capital at the time (¶¶ 121, 123, 144); (2) Archegos's exposures to numerous issuers greatly exceeded the percentage of the issuers' outstanding shares to which Archegos represented it had exposure (¶¶ 125, 132, 159); and (3) Archegos held the same, highly concentrated Swaps positions in the same stocks across its various Counterparties (¶ 112).

*Second*, Defendants painted a false picture of Archegos's overall portfolio liquidity. Defendants typically did so through false and misleading statements to the Counterparties that

(1) Archegos could sell all of its positions (or some significant portion of its portfolio) in a matter of days or weeks at a rate of 10-20% of each stock's average daily trading volume (¶¶ 114, 139, 151); and (2) that Archegos's positions away from the Counterparty were concentrated in highly liquid, mega-cap stocks that it could exit quickly and in an orderly fashion (¶¶ 124, 150). In actuality, as Defendants knew, (1) Archegos would need several months to liquidate its portfolio at a rate of 10-20% of each stock's average daily trading volume, given the portfolio's size and the extent of its concentration in just a handful of issuers (¶ 115); and (2) Archegos's holdings across Counterparties were not weighted toward highly liquid, mega-cap issuers but, rather, were concentrated in Archegos's less liquid Top 10 Holdings (¶ 61).

In their respective plea allocutions to criminal conduct arising from this precise course of conduct, both Tomita and Becker described at length this fraudulent scheme, its deceptive purpose, its illegality, and Defendants' roles in it. Becker admitted the following:

> I understood that [Counterparties] would not open relationships with Archegos, extend Archegos trading capacity, or offer Archegos favorable margin rates without certain representations to them about the overall holdings with the Archegos portfolio. In order to induce [Counterparties] to, among other things, extend Archegos the credit necessary to purchase equities or to engage in swap transactions, on several occasions, in coordination with others at Archegos, I made false or misleading statements to the [Counterparties] about Archegos's portfolio. For example, in 2021, I falsely represented to certain financial institutions that Archegos'[s] largest position was approximately 35 percent of its net asset value when, in fact, I knew the largest position had grown to…a significantly higher percentage than that. At around the same time, I also falsely represented to one of its counterparties that Archegos's portfolio with that specific [Counterparty] was materially different than Archegos's portfolio overall I knew these statements to be untrue. I made these and other similar misstatements to induce [Counterparties] to continue extending Archegos trading capacity as well as to dissuade these [Counterparties] from liquidating positions held in Archegos's account or to take other action that might hurt Archegos's overall portfolio.

(¶ 106; Decl. of Mary E. Mulligan (Dkt. No. 60), Ex. L (Becker Allocution) at 34-35.)[5]

---

[5]     The transcript of Becker's plea allocution, which Halligan attaches to his motion papers, includes the two examples quoted above, which the Amended Complaint does not include.

Tomita similarly admitted:

> In addition to manipulating the prices of certain securities, I also made misrepresentations to Archegos['s] trading counterparties. These counterparties were banks and brokers who extended the fund credit to trade on margin and entered into swap agreements with the fund. I knew that the fund's counterparties considered Archegos's portfolio and assets when setting margin rates and limits on swap capacity. In order to maintain favorable margin rates and gain additional swap capacity, I made false and misleading statements and omissions regarding the size and the composition of the fund's portfolio. I knew that doing so would mislead counterparties as to the true risks presented by the fund…. While engaged in the activities I described, I worked under the supervision of [Hwang]…. I agreed with [Hwang] and others to carry out the business of Archegos through a pattern of manipulating the prices of securities and deceiving counterparties.

(¶ 45.)

### A.    Hwang's Role in Deceiving Archegos's Counterparties

Hwang both directed and personally participated in these deceptions. For example, Hwang personally lied to a Counterparty concerning the extent of Archegos's exposures. In December 2020, Hwang signed a Portfolio Swap Annex ("Annex") (an agreement governing the terms and conditions of Archegos's Swaps) with one of Archegos's Counterparties (identified as "CP8" in the Amended Complaint) representing that Archegos's combined exposures (inclusive of any derivative positions) would not exceed 20% of any issuer's outstanding shares when Archegos entered into a Swap referencing that issuer's stock. Hwang attested to this representation even though he knew at the time that Archegos's cumulative exposures to several issuers far exceeded 20% of those companies' outstanding shares. This false assurance induced the Counterparty to continue to extend capacity to Archegos and execute Swaps with Archegos into 2021. Notwithstanding his signed representation to the contrary, Hwang continued to add long Swaps with the Counterparty in Archegos's most concentrated positions—exposures that Hwang knew far exceeded 20% of the issuers' shares outstanding. (¶¶ 155-159.)

Hwang also directed and, thus, was responsible for, others' misstatements. For example, Hwang coordinated with Tomita to fabricate a rationale for refusing a Counterparty's request that

Archegos transfer some of its concentrated positions to a different Counterparty. (¶¶ 141-142.) Disclosing the truth—that Archegos was unable to transfer these positions elsewhere because it likewise had exhausted its other Counterparties' capacities in these same stocks—would have revealed to the Counterparty the extent of Archegos's portfolio concentrations. (*See id.*) Accordingly, after consulting with Hwang and at his direction, Tomita relayed a false tax-based pretext for deferring the requested transfer. (*Id.*; *see also* ¶ 146 (Hwang directed Tomita to provide "decoy" names to CP7 when engaging it as a new Swap Counterparty to mislead CP7 into believing that the positions Archegos would hold with it would be different than those Archegos held at other Counterparties).)

        More broadly, Hwang directed Halligan, Tomita, and Becker to obtain additional capacity from the Counterparties to put on more exposures to Archegos's Top 10 Holdings, yet insisted that his overall portfolio positions be kept secret from these Counterparties. (¶¶ 101-104.) Hwang knew that the Counterparties would not extend Archegos additional capacity or favorable margin rates if they understood the true extent of Archegos's concentration and liquidity risks or if Archegos refused to provide information to give them comfort on these risk factors. (¶ 102.) He thus demanded that his employees negotiate capacity increases while simultaneously mandating that they keep from these Counterparties the detailed information about Archegos's overall portfolio and concentrations profile that the Counterparties needed to justify extending their risk limits. (¶¶ 95-105.) In other words, Hwang knew that the risk limit extensions his employees secured at his behest could only be achieved through deception. (¶¶ 102-105.) Indeed, Tomita acknowledged in his allocution that he defrauded Archegos's Counterparties with Hwang's express approval. (¶ 105 ("I agreed with [Hwang] and others to carry out the business of Archegos through a pattern of … deceiving Counterparties.").)

### B.    Halligan's Role in Deceiving Archegos's Counterparties

Halligan likewise knowingly participated in the fraudulent scheme. For example, Halligan personally misrepresented Archegos's portfolio positions to another Counterparty (identified in the Amended Complaint as "CP3"). In connection with Archegos's execution of Swaps with this Counterparty, Halligan signed trade confirmations in which he falsely attested that Archegos's exposure to the referenced security, inclusive of Archegos's derivative positions, amounted to less than 5% of the issuer's outstanding shares. Given Halligan's operational responsibilities as Archegos's CFO, and his daily receipt of Archegos's then-current positions, Halligan understood that, in fact, Archegos maintained exposures well in excess of 5% of these issuers' outstanding shares and that, therefore, his representations were materially false. (*See, e.g.,* ¶¶ 25, 31, 115.)

Halligan additionally directed, coordinated, and assisted in Becker and Tomita's deception of Archegos's Counterparties in numerous ways. When Halligan first assigned Becker responsibility for risk-related Counterparty communications, Halligan instructed Becker always to assure the Counterparties that Archegos's largest position was only 35% of Archegos's net asset value, regardless of whether that was true. (¶ 110.) In late 2020, as Archegos's skyrocketing portfolio growth raised concerns at Archegos regarding the credibility of that 35% figure, Becker asked Halligan whether he should continue repeating it to the Counterparties. Halligan responded by directing Becker to stick by the 35% claim, even though Halligan knew it was false. (¶ 152.) As instructed, Becker continued to use that misrepresentation in his further dealings with the Counterparties. (¶¶ 111, 117-19, 123, 135, 150.)

Also, in early 2021, to ensure that Tomita's and Becker's misrepresentations to the Counterparties were consistent, Halligan instructed Becker to join telephone calls that Tomita had with Counterparties concerning margin or capacity restrictions. (¶ 149.) Upon being informed by Becker of the falsehoods he and Tomita relayed to assuage a Counterparty's concerns about

Archegos's Counterparty risk, Halligan replied "if they only knew." (*Id.*) This confirmed his understanding of both (1) the falsity of the information being provided to Counterparties concerning Archegos's risk profile; and (2) the fact that the Counterparties would take risk-mitigating countermeasures inhibiting Archegos's continued purchases if the Counterparties knew the truth. (¶ 149.)

In addition, in March 2021—to respond to concerns of a Counterparty that was considering Archegos's request for additional trading capacity—Halligan met with Tomita and Becker to devise a fabricated liquidity profile to convey to the Counterparty. (¶ 114.) Halligan agreed that Becker should tell the Counterparty that Archegos could liquidate its entire portfolio within thirty days, at just 10-15% of each stock's average daily trading volume, though Halligan knew it would take more than twice that long to exit Archegos's large, concentrated positions. (¶ 115.) As Halligan requested, Becker relayed this false information to the Counterparty and secured the additional capacity for Archegos, which it immediately used to execute additional Swaps in its Top 10 Holdings. (¶ 116.)

## V.   ARCHEGOS CONTINUED ITS MANIPULATION AND DECEPTION IN THE FACE OF ITS COLLAPSE.

Defendants persisted in their fraud and manipulation even in the face of Archegos's imminent demise. After the market closed on March 22, 2021, ViacomCBS announced a $3 billion secondary offering of its shares. (¶ 160.) The next day, the dilutive impact of the offering caused a 10% price drop in ViacomCBS stock—Archegos's single largest long position. (*Id.*) This shock to Archegos's most concentrated holding precipitated precisely the downward spiral that Archegos's excessive leverage and concentrations had risked during the Relevant Period.

In an attempt to stabilize and reverse the price declines and avoid margin calls, Hwang directed Archegos to use all of its available cash and credit to increase its most concentrated long positions. (¶ 161.) Thus, on March 23, Hwang added $2.6 billion in additional exposures to Archegos's portfolio. (*Id.*) His last-ditch, manipulative effort proved futile: by the end of the trading

day on March 23, Archegos still faced $2.5 billion in margin calls which—coupled with the assets

deployed from its trading activity that day—depleted virtually all cash and credit Archegos

maintained in reserve. (¶ 163.)

With Archegos no longer able to supply an artificial backstop via its manipulative

purchasing, the prices of its most concentrated holdings cratered. Archegos's net asset value

declined by over 70% in the course of the next two trading days, due principally to losses in its

largest long positions.[6] (¶¶ 162, 171, 175.)

After the market closed on March 24, 2021, Defendants began informing Archegos's

Counterparties that the market movements left it unable to meet anticipated margin calls. (¶ 171.)

Yet Halligan's fraudulent dealings with their trading partners persisted. On March 24, as

Counterparties were assessing the situation and determining their remedial course of action, Halligan

directed Becker to provide a false and inflated figure in response to a Counterparty's questions about

Archegos's then-current capital levels. (¶ 173.) In addition, on March 25, Halligan reviewed and

approved a script for Becker to use in addressing Counterparties' concerns, and thus directed Becker

to feign ignorance as to Archegos's trading positions, cash balances, and outstanding margin calls. (¶

174.) On March 25, with Halligan's approval, Becker relayed these misrepresentations in his

conversations with Counterparties to try to prevent Counterparties from issuing default notices

and/or forcing the liquidation of Archegos's portfolio. (*Id.*)

These fraudulent efforts failed. Archegos was unable to pay down its margin calls, and its

---

[6]     A lower-than-expected pricing of the Viacom secondary offering (which had a spillover
effect on the price of Discovery), as well as a negative news announcement affecting the American
depositary receipts of Chinese issuers that comprised the balance of Archegos's Top 10 Holdings,
further contributed to the deterioration of Archegos's portfolio positions. (¶¶ 164-65.) Archegos's
depletion of its capital rendered it impotent to counteract these negative developments through
additional manipulative purchases. (¶ 163.)

Counterparties ultimately delivered notices of default. (*Id.*) The Counterparties terminated their Swaps with Archegos and unwound Archegos's positions, including the Counterparties' hedges, which required selling into the market the same securities underlying Archegos's Top 10 Holdings. The Counterparties' large-volume selling into a falling market depressed the prices of the stocks still further, costing billions of dollars in losses to the Counterparties, as well as to ordinary investors who purchased the securities at values inflated by Archegos's manipulations and whose investments have yet to recover. (*See id.*)

## STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure ("Civil Rule") 12(b)(6), a district court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (internal quotations and citation omitted). "Fact-specific questions cannot be resolved on the pleadings.'" *International Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022). Accordingly, "arguments for the veracity or non-misleading nature of [d]efendants' statements or omissions or otherwise…fact-based matters such as materiality…must be resolved in favor of [p]laintiff[ ] on a motion to dismiss." *In re OSI Pharma., Inc. Secs. Litig.*, No. 04-cv-5505 (JS) (WDW), 2007 WL 9672541, at *6 (E.D.N.Y. Mar. 31, 2007) (citation omitted). Dismissal is not warranted unless the plaintiff cannot provide the basis for its claims through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To meet Civil Rule 8(a)'s liberal pleading standard, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). To satisfy Civil Rule 9(b)'s heightened standard for pleading fraud, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify

the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *SEC v. Badian*, No. 06-cv-26212008, WL 3914872, at *3 (S.D.N.Y. Aug. 22, 2008) (internal quotations marks omitted). For market manipulation, a complaint need only allege, "to the extent possible: [1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were performed, and [4] what effect the scheme had on the market for the securities at issue." *Id.* at 4 (internal quotations omitted).

## ARGUMENT

### I.    THE AMENDED COMPLAINT ADEQUATELY PLEADS MARKET MANIPULATION.

Contrary to Archegos's and Hwang's arguments, market manipulation claims based on open market transactions are cognizable in the Second Circuit, and the Amended Complaint adequately pleads market manipulation against Archegos and Hwang.[7]

#### A.    The General Market Manipulation Standard in the Second Circuit

"'Manipulation' is 'virtually a term of art when used in connection with securities markets.'… The term refers generally to practices…that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (internal citations omitted). As the Second Circuit has observed, in using the term "manipulation," "there is '[n]o doubt' that 'Congress meant to prohibit the *full range* of ingenious devices that might be used to manipulate securities prices.'" *SEC v. Vali Mgmt. Partners*, No. 21-453, 2022 WL 2155094, at *1 (2d Cir. June 15, 2022) (summary order) (citing *Santa Fe*, 430 U.S. at 477) (emphasis added). "The

---

[7]    Archegos and Hwang each adopt and incorporate by reference all arguments concerning the SEC's market manipulation claims made by the other Defendant in their respective briefs in support of the Motions to Dismiss. (*See* Archegos Br. at 14 n.22; Hwang Br. at 9 n.7.) As such, the SEC addresses those arguments collectively here.

gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.* (citing *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)). Manipulative conduct need not be successful in order to violate the federal securities laws: "intent—not success—is all that must accompany manipulative conduct to provide a violation of the Exchange Act." *SEC v. Lek Secs. Corp.*, 276 F. Supp. 3d 49, 60 (S.D.N.Y. 2017) (internal citation and quotations omitted).

As Archegos and Hwang acknowledge, to state a claim under Exchange Act Section 9(a)(2), the SEC need therefore only plead (1) a series of transactions in any security, or in connection with any security-based swap, "creating actual or apparent trading in that security or raising or depressing the price of that security," (2) "carried out with scienter," and (3) "for the purpose of inducing the security's sale or purchase by others." *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992); 15 U.S.C. § 78i(a)(2). (*See* Archegos Br. at 15 (citation omitted); Hwang Br. at 8 n.6 (citations omitted).) Similarly, Exchange Act Section 10(b) makes it "unlawful for any person, directly or indirectly…to use or employ, in connection with the purchase or sale of any security…or any securities-based swap agreement…any manipulative or deceptive device or contrivance in contravention of [Commission rules]." 15 U.S.C. § 78j(b). Correspondingly, Rule 10b-5 broadly "prohibits…any device, scheme or artifice to defraud" or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. To state a claim under Section 10(b), the SEC must therefore allege, in relevant part, (1) "manipulative acts," (2) conducted with scienter, (3) "in connection with the purchase or sale of securities." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021). The elements of a claim under Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), on which Rule 10b-5 was largely fashioned, are "[e]ssentially the same as the elements of claims under § 10(b) and Rule 10b-5." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (internal quotations and citation omitted).

**B.    Market Manipulation Involving Open Market Transactions Is Actionable Securities Fraud in the Second Circuit.** [8]

Archegos and Hwang erroneously assert that "open market" trading cannot constitute illegal manipulation unless it involves "inherently deceptive acts." (Hwang Br. at 19; *see also* Archegos Br. at 14.) That is not the law of this Circuit. To the contrary, the Second Circuit has explicitly held that open market activities that are not inherently deceptive may nonetheless constitute manipulation so long as they are done with manipulative intent. *Set Capital*, 996 F.3d at 77.

In *Set Capital*, the Second Circuit recognized that transacting on the open market with manipulative intent is an actionable form of manipulation in this Circuit. There, the court reviewed the lower court's dismissal of a complaint for failure to state a claim of market manipulation. *Id.* at 64. Plaintiffs in that case alleged that, through high-volume purchasing of futures contracts on the Chicago Board Options Exchange's Volatility Index (the "VIX"), Credit Suisse artificially depressed the price of certain exchange-traded notes it had issued. *Id.* at 70. Those notes inversely tracked an index that itself tracked a portfolio of certain VIX futures contracts, such that when prices underlying the VIX rose, the value of the notes would decline proportionally. *Id.* Plaintiffs alleged that Credit Suisse made the purchases of VIX futures contracts—which constituted approximately 25% of the entire VIX futures market—with the intent of causing VIX futures contracts' prices to skyrocket, which in turn drove down the value of the inversely-correlated notes by over 96% in one day. *Id.* at 73. Plaintiffs alleged that Credit Suisse knowingly or recklessly disregarded the virtual certainty that the purchases "would trigger a liquidity squeeze in VIX futures contracts" and

---

[8]    Some courts have referred to transactions in the market that would otherwise be legal absent defendant's manipulative intent as "open market manipulation." *See, e.g.*, *Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 43 (S.D.N.Y. 2022). Others have expressed doubt that there is any difference between "open market manipulation" and any other kind of manipulation proscribed by the federal securities laws. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 391 (S.D.N.Y. 2003).

"destroy the value of [related] Notes," and, thus, manipulated the market for the notes in violation of the federal securities laws. *Id.* at 76.

In vacating the lower court's dismissal of plaintiffs' market manipulation claim, the Second Circuit expressly rejected Credit Suisse's argument that its purchases served merely to hedge its exposure to the notes and that hedging activities "done openly for the legitimate purpose of managing risk, not deceiving investors," could not be actionable market manipulation. *Id.* at 77 (internal quotations omitted). Although the *Set Capital* court acknowledged "it is generally true that short selling or other hedging activity is not, by itself, manipulative," it held that "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Id.* Consequently, because plaintiffs alleged "more than routine hedging activity"—*i.e.*, that Credit Suisse had "flooded the market with millions of additional XIV Notes for the very purpose of enhancing the impact of its hedging trades and collapsing the market for the notes"—it was "no defense that Credit Suisse's transactions were visible to the market and reflected otherwise legal activity." *Id.* The Second Circuit held, therefore, that the alleged open market conduct was adequate to state a claim for market manipulation in violation of Exchange Act Section 10(b).[9]

In *Vali*, the Second Circuit reconfirmed its *Set Capital* holding: "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Vali*, 2022 WL 2155094, at *1. There, the defendants appealed a jury verdict finding that they had violated anti-manipulation provisions of the federal securities laws. The

---

[9]     Archegos and Hwang misconstrue the holding in *Set Capital* as having been based on "several alleged deceptive acts related to the trading," beyond the trading itself (Hwang Br. at 23), but that is wrong. The *Set Capital* court explicitly held that "[i]n some cases, *as here*, scienter is the *only* factor that distinguishes legitimate trading from improper manipulation." 996 F.3d at 77 (emphasis added).

defendants asserted that the trial court's "manipulative act" jury instruction erroneously stated that, in some cases, "a defendant's intent to manipulate the securities market[ ] is all that distinguishes legitimate trading from manipulative trading." *Id.* In rejecting that argument, the Second Circuit again made clear: "in some cases…scienter is the only factor that distinguishes legitimate trading from improper manipulation," and intent "is all that must accompany manipulative conduct to prove a violation of the Exchange Act and its implementing regulations." *Id.* (internal citations and quotations omitted). The Second Circuit thus concluded, "The district court's instruction was…consistent with [the court's] articulation of market manipulation, and accurately informed the jury on the law." *Id.*

Older decisions in this Circuit are consistent with *Set Capital* and *Vali*—likewise recognizing that open market transactions may be actionable market manipulation where the alleged illegal acts are accompanied by manipulative intent. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) ("[I]n some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation."); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 82 (S.D.N.Y. 2015) (acknowledging that "courts in this district have found that open-market transactions that are not, in and of themselves, manipulative or illegal, may constitute manipulative activity…when coupled with manipulative intent"; and finding that allegations of high-volume short selling, coupled with intent to manipulate issuer's stock price, stated a claim for market manipulation); *SEC v. Masri*, 523 F. Supp. 2d 361, 371-72 (S.D.N.Y. 2007) ("[T]he Court declines to adopt defendants' proposed *per se* rule that open-market activity cannot be considered manipulative based solely on manipulative intent, that is, without additional deceptive or fraudulent conduct…. Indeed, the only definition [of market manipulation] that makes any sense is subjective—it focuses entirely on the intent of the trader.") (internal citations and quotations omitted); *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1298 (S.D.N.Y. 1996) (denying motion to dismiss market manipulation claim—where, defendants argued,

alleged illegal trading "merely amount[ed] to legal, open-market purchases of stock"—because defendants allegedly "acted to affect market activity artificially").

Archegos and Hwang all but disregard this precedent, and, in particular, the scope and import of *Set Capital*. Instead, relying primarily on the Second Circuit's prior holdings in *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991), and *ATSI*, as well as the non-binding decisions of several other Circuits, Archegos and Hwang erroneously assert that open market trading alone, even if done with manipulative intent, is not actionable. (*See* Archegos Br. at 16-17; Hwang Br. at 20-23.) But none of those cases so holds or otherwise forecloses the SEC's market manipulation claims here.

As an initial matter, Archegos and Hwang inaccurately refer to *Mulheren* as the "leading case in this Circuit" regarding the "theory of 'open market manipulation.'" (Hwang Br. at 22.) *Mulheren* preceded *Set Capital* by thirty years and, as Archegos and Hwang admit, "did not [even] reach the question of whether an open-market manipulation claim could ever be viable." (*Id.*) Indeed, although the *Mulheren* court expressed "misgivings about the government's view of the law," it nonetheless "assume[d], without deciding on [that] appeal, that an investor *may* lawfully be convicted under Rule 10b-5 where the purpose of his transaction is solely to affect the price of a security." 938 F.2d at 368 (emphasis added). As such, *Mulheren* expressly left open the question of whether "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent"—a question the Second Circuit answered in the affirmative in *Set Capital*. 996 F.3d at 77.

Likewise, the *ATSI* court held that, to plead market manipulation, "[t]here must be *some* market activity," and the court merely provided as examples "wash sales," "matched orders," and "rigged prices." 493 F.3d at 101 (emphasis added). Nothing in *ATSI*, however, requires a plaintiff to allege one of those activities to the exclusion of other potentially manipulative "market activity." Consistent with *Set Capital*, the *ATSI* court merely acknowledged that, because "taking a short

position is no different than taking a long position," to be "actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security." *Id.* Indeed, *Set Capital* cited *ATSI* for the very proposition at issue here—that "a defendant may manipulate the market through open-market transactions." *Set Capital*, 996 F.3d at 76-77.

The other decisions Archegos and Hwang cite from this Circuit or District (*see* Hwang Br. at 20-21; Archegos Br. at 16) furnish no better support for their argument: none precludes claims of market manipulation based upon open market transactions and all involve facts either distinguishable from, or consistent with, this case. *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (affirming dismissal of Rule 10b-5 claims where plaintiffs alleged that defendants manipulated market by making undisclosed payments for online articles promoting company's stock without alleging that articles manipulated market or were intended to do so); *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 131-32 (2d Cir. 2011) (affirming dismissal of Section 10(b) claim because defendant had publicly disclosed its allegedly manipulative bidding practices); *Malenfant*, 784 F. Supp. at 145 (denying motion to dismiss Section 9(a)(1) and (2) manipulation claims where "complaint specifically allege[d] that the defendants acted with intent to manipulate the market in Texscan common stock"); *Trane Co. v. O'Connor Secs.*, 561 F. Supp. 301, 305 (S.D.N.Y. 1983) (on motion for preliminary injunction, court found insufficient evidence that defendants had engaged in market manipulation because defendants' "purpose was not to create an artificial demand for [plaintiff's] stock nor to induce public investment to its detriment").

Archegos's and Hwang's reliance on decisions from other jurisdictions is equally misplaced. (*See* Archegos Br. at 16-17; Hwang Br. at 23-24.) Those cases are either inapposite or support the SEC's position. *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207-208 (3d Cir. 2001) (upholding dismissal of counterclaim for violation of Section 10(b) as Section 29(b) affirmative

defense where defendant presented *no* evidence that plaintiff's lawful short selling was motivated by unlawful intent); *U.S. v. Gilbertson*, 970 F.3d 939, 948-50 (8th Cir. 2020) (affirming criminal conviction for manipulative conduct, court rejected defendant's argument that "his acts were not manipulative because he engaged in legitimate open-market trading" since evidence established defendant had intended to inflate price of issuer's stock); *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1273-74 (11th Cir. 2016) (affirming dismissal of material misrepresentation claim and holding that publication of truthful information concerning company is not manipulative); *Sullivan & Long Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (affirming dismissal of Section 9(a)(2) and 10(b) manipulation claims where defendant's lawful arbitrage "promote[d] the convergence of market and economic values that [are] the central objective of securities regulation" by driving prices *closer* to subject stock's true value rather than creating a false impression of supply or demand).

Thus, Archegos's and Hwang's protestation that market manipulation claims require allegations of transactions that are not "real" or that were solely for a non-economic purpose is unfounded. (*See* Archegos Br. at 14, 17; Hwang Br. at 9, 19, 21.) The Second Circuit imposes no such requirement. To the contrary, the Second Circuit has "twice analyzed this issue and never expressed a categorical rule that open-market manipulation is actionable only when there is no legitimate economic purpose for the open-market transaction." *Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 43 (S.D.N.Y. 2022) (denying motion to dismiss where CFTC adequately alleged that defendant intended open market trades to create artificial price for ten-year swap spreads) (citing *Set Capital*, 996 F.3d at 77, and *ATSI*, 493 F.3d at 101).

Indeed, courts in this Circuit and elsewhere, including *Set Capital*, have regularly rejected this argument. *See, e.g.*, *Set Capital*, 996 F.3d at 77 (rejecting defendant's argument that complaint failed to allege manipulation because defendant's "hedging trades were 'done openly' for the legitimate purpose of 'managing risk,'" where plaintiffs alleged defendants hedged with manipulative intent);

31

*Sharette*, 127 F. Supp. 3d at 82 (rejecting defendants' argument that short selling, even in large volumes, could not be manipulative, where plaintiffs alleged that the purpose of short selling was to manipulate stock prices); *SEC v. Kwak*, No. CIVA 304-CV-1331 JCH, 2008 WL 410427, at *4-5 (D. Conn. Feb. 12, 2008) (denying defendants' post-trial Rule 50(b) motions and rejecting defendants' argument that, "because all of their trades were executed on behalf of real individuals in the open market and did not contain the traditional hallmarks of manipulation, they [could not] be guilty of market manipulation," where the SEC presented sufficient evidence that defendants engaged in the transactions "for the purpose of maintaining or raising the price of [the issuer's] stock"); *cf. Masri*, 523 F. Supp. 2d at 372 (concluding that "if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation," and not foreclosing manipulation claims where both manipulative intent and an economic reason exist); *see also Markowski v. SEC*, 274 F.3d 525, 528 (D.C. Cir. 2001) (upholding SEC's finding that trades were manipulative because they were done for the illegal purpose of maintaining artificially high prices and rejecting defendants' argument that trades could not be classified as unlawful manipulation because they "they involved real customers, real transactions, and real money").

## C.  The Amended Complaint Adequately Alleges Market Manipulation.

As discussed above, under governing Second Circuit precedent, manipulative intent alone can render otherwise legitimate open market trading actionable market manipulation under the federal securities laws. *Set Capital*, 996 F. 3d at 77. Thus, the critical question is whether the Amended Complaint adequately pleads that Defendants engaged in the conduct alleged with manipulative intent. The answer is plainly yes.

The Amended Complaint alleges that Defendants Hwang and Archegos traded, and caused trading in, multiple stocks with the intent of manipulating their prices. To begin with, unlike most

market manipulation complaints that withstand a motion to dismiss based on pleading solely

circumstantial facts, the Amended Complaint alleges specific sworn statements by a co-conspirator

(and employee of Defendant Archegos) in his plea allocution that establish manipulative intent.

Tomita—a percipient witness to, and integral participant in, Defendants' market manipulation—

substantiates that Archegos and Hwang committed every essential element of the alleged market

manipulation. He has affirmed under oath that he "agreed with [Hwang] and others to carry out the

business of Archegos through a pattern of manipulating the prices of securities":

> Archegos used security-based swaps to gain exposure to these securities while
> concealing the true size of the fund's positions from the market and our trading
> counterparties. Once Archegos gained market power in these securities, I and others
> used this power to trade in such a way as to artificially manipulate the prices of the
> securities…. I manipulated the prices of these securities in order to influence others
> in the market to buy or sell the securities in ways that would benefit Archegos'[s] key
> positions and increase Archegos'[s] purchasing power through variation margin.

(¶ 45.)

Statements made under oath by Scott Becker, Archegos's Director of Risk Management,

further demonstrate Archegos's manipulative intent:

> In order to induce [Counterparties] to, among other things, extend Archegos the
> credit necessary to purchase equities or engage in swap transactions, on several
> occasions, in coordination with others at Archegos, I made false or misleading
> statements to the [Counterparties] about Archegos's portfolio…. I knew these
> statements to be untrue. I made these and other similar misstatements to induce the
> [Counterparties] to continue extending Archegos trading capacity as well as to
> dissuade these [Counterparties] from liquidating positions held in Archegos's
> account or to take other action that might hurt Archegos's overall portfolio.

(¶ 106.)

Hence, Archegos's and Hwang's suggestion that the SEC's claims are not "plausible" under

*Iqbal*, 556 U.S. 662, 678 (2009), (Archegos Br. at 21, 41, 43) should not be accepted at face value.

Moreover, the Amended Complaint alleges many additional factual circumstances that, if

proven, would establish Defendants' manipulative purpose. As described more fully below,

Defendants' trading activities, deliberate use of Swaps to avoid disclosure obligations, and false

assurances to Counterparties, taken together, reflect Defendants' manipulative intent. More importantly, that same collective conduct disrupted "the natural interplay of supply and demand" in the market for Archegos's Top 10 Holdings and is therefore sufficient to state a claim for market manipulation in the Second Circuit. *ATSI*, 493 F.3d 87, 100 (internal quotations and citation omitted). (*See also* Archegos Br. at 16; Hwang Br. at 20.)[10]

### 1.   Archegos's Manipulative Trading Strategies

Archegos, at Hwang's direction, intentionally traded in ways "to artificially inflate the stock prices of Archegos's Top 10 Holdings" and "to inject false information into and manipulate the market in [Archegos's] largest holdings." (¶¶ 46, 49.) As described in detail above at Facts Section III, the Amended Complaint alleges at least six specific Archegos trading strategies that were all designed to artificially inflate the share prices of the Top 10 Holdings. (¶¶ 43, 46, 48, 51.) Those techniques included: (1) establishing domination and control over the securities, by accumulating exposures (and correspondingly reducing the freely tradable outstanding shares) of 45%, 50%, 60%, and in one instance over 70% of an issuer's outstanding stock (¶ 66); (2) engaging in large volume trading, establishing long Swaps positions day-over-day representing in excess of 30% and even up to 40% of the issuers' average daily trading volume—a level that Hwang and Archegos traders knew would generate positive price improvements (¶¶ 71-76); (3) incrementally raising limit orders at

---

[10]     Archegos and Hwang incorrectly argue or suggest that the Court should consider in isolation each type of manipulative conduct that the Amended Complaint alleges against them. (*See* Archegos Br. at 25-41; Hwang Br. at 25-33.) But that approach is irreconcilable with the Second Circuit's mandate that courts "consider the complaint in its entirety." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). As the Second Circuit has explained, "[t]he proper question is whether there is a permissible relevant inference from *all* of the facts alleged, taken collectively, not whether an inference is permissible based on any individual allegation, scrutinized in isolation." *Id.* (internal quotations and citation omitted) (emphasis in original). The Court should therefore assess Defendants' alleged manipulative intent and acts as a whole—and, for the reasons discussed here, conclude those allegations are sufficient to plead market manipulation.

successively higher prices throughout the day to walk the price up (¶¶ 91, 94); (4) entering substantial orders pre-open to exploit diminished market volume and liquidity to achieve disproportionate price influence (¶¶ 85-87); (5) entering late-day Swaps orders to "mark the close" and raise the reference stocks' closing prices, with the goal of generating variation margin and/or staving off end-of-day declines that might trigger margin calls (¶¶ 88-90); and (6) deploying both the firm's capital and borrowed capital strategically in response to identified negative news or selling pressures to counteract potential price declines and stabilize the referenced securities' share prices (¶¶ 92-94.)

Archegos and Hwang employed these trading strategies collectively, "in order to influence others in the market to buy or sell the securities in ways that would benefit Archegos's key positions and increase Archegos's purchasing power through variation margin." (¶ 45; *see also* ¶ 51.) And the manipulative strategies worked: "the share prices of a number of the Top 10 Holdings experienced price spikes during the Relevant Period, increasing to artificial levels that were not sustained after Archegos's collapse in late March 2021." (¶ 77; *see also* ¶ 7.)

Archegos and Hwang contend that none of these trading strategies, taken in isolation, is sufficient to plead manipulation. (*See* Archegos Br. at 25-34; Hwang Br. at 27-33.) They contend, for instance, that "trading large volumes – *without more* – cannot state a claim for market manipulation," and that "[a]llegations based on the timing of trading activity, *without more*, are insufficient to demonstrate market manipulation." (Archegos Br. at 25, 32 (emphasis added).) These arguments both miss and make the critical point—that the Amended Complaint alleges *more* here. Archegos and Hwang ignore that the trading strategies are pled (1) collectively, together with Defendants' related misrepresentations, and required to be considered in their entirety; and (2) in conjunction with Hwang's and Archegos's manipulative intent. Thus, the conduct alleged cannot be viewed as

merely that of an "enthusiastic investor with the means to pursue an investment opportunity."[11]

(Archegos Br. at 25.)

The cases Archegos and Hwang cite are also inapposite. (*See* Archegos Br. at 26-28, 31-32;

Hwang Br. at 27-31.) Plaintiffs in those cases did not allege multiple types of manipulative conduct

collectively that were done explicitly for a manipulative purpose. *See Trane Co.*, 561 F. Supp. at 305

(mere large scale nature of transactions not sufficient to support Section 9(a)(2) claim where

defendants' "purpose was not to create an artificial demand for Trane stock nor to induce public

investment to its detriment"); *Sullivan & Long*, 47 F.3d at 862 (short selling stock in a way that

achieved the objectives of securities regulation, absent any allegation of manipulative intent, was not

manipulation); *In re College Bound Consol. Litig.*, No. 93 CIV. 2348 (MBM), 1995 WL 450486, at *6

(S.D.N.Y. July 31, 1995) (considering market dominance only); *Mulheren*, 938 F.2d at 371 (rejecting

government's argument that manipulative intent could be inferred solely from defendant's single

purchase of shares comprising 70% of issuer's stock because "the extent to which an investor

controls or dominates the market at any given period of time cannot be viewed in a vacuum" and

must be viewed in light of "other indicia of manipulation"); *Masri*, 523 F. Supp. 2d at 370 (merely

commenting that, as a general matter, "stock transactions made at the close of the day are not

prohibited"); *ATSI*, 493 F.3d at 103 (plaintiffs did not offer specific allegations that defendants did

anything to manipulate the market); *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03-CIV-3120

(LTS)(THK), 2009 WL 1492196, at *7 (S.D.N.Y. May 27, 2009) ("The mere fact that [defendant]

---

[11]     To the extent Archegos or Hwang claim Archegos engaged in the trading alleged in the
Amended Complaint "for a legitimate purpose, [their] position contradicts the complaint," which
"specifically alleges that [Archegos] executed its [trades] for a manipulative purpose," and the Court
must accept those allegations as true, drawing all reasonable inferences in the SEC's favor. *Set
Capital*, 996 F.3d at 75, 78.

effected such a large volume of trades in Sedona's stock is…not indicative of anything manipulative."); *Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 881 n.5 (2d Cir. 2011) (simply noting that "[s]ecurities may be traded off the exchange before the exchange or exchanges on which the securities are traded open"); *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 352 (S.D.N.Y. 2015) (simply defining "limit orders").[12]

Archegos's and Hwang's further unsupported assertion that the SEC must allege the same "[trade] volumes at issue in [*United States v.*] *Gilbert*," 668 F.2d 94, 95 (2d Cir. 1981), and the "four months of dominance at issue in [*United States v.*] *Stein*," 456 F.2d 844, 846, 849 (2d Cir. 1972), in order for the alleged trading activity to be manipulative is baseless. (Archegos Br. at 29.) The Second Circuit imposes no such numerical floors—rather, trading conduct of any kind may be manipulative when accompanied by manipulative intent. *See Set Capital*, 996 F.3d at 77.

### 2.   Archegos's Deliberate Use of Swaps and Its Misrepresentations to Counterparties

In addition to employing trading techniques aimed at artificially driving up the stock prices of its Top 10 Holdings, Archegos used Swap transactions and made misrepresentations to Swap Counterparties to intentionally hide from them and other market participants the extent of Archegos's aggregate holdings in the Top 10 Holdings and to distort the actual demand for those stocks.

---

[12]   Archegos and Hwang also ignore case law establishing that indicia of manipulative trading may include precisely the types of trading strategies Archegos employed here. *See, e.g., In re J. H. Goddard & Co., Inc.*, 42 SEC 638, Rel. No. 34-7618, 1965 WL 87926, at *3 (June 4, 1965) (domination and control of the market for the security); *SEC v. Resch-Cassin, Co.*, 362 F. Supp. 964, 977 (S.D.N.Y. 1973) (increasingly higher buy orders, otherwise known as "bidding up" a security); *Kwak*, 2008 WL 410427, at *1, 3 (trading later in the day to "mark" the closing price); *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 595 (10th Cir. 1979) (transactions that are economically irrational).

As a preliminary matter, Archegos deliberately traded Swaps to evade disclosure obligations under Section 13(d) of the Exchange Act in order to conceal from the market that Archegos itself was the principal driver of increased demand in the Top 10 Holdings stocks. (¶¶ 30-31.) That "Archegos had no duty to disclose its significant exposure – via swaps – in the Top 10 Holdings" (Archegos Br. at 22) is irrelevant—an act need not be inherently unlawful to be deceptive. *See SEC v. Wey*, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017). Here, Archegos's decision to shift from purchasing cash equity positions to purchasing synthetic exposure through Swaps was done intentionally and to facilitate its market manipulation scheme.

The Amended Complaint is also replete with allegations that, integral to its scheme, Archegos engaged in a series of material misrepresentations and omissions to equally conceal from Counterparties its true market positions and efforts to artificially inflate the prices of the Top 10 Holdings. (*See, e.g.,* ¶¶ 1, 5, 6, 43, 53, 95-159.)

As detailed in the Amended Complaint (¶¶ 5-6, 95-144) and summarized in Facts Section IV above, Defendants lied to Counterparties about Archegos's portfolio composition, concentrated exposure, and liquidity profile, and misled them into believing that Archegos's overall positioning was less concentrated and more liquid than it actually was, and that Archegos was therefore more secure and well-managed than it actually was. These deceptions induced Counterparties to continue to transact with Archegos, to agree to execute Swaps they otherwise would not have executed, and to extend trading capacity beyond what they otherwise would have permitted, had they known the truth. (¶ 6.) As a result, Archegos induced Counterparties to hedge by purchasing the underlying securities of the Top 10 Holdings in the market, and Archegos also received the additional margin necessary to perpetuate its manipulative trading in the same securities.

Consequently, the Amended Complaint alleges that Archegos's conduct in connection with both its equities trading and Swaps transactions described above:

interrupted the natural interplay of supply and demand for those stocks – and distorted their underlying economic value for the Counterparties and other market participants – by causing at least two sets of false pricing signals in the market: (1) that the Top 10 Holdings stocks were held by a relatively broad range of market participants, reflecting a relatively broad supply and demand for those stocks – when, in fact, a single buyer (Archegos) was surreptitiously, and by fraudulent means, dominating the market for those stocks; and (2) that the prices of those stocks, both daily and over time, reflected normal market forces when, in fact, their steep climb (and ultimate precipitous fall) was due at least largely to Archegos's fraudulently dominating the market for, and engaging in manipulative trading of, those stocks.

(¶ 53.)

The Amended Complaint thus amply alleges conduct that created "a false impression of how market participants value a security" (Archegos Br. at 16), and, coupled with its allegations of Archegos's and Hwang's manipulative intent, contemplates precisely the sort of conduct the Second Circuit held sufficient in *Set Capital* to state a claim for market manipulation.[13] 996 F.3d at 77, 86.

To the extent Archegos and Hwang contend the above conduct is "distinguishable" from that alleged in *Set Capital*, the allegations they point to in that case—that the defendant "deliberately destroyed the value of a security so that it could massively profit from coordinated hedging activity and then declare an 'Acceleration Event' enabling it to lock in that profit, all while simultaneously making misleading public statements about the expected impact of its trading"—are actually analogous to the allegations concerning Archegos's conduct summarized above. (Hwang Br. at 23.)

---

[13]     Archegos and Hwang cite no authority for their assertion that "where [the SEC's] own regulations did not call for market participants to disclose their swaps positions, the SEC cannot now claim Archegos sent a 'false signal' to the market by failing to make such a disclosure." (Archegos Br. at 21.) That Archegos "had no duty to disclose its significant exposure – via swaps – in its Top 10 Holdings," (Archegos Br. at 22), does not render its intent or conduct any less manipulative, or its misrepresentations any less false and misleading. Archegos's and Hwang's flawed logic is also at odds with the central objective of the anti-fraud provisions of the federal securities laws: "to root out all manner of fraud in the securities industry." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1104 (2019). If the absence of a duty to disclose were a complete bar to liability for manipulation, any market participant could engage in various forms of manipulative trading with the express intent to manipulate without fear of legal or regulatory repercussion. Such an absurd outcome would contravene Congress's intent and the spirit of the federal anti-manipulation statutes.

Meanwhile, the Amended Complaint pleads the same type of scheme that the plaintiffs alleged in *Set Capital*: a market actor engaging in what otherwise might be viewed as "real trading activity," coupled with the manipulative intent to artificially impact the price of a security in a way that is designed to be advantageous to the actor, as described above in Facts Section III and Argument Section I.C.1. And, as established above in Argument Section I.B, it is "no defense that [Archegos's] transactions were visible to the market and reflected otherwise legal activity." *Set Capital*, 996 F. 3d at 77. The fact that the transactions were "real" in that they involved "real" counterparties and "actual purchases of securities…for which Archegos bore economic risk," or that they were possibly done for an economic purpose (Archegos Br. at 14, 17; Hwang Br. at 9, 19, 21) is irrelevant because, as alleged, Archegos's and Hwang's conduct was accompanied by their manipulative intent. *Id.*

The Amended Complaint therefore adequately alleges that Defendants purposefully engaged in acts through which they intended to manipulate the share prices of Archegos's Top 10 Holdings. Under Second Circuit precedent, including *Set Capital*, the Motions to Dismiss the SEC's manipulation claims should be denied.

> ### D. Archegos's and Hwang's Additional Arguments Concerning the Standard for Pleading Market Manipulation Are Without Merit.
>
> #### 1. The Manipulative Act Need Not Be a Trade in the Security That Is the Target of the Alleged Manipulation.

Archegos and Hwang assert that the Amended Complaint does not state a claim for market manipulation because Archegos's Swap transactions were not "trades in the market" and, therefore, could not have sent a "false signal" to the market. (Archegos Br. at 17-21.) Specifically, they argue that, because the stock price movements here allegedly resulted largely from Counterparties' stock purchases to hedge the Swap trades, rather than from the Swap trades made by Archegos itself (or by others under Archegos's direct control), the Amended Complaint fails to state a claim for market

manipulation. (*Id.*) This argument has no basis in law or fact and should be rejected.

First, Archegos and Hwang do not cite a single case that holds that the defendant's manipulative act must be an equity transaction in the security that is the target of the alleged manipulation, that the alleged manipulative actor himself must have directed or controlled such a transaction, or that a market manipulation claim cannot be predicated on the known and intended consequences of derivative purchases. Section 10(b)'s "broad language, on its face, extends to manipulation of all kinds," *United States v. Royer*, 549, F.3d 886, 900 (2d Cir. 2008), and "prohibit[s] the full range of ingenious devices that might be used to manipulate securities prices." *Santa Fe*, 430 U.S. at 477. Nothing in the antifraud provisions of the federal securities laws suggests either a categorical exemption for manipulations effected through the use of derivatives or a safe harbor for price manipulations achieved through the purposeful inducement of another's market transactions. *See City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*, 878 F.3d 36, 50 (2d Cir. 2017) (rejecting defendants' argument that market manipulation claims require trading activity by defendants themselves, as opposed to others, noting defendants "do not cite, and we are not aware, of any authority explicitly stating that such a claim must concern a defendant's trading activity"). Indeed, the inducement of market activity by others to affect market prices is a frequent hallmark of, and often essential to, actionable market manipulation schemes. *See, e.g., Lek Secs.*, 276 F. Supp. 3d at 55 (sustaining allegations of manipulation where defendant submitted non-*bona fide* orders to "induce other market participants to execute" against them). Such inducement was critical to Defendants' manipulation scheme here: by using Swaps to stimulate Counterparty hedging market purchases in the referenced securities, Defendants were able to drive up share prices in Archegos's Top 10 Holdings while masking from the market (and their Counterparties) the size and extent of Archegos's positions in those issuers.

Moreover, Archegos's and Hwang's argument rests on the false premise that Counterparty

hedging practices were somehow unknowable and unpredictable and that the Amended Complaint

merely "relies on the assumption that Archegos's counterparties purchased and held the equity

shares referenced in the swaps." (Archegos Br. at 18-21.) This argument ignores the Amended

Complaint's allegations, which the Court must accept as true for purposes of adjudicating

Defendants' motions. The Amended Complaint alleges that the Counterparties would "ensure any

corollary synthetic exposure created by its execution of Swaps with Archegos was fully hedged" by

"purchas[ing] shares of referenced issuers in the market to the extent necessary to hedge any

synthetic exposure created by the [Swaps]," such that "the Counterparties purchased one share of an

issuer's stock for each share of Archegos's [Swap] exposure to that stock." (¶¶ 37-38.) The Amended

Complaint further alleges that Defendants were fully familiar with this well-established market

practice and executed Swaps with the understanding that they would result in the Counterparties'

hedging market purchase. (¶ 39.) The price movements of the underlying securities buttress those

allegations: the prices of Archegos's Top 10 Holdings spiked while Archegos was adding its

derivative exposures (consistent with Counterparties' corresponding purchases of the underlying

shares) and crashed precipitously when Archegos defaulted and Counterparties exited their

Archegos positions (consistent with their sales of the underlying shares they held as hedges). (¶¶ 77-

81, 178.) Indeed, Archegos acknowledges as much elsewhere in its moving papers. (*See* Archegos Br.

at 31 (conceding that price declines in wake of Archegos's collapse resulted from "sale[s] into the

market of any underlying shares [Counterparties] used to hedge Archegos's swap positions").)

     Ignoring the Amended Complaint's allegations, Archegos and Hwang theorize that

Counterparties might have hedged their swap exposures in some other way because "[i]t is common

knowledge in the securities industry that parties to swap contracts do not always hedge with the

underlying referenced securities." (Archegos Br. at 19-20.) But the lone case they cite in support of

this irrelevant conjecture holds precisely the opposite. *See CSX Corp. v. Children's Inv. Fund Mgmt.*

*(UK) LLP*, 562 F. Supp. 2d 511, 541-42 (S.D.N.Y. 2008) (concluding it is "inevitable" that counterparties will hedge exposures to total return swaps by purchasing equity shares of underlying security and finding that party to swap contract knew and intended as much). And, regardless, such speculation contravenes the Amended Complaint's factual allegations, and, thus, is inappropriate for consideration on a motion to dismiss.[14]

Thus, the mere fact that Archegos's Swaps were not themselves "trades in the market" does not support Archegos's and Hwang's argument for dismissal. To the contrary, as the Amended Complaint alleges, hiding Archegos's enormous exposure and control of the market in its Top 10 Holdings through Swaps (and equities) transactions was part and parcel of Archegos's and Hwang's market manipulation scheme.

> ## 2. The SEC Need Not Allege That Archegos Profited From Its Manipulative Scheme.

To the extent Archegos or Hwang suggest that the Amended Complaint does not adequately allege market manipulation because it does not allege that (or how) Archegos profited (*see* Archegos Br. at 41-42; Hwang Br. at 33), they are mistaken. The SEC need not allege profit or other benefit to Defendants to state a manipulation claim. Indeed, "an attempted manipulation is as actionable as a successful one," and "the SEC need not identify a specific victim who acted upon the manipulation." *SEC v. Martino*, 255 F. Supp. 2d 268, 287 (S.D.N.Y. 2003) (quoted in *SEC v. Fiore*, 416 F. Supp. 3d 306, 326 (S.D.N.Y. 2019)); *see also Lek Secs.*, 276 F. Supp. 3d at 60 ("[I]ntent—not

---

[14]    The only other support Archegos cites for its theory that Counterparties might have hedged in some other way is an internal investigative report by Credit Suisse. (*See* Archegos Br. at 20). That document (i) is extrinsic to and not referenced in the Complaint, and is therefore inappropriate for consideration on this Motion (*Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 425 (S.D.N.Y. 2013); and (ii) in any event, only further substantiates the Amended Complaint's allegations as to customary Counterparty hedging practices. (*See* Decl. of Eric A. Hirsch Decl. (Dkt. No. 56), Ex. 5 (Credit Suisse Report) at 37 (noting that Credit Suisse "typically" hedged its Swap exposures by "immediately" buying the underlying referenced stock).)

success—is all that must accompany manipulative conduct to provide a violation of the Exchange Act.") (internal citation and quotations omitted)); *Markowski*, 274 F.3d at 530 ("Just because a manipulator loses money doesn't mean he wasn't trying."). Therefore, the SEC need not allege that Defendants received actual profits as a result of their manipulation scheme—only that they intentionally "engaged in conduct designed to deceive or to defraud" the market. *Fiore*, 416 F. Supp. 3d at 326.

## II.   THE AMENDED COMPLAINT ADEQUATELY PLEADS ARCHEGOS'S AND HWANG'S SCIENTER AS TO THE MARKET MANIPULATION CLAIMS.

Because a plaintiff "cannot be expected to plead a defendant's actual state of mind," *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987), a complaint adequately pleads scienter where it alleges that a defendant engaged in conscious misbehavior or recklessness. *See Wey*, 246 F. Supp. 3d at 912. Allegations of "defendants' knowledge of or access to contradictory information usually are sufficient to state a claim based on recklessness." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). As are allegations that demonstrate defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). An "express allegation of deliberate misconduct can also be sufficient to plead scienter." *Wey*, 246 F. Supp. 3d at 912.

The Second Circuit "evaluate[s] the sufficiency of a complaint's allegations of scienter holistically, considering all of the facts alleged, taken collectively, rather than any individual allegation, scrutinized in isolation." *Set Capital*, 996 F.3d at 78 (internal citation and quotations omitted). As the Second Circuit has instructed, "great specificity is not required with respect to allegations of scienter," and plaintiffs need only provide a "minimal factual basis for their conclusory allegations of scienter." *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (internal quotations and citations omitted); *see also SEC v. Alternative Green Techs.*, No. 11 Civ. 9056, 2012 WL 4763094, at *3

(S.D.N.Y. Sept. 24, 2012) ("Conclusory allegations of scienter are sufficient if there exist[s] a minimal factual basis giving rise to a strong inference of fraudulent intent.") (internal quotations and citations omitted). "'A complaint subject to Rule 9(b) should be allowed to survive a motion to dismiss based on 'fairly tenuous inferences' of intent, because intent is a fact that a jury should find.'" *SEC v. Shapiro*, No. 15-cv-7045 (RMB), 2018 WL 2561020, at *4 (S.D.N.Y. June 4, 2018) (internal citation omitted).

Under these standards, the Amended Complaint more than adequately alleges that Hwang and Archegos each acted knowingly or recklessly in executing Defendants' manipulative scheme. Indeed, if the Amended Complaint adequately alleges Archegos's and Hwang's manipulative intent for purposes of alleging market manipulation—as it does, for the reasons described in Argument Section I.C above—then the Amended Complaint necessarily alleges Archegos's and Hwang's scienter adequately.

### A.   The Amended Complaint Adequately Alleges Archegos's Conscious Misbehavior or Recklessness Regarding the Market Manipulation Scheme.

As described above in Argument Section I.C., the Amended Complaint alleges that Archegos, through Hwang, Tomita, and Becker, knowingly and intentionally manipulated the market for stocks in the firm's Top 10 Holdings and misled Counterparties in connection with the scheme.[15] Far exceeding the "fairly tenuous inferences" of intent necessary to establish scienter, the Amended Complaint alleges not only circumstantial facts showing Archegos's scienter but also sworn

---

[15]   The SEC need not establish Archegos's scienter through each of these individuals. Rather, adequately alleging facts sufficient to support conscious misbehavior or recklessness through any one of them is sufficient to plead Archegos's scienter. *See SEC v. Constantin*, 939 F. Supp. 2d 288, 308-09 (S.D.N.Y. 2013) (plaintiffs need only prove that "an agent" of a corporate entity acted with the requisite scienter) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).

statements by Tomita and Becker in their plea allocutions admitting their and therefore Archegos's conscious misbehavior, as described above.

Archegos incorrectly contends that Tomita's "statements concerning the purpose of any of Archegos'[s] trades are not relevant to the question of Archegos'[s] intent." (Archegos Br. at 41.) Under longstanding principles of *respondeat superior* applicable to federal securities law violations, both Tomita's conduct and scienter can be imputed to Archegos because he acted within the scope of his employment. *See, e.g.*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01, 105 (2d Cir. 2001) (reversing district court's dismissal of a Section 10(b) primary liability claim against corporate defendants because the complaint adequately alleged fraud by defendants' agent); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011) ("When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the corporation.") (citing *Dynex Capital Inc.*, 531 F.3d at 195); *SEC v. Kinnucan*, 9 F. Supp. 3d 370, 375 (S.D.N.Y. 2014) ("The misconduct of an agent … is imputed to the corporation if committed within the scope of his employment.") (internal quotations and citation omitted).

Indeed, there can be no serious question that the Amended Complaint alleges that Tomita—Archegos's head trader—acted within the scope of his employment. At Hwang's direction, Tomita executed multiple trading tactics, such as "setting the tone," on Archegos's behalf that were designed to artificially inflate the share price of Archegos's Top 10 Holdings, as detailed in Argument Section I.C.1 above. (¶¶ 45, 48, 82-85, 88, 91, 92.)

Archegos's other attempts to rebut the Amended Complaint's allegations of Archegos's scienter—by arguing that its activities were "consistent with the activity of an investor who wants to build concentrated positions in securities…and who has the capital to make those investments," and that "Archegos made each of its investments because it believed in the fundamentals of the companies it invested in" (Archegos Br. at 37, 41)—are inappropriate on a motion to dismiss and

should be rejected. These arguments, which contradict the Amended Complaint's factual allegations, are suited for trial—not for a motion to dismiss or even summary judgment. *See International Code Council*, 43 F.4th at 53. Accepting all the facts alleged in the Amended Complaint "as true, and drawing all reasonable inferences in [the SEC's] favor," the allegations as to Archegos's intent support a strong inference of scienter. *Set Capital*, 996 F.3d at 78.

> **B.     The Amended Complaint Adequately Alleges Hwang's Conscious Misbehavior or Recklessness Regarding the Market Manipulation Scheme.**

As described above in Argument Section I.C., the Amended Complaint alleges that Hwang acted with manipulative intent with respect to the market manipulation scheme. In addition, the Amended Complaint alleges that Hwang—as the founder, owner, and manager of Archegos—held sole responsibility for all investment decisions made by or on behalf of the firm, which was his own family office, and orchestrated Archegos's manipulative scheme. (¶¶ 16, 45-46, 48-52.) Indeed, Hwang specifically intended to execute investment decisions and trading that would allow Archegos to the market price of the firm's Top 10 Holdings and artificially raise those issuers' stock prices while avoiding stock price declines. (¶¶ 51-52.) And he consciously directed others at Archegos to trade in ways that would accomplish those objectives. (¶¶ 43, 45, 46, 48-49, 84-85.)

As described in Facts Section III and Argument Section I.C above, Hwang knew Archegos could artificially impact stock prices in certain issuers and instructed traders to add large levels of exposure to exercise domination over the Top 10 Holdings and to conduct pre-open, intraday, pre-close, and non-economic trades solely to artificially increase the stock prices of the Top 10 Holdings, or to counteract selling pressure and maintain share prices. (¶¶ 45, 48-51, 67-68, 76, 92-94.) His conscious goal was to induce other traders in the market to "observe active trading in and upward price movement of the share prices of certain issuers, and, as a result, purchase those issuers' securities during the day" in order to facilitate the price momentum artificially created by Archegos's trading. (¶¶ 85, 91.)

In addition, Hwang intentionally instructed traders not to provide full and accurate information to Counterparties concerning Archegos's concentration and portfolio construction in order to ensure Archegos could secure capacity increases, obtain more favorable margin changes, and enter into additional Swaps with new Counterparties. (¶¶ 100-104.) In light of the significant pressure he put on adding trade capacity, Hwang knew or recklessly disregarded that Halligan, Tomita, and Becker could not have successfully obtained the trading capacity increases and margin changes they negotiated without providing false or misleading information to Counterparties. (¶¶ 101-105.) These allegations are supported not merely by allegations of circumstantial facts but also by the allegations of Tomita's sworn plea allocution describing Hwang's role in directing the firm's manipulative activities, as described above in Argument Section I.C.

These allegations adequately plead that Hwang knowingly, or at least recklessly, directed Archegos's manipulative scheme and thus his scienter as to the manipulation claims.

## III.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES SECURITIES FRAUD CLAIMS BASED ON DEFENDANTS' MISREPRESENTATIONS.

Claims 1 through 3 of the Amended Complaint allege that Defendants engaged in securities fraud under Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5. To adequately plead a primary violation of Section 10(b) and Rule 10b-5 based on misrepresentations, the Amended Complaint must allege that defendants: (1) "made a material misrepresentation or omission" or "disseminat[ed]" a statement containing such a misrepresentation, (2) "with scienter," (3) "in connection with the purchase or sale of securities." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (citations omitted); *see also Lorenzo v. SEC*, 139 S. Ct. 1094, 1100-01 (2019).

To adequately plead a primary violation of Section 17(a)(2), the Amended Complaint must allege that Defendants (1) "obtain[ed] money or property," (2) by means of a material misstatement or omission, (3) "in the offer or sale of a security." 15 U.S.C. § 77q(a)(2); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). An actionable claim under Sections 17(a)(1) and 17(a)(3)

need not plead that Defendants obtained money or property. 15 U.S.C. § 77q(a)(1), (3); *SEC v. Stoker*, 865 F. Supp. 2d 457, 47-68 (S.D.N.Y. 2012). But a claim under Section 17(a)(1) does require allegations of Defendants' scienter, unlike Sections 17(a)(2) and 17(a)(3), for which a showing of negligence suffices. *Monarch Funding*, 192 F.3d at 308 (citing, among others, *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980)).

Archegos does not contest the sufficiency of the misstatement allegations against it as to either the materiality of its misstatements or scienter. In any event, Becker's and Tomita's admitted guilt satisfies those elements and can be imputed to Archegos under principles of *respondeat superior*, as discussed above in Argument Section II.A. Instead, Archegos—joined by Hwang and Halligan—asserts that the Amended Complaint does not adequately plead the requisite jurisdictional nexus between its misstatements and securities transactions and, thus, that its misrepresentations were not "in the offer or sale" or "in connection with the purchase or sale" of a security. (Archegos Br. at 46-50; Hwang Br. at 17-19; Halligan Br. at 11-16.) In addition, Hwang and Halligan argue that the Amended Complaint does not adequately allege that they were responsible for the alleged misstatements or that they had the requisite scienter. (Hwang Br. at 14-17; Halligan Br. at 16-28.) As explained below, the Amended Complaint adequately alleges each of these elements as to each of the Moving Defendants.

### A. The Amended Complaint Adequately Alleges the Jurisdictional Nexus Between the Misrepresentations and the Offer, Purchase, or Sale of Securities.

Moving Defendants' jurisdictional arguments rest on an incorrectly narrow reading of the "in connection with" element, not supported by governing Supreme Court or Second Circuit precedent. As the Supreme Court has explained, Section 10(b)'s nexus requirement "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819 (2002). Those purposes encompass not only "investor protection," but also "the effort to achieve a high standard of business ethics in every facet of the securities

industry." *United States v. Naftalin*, 441 U.S. 768, 775 (1979). Commensurate with the expansive aims

of the securities laws' antifraud statutes, the scope of their jurisdictional reach is "define[d]

broadly."[16] *Id.* at 773. It is accordingly "enough that the fraud alleged 'coincide' with a securities

transaction—whether by plaintiff or by someone else." *Merrill Lynch, Pierce, Fenner & Smith Inc. v.

Dabit,* 547 U.S. 71, 85 (2006) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)). "'The Second

Circuit has broadly construed the phrase 'in connection with,' interpreting the Congressional intent

underlying the phrase to mandate only that the act complained of somehow induced the purchaser

to purchase the security at issue." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537 (1999). This

standard is met "where plaintiff's claims 'necessarily allege,' 'necessarily involve,' or 'rest on' the

purchase or sale of securities," *Romano v. Kazacos*, 609 F.3d 512, 521 (2d Cir. 2010) (citations

omitted), or where "the misconduct somehow touches upon or has some nexus with any securities

transaction." *SEC v. Ramoil Mgmt., Ltd.,* No. 01-cv-9057, 2007 WL 3146943, at *8 (S.D.N.Y. Oct. 25,

2007) (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)). The Supreme Court has

instructed that the nexus requirement is "expansive enough to encompass the entire selling process."

*Naftalin*, 441 U.S. at 773. Moving Defendants' fraudulent misrepresentations easily fall within these

requirements.

　　As an initial matter, the alleged misrepresentations involved offers, purchases, or sales of

securities. Both the Securities Act and Exchange Act expressly define the Swaps at issue as securities,

subject to the statutes' antifraud provisions. Securities Act Section 2(a)(1) and Exchange Act Section

---

[16]　　The nexus requirement under Section 10(b)'s statutory term, "in connection with the purchase or sale of any security," 15 U.S.C. § 78j(b), is coextensive and interchangeable with Section 17(a)'s corollary use of term "in the offer or sale of any securities," 15 U.S.C. § 77q(a), despite the slight difference in phraseology, at least insofar as securities purchases or sales are involved. *Naftalin*, 441 U.S. at 773 n.4.

3(a)(10) define a security to include "security-based swaps." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). A "security-based swap," in turn, includes "any agreement, contract or transaction, that is a swap...and is based on...a single security or loan." *Id.* §§ 77b(a)(17), 78c(a)(68). The Swaps Archegos executed referenced a single underlying security and therefore satisfy the definition of security-based swap. Moving Defendants do not argue otherwise.[17]

Next, Moving Defendants' alleged misrepresentations occurred "in connection with" sales of securities—the Swaps—because the misrepresentations induced these sales. Defendants misled Archegos's Counterparties into believing that Archegos was more secure and well-managed than it really was. (*See, e.g.*, ¶¶ 5-6, 45, 104-159.) In reliance on these falsehoods, Counterparties agreed to execute Swaps contracts with Archegos that they otherwise would not have. (*See id.*) And Counterparties assumed greater financial risks under their Swaps contracts than they otherwise would have accepted had they known the truth. (*See id.*) Thus Defendants' deceptions directly induced Counterparties to sell them securities. No more clear or direct "connection" can exist between Defendants' misrepresentations and the sale of securities. *See SEC v. Jakubowski*, 150 F.3d

---

[17]     In addition, the alleged misrepresentations involved securities sales for an independent reason. As Defendants knew and expected, Archegos's Counterparties intended to hedge their synthetic exposure by purchasing shares in the underlying stocks. (¶¶ 36-39.) That expectation was part and parcel of Defendants' fraudulent scheme and therefore involved those stock purchases and sales. (*See id.*); *see also SEC v. Wyly*, 788 F. Supp. 2d 92, 120-21 (S.D.N.Y. 2011) (holding that a fraud in connection with a swap agreement is "in connection with" the counterparty's hedging purchase of the underlying shares); *see also SEC v. Maillard*, No. 13-cv-5299 (VEC), 2014 WL 1660024, at *2 (S.D.N.Y. Apr. 23, 2014) (fraud in connection with a foreign contract-for-difference found "in connection with" counterparty broker's subsequent hedging purchase on a domestic exchange); *SEC v. One or More Unknown Traders in Sec. of Fortress Inv. Grp., LLC*, No. 17-CV-01287, 2018 WL 4676043, at *13 (D.N.J. Sept. 27, 2018) (same, rejecting defendant's argument that "in connection with" requirement was not met because "brokerage firms have discretion to hedge...by purchasing stock on the NYSE"); *SEC v. Suterwalla*, No. 06-cv-1446 DMS (LSP), 2008 WL 9371764, at *3 (S.D. Cal. Feb. 4, 2008) (defendant's purchase of "spread bets" (which were not securities) found "in connection with" broker's hedging purchase of call options (which were), where securities-based hedging transaction was a foreseeable consequence of defendants' trades).

675, 679 (7th Cir. 1998) ("[Defendant] made his statements directly to the issuer of securities, in order to induce the issuer to accept his offer to buy. The offer was accepted and the shares issued. How could there be a closer 'connection' between statements and 'the purchase or sale of any security'?").

Moving Defendants' collective argument that *Chemical Bank v. Arthur Anderson & Co.* confounds this straightforward application of the nexus requirement is misguided. (*See* Archegos Br. at 47-49 (relying on *Chemical Bank*, 726 F.2d 930, 942-44 (2d Cir. 1984); Hwang Br. at 17 (same); Halligan Br. 11-13 (same).) *Chemical Bank* involved facts far removed from the ones in this case. In *Chemical Bank*, the defendants fraudulently procured a loan (not a security) by deceiving a bank about their financial condition. 726 F.2d at 932, 944. The loan happened to be secured in part by stock of the borrower's subsidiary. *Id.* at 933. The Second Circuit found that the defendants' misrepresentation neither pertained to these collateral securities nor persuaded the bank to accept the pledge of them as collateral for the loan. *Id.* at 944-45. Thus, the misrepresentation was "in connection with" the procurement of a loan, not a security, and the mere collateralization of the loan with securities was insufficient to satisfy the "in connection with" element. *Id.* The *Chemical Bank* court stressed the limited scope of its holding, emphasizing that its decision was compelled by its particular factual context and the purely incidental relation of the securities pledge to the overall transaction and the alleged fraud. *Id.* at 944 & n.24. Indeed, the court expressly differentiated the situation before it from those, such as in this case, in which the essential aim of the alleged misrepresentation is to induce a party to part with securities. *See id.* at 944 (distinguishing *Weaver v. Marine Bank*, 637 F.2d 157, 159-60 (3d Cir. 1980)).

Subsequent Second Circuit precedent underscores the dispositive nature of this distinction. *SEC v. Drysdale Securities Corp.*, like *Chemical Bank*, involved a Defendant's falsification of its financial health. 785 F.2d 38, 39-40 (1986). Unlike *Chemical Bank*, however, the defendant in *Drysdale* made its

misrepresentation not to procure a loan but, rather, to procure a counterparty's participation in repurchase transactions that obligated the defendant to repurchase (or resell) a security from (or to) its counterparty at a later time. *Id.* at 39 & n.2. The downstream exchange of securities that these repurchase arrangements required supplied the necessary nexus to a securities transaction that was lacking in *Chemical Bank. Id.* at 43. As the *Drysdale* court observed, "in this case, securities were transferred *as a direct result* of a misrepresentation, whereas in *Chemical Bank* the *direct result* of the misrepresentations was a loan and not a securities transfer." *Id.* (emphasis added).

So, too, Defendants' misrepresentations here "directly resulted" in the sale of securities. *See id.* The Amended Complaint does not allege that the object of Defendants' misrepresentations was some broader business transaction of which the securities played a minor or incidental part. The sole purpose of Defendants' duplicity, as the Amended Complaint alleges, was to induce the Counterparties to put on more Swaps trades with Archegos—and, in turn, trigger the Counterparties' corresponding hedging purchases in the market—to sustain its manipulative trading. (¶¶ 5-6, 102-106.) Indeed, the nexus between the misrepresentations and the sale of securities is even more clear and compelling here than in *Drysdale* because the Swaps contracts induced through Defendants' deception did not merely contemplate subsequent securities transfers but were themselves securities transactions.[18]

---

[18]     The other cases Moving Defendants cite are likewise inapposite, as none involved the direct inducement of a securities transaction. *See, e.g., Levitin v. PaineWebber, Inc.,* 933 F. Supp. 325, 329 (S.D.N.Y. 1996), *aff'd,* 159 F.3d 698 (2d Cir. 1998) (broker's nondisclosure that it would retain interest on collateral deposited in margin accounts did not meet nexus requirement because plaintiff did not "allege that she relied upon PaineWebber's nondisclosure in deciding to conduct short sales of securities or in deciding what securities to sell"); *Bissell v. Merrill Lynch & Co.,* 937 F. Supp. 237, 243 (S.D.N.Y. 1996), *aff'd,* 157 F.3d 138 (2d Cir. 1998) (same); *Production Res. Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.,* 6 F. Supp. 2d 236, 241 (S.D.N.Y. 1998) (complaint failed to "make[ ] any statement regarding plaintiff's inducement to enter into an agreement"). Indeed, many

Moving Defendants do not seriously contest this linkage, and their efforts to fit the Amended Complaint's allegations within *Chemical Bank*'s framework are not well-founded. First, Moving Defendants' claim that their lies induced only additional "trading capacity" and not "trades" (Archegos Br. at 48-49; Hwang Br. at 18; Halligan Br. at 15)—a distinction that is both incorrect (because their lies also induced new Counterparties to enter into Swaps, which were themselves securities) and in any event irrelevant to the jurisdictional issue. The Counterparty capacity restrictions operated as ceilings on the notional amounts and volumes that Archegos could trade with them. Defendants did not inveigle capacity extensions for their own sake. Rather, they sought this additional capacity so Archegos could use it—to add exposures and put on more trades.

Moving Defendants' suggestion that the resulting securities transactions were "merely an incident" to the capacity extensions distorts reality. *Cf. Chemical Bank*, 726 F.2d at 945 n.24. A nexus requirement "expansive enough to encompass the entire selling process" easily includes not just the fraudulent inducement of trades, but as well the inducement of a party's willingness or authority to enter into them. *See Naftalin*, 441 U.S. at 773; *Perez-Rubio v. Wycoff*, 718 F. Supp. 217, 236 (S.D.N.Y. 1989) ("[T]he in connection with requirement is satisfied where accomplishment of the alleged scheme is 'directly related to the trading process.'") (quoting *United States v. Newman*, 664 F.2d 12, 18

---

of the cases Moving Defendants rely upon involved no securities trading at all. *Manufacturers' Hanover Trust Co. v. Smith Barney, Harris Upham & Co*, 770 F. Supp. 176, 181 (S.D.N.Y 1991) ("[T]here was no investment decision made by [Plaintiff] and no such decision was effected by any fraud on defendant's part."); *Crummere v. Smith Barney, Harris Upham & Co.*, 624 F. Supp. 751, 756 (S.D.N.Y. 1985) ("in connection with" requirement not met because "no securities were purchased on [defendant's] behalf."). Others involve misstatements or omissions that post-dated the relevant securities transaction and therefore by definition could not have induced it. *Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 402 (S.D.N.Y. 2013) ("In this case, Taylor's allegations encompass behavior by the Westor Defendants that post-dates his decision to purchase any of the securities…, he does not allege that the Westor Defendants' behavior impacted any of his purchasing decisions."); *Alex. Brown and Sons Inc. v. Marine Midland Banks Inc.*, No. 96-cv-2459 (RWS), 1997 WL 97837, at *6 (S.D.N.Y. Mar. 6, 1997) ("[T]he sale of securities took place well before the alleged misrepresentations and omissions were made.").

(2d Cir. 1981)). This is especially true given the centrality of Defendants' misrepresentations to Archegos's broader and related manipulative trading efforts, a fraudulent scheme that "necessarily involve[d]" and "rest[ed] on" its securities purchases. *See Romano*, 609 F.3d at 522; *see also Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 815 (2d Cir. 1975) ("[I]n connection with" requirement met where the "very purpose" of defendants' false statements was "to aid in placing [defendant's client] in a position where he could manipulate securities prices.").

Moving Defendants' next argument—that their fraudulent procurement of margin loans from Counterparties to put on trades is too attenuated from securities trading to meet the "in connection with" requirement (Archegos Br. at 48-49; Hwang Br. at 18; Halligan Br. at 15)—fails for similar reasons. Archegos did not secure credit from its Counterparties to fund general business or operational expenses; its sole use of these margin loans was added trading. *Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir. 1985) ("Investors maintain margin accounts with brokerage firms for the very purpose of trading in securities."). The margin Defendants fraudulently obtained was inextricably and unavoidably bound up with—and in no way "incidental" to—the securities Archegos purchased with it. Indeed, courts routinely have found that misrepresentations related to margin extensions used exclusively for trading purposes are sufficiently linked to securities transactions to satisfy the "in connection with" requirement. *See Calderon Serra v. Banco Santander Puerto Rico*, 747 F.3d 1, 7 (1st Cir. 2014) (fraudulent provision of a margin loan extended exclusively for the purchase of securities is "in connection with" the purchase or sale of securities); *Angelastro*, 764 F.2d at 946 (misrepresentations concerning credit terms of margin accounts meet the "in connection with" requirement where margin account was established for the purpose of trading in securities); *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981) (rejecting defendant's contention that fraud "in connection with the method of financing the purchases of securities, not with the purchase itself" fell outside of Section 10(b)'s coverage:

"[m]isrepresentation of the risks of buying securities on margin in a declining market is fraud 'in connection with' the purchase of the securities").[19]

There is also no merit to Moving Defendants' alternative contention that their misrepresentations were not "in connection with" a securities transaction because they pertained solely to the composition of Archegos's portfolio and not the nature, characteristics, or value of the securities Archegos traded. (*See* Archegos Br. at 49-50; Hwang Br. at 18-19; Halligan Br. at 13-14.) This argument is flawed as a matter of law and fact.

The argument fails as a matter of law because "judges in this District have repeatedly rejected the contention that the alleged fraud or misrepresentations must relate to the value of the securities purchased or sold." *Uni-World Capital LP v. Preferred Fragrance, Inc.*, No. 19-cv-7204 (PAE), 2014 WL 3900565, at *9 (S.D.N.Y. Aug. 8, 2014) (collecting cases); *see also Zandford*, 535 U.S. at 815 ("[N]either the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security to run afoul of the Act."); *Perez-Rubio v. Wyckoff*, 718 F. Supp. 217, 237 n.20 (S.D.N.Y. 1989) ("[T]his Court is unable to square with applicable law the suggestion…that a failure to allege fraud 'regarding the character or nature of the securities involved' is fatal to a 10(b) claim."). Where, as here, a defendant's fraudulent misstatements induce a securities transfer, the "in connection with" requirement is satisfied regardless of whether the misrepresentations concern the value or any other attribute of the particular security at issue. *See, e.g. Press*, 166 F.3d at 537 (broker-

---

[19]     Moving Defendants' argument finds no support in the language of a 2021 SEC Rule proposal addressing fraudulent misconduct in connection with ongoing payments and deliveries occurring over the life of a Swap contract. (*See* Halligan Br. at 15-16 (citing *Prohibition Against Fraud, Manipulation, or Deception In Connection With Securities-Based Swaps*, Exch. Act Rel. No. 34-93784, 2021 WL 6755214 (Dec. 15, 2021)).) As the proposal itself expressly acknowledges, existing antifraud statutes already prohibit fraud in the offer, sale, or purchase of Swaps (2021 WL 6755214, at *4), and, as described above, Defendants' fraudulent misrepresentations were made directly in connection with the offer, sale, or purchase of Swaps.

dealer's failure to disclose to its customer that funds from a maturing note would not be available on the maturity date); *Marbury Mgmt., Inc v. Kohn*, 629 F.2d 705, 710 (2d Cir. 1980) (securities salesman's fraudulent representation that he was a licensed registered representative when he was only a trainee); *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 396-97 (2d Cir. 1967) (misrepresentation concerning defendant-purchaser's intent to pay for buy orders placed with broker-dealers); *SEC v. Czarnik*, No. 10-cv-745 (PKC), 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010) (false representations to a transfer agent concerning prospective purchaser's status as an accredited investor).

Moving Defendants' argument also fails as a matter of fact, because Defendants' alleged misrepresentations *did* bear directly on both the Swaps' value and the consideration Counterparties understood they were receiving under the Swap contracts. The value of a total return swap contract to the short party (the Counterparty) is the downside protection the long side of the contract (Archegos) guarantees against price declines in the referenced stock. Put another way, the consideration the short party receives is the long party's promise to provide payment streams correlated to negative market movements in the underlying stock. That consideration is inherently less valuable to the short side of the trade if the long party lacks the intention or ability to fulfill those contractual obligations.

Here, Defendants represented that Archegos's portfolio was sufficiently liquid and diversified to provide steady cash flows if the price of the Swaps contracts' referenced stocks fell. Those assurances were material to the Counterparties' decisions to enter into Swaps contracts with Archegos. The assurances' falsity deprived Counterparties of the benefits of their bargain and magnified the risks the Counterparties assumed under the Swaps—a reality the Counterparties learned later, to billions of dollars of their detriment.

Indeed, many cases have found the "in connection with" requirement satisfied based on

analogous deceptions. In *Drysdale*, for example, the defendant's misrepresentations to a counterparty inducing agreements to later repurchase (or resell) securities from (or to) it had no bearing on the characteristics of the securities to be exchanged. 785 F.2d at 41. Rather, the misrepresentation pertained only to the financial health of the defendant's firm. *Id.* The Second Circuit held that the misrepresentation was nonetheless "in connection with" the purchase or sale of a security because it pertained to the consideration for the contemplated securities transactions. *Id.* at 40. Specifically, the defendant's misrepresentation of its financial solvency provided assurance to its counterparty that it would be able to honor its future contractual repurchase (or resale) commitments, an assurance rendered illusory by its fabrication. *Id.* at 42.

Similarly, *Naftalin* involved a defendant's false representations that he owned shares of stock sufficient to cover short-sale orders he placed with certain broker-dealers. 441 U.S. at 770. That misrepresentation likewise did not involve the nature or value of the subject securities. Rather, it concerned only the defendant's supposed ownership of them—a deception that fraudulently concealed from broker-dealers that they, and not the defendant, would bear the risk of loss upon appreciation in the securities' market price. *See id.* The Supreme Court found that the misrepresentations satisfied the nexus requirement because they affected the broker-dealers' willingness to transact with the defendant and the terms on which they would do so. *Id.* ("[H]ad the brokers who executed his sell orders known that he did not own the securities, they either would not have accepted the orders or would have required a margin deposit.").

Here, as in those cases, Archegos's financial soundness—specifically, the stability and strength of its securities portfolio—was a critical component of the risk and value propositions of its Swaps contracts and played an essential role in dictating whether and on what terms the Counterparties would execute Swaps trades with Archegos. Defendant's false portrayals of Archegos's portfolio liquidity, concentration, and composition thereby pertained directly to the

nature, characteristics, and risks inherent to the Swaps trades at issue, and the consideration offered

for the trades, and thus meet even the narrow jurisdictional standard Moving Defendants urge.

> **B.    The Amended Complaint Adequately Alleges Hwang's Primary Liability for His Misrepresentations to One Counterparty.**

The Amended Complaint alleges intentional misrepresentations that Hwang made directly to

one Counterparty, CP8. (¶¶ 154-59.) In December 2020, Hwang signed an Annex with CP8 that

falsely represented to CP8 that Archegos's cumulative exposures to any security referenced in any

swap transaction executed thereunder (including its derivative positions) would not exceed 20% of

the outstanding shares of that issuer's securities. (*Id.*) As the architect of Archegos's portfolio, and

given his particular attentiveness to its ownership positions relative to the outstanding shares (or

"float") of any issuer whose stock Archegos held (¶¶ 23, 30-31), Hwang knew or recklessly

disregarded that this representation was false (¶¶ 158-59).

Relying on *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), Hwang first

asserts that he did not "make" the false statements in the Annex (Hwang Br. at 14-16), but his

reliance on *Janus* is misplaced. Under *Janus*, "attribution within a statement or implicit from

surrounding circumstances is strong evidence that a statement was made by—and only by—the

party to whom it was attributed." 564 U.S. at 142-43. Hwang signed the Annex and thus attested to

the accuracy of its representations, which are, accordingly, attributable to Hwang. *See id.* Indeed,

"courts in this district consistently hold that signatories of misleading documents 'made' the

statements in those documents." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164

(S.D.N.Y. 2012) (collecting numerous cases).

Hwang further contends that the Amended Complaint is deficient because it does not

adequately "allege that Mr. Hwang was ever aware of this representation" in the Annex. (Hwang Br.

at 16.) However, "the affixing of a signature is not a mere formality, but rather signifies that the

signer has read the document and attests to its accuracy," *SEC v. Jensen*, 835 F.3d 1100, 1112 (9th

Cir. 2016), and courts deem corporate officers to have read the documents they sign. *See Smith Barney*, 884 F. Supp. 26 at 164 ("Courts assume that corporate officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for their contents.") (quoting *Steamfitters Local 449 Pension Fund v. Alter*, No. 09-cv-4730, 2011 WL 4528385, at \*9 (E.D. Pa. Sept. 30, 2011)); *cf. SEC v. Berlacher*, 07-cv-3800, 2010 WL 3566790, at \*9 (E.D. Pa. Sept. 13, 2010) ("It will not do for a man to enter into a contract, and when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained.") (quoting *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875)). The allegation that Hwang signed the Annex therefore necessarily includes, and adequately alleges, his familiarity with its contents (including its false representations), and the Amended Complaint need not also allege that he read it. *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 618 (S.D.N.Y. 2015) ("[D]efendants argue that the plaintiff does not specifically allege that Buxton read the reports, but such an allegation is not required in this case").

Furthermore, the SEC may establish the requisite strong inference of Hwang's fraudulent intent through factual allegations tending to show that he "knew facts *or had access to information* suggesting that [his allegedly false] statements were not accurate" or "failed to check information that [he] had a duty to monitor." *Novak*, 216 F.3d at 311 (emphasis added). At a minimum, Hwang had access to the false Annex he signed, and he had a duty to review it before signing to ensure its accuracy. At the very least, any failure to do so was reckless.

### C. The Amended Complaint Adequately Alleges Halligan's Primary Liability for His Misrepresentations to One Counterparty.

The Amended Complaint alleges that Halligan signed and disseminated transaction confirmations to another Counterparty, CP3, and that these confirmations falsely attested that Archegos's cumulative exposures to the stock underlying its Swap (including its derivative positions) did not exceed 5% of the issuer's outstanding shares. (¶¶ 125-27.) Halligan concedes that the

Amended Complaint adequately alleges that he made these misstatements. (Halligan Br. at 23 (acknowledging these confirmations to involve "misrepresentation[s] that Halligan is alleged to have made himself").) Nor does he appear to contest his awareness of these representations when he signed and disseminated the documents. *See id.* Halligan instead challenges the adequacy of the Amended Complaint's allegations regarding his scienter by claiming they fail to identify the bases for his knowledge or reckless disregard of the falsity of his representations. (*Id.*)

This argument is meritless. The Amended Complaint alleges that Halligan was a senior manager and Chief Financial Officer of a family office whose sole function was to manage a portfolio of investments. (¶¶ 17, 20, 25.) As the Amended Complaint alleges, that role necessarily entailed Halligan's ready access to, and intimate familiarity with, the fund's portfolio. (*See* ¶ 127 (alleging Halligan's "knowledge of Archegos's portfolio").) The falsity of the attestations in these trade confirmations would have been obvious from a rudimentary comparison of Archegos's position in any stock to that stock's outstanding float—a figure that is publicly available. But the Amended Complaint alleges even more: it alleges that Halligan received daily reports that compared Archegos's holdings to the outstanding shares of each issuer whose stock Archegos owned (¶ 31) and that Halligan was privy to internal analyses detailing Archegos's overall positions and how long it would take to exit them (¶ 115). Thus, Halligan knew (or at least recklessly disregarded) that Archegos's exposures exceeded 5% of the issuers' outstanding shares. These allegations amply support Halligan's knowledge, or at least reckless disregard, of the falsity of the representations contained in the confirmations he signed and sent to CP3. *See Orthofix Int'l*, 89 F. Supp. 3d at 618 (allegations of a CFO's access to reports contradicting her public statements sufficient to plead that "she either knew about the information or showed a reckless disregard for it"); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (scienter met where plaintiff alleged that "executives reviewed specific reports that should have alerted them to the problems they later

allegedly misrepresented").

Halligan's professed ignorance of Archegos's holdings—which conflicts with the Amended Complaint's allegations—is not a basis to dismiss these claims, but rather a disputed fact suitable for resolution only by the factfinder. *See, e.g., In re Allianz Global Investors U.S. LLC Alpha Series Litig.*, No. 20-cv-5615, 2021 WL 4481215, at *30 (S.D.N.Y. Sept. 30, 2021) (allegation that employees had management responsibility over funds and thus were familiar with the fund's portfolio adequately pled scienter with respect to misrepresentations concerning the fund's portfolio composition); *In re Rsrv. Fund Sec. and Deriv. Litig.*, 732 F. Supp. 2d 310, 322 (S.D.N.Y. 2010) ("Once a plaintiff has adequately alleged that a defendant made false or misleading statements about the core operations of a company … an inference arises that the defendant knew or should have known the statements were false when made."); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001) ("[O]n a motion to dismiss, making all reasonable assumptions in favor of the plaintiff includes assuming that principal managers of a corporation are aware of matters central to that business's operation.").[20]

## IV.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES HALLIGAN'S AND HWANG'S PRIMARY LIABILITY FOR ARCHEGOS'S FRAUDULENT COUNTERPARTY DECEPTIONS.

Halligan's and Hwang's numerous deceptions of Archegos's Counterparties additionally violated the antifraud statutes' "scheme" liability provisions. Exchange Act Section 10(b) and Rules 10b-5(a) and (c) prohibit any person from employing "any device, scheme, or artifice to defraud" or

---

[20]   Some courts have questioned whether this "core operations" principle remains viable in private lawsuits brought under the Private Securities Litigation Reform Act ("PSLRA"). *See City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 18-cv-10330 (JPO), 2020 WL 2834857, at *4 (S.D.N.Y. June 1, 2020). The SEC, however, "is not a private litigant and, thus, is not subject to the heightened scienter pleading requirements of the [PSLRA]." *SEC v. Gold*, No. 05-cv-4713, 2006 WL 3462103, at *5 n.3 (E.D.N.Y. Aug. 18, 2006).

engaging in any "act, practice, or course of business" which operates as a fraud or deceit, in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(a), (c). Securities Act Sections 17(a)(1) and (a)(3) similarly prohibit any person from, in the offer or sale of a security, employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates as a fraud or deceit. 15 U.S.C. § 77q(a)(1), (3). As described above in Argument Section III, allegations of scienter are required to sustain a violation of Rules 10b-5(a) and (c) and Section 17(a)(1), but negligence suffices for Section 17(a)(3).

To assert a violation of these subparts the SEC must allege that Moving Defendants, with scienter (or negligence under Section 17(a)(3)), committed a manipulative or deceptive act in furtherance of the scheme to defraud. *Wey*, 256 F. Supp. 3d at 915-16. The SEC need not allege that a defendant "participated in each and every aspect of the fraudulent scheme" to establish primary scheme liability. *SEC v. Sugarman*, No. 19-cv-5998, 2020 WL 5819848, at *9 (S.D.N.Y. Sept. 30, 2020). The SEC need only allege that a defendant employed a deception that "contributed to the larger scheme." *Id.* (quoting *SEC v. Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020)). Finally, to be "deceptive," an act need not be inherently unlawful. *Wey*, 246 F. Supp. 3d at 918 (defendant's "conduct may not have been inherently unlawful, but it was deceptive"); *see also United States v. Treacy*, No. 08 CR 0366(RLC), 2008 WL 4934051, at *4 (S.D.N.Y. Nov. 19, 2008) ("If the activity in question amounts to a scheme to deceive, irrespective of its legality, it may be violative"). The Amended Complaint more than adequately alleges that Hwang and Halligan violated the scheme liability provisions based on their deceptions of Archegos's Counterparties for the reasons described below.

### A. The Amended Complaint Adequately Alleges Claims Against Halligan for Primary Violations of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c).

The Amended Complaint alleges in detail Halligan's many deceptive contributions to Archegos's overall fraudulent scheme. As described above in Facts Section IV.B and Argument

Section III.C, Halligan affirmatively misstated to CP3 that Archegos's exposures amounted to less than 5% of the referenced securities' outstanding float. In addition, Halligan also played an instrumental part in orchestrating Archegos's serial and systemic deceptions of its Counterparties through Tomita and Becker. Among other things, the Amended Complaint alleges that Halligan: (1) directed Becker to use a false number when detailing Archegos's largest portfolio position size in his communications with Counterparties (¶¶ 110, 152); (2) concocted a fabricated liquidity profile for Archegos's portfolio to deceive Counterparties into believing that Archegos could exit its concentrated positions more quickly than it actually could (¶¶ 114-115); and (3) instructed Becker to coordinate with Tomita in their fraudulent Counterparty dealings to ensure that their (false) stories stayed straight (¶ 149). Halligan's misconduct persisted even as Archegos was collapsing, as Halligan directed and approved a series of known falsehoods for Becker to use in order to allay Counterparty concerns and stave off default notices and account seizures. (¶¶ 173-174.)

Each of these acts was inherently deceptive, and each (independently and cumulatively) contributed materially to Defendants' broader fraudulent market manipulation scheme. Halligan's sole purpose in engaging in this conduct was to deceive Archegos's Counterparties as part of a concerted effort to circumvent their risk controls and, through false pretenses, access additional trading capacity and margin. Archegos needed these capacity and credit extensions to perpetuate the manipulative trading scheme designed to artificially inflate the prices of Archegos's Top 10 Holdings. Halligan's deceptive conduct was similarly instrumental to obscuring from the Counterparties and the market Archegos's role in driving the price run-up of these stocks. These allegations, including Halligan's directions and instructions to Becker, amply establish Halligan's primary liability for his role in Archegos's manipulative scheme.

Halligan's only counterargument posits that, because his misconduct involved creating or making false statements to Archegos's Counterparties, it is actionable only under Rule 10b-5(b), and

the SEC's allegations therefore improperly repackage misrepresentation claims as a scheme. (*See* Halligan Br. at 26-29.) Advancing this argument, Halligan relies almost exclusively on *SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022), but that decision does not affect scheme liability here.

In *Rio Tinto*, the Second Circuit addressed only the "narrow" question of whether the Supreme Court's holding in *Lorenzo v. SEC*, 13 S. Ct. 1094 (2019)—that "dissemination" of false statements may support a finding of scheme liability—abrogated *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), which held that "misstatements and omissions alone are not enough for scheme liability." The Second Circuit concluded that it did not. *Rio Tinto*, 41 F.4th at 49. *Rio Tinto* harmonized those two precedents by holding that although scheme liability still requires "something beyond misstatements and omissions," dissemination of those misstatements "is one example of something extra that makes a violation a scheme." *Id.* at 54 (citing *Lorenzo*, 139 S. Ct. at 1100). If merely disseminating another's false statement constitutes conduct beyond misrepresentations sufficient to provide a basis for scheme liability, then plainly Halligan's conduct—involving his oversight and direction of a coordinated campaign to mislead Archegos's Counterparties into departing with securities and credit they otherwise would not have—does as well. *See SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 495 (S.D.N.Y. 2007) ("[K]nowingly supervising employees who are carrying out a fraudulent scheme is itself the employment of a deceptive device.").

Moreover, *Rio Tinto* addressed schemes—unlike Defendants' scheme here—predicated exclusively on misstatements. In *Rio Tinto*, the ultimate objective of the alleged scheme was the defendant mining company's fraudulent overstatement of the quality of its coal reserves in its financial statements and auditing papers. 41 F.4th at 50. In *Lentell*, the ultimate purpose and effect of the purported scheme was an investment bank's publication of research reports containing positive stock recommendations that were materially false. 396 F.3d at 161. In each case, there was no difference between the alleged misrepresentations and the "scheme" to create them; the end result

of the "scheme" and the misstatements were one and the same. *See Rio Tinto*, 41 F.4th at 53 ("We have no occasion to determine for ourselves whether the scheme liability claims in this complaint allege something beyond misrepresentations and omissions. Our analysis is premised on the district court's ruling…, which characterized the scheme liability claims as a collection of misstatements and omissions."); *Lentell*, 396 F. 3d at 177 (a plaintiff has not made out a market manipulation claim under Rule 10b-5(a) and (c) "where the *sole basis* for such [scheme] claims is alleged misrepresentations or omissions") (emphasis added); *see also SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (cited in Halligan Br. at 28) (addressing a situation "where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission"). The Second Circuit held that in such situations—where "scheme" and "misrepresentation" claims overlap entirely—fidelity to *Janus*'s limitation on primary liability for misstatements (to only their "makers") and the distinction between primary liability (which is actionable in private suits) and secondary liability (which is not), requires the claims to be asserted under the misstatement provisions alone. *Rio Tinto*, 41 F.4th at 54-55.

No similar concerns are present where the scheme alleged involves conduct beyond the misrepresentations. *See In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) (distinguishing scheme claims that allege merely that defendant "was a participant in a scheme through which [mis]statements are made," which are not actionable under Rule 10b-5(a) and (c), from those alleging "a deceptive scheme or course of conduct that went beyond the misrepresentations," which are).

Consistent with this precedent, the Amended Complaint plainly alleges a scheme distinct and apart from the alleged misstatements. The frauds that Halligan perpetrated on Archegos's Counterparties were not ends in themselves but, rather, the essential means to achieve Archegos's larger scheme to fraudulently inflate the share prices of its most concentrated positions through rampant manipulative trading. (¶¶ 4-6.) Where, as here, the alleged scheme includes, but is more

expansive than, the misrepresentations, a defendant's active and knowing employment of deceptive conduct in furtherance of it will establish his primary liability under the scheme sub-provisions, regardless of whether that deception takes the form of fraudulent misstatements or some other type of activity. *See Sason*, 433 F. Supp. 3d at 509 (allegations of scheme liability found sufficient where plaintiff alleged that defendants "condoned the creation of the falsified…documents and used them to facilitate" scheme's ends); *SEC v. Sayid*, No. 17 CIV. 2630 (JFK), 2018 WL 357320, at *7 (S.D.N.Y. Jan. 10, 2018) (defendant's primary scheme liability was adequately pled where his misrepresentations in opinion letters "were an integral part of [an] overall pump and dump scheme"); *Collins & Aikman Corp.*, 524 F. Supp. 2d at 486 ("Participation in a scheme can thus be sufficient for liability under section 10(b)…if that participation took the form of actions *or statements* that were independently deceptive or fraudulent.") (emphasis added). Halligan cannot evade liability for his deceptive contributions to this scheme by labeling them as mere "misrepresentations."[21]

Halligan additionally argues that he lacked the intent required to support a primary charge against him on the basis of his contributions to Archegos's overarching scheme because he "had no role in trading or investment decisions" and "is not even alleged to have known about the 'non-economic trading' that [Archegos] was allegedly effecting through its Counterparties." (Halligan Br.

---

[21]     That Halligan's efforts to deceive Archegos's Counterparties may be independently actionable as violations of the antifraud statutes' misstatement *and* scheme provisions is of no moment. Courts have long observed that there is "considerable overlap among the subsections" of Rule 10b-5 and Section 17(a) and that the same underlying conduct may establish a violation of more than one subsection. *Lorenzo*, 13 S. Ct. at 1102 ("[I]t is hardly a novel proposition" that different subsections of Rule 10b-5 "prohibit some of the same conduct"); *see also SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 286-87 (2d Cir. 2013) (affirming liability under all three prongs of Rule 10b-5 for a late trading scheme where defendant implicitly misrepresented that orders were received before market close and actively sought out brokers who would permit late trades); *VanCook v. SEC*, 653 F.3d 130, 138-39 (2d Cir. 2011) (similar); *Collins & Aikman Corp.*, 524 F. Supp. 2d at 492-93 (complaint stated claim under all subsections of antifraud provision where it alleged that defendants schemed to overstate revenue and engaged in "activities designed to conceal their fraud from the Audit Committee's investigators").

at 27.) But the SEC is not required to allege that a defendant participated in every aspect of the fraudulent scheme to establish scheme liability, as discussed above. *See Sugarman*, 2020 WL 5819848, at *9 (quoting *Wey*, 246 F. Supp. 3d at 916). Further, as detailed above in Facts Section I and Argument Section III.C, Halligan's oversight of Archegos's operations, finances, and back office and risk functions plainly provided—and, indeed required—his visibility into Archegos's portfolio positions and values, and the Amended Complaint expressly identifies specific internal reports that would have alerted him to Archegos's rapid accumulation of market dominance over Archegos's Top 10 Holdings during the Relevant Period. Those allegations provide ample basis to infer that he knew, or recklessly disregarded, that Archegos was recycling the capacity and credit he fraudulently procured into repeated purchases of the Top 10 Holdings designed to diminish their public float and prop up their prices. *See SEC v. U.S. Environmental, Inc.*, 155 F.3d 107, 111-12 (2d Cir. 1998) (reckless participation in a manipulation may suffice to support scienter).

In any event, neither Halligan's factual denial of these allegations nor his factual disputes as to his intent are appropriate for resolution on a motion to dismiss. *See LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 517 (S.D.N.Y. 2014) ("[I]ssues of intent and motive are typically factual inquiries that should not be decided on a motion to dismiss."); *SEC v. Landberg*, 836 F. Supp. 2d 148, 156 (S.D.N.Y. 2011) ("Gould's factual claim that his role as CFO of a public company was merely that of a 'scrivener'…can only be resolved at trial or on a full factual record.").

To the extent that Halligan attempts to argue that he cannot be held to account for his deceptive contributions to the scheme because he did not share Archegos's and Hwang's specific manipulative intent to inflate share prices, that argument should fail as well. *See U.S. Environmental*, 155 F.3d at 111-12 (extending primary liability to a registered trader who "did not himself have a manipulative purpose" when he engaged in deceptive trading at the direction of his employer). As long as the SEC has alleged that Halligan knowingly or recklessly (or negligently for purposes of

Section 17(a)(3)) engaged in deceptive conduct in furtherance of the manipulative scheme, it has met

its burden, regardless of Halligan's personal motivation for his misconduct. *See id.* at 112 (where a

defendant has engaged in deceptive conduct contributing to a market manipulation scheme, his

"personal motivation for manipulating the market is irrelevant"). The Amended Complaint's

allegations meet that burden here.

### B.   The Amended Complaint Adequately Alleges Claims Against Hwang for Primary Violations of Sections 17(a)(1) and (3) and Rules 10b5-(a) and (c).

This same analysis compels sustaining Hwang's primary liability for Becker and Tomita's

misstatements under Sections 17(a)(1) and (3) and Rules 10b5-(a) and (c). The Amended Complaint

alleges not only that Hwang knew of and contributed to the series of lies Tomita relayed to

Archegos's Counterparties, but also that Hwang orchestrated and directed these lies. (¶ 105 (alleging

Tomita's allocution) ("I agreed with [Hwang] and others to carry out the business of Archegos

through a pattern of…deceiving counterparties."); *see also* ¶¶ 100-104, 146.) Such allegations more

than suffice to establish Hwang's primary liability for the deceptive scheme, as the very case Hwang

relies on in urging a contrary result recognizes. *See Hawaii Ironworkers Annuity Trust Fund v. Cole*, No.

10-cv-371, 2011 WL 3862206, at *7-9 (N.D. Ohio Sept. 1, 2011) (cited in Hwang Br. at 16) (senior

officers who pressured subordinates into falsely inflating profit forecasts could be primarily liable

under Rules 10b-5(a) and (c) for the misstatements even if they did not "make" them for purposes

of Rule 10b-5(b)); *see also Collins & Aikman Corp.*, 524 F. Supp. 2d at 495. Put another way, the

Supreme Court has held that disseminating false statements is actionable under the scheme liability

provisions, *Lorenzo*, 13 S. Ct. at 1100, and orchestrating and directing false statements is logically just

as actionable.

### V.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES AIDING-AND-ABETTING CLAIMS AGAINST HALLIGAN.

In addition to alleging primary fraud liability against Halligan—under Exchange Act Section

10(b) and Securities Act Section 17(a)—for his participation in Archegos's material false statements to the Counterparties, the Amended Complaint also alleges, for the same conduct, that Halligan aided and abetted Becker's violations of those provisions. (¶¶ 189-194.) To adequately allege an aiding-and-abetting claim, the SEC must demonstrate: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party"; (2) knowledge or reckless disregard of this violation by the aider and abettor; and (3) "'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 & n.6 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).

The Amended Complaint adequately alleges each of these elements. First, as to Becker's primary liability, the Amended Complaint alleges that Becker has pleaded guilty to securities fraud and allocuted to the very fraudulent conduct that the Amended Complaint alleges against him in this case. (¶ 106.) Halligan does not dispute these facts. Second, the Amended Complaint adequately alleges Halligan's scienter for the reasons described above in Argument Section IV.A. Finally, the Amended Complaint alleges Halligan's substantial assistance, including through his directions and instructions to Becker, as further described above in Argument Section IV.A.

Halligan nevertheless asserts that the Amended Complaint does not state a claim for secondary liability against him because it does not adequately plead (1) a primary liability claim against Becker, (2) Halligan's knowledge of Becker's primary violation, and (3) Halligan's substantial assistance as to Becker's primary violation. Halligan's arguments are meritless.

First, Halligan argues that no primary violation occurred because Becker's actions in defrauding the Counterparties were not "in connection with" the purchase or sale of a security and, thus, do not satisfy the elements of a primary Section 10(b) or 17(a) claim against Becker. For the reasons set forth in Argument Section III.A above, however, Defendants' alleged fraudulent conduct was "in connection with" purchases and sales of securities—the Swaps—for purposes of

Sections 10(b) and 17(a).

Second, with respect to scienter and substantial assistance, the Amended Complaint is replete with detailed allegations—most of which Halligan ignores—and which, taken together, sufficiently allege both elements. *See supra* Facts Section IV.B. Among other things:

- Halligan instructed Becker to tell Counterparties that Archegos's largest position was 35% of its net asset value when he knew that figure was false (¶¶ 110, 152), a lie Becker relayed repeatedly to multiple Counterparties to deceive them as to the extent of Archegos's portfolio concentration (*see, e.g.* ¶¶ 111, 117-19, 123, 135, 150);

- Halligan directed that Becker and Tomita participate jointly in calls with Counterparties to make sure their falsehoods concerning Archegos's portfolio liquidity and concentrations remained consistent (¶ 149);

- Informed by Becker of false concentration information Becker provided a counterparty, Halligan responded "if they only knew," which Becker understood reflected Halligan's knowledge of his serial deceptions of Archegos's Counterparties and his encouragement of its continuation (*id.*);

- Halligan colluded with Tomita and Becker to manufacture a false portrayal of Archegos's overall portfolio liquidity that was to be (and was) relayed to a Counterparty to obtain additional trading capacity to permit the continuation of Archegos's manipulative Swaps purchasing (¶¶ 115-16); and

- Even as Archegos was collapsing, Halligan directed Becker to provide false and misleading information about Archegos's positions to deter the issuance of default notices and/or the forced liquidation of Archegos's portfolio (¶¶ 173-74).

Notwithstanding Halligan's attempts to ignore or gloss over many of these allegations, the Amended Complaint more than adequately pleads that Halligan aided and abetted Becker's fraud with respect to Archegos's material misrepresentations to Counterparties.

## VI.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY AGAINST HWANG.

To state a claim for control person liability under Exchange Act Section 20(a), the SEC must allege "(1) a primary violation by the controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant in the primary violation.'" *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

Regarding the first element, the Amended Complaint alleges that Hwang is liable as a control person for primary violations by Defendants Archegos and Tomita. (¶¶ 198-202). For the reasons set forth in Argument Sections I.C and III above, the Amended Complaint adequately alleges primary violations by Archegos and Tomita, who pled guilty to criminal charges that he engaged in market manipulation and misled Counterparties. Hwang's arguments to the contrary with respect to control person liability simply repeat his arguments that Archegos and Tomita are not primary violators, which are meritless for the reasons discussed above.

Regarding the second element, the Amended Complaint adequately alleges Hwang's "control" of Archegos and Tomita with respect to the conduct at issue—and Hwang does not appear to contend otherwise. For purposes of Section 20(a), the SEC can establish Hwang's control by showing that he possessed the "power to direct or cause the direction of the management and policies [of the controlled entity], whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2 (defining "control"); *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 306 (S.D.N.Y. 2008). Furthermore, to satisfy this element, it is not necessary for the SEC to allege that Hwang controlled each and every violative transaction that the Amended Complaint alleges. *See In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 551-52 (S.D.N.Y. 2007); *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). The Amended Complaint alleges that Hwang was Archegos's founder and majority owner and that he was responsible for all Archegos investment and management decisions. (¶ 16.) The Amended Complaint further alleges that, at all relevant times, Hwang controlled Tomita's actions as an Archegos employee. (¶ 45.) These allegations adequately plead that Hwang controlled Archegos and Tomita under Exchange Act Section 20(a).

Finally, as explained in Argument Sections I.C, II, and IV.B, the Amended Complaint adequately alleges that Hwang was at least a "culpable participant" in Archegos's and Tomita's

primary violations. As Hwang notes, to establish his culpable participation, the SEC must allege "particularized facts of the controlling person's conscious misbehavior or recklessness." *Sason*, 433 F. Supp. 3d at 514–15; *see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008) ("[T]o withstand a motion to dismiss a section 20(a) controlling person liability claim, a plaintiff must allege 'some level of culpable participation at least approximating recklessness in the section 10(b) context.'"). As explained in Section II.B above, the Amended Complaint amply alleges in detail Hwang's knowledge or recklessness regarding the market manipulation scheme, including his knowledge or reckless disregard of the false representations in the Counterparty Annex he signed. While Hwang asserts that the Amended Complaint does not adequately allege his culpable participation, he ignores the specific allegations of his scienter—for example, Tomita's statements that Hwang directed him to trade in manipulative ways and agreed to carry out Archegos's business through deceiving Counterparties (¶ 45)—which more than suffice to state a claim for control person liability.

Furthermore, the cases Hwang cites (Hwang Br. at 34-36) are inapposite and, if anything, show that the Amended Complaint states a control person liability claim. The complaints in those cases contained one of three problems that do not exist here: the complaints pled only the most general scienter allegations, pled only allegations of negligence, or failed to plead a primary violation—and none contained the level of detail that the Amended Complaint alleges regarding Hwang's culpable participation. *See Sason*, 433 F. Supp. 3d at 414-15 ("The SEC's only allegations as to [defendant's] culpability are that he approved the Lustros Notes transactions without reviewing the deal documents or diligence materials…. At most, that establishes negligence, not conscious misbehavior or recklessness."); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA Ltd.*, 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014) (plaintiff's sole allegation of defendant's culpable participation involved conduct that plaintiff did not otherwise allege was "improper or suspicious");

*In re Gentiva Secs. Litig.*, 932 F. Supp. 2d 352, 390-91 (E.D.N.Y. 2013) (court dismissed plaintiff's "control person" claim mainly because, in addition to not adequately alleging scienter, the complaint otherwise failed to state a "primary violation"); *Edison Fund,* 551 F. Supp. 2d at 231-32 (in dismissing one of plaintiff's "control person" claims, court found that the amended complaint "only alleges [one defendant's] culpability in the most general of terms…. While the [a]mended [c]omplaint only alleges that [that defendant] was 'intentionally and/or recklessly' liable for the [other defendants'] conduct, it pleads no facts that would give rise to a showing of recklessness or intention on behalf of [that defendant].").

For these reasons, the Court should deny Hwang's motion to dismiss the Amended Complaint's claim for control person liability against Hwang.

## VII.   THE AMENDED COMPLAINT SATISFIES THE PLEADING REQUIREMENTS OF CIVIL RULES 8(A) AND 9(B).

The Amended Complaint divides its relevant factual allegations into clearly-labeled sections, including Section III concerning Defendants' manipulative trading and Section IV describing the material misrepresentations, and subsections addressing specific trading conduct and specific misrepresentations. (¶¶ 43-94, 95-159.) The Amended Complaint also alleges facts that describe Defendants' manipulative acts in furtherance of their scheme and acts that show why each alleged misrepresentation is false or misleading. (*Id.*) In order to avoid repetition, as permitted by Civil Rule 10(c), the Amended Complaint re-alleges and incorporates these factual allegations by reference into each of its claims sections. (¶¶ 180, 183, 186, 189, 192, 195, 198); Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading.").

Hwang nevertheless asserts that the Amended Complaint fails to provide him with adequate notice of the claims against him as required by Civil Rule 8(a) (Hwang Br. at 9-11), and Archegos and Hwang contend that the Amended Complaint does not satisfy the particularity pleading requirement for fraud claims under Civil Rule 9(b). (Archegos Br. at 34-36, 41; Hwang Br. at 11-14.)

Both arguments are without merit.

*First*, with respect to Civil Rule 8(a), Hwang argues that the Amended Complaint "does not provide even the barest indication of which subsections of [Securities Act Section 17(a) and Exchange Act Section 10(b)] Mr. Hwang allegedly violated[.]" (Hwang Br. at 10.) This assertion is puzzling, as Counts I and III specifically allege that Hwang violated each subsection of those statutes. (¶ 181 ("Defendant[] Hwang…(a) knowingly or recklessly employed devices schemes, and artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of such securities."); ¶ 187 (alleging that "All Defendants," including Hwang, "(1) employed one or more devices, schemes, or artifices to defraud; (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.").)

Any notion that Hwang was unable to "discern the conduct in which he is alleged to have engaged" (Hwang Br. at 9) is similarly absurd in light of the Amended Complaint's extensive factual allegations detailing Hwang's central role in Archegos's manipulation scheme and its misrepresentations to Counterparties. (*See, e.g.*, ¶¶ 62, 67-70, 76, 82-85, 91-94, 99-100, 102-105, 141-142, 146, 157-159.) Indeed, despite his protestations, Hwang's own moving papers show a clear understanding of which factual allegations correspond to the fraud claims against him. There can be no serious question the Amended Complaint satisfies Civil Rule 8(a). *Bai v. Tegs Mgmt., LLC*, No.

20CV4942 (DLC), 2022 WL 602711, at *5 (S.D.N.Y. Mar. 1, 2022) ("The Second Circuit has…made clear that dismissal [pursuant to Rule 8(a)] is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.") (citing *Harnage v. Lightner*, 916 F.3d 138, 141 (2d Cir. 2019)) (internal quotations omitted).

*Second*, Archegos and Hwang both misstate Civil Rule 9(b)'s particularity pleading requirement and ignore many of the Amended Complaint's detailed allegations, which more than suffice to satisfy Civil Rule 9(b).

As a general matter, for fraud claims, Civil Rule 9(b) "requires the plaintiff to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Badian*, 2008 WL 3914872, at *3 (internal quotation marks omitted). This "is not intended to be an 'insurmountable hurdle for [claimants] to overcome.'" *SEC v. Power*, 525 F. Supp. 2d 415, 423 (S.D.N.Y. 2007). "Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map. Nor should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court." *Bangkok Crafts Corp. v. Capitolo di San Pietro*, No. 03 Civ. 0015, 2006 WL 1997628, at *5 (S.D.N.Y. July 18, 2006) (internal quotations and citation omitted).

In addition, although "the SEC is subject to the pleading standard codified in Civil Rule 9(b), the heightened pleading standards imposed by the [PSLRA]…do not apply to actions brought by the SEC." *Id.*; *see also SEC v. Dunn*, 587 F. Supp. 2d 486, 500 (S.D.N.Y. 2008) (standard in PSLRA actions that inference of scienter must be "cogent and at least as compelling as any opposing inference" does not apply in SEC enforcement actions); *SEC v. Alternative Green Techs.*, No. 11 Civ. 9056, 2012 WL 4763094, at *3 (S.D.N.Y. Sept. 24, 2012) (to satisfy Civil Rule 9(b) "[c]onclusory

allegations of scienter are sufficient if there exist[s] a minimal factual basis giving rise to a strong inference of fraudulent intent") (internal quotations and citations omitted). Further, the Rule 9(b) particularity "standard is relaxed somewhat with respect to claims of market manipulation because they can involve facts solely within the defendant's knowledge." *Alternative Green Techs.*, 2012 WL 4763094, at *4. "Therefore, at this early stage of litigation," the SEC "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Id.* Rather, the SEC need only allege, "to the extent possible: [1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were performed, and [4] what effect the scheme had on the market for the securities at issue." *Id.* (internal quotations omitted).

The Amended Complaint alleges a market manipulation claim against Archegos and Hwang, and it satisfies Civil Rule 9(b)'s pleading requirements for such fraud claims. The Amended Complaint alleges each of these four categories in detail. First, as to the "manipulative acts that were performed," the Amended Complaint alleges Defendants' deception of the Counterparties to obtain and increase Archegos's Swaps exposure (*see supra* Facts Section IV; Argument Section III-IV) and Archegos's various manipulative open-market trading techniques (*see supra* Facts Section III; Argument Section I.C.1). Second, with respect to "which defendants performed" the manipulative acts, the Amended Complaint alleges that, at Hwang's direction, Becker, Tomita, and Halligan deceived the Counterparties, and Hwang himself did so directly (*see supra* Facts Section IV; Argument Section III-IV) and that, at Hwang's direction, Tomita performed the open-market manipulations (*see supra* Facts Section III; Argument Section I.C.1). Third, as for "when the manipulative acts were performed," the Amended Complaint specifies the dates when the individual Defendants deceived the Counterparties (*see* ¶¶ 108-170), further alleges that Defendants' manipulative trading occurred during the Relevant Period (September 2020 through March 2021) (*see, e.g.*, ¶ 3), and provides specific examples during that time period (*see, e.g.*, ¶¶ 73, 86-87, 89).

Finally, as to the "effect the scheme had on the market," the Amended Complaint details the effect Defendants' manipulation scheme had on the stock of Archegos's Top 10 Holdings (*see supra* Facts Section III, V; Argument Section I.C.) Thus, the Amended Complaint pleads market manipulation, and otherwise pleads fraud against Archegos and Hwang, with adequate particularity.

Hwang also asserts that the Amended Complaint does not adequately "tie" him to Defendants' false statements to the Counterparties. (Hwang Br. at 12.) But Hwang both ignores certain of the Amended Complaint's specific allegations against him and misapplies Civil Rule 9(b)'s particularity standard. To begin with, the Amended Complaint alleges that Hwang directly and intentionally made certain material false statements to the Counterparties, including the dates and nature of those false statements (*see supra* Facts Section IV.A; Argument Section II.B.). Furthermore, the Amended Complaint alleges—as Tomita has acknowledged—that Hwang directed the other individual Defendants to make numerous other false statements to the Counterparties, each of which the Amended Complaint pleads with particularity as to time and substance (*see supra* Facts Section IV; Argument Section VI). At trial or on summary judgment, the SEC will offer evidence sufficient to establish how Hwang so directed the other Defendants, but at the pleading stage, Civil Rule 9(b) requires no greater specificity regarding these claims, and Hwang cites no case suggesting otherwise.

As for the Amended Complaint's allegations of Defendants' open market transactions, Hwang and Archegos claim that the Amended Complaint does not adequately detail the specific manipulative acts and when they occurred. (Hwang Br. 12-14; Archegos Br. 34-36.) Directly contrary to this assertion, the "relaxed" pleading requirement in this Circuit for market manipulation claims does not require the SEC to plead these facts with the degree of particularity Defendants assert. In any event, the Amended Complaint pleads with specificity the various categories of Defendants' manipulative trading (*see supra* Facts Section III; Argument Section I.C.1), as well as specific

instances of Defendants' manipulative trading (*see, e.g.*, ¶¶ 86, 87, 89, 90, 93, 94)—and that the manipulative trading occurred during the Relevant Period. Contrary to Hwang's argument, these allegations are sufficiently particular to satisfy Civil Rule 9(b)—especially in the context of a market manipulation claim. *See Badian*, 2008 WL 3914872, at *4-5 (plaintiff's allegations of defendants' manipulative "short sales," "wash sales," and "matched orders" from "March 2001 through April 2001" satisfied Rule 9(b)'s particularity requirement); *Internet Law Library v. Southridge Capital Mgmt., LLC,* 223 F. Supp. 2d 474, 482 (S.D.N.Y.2002) (holding that "a two month period is sufficiently circumscribed to satisfy the requirement of Rule 9(b)").

Hwang finally erroneously asserts that the Amended Complaint does not adequately allege "what false information these trades conveyed to the market." (Hwang Br. at 13.) To the contrary, the Amended Complaint specifically alleges "the false pricing signals" that Defendants' manipulative scheme sent to the market. (¶ 53.) The Amended Complaint further details how Archegos employed various manipulative trading techniques—"pre-open trading," "trading at the end of the day," and "intra-day" trading—with the specific intent of maintaining or increasing the stock price of its Top 10 Holdings. (¶¶ 82-94.) Again, Civil Rule 9(b) requires no greater specificity.

For these reasons, the Amended Complaint satisfies Civil Rule 9(b)'s particularity requirements for pleading fraud—particularly in the context of this case, where the SEC alleges market manipulation against Defendants Archegos and Hwang.[22]

## CONCLUSION

For the foregoing reasons, the Court should deny the Motions to Dismiss in their entirety.

Dated: December 23, 2022
New York, New York

---

[22] If the Court nevertheless dismisses any portion of the Amended Complaint for failure to provide adequate notice under Civil Rule 8(a) or plead fraud with particularity under Civil Rule 9(b), the SEC respectfully requests leave to replead.

Respectfully submitted,

/s/ *Jessica T. Quinn*

Jessica T. Quinn
David Zetlin-Jones
Jack Kaufman
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0929 (Quinn)
quinnj@sec.gov