UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

SUNG KOOK (BILL) HWANG; PATRICK
HALLIGAN; WILLIAM TOMITA; SCOTT
BECKER; and ARCHEGOS CAPITAL
MANAGEMENT, LP,

Defendants.

No. 1:22-cv-3402 (JPO)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT
ARCHEGOS CAPITAL MANAGEMENT'S
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

Carmen J. Lawrence
William F. Johnson
Eric A. Hirsch
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100

*Attorneys for Defendant
Archegos Capital Management, LP*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ...................................................................................... 3

    I.    The SEC's Allegations Are Insufficient to State A Market Manipulation Claim .......... 3

        A.    Deception is Required For a Market Manipulation Claim...................................... 6

        B.    The SEC Has Failed to Adequately Allege That the Market Price of the Relevant Securities Was Both Artificial And Due to Archegos' Conduct .......................... 12

            1.    *The Counterparty Hedging Allegations Fail to Support the Claim That Trading in Private Swaps Transactions Sent a False Signal to the Market* ... 12

            2.    *Allegations Describing Multiple Instances of Non-Manipulative Trading Do Not Generate a Viable Claim of Market Manipulation* ................................. 15

            3.    *There Are No Allegations that Archegos Deceived Counterparties About Trades or Their Prices* ..................................................................... 17

            4.    *Archegos' Use of Swaps Does Not Amount to Deceptive Conduct* ............... 19

        C.    The SEC Has Not Adequately Alleged Scienter..................................................... 20

            1.    *Mr. Becker's and Mr. Tomita's Allocutions Do Not Generate A Strong Inference of Scienter* ..................................................................... 20

            2.    *The Economics of the Alleged Scheme Are Relevant To, And Undermine, Any Inference of Scienter* ..................................................................... 24

    II.    The SEC's Jurisdictional Arguments Ignore Controlling Precedent ............................ 24

CONCLUSION ..................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp. Inc.*,
  47 F.3d 47 (2d Cir. 1995) ....................................................................21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................... *passim*

*ATSI Commc'ns Inc. v. Shaar Fund Ltd.*,
  493 F.3d 87 (2d Cir. 2007)......................................................... *passim*

*Bai v. Tegs Mgmt, LLC*,
  2022 WL 602711 (S.D.N.Y. Mar. 1, 2022) ...........................................26

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................3

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005).....................................................23

*In re Blech Secs. Litig.*,
  928 F. Supp. 1279 (S.D.N.Y. 1996).......................................................10

*CFTC v. Gorman*,
  587 F. Supp. 3d 24 (S.D.N.Y. 2022)................................................10, 11

*Chadbourne & Parke LLP v. Troice*,
  571 U.S. 377 (2014)........................................................................ 25-26

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)......................................................... *passim*

*Chemical Bank v. Arthur Andersen & Co.*,
  726 F.2d 930 (2d Cir. 1984).......................................................... 26, 29

*In re College Bound Consol. Litig.*,
  1995 WL 450486 (S.D.N.Y. July 31, 1995) ...........................................16

*CSX Corp. v. Children's Inv. Fund. Mgmt. (UK) LLP*,
  562 F. Supp. 2d 511 (S.D.N.Y. 2008).....................................................14

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976).................................................................................9

*Markowski v. SEC,*
   274 F.3d 525 (D.C. Cir. 2001) ........................................................................................12, 24

*In re McKesson HBOC, Inc. Secs. Litig.,*
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................................21

*Menzies v. Seyfarth Shaw LLP,*
   943 F.3d 328 (7th Cir. 2019) ...................................................................................... 29-30

*Noto v. 22nd Century Grp. Inc.,*
   35 F.4th 95 (2d Cir. 2022) ...............................................................................................8

*River Birch Capital, LLC v. Jack Cooper Holdings Corp.,*
   2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ..........................................................................27

*Santa Fe Indus., Inc. v. Greene,*
   430 U.S. 462 (1977)..........................................................................................................9

*SEC v. Alternative Green Techs., Inc.,*
   2012 WL 4763094 (S.D.N.Y. Sept. 24, 2012).........................................................................23

*SEC v. Drysdale Secs. Corp.,*
   785 F.2d 38 (2d Cir. 1986)................................................................................................29

*SEC. v. Dunn,*
   587 F. Supp. 2d 486 (S.D.N.Y. 2008)...................................................................................23

*SEC v. Fiore,*
   416 F. Supp. 3d 306 (S.D.N.Y. 2019)...............................................................................3, 23

*SEC v. Im,*
   2018 WL 840094 (S.D.N.Y. Feb. 12, 2018)...........................................................................23

*SEC v. Jakubowski,*
   150 F.3d 675 (7th Cir. 1998) ............................................................................................29

*SEC v. Kinnucan,*
   9 F. Supp. 3d 370 (S.D.N.Y. 2014).....................................................................................22

*SEC v. Kwak,*
   2008 WL 410427 (D. Conn. Feb. 12, 2008) ..........................................................................10

*SEC v. Lek Secs. Corp.,*
   276 F. Supp. 3d 49 (S.D.N.Y. 2017).................................................................................9, 24

*SEC v. Maillard,*
   2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014).........................................................................28

*SEC v. Martino*,
   255 F. Supp. 2d 268 (S.D.N.Y. 2003)....................................................................24

*SEC v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007)....................................................................11

*SEC v. One or More Unknown Traders in the Secs. of Fortress Inv. Grp., LLC*,
   2018 WL 4676043 (D.N.J. Sept. 27, 2018) ..........................................................28

*SEC v. Parnes*,
   2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) .......................................................20

*SEC v. Suterwalla*,
   2008 WL 9371764 (S.D. Cal. Feb. 4, 2008) ..........................................................28

*SEC v. Vali Mgmt. Partners*,
   2022 WL 2155094 (2d Cir. June 15, 2022) ........................................................ 9-10

*SEC v. Wey*,
   246 F. Supp. 3d 894 (S.D.N.Y. 2017)............................................................... 19-20

*SEC v. Wyly*,
   788 F. Supp. 2d 92 (S.D.N.Y. 2011)......................................................................28

*SEC v. Zandford*,
   535 U.S. 813 (2002).......................................................................................... 27-28

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
   2009 WL 1492196 (S.D.N.Y. May 27, 2009) .......................................................16

*Set Capital LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021)......................................................................... *passim*

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015).......................................................................10

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)......................................................................................19

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001)......................................................................................22

*Sullivan & Long, Inc. v. Scattered Corp.*,
   47 F.3d 857 (7th Cir. 1995) ............................................................................. 11-12

*Taylor v. Westor Capital Grp.*,
   943 F. Supp. 2d 397 (S.D.N.Y. 2013)............................................................... 4-5, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................23

*Tepperwien v. Entergy Nuclear Operations, Inc.*
    663 F.3d 556 (2d Cir. 2011)....................................................................15

*U.S. v. Gilbert*,
    668 F.2d 94 (2d Cir. 1981)................................................................ 16-17

*U.S. v. Mulheren*,
    938 F.2d 364 (2d Cir. 1991).....................................................................24

*U.S. v. Naftalin*,
    441 U.S. 768 (1979)..................................................................................30

*U.S. v. Stein*,
    456 F.2d 844 (2d Cir. 1972)............................................................... 16-17

*Vaher v. Town of Orangetown, N.Y.*,
    916 F. Supp. 2d 404 (S.D.N.Y. 2013).....................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd,* 838 F.3d 223 (2d Cir. 2016)..........................22

## Statutes

15 U.S.C. § 78i(a)(2)...................................................................................7

15 U.S.C. § 78j(b) ............................................................................. *passim*

15 U.S.C. § 78bb(f)(1)(A).........................................................................25

## Other Authorities

Fed. R. Civ. P. 9(b) ........................................................................... *passim*

Fed. R. Civ. P. 50(b) ................................................................................10

## PRELIMINARY STATEMENT

The opening brief of Archegos Capital Management, LP ("ACM Br."), demonstrated that the SEC failed to state any actionable claims against ACM. The SEC's Amended Complaint fails because critical allegations are made through legal conclusions, rather than descriptions of factual matters. It further includes unsupported inferences stated as fact that are not entitled to the assumption of truth that properly pleaded facts are accorded. When these conclusions and inferences are stripped away, what is left does not state a claim of market manipulation. The SEC's Opposition Brief ("Opp.") fails to address these defects. The SEC has not alleged that Archegos did not believe in the long-term prospects of its investments, a flaw in any claim that Archegos' investment activity was intended to result in or did result in artificial prices. If the allegations in the Amended Complaint are deemed to state a market manipulation claim, it opens the possibility of an enforcement action against any market participant placing significant capital at risk in large investments that they intend to buy and hold on a long term basis.

The Amended Complaint's market manipulation allegations are inadequate because they fail to allege any deceptive conduct or false signal to the market. They fail to allege the market impact resulting from Archegos' trading in swaps and how that market impact resulted in an artificial price for the equity shares (the securities supposedly manipulated) referenced by the swaps. They also fail to allege scienter based on, among other things, an inability to articulate an economically plausible scheme to defraud. The SEC has not been able to rehabilitate these failures.

The SEC's argument that Archegos' open market trades are actionable based on intent alone is wrong and rests primarily on a misreading of *Set Capital*, in which the court explicitly stated that deception in the form of a false signal to the market was the essential component of a

market manipulation claim.  As explained in ACM's opening brief, the SEC's allegations of supposedly "manipulative" trading practices describe lawful trading activity.  The SEC largely ignores ACM's argument.  Instead, the SEC argues that Archegos' alleged misrepresentations to its counterparties and its use of swaps were deceptive acts intended to conceal the extent of Archegos' holdings and to "distort the actual demand for those stocks."  This argument is nonsensical.  The SEC has pled no factual allegations that support the claim that Archegos' demand for its investments was not real, and therefore the market could not have been misled by Archegos' purchases into thinking that there was more demand than there actually was (which is what happens with genuinely manipulative techniques such as matched orders and washed sales).

Recognizing that its allegations are weak on manipulative intent, the SEC is left pointing to the after-the fact-allocution of William Tomita to attempt to address the problem.  But the allocution is nothing more than a recitation of elements and conclusory statements, which is not specific enough to satisfy the pleading requirements of Rule 9(b).  Furthermore, even when read in the light most favorable to the SEC, the allocution does not generate a strong inference of scienter that is cogent and at least as compelling as a competing inference – that Archegos' trades were made for non-manipulative investment purposes.

Finally, the SEC resorts to a misapplication of controlling Supreme Court and Second Circuit precedent in an attempt to stretch its jurisdiction to cover its misrepresentation claims.  But the SEC has not alleged facts that support a nexus between the alleged misrepresentations by ACM about the characteristics of Archegos' portfolio and Archegos' trades, and their misrepresentation-based claims against ACM should be dismissed.

ARGUMENT[1]

I.      **The SEC's Allegations Are Insufficient to State A Market Manipulation Claim**

        To state a market manipulation claim, the SEC must allege that the defendant committed

a manipulative or deceptive act, in furtherance of a scheme to defraud, with scienter.  *SEC v.*

*Fiore*, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019).  The SEC has not alleged well-pled facts that

meet these elements.  The SEC does not address many of ACM's arguments directly, but instead

argues that ACM's motion relies on "factual disputes about intent and other matters … that are

not appropriate for resolution on motions to dismiss."  Opp. at 3.  This misstates the standard of

how pleadings are evaluated on a motion to dismiss.  The Court should not accept as true any

"legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79

(2009).  Here, the Amended Complaint is dependent on "allegations" that are nothing more than

legal conclusions dressed as facts, and with factual allegations that do not describe deceptive

conduct.  *Iqbal* makes clear that "[a] pleading that offers 'labels and conclusions' or 'a formulaic

recitation of elements of a cause of action will not do.'"  *Id.* at 678.  Stripped of such "labels and

conclusions," the SEC's remaining factual allegations are insufficient to state a claim.

        The following are examples of the types of allegations in the Amended Complaint that

are legal conclusions that, under *Iqbal* and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),

the Court must disregard in evaluating the sufficiency of the Amended Complaint:

- AC ¶ 43:  "Archegos, through Hwang's investment decisions and Tomita's trading to execute on those decisions, engaged in manipulative trading that impacted multiple securities …."  *See also* AC ¶¶ 52, 82, 91.
- AC ¶ 45: (quoting Mr. Tomita's allocution):  "Once Archegos gained market power in these securities, I and others used this power to trade in such a way as to artificially manipulate the prices of the securities….  I manipulated the prices of these securities in order to influence others in the market to buy or

---

[1]  ACM incorporates by reference all arguments made in Mr. Halligan's and Mr. Hwang's reply briefs in further support of their motions to dismiss.  Citations and quotations are omitted in case quotations throughout.

sell the securities in ways that would benefit Archegos'[s] key positions and increase Archegos'[s] purchasing power through variation margin."

- AC ¶ 65:  "The size of Archegos's exposures to its Top 10 Holdings allowed Archegos to assert a dominant market position over the securities of these issuers, which was intended to artificially manipulate the value of those positions."

- AC ¶ 84:  "Archegos, as directed by Hwang, engaged in a series of transactions prior to market open with manipulative intent and for the purpose of 'setting the tone' for the trading day, that is, pushing the share prices of certain issuers, in which Archegos held long exposures, upwards."

- AC ¶ 88:  "Archegos also engaged in substantial trading during the end of the trading day – that is, 'marking the close' – to again push the stock prices of certain issuers, in which Archegos held long exposures, upward."

- AC ¶ 92:  "In addition, Archegos traded in other non-economic ways in response to intra-day price movements in the share price rather than, for example, changes in the fundamental outlook for the issuer."

These allegations "amount to nothing more than a 'formulaic recitation of the elements'" of a market manipulation claim, and as such they are "conclusory and not entitled to be assumed true." *Iqbal*, 556 U.S. at 681.

Although the SEC attempts to support these formulaic allegations with supposed examples of improper trading, ACM's Opening Brief dissected each of the examples and explained how they do not support the SEC's manipulation claims. *See* ACM Br. at 25 (large trading volumes); 26 (daily trading volumes); 32 (pre-market trading); 33 ("marking the close"); 34 (additional examples of so-called manipulative trades).  All have specific deficiencies, but one common flaw runs throughout:  the SEC has not alleged any trade by Archegos that had a specific impact on the market price of any of its Top 10 Holdings, a flaw in pleading that is compounded by the uncontested fact that the majority of Archegos' trades were not in equity shares, but were in private swaps contracts which, on their own, had no market impact. *See* *Taylor v. Westor Capital Grp.*, 943 F. Supp. 2d 397, 401 (S.D.N.Y. 2013) (SEC must "specify …

what effect the scheme had on the market for the securities at issue.").  The SEC makes no attempt to rehabilitate any of its examples of so called "manipulative" trading.

The SEC also contends that Archegos traded to avoid price declines that could result in margin calls.  AC ¶ 51.  But it alleges no facts to support these conclusory allegations.  There are no allegations as to what Archegos' margin calls were at any point before the week of its collapse, what specific trades Archegos made to prevent price declines that would have resulted in margin calls at any time, and what effect Archegos' trades ever had with respect to any margin calls it received or supposedly avoided.  The SEC, in contrast to a private litigant, has had access to substantial pre-litigation discovery, as well as a chance to amend its complaint.  If the facts supported the SEC's theory, it had every opportunity to allege them.

On a motion to dismiss, this Court must assess the plausibility of the alleged scheme in the Amended Complaint.  *Iqbal*, 556 U.S. at 679 ("only a complaint that states a plausible claim for relief survives a motion to dismiss.").  Here, the alleged scheme is not plausible.  The SEC has alleged a very wealthy individual invested his own money in a concentrated portfolio of securities.  Those investments were primarily made in off-market transactions – private swaps contracts – that in and of themselves had no impact on the market price of the equity shares the swaps referenced.  The SEC has further alleged that Archegos' swap transactions dominated the market in the referenced equity shares even though Archegos was not the beneficial owner of, and had no control over, the equity shares referenced by those swaps.  The SEC has alleged that counterparties "typically" hedged using the referenced equity shares (AC ¶ 38), but has not alleged the extent the counterparties used equity shares to hedge or whether those equity shares were held for the duration of any swap with Archegos.  Without such specificity, it is impossible to determine any impact those hedges had on the market price of the referenced equity shares.

5

Additionally, even if the SEC had alleged such facts, they would not be sufficient to support allegations that the counterparties' hedges resulted in an artificial price for the referenced equity shares.  This is because the SEC has not and cannot allege that any such hedging was the product of anything other than natural market forces – the risk management decisions of the counterparties.  Finally, the scheme proposed by the SEC – that Archegos traded to increase the price of equity shares – has been discredited by market experts as facially implausible.  ACM Br. at 41.

In *Iqbal*, the Supreme Court admonished that a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  A complaint must do more than pleading facts that "are 'merely consistent with' a defendant's liability …."  *Id.*  With the labels, conclusions, and recitations of elements stripped away, and the allegations about Archegos' trading practices examined and found to be lacking, the SEC's market manipulation allegations fail to meet that standard  *Id.*  ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.").  It is therefore proper for the Court to conclude on a motion to dismiss that the SEC has described nothing more than the conduct of an enthusiastic investor managing his own money, with capital to deploy, making large investments in private swaps contracts that referenced companies whose fundamentals he believed in.

A.      **Deception is Required For a Market Manipulation Claim**

Courts in the Second Circuit have held that to state a market manipulation claim, the trading at issue must send a "false pricing signal" to the market or directly cause an artificial price.  *ATSI Commc'ns Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007).  Here, where the alleged trading conduct is based solely on open market transactions, the Amended Complaint

fails to allege well-pled facts – as opposed to legal conclusions – that identify any false signal to the market or an artificial price that resulted from Archegos' trading activity.  For this reason alone, the SEC's market manipulation claim should be dismissed.

In its Opposition, the SEC urges this Court to misapply *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021), asking the Court not only to disregard the express language of the opinion, but also binding Supreme Court construction of §§ 10(b) and 9(a)(2) of the Exchange Act.  Opp. at 26-27.  The portions of the opinion omitted from the SEC's discussion confirm, however, that the Second Circuit did not articulate a new standard for market manipulation claims that would permit a claim to survive absent allegations that a false signal was sent to the market.

*Set Capital* did not alter the requirement that a manipulation claim must include allegations of manipulative deception as well as scienter.  *See* 996 F.3d at 76 ("As the Supreme Court has observed, the word 'manipulative' is virtually a term of art …. It 'refers generally to practices, such as wash sales, matched orders or rigged prices, that are intended to mislead investors by artificially affecting market activity' and 'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'") (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)).  Rather, the court explained that "[w]hile a defendant may manipulate the market through open-market transactions, *some misrepresentation or nondisclosure is required*."  996 F.3d at 76-77 (emphasis added).  The SEC omits this key language, despite quoting the beginning of this very sentence on page 30 of their brief.  Indeed, when the reasoning of *Set Capital* is considered in its entirety, it is clear that the Second Circuit held that a false pricing signal to the market was a necessary component of any market manipulation claim:

7

> For market activity to "artificially" affect a security's price, we generally ask whether the transaction or series of transactions "sends a false pricing signal to the market" or otherwise distorts estimates of the 'underlying economic value' of the securities traded.  While a defendant may manipulate the market through open-market transactions, some misrepresentation or nondisclosure is required.  Deception is the gravamen of a claim for market manipulation, and "the market is not misled when a transaction's terms are fully disclosed."

996 F.3d at 76-77 (Walker, Jr., J.) (quoting *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011)).  This is consistent with *ATSI*, which held that a market manipulation claim must be based on conduct that sends a "false pricing signal" to the market or directly causes an artificial price.  493 F.3d at 100-01.  It is also consistent with *Noto v. 22nd Century Grp. Inc.*, 35 F.4th 95 (2d Cir. 2022) (Walker Jr., J.), which held that "[a] court must ask whether a defendant injected inaccurate information into the marketplace."  35 F.4th at 106.

In *Set Capital*, the deceptive conduct generating a false signal consisted of two components:  (1) issuance of large quantities of securities (the XIV Notes) into the market; and (2) hedge trading in another security (the VIX Futures) to exploit the market conditions after the notes were issued.  The plaintiff alleged that Credit Suisse had observed that during three prior spikes in market volatility, its hedging had contributed to a liquidity squeeze that depressed the value of the XIV Notes purchased by the plaintiffs.  Credit Suisse "used this knowledge as part of an undisclosed scheme to profit at their investors expense."  *Set Capital*, 996 F.3d at 77.  That "undisclosed scheme" included conduct that "exacerbated the risk of illiquidity" for the VIX Futures hedging instrument by issuing two more substantial offerings of the XIV Notes.  *Id.*  The Second Circuit's observation that "[i]n some cases, as here, scienter is the only factor that distinguishes legitimate trading from improper manipulation" (*id.* at 77) must be read in conjunction with its earlier statements framing the market manipulation analysis, in which the court was clear that a market manipulation claim requires a false signal to the market.  In *Set Capital*, the false signal –  the deceptive conduct – was Credit Suisse exacerbating the risk of

8

illiquidity for the hedging instrument by "flooding the market" with XIV Notes, then engaging in hedge trades, armed with the undisclosed knowledge that "its hedging trades would destroy the value of XIV Notes during the next volatility spike" due to the illiquidity of the VIX Futures hedging instrument, and then locking in its profits by declaring an "Acceleration Event."  *Id.*

Furthermore, the Supreme Court has made clear that to proceed on a market manipulation claim, the SEC must include allegations that ACM engaged in intentional conduct leading to an "artificial" market price.  *See Santa Fe Indus., Inc. v. Greene*, 430 U.S. 462, 473-74 (1977); *Ernst & Ernst*, 425 U.S. at 199.  The SEC's argument that its claims can survive based on allegations of intent alone (Opp. at 26), and without allegations of deceptive conduct (i.e., a false signal to the market leading to an artificial price), is not supported by the plain language of *Set Capital* or the controlling Supreme Court case law.

The SEC turns next to a summary order that has no precedential value:  *SEC v. Vali Mgmt. Partners*, 2022 WL 2155094 (2d Cir. June 15, 2022) (summary order).  But *Vali* would not save the SEC's claims even if it had precedential value.  The approved jury instruction in *Vali* included language – as it must – that "to find Defendants liable for manipulative acts under the Exchange Act, the Defendants must have *engaged in an act that 'sends a false pricing signal to the market or creates a false impression of supply and demand*' with 'scienter,' or the 'intent to deceive, manipulate, or defraud.'"  *Vali*, 2022 WL 2155094 at *3 n.2 (emphasis added) (quoting jury instruction).  *Vali*'s facts are described in *SEC v. Lek Secs. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017).  The case involved a layering/spoofing scheme in which the defendants placed market orders that they had no intention of executing.  *Lek*, 276 F. Supp. 3d at 55 (quoting email from defendant trading firm to defendant broker-dealer, "so we will put hundre[d]s of orders to push [the] stock price and then cancel them.").  Trade orders placed and then canceled

9

are clearly false signals to the market, and represent conduct that is nothing like the trading alleged here, where Archegos remained at constant market risk from its investment activities.

None of the SEC's other market manipulation cases support its argument that open market trading alone is sufficient to state a manipulation claim, as each involved some form of allegedly deceptive conduct not present here.  In *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015) (Opp. at 28), the defendant investment bank was alleged to have intentionally structured a share lending agreement with the plaintiff to allow it to lend out plaintiff's shares to the bank's more lucrative hedge fund clients so that they could profit from excessive short sales of the plaintiff's securities, and to have concealed this purpose from the plaintiff.  *Id.* at 83.  In *In re Blech Secs. Litig.*, 928 F. Supp. 1279 (S.D.N.Y. 1996) (Opp. at 28-29), the defendants were alleged to have bribed investment managers by gifting, or permitting them to purchase at low prices, securities in new-issue bio-tech companies in exchange for which the investment managers caused the accounts under their control to purchase those securities at artificially high prices post IPO.  *Id.* at 1298.[2]

*CFTC v. Gorman*, 587 F. Supp. 3d 24 (S.D.N.Y. 2022) (Opp. at 26) is equally unavailing.[3]  *Gorman* represents the classic market manipulation scenario of a trader trading in one security in order to generate a profit outside of its investment in the security at issue.  In *Gorman*, the defendant trader was alleged to have manipulated the price of ten-year swaps

---

[2] *SEC v. Kwak*, 2008 WL 410427 (D. Conn. Feb. 12, 2008) (Opp. at 32) is a decision on a Rule 50(b) motion.  The court found that the trial evidence supported the jury's verdict that the defendants manipulated the market through matching trades and marking the close, although it also found that "[i]t is certainly clear that a jury *could* have returned a verdict in favor of Kwak and Wilson."  *Id.* at *5. (emphasis in original).

[3] The SEC's reliance on *Gorman* disregards the rather critical fact that the court's opinion, which was decided based on pre-motion letters without the benefit of full briefing (587 F. Supp. 3d at 29), is currently under reconsideration at the request of the defendant.  The court has ordered the parties to fully brief the defendant's motion to dismiss, and that motion is presently *sub judice*.  8/11/22 Order in *CFTC v. Gorman*, Dkt# 39 (attached hereto as Exhibit A).

spreads so that his employer, an investment bank, could profit from an interest rate swap the bank was entering into with one of its issuer-clients that was priced off of ten-year swaps spreads.  The court found the CFTC had alleged a false pricing signal because, among other things, the trader's bids for ten-year swaps spreads were contrary to existing market demand. *Gorman*, 587 F. Supp. 3d at 35.  Specifically, after being repeatedly told by a broker that demand exceeded supply, the trader made an offer at 13.5 basis points during the pricing window for the interest rate swap between the bank and its client, which was lower than his prior successful sale at 13.75 basis points minutes before.  *See id.*  Unlike *Gorman*, there is no allegation here that Archegos was trading in other instruments to negate or minimize the risks of its investments.[4] Archegos bore the full market risk of every swap contract executed.

The SEC also fails to distinguish the Seventh Circuit's decision in *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995).  In *Sullivan & Long*, the Seventh Circuit rejected a market manipulation claim based on allegations that the defendant engaged in a massive amount of short sales on the Chicago Stock Exchange because those open market trades did not indicate the defendant was "creating a false impression of supply or demand …."  ACM Br. at 17.  The SEC suggests that the short sales in *Sullivan & Long* were justified because the defendant was "driving prices *closer* to subject stock's true value rather than creating a false impression of supply or demand."  Opp. at 31 (emphasis in original).  Here, the SEC has not alleged facts about the true value of any of Archegos' investments – it just assumes that the value

---

[4] *SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) (Opp. at 32) is similar to *Gorman*.  In *Masri*, the defendant was alleged to have transacted in one instrument (equity shares) in order to eliminate liability from another (put options on those equity shares).  On a summary judgment motion the court found that the SEC had submitted enough evidence to raise a question of fact as to the investment purpose of the defendant's stock trades, particularly given the economic incentives caused by the put options.  *Id.* at 372.

11

attributed by Archegos created a false impression of demand.  The SEC does not explain why Archegos' trading sent a false signal to the market, but the trading in *Sullivan & Long* did not.[5]

B.      **The SEC Has Failed to Adequately Allege That the Market Price of the Relevant Securities Was Both Artificial And Due to Archegos' Conduct**

    1.      *The Counterparty Hedging Allegations Fail to Support the Claim That Trading in Private Swaps Transactions Sent a False Signal to the Market*

Because the SEC must allege that Archegos generated a false signal or artificial price, one of the fundamental flaws of the SEC's claim is its failure to allege facts that tie Archegos' private swaps trades to any market effect.  While the SEC points to the counterparties' hedging trades, it fails to allege the actual extent to which the counterparties purchased equity shares to hedge Archegos' swaps or the effect on market prices from those hedges.  Further, because the SEC alleges that the counterparty hedging offset the genuine market risk of Archegos' swap trades, it fails to allege that any such hedging was not based on natural market forces.  The counterparties had a legitimate interest in making the equity share purchases, so those purchases reflected real demand and the prices reflected the natural forces of supply and demand.

In response, the SEC sets up and strikes down a straw man, claiming ACM is arguing that an alleged manipulative act must be in the security targeted for manipulation.  Opp. at 40.  That is not ACM's argument.  The SEC has failed to allege that Archegos had any control over its counterparties' hedges or actual knowledge of their hedging activities.  The SEC also does not quantify the extent to which Archegos' counterparties did in fact purchase those equity shares and hold them while any swap with Archegos was in effect, and does not allege that the hedges

---

[5] The SEC asserts that *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001) (Opp. 32) is analogous because it involved "real customers, real transactions, and real money."  274 F.3d at 528.  It is not.  The defendants in that case – the CEO and head trader of an underwriter – were not alleged to have profited from trading the securities at issue.  The SEC alleged they traded in the subject securities to maintain client interest in their underwriting firm, and to "sustain confidence" in the other securities the firm underwrote.  *Id.* at 529.  *Markowski* has no application here.

were not intended to offset genuine market risk.  The SEC's allegations amount to unsupported legal conclusions, and do not plead the market impact of the alleged manipulative activity with the specificity required by Rule 9(b).

The SEC next argues that the inducement of market activity by others "is a frequent hallmark of, and often essential to, actionable market manipulation schemes," (Opp. at 41) but this is another unsupported legal conclusion.  The SEC does not allege that Archegos induced or had any control over whether its counterparties purchased the equity shares referenced by its swaps.  Those discretionary hedging decisions were specific to each counterparty and likely to each swap transaction.  The SEC does not describe Archegos' counterparties' hedging strategies, and – critically – does not even describe what amount of equity shares any counterparty purchased in response to the example trades in the Amended Complaint.

The SEC's defense of its hedging allegations falls short.  First, it directs the Court to ¶ 37 (Opp. at 42), which alleges that "Archegos' Counterparties would purchase shares of referenced issuers in the market *to the extent necessary* to hedge any synthetic exposure created by the [swaps]."  AC ¶ 37 (emphasis added).  The Amended Complaint contains no allegation explaining or quantifying – even at a general level – what "to the extent necessary" means.  Because the counterparties' hedging was the only manner in which Archegos' swaps could have had a market impact, the failure to include more specific allegations is fatal to the SEC's claims.  Next, the SEC misquotes its own allegations, but in so doing reveals their inadequacy.  In its Opposition, the SEC cites ¶ 38 as alleging "the Counterparties purchased one share of an issuer's stock for each share of Archegos's [Swap] exposure to that stock."  Opp. at 42.  What ¶ 38 actually alleges is, "*Typically,* therefore, as Defendants understood and expected, the Counterparties purchased one share of an issuer's stock for each share of Archegos's [Swap]

exposure to that stock."  AC ¶ 38 (emphasis added).  The Amended Complaint does not explain

what "typically" means or provide examples of counterparty hedging as a result of swap

transactions that supports this "one-for-one" allegation, and thus the allegation fails to provide

the details necessary to support its content.

Ensuring a swap transaction is fully hedged does not exclusively mean purchasing the

underlying equity, which the carefully crafted language in the Amended Complaint effectively

concedes.  ACM Br. at 19-20.[6]  ACM is not – as the SEC claims – "theorizing" about what

Archegos' counterparties may have done.  Opp. at 42.  By qualifying its description of hedging

with the word "typically," the Amended Complaint concedes that its description of hedging is

incomplete.  This is consistent with the Credit Suisse Report, arising from this very matter,

which states that Credit Suisse would ultimately "seek to enter a [swap] in the opposite

direction" because that synthetic trade was a "more efficient" hedge than purchasing the equity

shares.  Hirsch Decl. Ex. 5 (Credit Suisse Report, pp. 38-39).[7]  The SEC is entitled only to

reasonable inferences from its factual allegations, not to the unreasonable inference that

sophisticated financial institutions would fail to pursue the most efficient means of hedging.

The SEC's market manipulation allegations also fail because they depend exclusively on

its theory that Archegos' swap trades caused counterparties to purchase equity shares to hedge

the market risk of the swaps.  But the SEC's own allegations directly contradict its theory that

---

[6]  Although the district court in *CSX Corp. v. Children's Inv. Fund. Mgmt. (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y. 2008) found that "as a practical matter" the positions at issue in that case "could not be hedged through the use of other derivatives," (*id.* at 542) that finding does not negate the testimony in that case that as a general matter, an equity swap hedge can be effected through different methods.  ACM Br. at 19.

[7]  *See ATSI*, 493 F.3d at 98 (court may consider on a motion to dismiss "legally required public disclosure documents filed with the SEC").  *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404 (S.D.N.Y. 2013) (Opp. 43 n.14) is inapposite – there the defendant attached a number of exhibits to their memo of law "which are nowhere properly identified or authenticated" and did "not offer any legal authority for why it would be appropriate for the Court to consider" the exhibits.  *Id.* at 424.

Archegos' swaps "interrupted the natural interplay of supply and demand."  AC ¶ 53.  By alleging that the hedges were placed to mitigate the market risk of the swaps (AC ¶¶ 36-38), the SEC has conceded that such hedging was in response to genuine market demand for the equity shares – the desire of the counterparties' risk management function to mitigate risk.  Therefore, the SEC's allegations establish that Archegos' swaps did not disrupt natural market forces.

2.     *Allegations Describing Multiple Instances of Non-Manipulative Trading Do Not Generate a Viable Claim of Market Manipulation*

In its opening brief, ACM explained in detail how the SEC had failed to support its allegations of so-called manipulative trading practices with any facts indicating that investors were deceived or that the prices of any particular securities were artificially impacted.  ACM Br. at 21-41.  In its Opposition, the SEC does not allege a factual basis for its theory that Archegos' trading activity sent a false pricing signal to the market.  Instead, it summarizes the allegations that describe lawful trading practices in pejorative terms (Opp. at 34-35), and argues that since it has alleged "multiple types of manipulative conduct" (Opp. at 36) its allegations state a claim.

The SEC's arguments are circular.  It contends that allegations of manipulative intent alone are sufficient to state a claim for market manipulation, and then argues that it has satisfied the requirement to allege manipulative intent through allegations of lawful trading strategies which, although not deceptive, are pled "collectively" and were supposedly executed with manipulative intent.  Opp. at 35.  None of the SEC's cited cases hold, however, that a market manipulation claim can be based on multiple types of lawful trading strategies that are not deceptive.  While the Court should view the SEC's allegations collectively, the Second Circuit has held that when viewing non-actionable facts in the aggregate, "[z]ero plus zero is zero." *Tepperwien v. Entergy Nuclear Operations, Inc.* 663 F.3d 556, 572 (2d Cir. 2011).

15

The SEC argues that the cases cited by ACM "did not allege multiple types of manipulative conduct collectively…" Opp. at 36. That is not accurate nor is it determinative. Several of the cases the SEC refers to involved allegations of multiple types of manipulative conduct that were, collectively, found to be insufficient on a motion to dismiss. *See ATSI*, 493 F.3d at 104 (holding market manipulation allegations failed to satisfy Rule 9(b) where plaintiff argued it had alleged facts "indicating 'wash trades, matched trades, phantom shares, and other manipulative trading.'"); *Sedona Corp. v. Ladenburg Thalmann & Co.*, 2009 WL 1492196, at *6 & n.8 (S.D.N.Y. May 27, 2009) (holding "… the SAC's vague references to *various manipulative techniques* are unsubstantiated by any particularized allegations" and summarizing the various manipulative techniques in a footnote) (emphasis added); *In re College Bound Consol. Litig.*, 1995 WL 450486, at *4, 6 (S.D.N.Y. July 31, 1995) (dismissing allegations based on mere assertions of "market domination" and "mark[ing] the close"). More importantly, simply aggregating allegations of different lawful trading conduct does not magically create a claim of manipulative conduct.

The SEC also provides no rebuttal to ACM's arguments that its allegations concerning Archegos' trades in the pre-market (ACM Br. at 32-33) and at the close (ACM Br. at 33-34) are insufficient to describe manipulative trading. The only specific response the SEC offers to ACM's detailed examination of its trading allegations is to argue that *U.S. v. Gilbert*, 668 F.2d 94 (2d Cir. 1981) and *U.S. v. Stein*, 456 F.2d 844 (2d Cir. 1972) did not impose a "numerical floor" for market domination allegations. Opp. at. 37. This dodges the point. First, the SEC has not identified any case that holds that one can "dominate" the market for a security through private swaps contracts. It is axiomatic that market domination can only occur through the ownership of the equity shares at issue, and the SEC has not alleged any details about the

quantity of equity shares beneficially owned at any given point in time by Archegos'
counterparties to hedge Archegos' swaps, nor can it get past its own allegations that whatever
hedging did occur resulted from genuine demand to offset market risk.  Second, it is the SEC's
burden to set forth, consistent with Rule 9(b), particularized allegations of manipulative trading
activity that sent a false signal to the market.  Compared to the allegations of dominance in
*Gilbert* and *Stein*, the SEC's allegations fall far short not only in terms of percentage of volume,
but also with respect to sustained trading activity.  ACM Br. 29-31.  The point is not that the
*Gilbert* and *Stein* cases established a "numerical floor" that the SEC has not met, but rather that
those cases involved a type and scope of activity found to be manipulative that is not comparable
to the SEC's allegations here.

> 3.     *There Are No Allegations that Archegos Deceived*
>        *Counterparties About Trades or Their Prices*

In its opening brief, ACM demonstrated how none of the alleged misrepresentations
made by Mr. Becker and Mr. Tomita about Archegos' portfolio sent a false signal or distorted
information available to the market concerning Archegos' trades or their prices.  ACM Br. at 44-
46.  In response, the SEC argues that the alleged misstatements created two sets of false pricing
signals to the market – first, by creating the impression that the equity shares underlying the
swaps were held by a broad range of market participants, and second, that the prices of those
equity shares reflected normal market forces and not "Archegos's fraudulently dominating the
market …"  Opp. at 38-39.

On the first point, the SEC fails to establish how Archegos' use of swaps that do not
create beneficial ownership and were not required by the SEC's own regulations to be disclosed
could deceive the market about the number of shareholders for the stocks at issue, let alone
connect that concept to a "false pricing signal."  Market participants understand that the

beneficial owners of equity shares include institutional investors that have purchased those shares both for their own investment purposes and to hedge exposure from private counterparties. Where those institutional investors beneficially own sufficient equity shares to trigger public disclosure obligations, they are not required to break out how many shares they own for their own investment purposes and how many they own for hedging purposes, and (in the case of the latter), related to what exposure from which of their private counterparties. The SEC's argument presumes a level of transparency that does not exist, and its position that compliance with existing regulations sent a false signal to the market does not make sense.

Furthermore, as noted above, the counterparties' purchase of equity shares to hedge Archegos' swaps was based on genuine demand to offset market risk. Even if the number of shareholders was no greater than the number of counterparties to Archegos swap trades, each of those shareholders owned shares based on genuine demand for the equity shares: to offset market risk for the swap. There is no allegation that such market risk did not exist. There was therefore no false pricing signal connected to lawful swap contracts and corresponding equity share purchases to offset genuine market risk on those swaps.

The SEC's first point should also be rejected because it relies on another unsupported legal conclusion – that the prices of the securities at issue would have been materially affected if Archegos' counterparties knew that Archegos was even more concentrated in certain swap positions than what they were told by Mr. Becker. There are no allegations that support the theory that the market price for any referenced equity shares would have been different if the market knew precisely how concentrated Archegos' swap portfolio was.

The SEC's second point is also unavailing, as it rests on yet another circular premise – that its claim of fraudulent domination can be supported through allegations that Archegos sent a

false signal that it was not fraudulently dominating the market.  Furthermore, the SEC cannot

base a market manipulation claim on conclusory allegations of market domination, particularly

where, as here, Archegos' trades were primarily based on private swaps, and not market trades,

and where Archegos was not the beneficial owner of the referenced equity shares.  *See* ACM Br.

at 24, 26-31.  Here again, the SEC's reliance on *Set Capital* (Opp. at 39) fails.  There, the

allegations were specific as to the precise effect Credit Suisse's conduct had on the value of the

notes purchased by the plaintiffs.  *Set Capital*, 996 F.3d at 77 (summarizing plaintiffs'

allegations that Credit Suisse's issuance of millions of XIV Notes and subsequent purchase of

"more than 105,000 VIX futures contracts, caused the price of XIV Notes to plummet by more

than 96%").  The SEC has not made similar allegations tying the alleged misstatements about

Archegos' portfolio characteristics to the market price of any equity shares.

### 4.    *Archegos' Use of Swaps Does Not Amount to Deceptive Conduct*

The SEC argues that it has alleged deceptive conduct because Archegos "deliberately

traded Swaps to evade disclosure obligations …."  Opp. at 38.  As explained in ACM's Opening

Brief, however, the use of swaps – even to avoid reporting requirements – is not deceptive.

There are legitimate reasons why a family office or a hedge fund might value keeping their

positions confidential, reasons that the SEC does not address.  *See* ACM Br. at 6 & n.6.  Indeed,

there are many categories of information that would be useful to market participants that the

securities laws permit to be kept confidential.  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94,

101 (2d Cir. 2015) ("'[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5.'")

(quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).

The SEC cites *SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) for the general

proposition that conduct need not be unlawful to be deceptive.  Opp. at 38.  *Wey* does not,

however, stand for the proposition that avoiding disclosure requirements equates to deceptive conduct. *Wey* involved the question of whether allegations of deceptive conduct – specifically, a plan to move shares into brokerage accounts to conceal the identities of shareholders in order to meet NASDAQ listing requirements – were sufficient to state a scheme liability claim. 246 F. Supp. 3d at 918. Indeed, in *Wey*, the court separately found that the defendants made materially false Section 13 disclosures, because (a) the defendants controlled entities that, in aggregate, beneficially owned more than 5% of equity shares outstanding; and (b) even if that were not the case, the defendants and the entities they controlled were "sufficiently interrelated that they constituted a group" under Section 13(d), and as such, they were required to publicly disclose their collective holdings. *Id.* at 908, 932-33. Here, the SEC does not allege that Archegos was ever out of compliance with its obligations under Section 13. *Wey* is therefore inapposite.

C.     **The SEC Has Not Adequately Alleged Scienter**

Even if a market manipulation claim could be based on scienter alone (it cannot), scienter is a separate and necessary element of any market manipulation claim. Here, the SEC has not alleged facts that generate a "strong inference of fraudulent intent." *SEC v. Parnes*, 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001). This failure provides an independent basis to dismiss the market manipulation claims.

1.     *Mr. Becker's and Mr. Tomita's Allocutions Do Not*
       *Generate A Strong Inference of Scienter*

Recognizing that the descriptions of Archegos' trading activity in the Amended Complaint do not represent deceptive conduct that would support a market manipulation claim, the SEC now relies on the after-the-fact allocutions of Scott Becker and William Tomita, arguing that they need only plead an intent to manipulate, and by quoting the allocutions they have satisfied that requirement. But as explained above, the Second Circuit (and the Supreme Court)

requires more than an intent to manipulate; it requires the plaintiff to allege that a false or deceptive signal was sent to the market, and the SEC has not done so here.

Even if intent alone were sufficient (it is not), the SEC's allegations fail to state a claim. The SEC's reliance on Mr. Becker's allocution is particularly misplaced, since it does not refer to the intention behind Archegos' trading at all. *See* AC ¶ 106.  With respect to Mr. Tomita's allocution, courts have rejected attempts to plead scienter based on the self-interested statements of co-defendants where those statements lack the specificity required by Rule 9(b).  In *In re McKesson HBOC, Inc. Secs. Litig.*, the court dismissed a § 10(b) claim brought against a CEO where the plaintiff alleged scienter based on the statement of a co-defendant, holding that, "[a] statement by another defendant implicating [the CEO] is not particularly reliable evidence."  *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1276 (N.D. Cal. 2000).  There, the statement from the co-defendant was in a newspaper article, but the same analysis applies to the sworn statement by Mr. Tomita here – if the statement is not sufficiently particularized as required by Rule 9(b), it cannot be used as a basis for a claim of securities fraud.

Here, Mr. Tomita's statement that he "traded to increase the prices" of securities in which Archegos invested is far too conclusory and unspecific to satisfy Rule 9(b).  The SEC does not respond to this point, but instead doubles-down on its pleading strategy by block quoting Mr. Tomita's allocution.  Opp. at 33.  Yet, Mr. Tomita's allocution is a recitation of the elements of a claim that relies on conclusions, not facts.  As such, it is insufficient under Rule 9(b).  *See McKesson HBOC*, 126 F. Supp. 2d at 1272 (allegations based on extraneous sources "should be credited only to the extent other factual allegations would be – if they are sufficiently particular and detailed to indicate their reliability.");  *see also Acito v. IMCERA Grp. Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) ("we must not mistake the relaxation of Rule 9(b)'s specificity requirement

regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations.")  Mr. Tomita's conclusory statement that he  "agreed …. to carry out the business of Archegos through a pattern of manipulating prices of securities" (AC ¶ 45) also does not describe conduct with the detail necessary to support a fraud claim in a federal complaint.  *See Taylor*, 943 F. Supp. 2d at 401 (the SEC must "specify what manipulative acts were performed, which defendant performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.").  And while the SEC suggests that Mr. Tomita admitted to "setting the tone" (Opp. at 46), Mr. Tomita did not use that phrase in his allocution.

The SEC argues that Mr. Tomita's confessed intent is attributable to ACM under the doctrine of *respondeat superior*.  Opp. at 46.  None of the cases cited by the SEC involve circumstances where the plaintiff has – as the SEC has here – affirmatively alleged that the corporate decisions at issue were, at all times, under the exclusive purview of another individual *whose scienter has not been adequately pled*.[8]  The SEC must live with its own allegations.  It cannot bootstrap Mr. Tomita's alleged scienter to Mr. Hwang or ACM having alleged that Mr. Hwang – not Mr. Tomita – was "*solely responsible* for all investment decisions…."  AC ¶ 16 (emphasis added).  By its own Amended Complaint, Mr. Tomita's state of mind is not relevant to the SEC's claims.

---

[8]  *See Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (Opp. at 46) (denying bank's motion to dismiss based on conduct of officer where "complaint alleges that DeReoziere was an officer of the Bank *and that he had primary responsibility for the dealings of that Bank and the other corporate defendants with*" plaintiff) (emphasis added); *SEC v. Kinnucan*, 9 F. Supp. 3d 370 (S.D.N.Y. 2014) (Opp. at 46) (imputing the misconduct of a company's president – not a less senior employee – to the company).  *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016) is a decision on a post-trial judgment as a matter of law based on a full evidentiary record.  It therefore has no application to the question of whether the SEC has pled itself out of a *respondeat superior* theory on a motion to dismiss.

The SEC cites no other facts supporting its allegations of intent as to ACM – no documents, no emails, no communications.  Instead, it refers generically to Archegos' trading, and argues that the Court should not accept ACM's arguments on a motion to dismiss that the alleged practices are consistent with the practices of an investor that intended to build a large, concentrated investment position.  Opp. at 46.  The SEC cannot, however, group allegations together that do not individually describe wrongful conduct and use them as a basis to allege scienter.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 449 (S.D.N.Y. 2005) (rejecting theory that scienter allegations "insufficient when considered in isolation – are somehow adequate when considered together.") (citing *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001)).

It is appropriate on a motion to dismiss for this Court to "take into account plausible opposing inferences" raised by the SEC's allegations.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007) (securities fraud complaint must be dismissed unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").[9]  Here, the SEC's allegations with respect to the person who made the investment decisions for Archegos – alleged to be solely Mr. Hwang – do not outweigh the plausible opposing inference that he believed in the fundamentals of the companies he invested in and was trading for legitimate investment purposes.[10]

---

[9]  In contrast to *SEC. v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008) (Opp. at 76), the majority of courts in this district, including this Court, have applied *Tellabs'* requirement that a complaint allege a strong inference of scienter that is at least as compelling as any plausible opposing inference to actions brought by the SEC.  *See, e.g.*, *Fiore*, 416 F. Supp. 3d at 323-24 (applying *Tellabs*); *SEC v. Im*, 2018 WL 840094, at *4 (S.D.N.Y. Feb. 12, 2018) (Oetken, J.); *SEC v. Alternative Green Techs., Inc.*, 2012 WL 4763094, at *5 n.70 (S.D.N.Y. Sept. 24, 2012) (Opp. at 76-77).

[10]  The SEC argues that its allegations (AC ¶¶ 100 – 104) that Mr. Hwang instructed traders not to provide accurate information to counterparties in order to increase trading capacity and obtain better margin terms establish scienter with respect to its market manipulation claim.  Opp. at 48.  These allegations are unsupported by facts, and also have nothing to do with whether, having obtained increased capacity or better margin terms, Archegos traded improperly.

2.  *The Economics of the Alleged Scheme Are Relevant To,*
    *And Undermine, Any Inference of Scienter*

The SEC argues that it need not allege that Archegos profited from the alleged scheme.

Opp. at 43.  This misses the point.  While profitability may not be a required element of a market

manipulation claim, a potential economic benefit from the alleged scheme is relevant to whether

the complaint's allegations are plausible.  *Iqbal*, 556 U.S. at 679.  In addition, the Second Circuit

considered the profitability of the purported scheme when it concluded that the government

failed to prove a market manipulation claim in *U.S. v. Mulheren*, 938 F.2d 364 (2d Cir. 1991).

*See* 938 F.2d 364, 370 (2d Cir. 1991) ("[o]ne of the hallmarks of manipulation is some profit or

personal gain inuring to the alleged manipulator.").  A "naked manipulation" scheme of the type

the SEC has alleged here is economically implausible because there is no way to exit the

positions without decreasing the securities' prices.  ACM Br. at 42.  It is a plausible inference

from the SEC's allegations that Mr. Hwang was an experienced and sophisticated investor who

would understand the futility of such a scheme.  On a motion to dismiss, the Court is required to

assess whether the SEC's claims are plausible.  *Iqbal*, 556 U.S. at 678 (complaint must contain

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'") (quoting *Twombly*, 550 U.S. at 570).  Allegations describing an alleged scheme that is

inherently unprofitable cannot meet that standard, and none of the SEC's cases hold otherwise.[11]

## II.   **The SEC's Jurisdictional Arguments Ignore Controlling Precedent**

The SEC argues that ACM's jurisdictional arguments rely on a "narrow" reading of the

"in connection with" element of the applicable sections of the Exchange Act.  Opp. at 49.

---

[11]  *SEC v. Martino*, 255 F. Supp. 2d 268 (S.D.N.Y. 2003) (Opp. at 43) does not help the SEC – the defendant was alleged to have profited from commissions on sales to foreign brokerage clients that purchased a stock the defendants had artificially inflated at discounted prices, which those foreign brokerages then resold at the artificially inflated market prices.  *Id.* at 287; *see also Lek*, 276 F. Supp. 3d at 54 (Opp. at 43-44) ("Together, Avalon's layering and cross-market manipulation activity generated profits of more than $28 million."); *Markowski*, 274 F.3d at 529

ACM's interpretation has most recently been endorsed by controlling decisions from the Supreme Court and the Second Circuit. The SEC ignores, and fails to reconcile the cases it cites with *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014), the Supreme Court decision that most recently analyzed the "in connection with" language in the Exchange Act. It also fails to acknowledge the Second Circuit's 2018 decision in *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018), which similarly applied a reading of the relevant Exchange Act provision consistent with ACM's position.

In *Chadbourne & Parke*, the Supreme Court considered whether the Securities Litigation Uniform Standards Act ("SLUSA") precluded plaintiffs' class actions based on violations of state law. SLUSA precludes any state court class action by a private party alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A). In analyzing this language, the Supreme Court looked to its prior interpretations of the same language in § 10(b). Indeed, the U.S. Government filed an amicus brief arguing that the interpretation ultimately adopted by the Supreme Court could curtail the SEC's enforcement powers. *See Chadbourne & Parke*, 571 U.S. at 393.

The Supreme Court held that "a fraudulent misrepresentation or omission is not made in connection with such a purchase or sale of a covered security unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a covered security." *Id.* at 387. In explaining its holding, the Supreme Court used the following example of the type of conduct that is not "in connection with" a securities transaction: "a lawsuit brought by creditors of a small business that falsely represented it was creditworthy, in part because it owns or intends

---

(Opp. at 44) (purpose of scheme was not to profit from the manipulated share price, "but to maintain customer interest in [defendant investment bank] generally and to sustain confidence in its … other securities.").

to own exchange-traded stock." *Id.* at 391.  That is precisely the type of conduct at issue here –

the SEC has alleged that Archegos personnel misrepresented the characteristics of the Archegos

portfolio in order to enhance the creditworthiness of the fund.  The purpose of those

misrepresentations, as explained elsewhere in the SEC's Opposition, was to represent that

Archegos was "more secure and well-managed than it actually was."  Opp. at 38.  The SEC

makes no reference to this controlling precedent in its Opposition, despite its applicability to

securities fraud claims.  *See Bai v. Tegs Mgmt, LLC,* 2022 WL 602711, at *6 (S.D.N.Y. Mar. 1,

2022) (citing *Chadbourne & Parke* in articulating standard for Section 10(b) claim).

Furthermore, the Second Circuit's approach has been – both before and after *Chadbourne*

*& Parke* – to interpret the "in connection with" element of the Exchange Act more narrowly than

what the SEC advocates here.  In *Charles Schwab Corp.* (ACM Br. at 48), the Second Circuit

held that an Exchange Act "claim fails where the plaintiff does not allege that a defendant misled

him concerning the value of the securities he sold or the consideration he received in return."

883 F.3d at 96; *see also Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.

1984) ("it is not sufficient to allege that a defendant has committed a proscribed act in a

transaction of which a pledge of security is a part.").  There is no allegation here that any

purported misrepresentation related, in any respect, to the value of or consideration received in

connection with the swaps Archegos traded with its counterparties.  The SEC does not address

the Second Circuit's holding in *Charles Schwab* in its Opposition.

The SEC's failure to address *Charles Schwab* also ignores its implications.  The SEC

cites a series of district court decisions that predate *Charles Schwab* for the proposition that the

alleged fraud need not "relate to the value of the securities purchased or sold."  Opp. at 56-57.

Those decisions are no longer authoritative in light of the Second Circuit's holding in *Charles*

*Schwab*.  The SEC attempts to salvage its claims by arguing that it has alleged Archegos'

counterparties were deceived with respect to the "value and consideration" they "understood they

were receiving" (Opp. at 57).  The SEC does not, however, cite to any allegations that support its

newly-minted contention that Archegos, at the time it made the alleged misrepresentations to its

counterparties, lacked the "intention or ability to fulfill" its contractual obligations under its

swaps contracts.  *See River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, 2019 WL

1099943, at *6 n.1 (S.D.N.Y. Mar. 8, 2019) ("It is axiomatic that the Complaint cannot be

amended by the briefs in opposition to a motion to dismiss….")

      The SEC relies on *SEC v. Zandford*, 535 U.S. 813 (2002) (Opp. at 56), a Supreme Court

decision that pre-dates *Chadbourne & Parke*.  *Zandford* declined to adopt a requirement that

Rule 10b-5 requires *"*a misrepresentation about the value of a particular security …. " 535 U.S.

at 820.  *Charles Schwab* is consistent with that holding because it requires a misrepresentation

about either the security's value or the consideration received (*see* 883 F.3d at 96), a broader

category of possible misrepresentations than merely those about the security's value.

      Furthermore the facts of *Zandford* are not comparable to the circumstances here.  In

*Zandford*, the defendant misappropriated the proceeds of his customer's securities account to

trade for his own benefit.  The defendant argued that his trades were not fraudulent, and were

separate from the fraudulent misappropriation of the proceeds of his customer's account.  The

Court disagreed, holding that the defendant's reinvestment of the proceeds of the customers'

securities account as part of a scheme to enrich himself satisfied the jurisdictional requirement.

*Zandford*, 535 U.S. at 822 (customers "were injured as investors through respondent's

deceptions, which deprived them of any compensation for the sale of their valuable securities.").

In *Zandford*, unlike here, the defendants' deception directly related to the consideration his

27

customers received for their investments.  ACM's reading of *Zandford* here is therefore

consistent with the Second Circuit's later holding in *Charles Schwab* that to state a § 10(b)

claim, a misrepresentation must "concern[] the value of the securities … sold or the

consideration … received in return." *Charles Schwab*, 883 F.3d at 96.

The SEC also attempts to recharacterize the misrepresentations alleged in the Amended

Complaint as involving "offers, purchases, or sales of securities," (Opp. at 50) but that is not

what the Amended Complaint alleges.  As detailed in ACM's opening brief (ACM Br. at 44 &

n.39), and as summarized elsewhere in the SEC's Opposition (Opp. at 38), the alleged

misrepresentations relate to the characteristics of Archegos' portfolio, not swaps transactions.[12]

The SEC next argues that it has sufficiently alleged that Archegos' alleged misrepresentations

were "in connection with" equity share transactions that Archegos' counterparties used to hedge

Archegos' swaps.  Opp. at 51 n.17.  The alleged misrepresentations in the Amended Complaint,

however, have nothing to do with Archegos' counterparties' hedging transactions (in the

underlying equity shares or in other positions).  For this reason, the cases cited by the SEC that

hold a counterparty's hedging transactions can satisfy the "in connection with" requirement (*see*

Opp. at 51 n.17) are inapposite.[13]

---

[12]  Elsewhere in the Opposition, the SEC describes the alleged misrepresentations as being about "Archegos's portfolio composition, concentrated exposure, and liquidity profile," and states that counterparties were misled "into believing that Archegos's overall positioning was less concentrated and more liquid than it actually was, and that Archegos was therefore more secure and well-managed than it actually was."  Opp. at 38.

[13]  The SEC cites a number of insider trading cases where courts found that even though the defendants traded in instruments that were not securities, their counterparty's hedging transactions in securities conferred jurisdiction. *See* Opp. at 51 n.17 (citing *SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011); *SEC v. Maillard*, 2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014); *SEC v. One or More Unknown Traders in the Secs. of Fortress Inv. Grp., LLC*, 2018 WL 4676043, at * 13 (D.N.J. Sept. 27, 2018); *SEC v. Suterwalla*, 2008 WL 9371764 (S.D. Cal. Feb. 4, 2008)).  These cases have nothing to do with how attenuated a misrepresentation can be from either the defendant's transactions or the underlying hedge and still satisfy the "in connection with" requirement.

One controlling decision that the SEC does acknowledge is *Chemical Bank v. Arthur Andersen & Co.*  The SEC attempts to distinguish *Chemical Bank* on the basis that the alleged misrepresentations involved the "procurement of a loan, not a security," (Opp. at 52) but that is directly analogous to what the SEC has alleged here – that Archegos made misrepresentations to obtain credit:  better margin rates and more trading capacity.  AC ¶ 5.  The SEC argues that *Chemical Bank* is different because here, "the essential aim of the alleged misrepresentation is to induce a party to part with securities" (Opp. at 52), but that does not save its claim.  At most, the SEC's allegations state that ACM personnel induced counterparties to offer margin rates and extend trading capacity – that is not the same as an allegation that a misrepresentation concerned any particular swap transaction.

The SEC attempts to analogize the circumstances here to the "downstream exchange of securities" required by the sale and repurchase ("repo") transactions in *SEC v. Drysdale Secs. Corp.*, 785 F.2d 38 (2d Cir. 1986) (Opp. at 52-53).  In *Drysdale*, the misrepresentations (related to the financial health of DGSI), were found to be "in connection with" DGSI's repo transactions because "part of the consideration offered by DGSI was a promise – in repos to repurchase and in reverse repos to resell – that its insolvency rendered worthless."  785 F.2d at 42.  Here, the SEC has not alleged that better margin rates or additional trading capacity obligated Archegos' counterparties to engage in any downstream securities transactions.  Absent such allegations, the SEC has not provided the link that was critical in *Drysdale*.

The SEC cites the Seventh Circuit's holding in *SEC v. Jakubowski*, 150 F.3d 675 (7th Cir. 1998), arguing that the appropriate question is whether the defendants' conduct "induced" its counterparties' swaps sales.  Opp. at 51-52.  That is not the standard in the Second Circuit, and the Seventh Circuit has also since clarified that it does not apply a "but for" test to determine

whether the "in connection with" element is satisfied.  *See Menzies v. Seyfarth Shaw LLP*, 943

F.3d 328 (7th Cir. 2019) ("'but for' allegations do not satisfy section 10(b) under the teachings of

*Zandford*.").  In the Second Circuit, the question is whether the SEC has alleged a

misrepresentation "concerning the value of securities … sold or the consideration … received in

return."  *Charles Schwab*, 883 F.3d at 96.  Whether the alleged misrepresentations about the

nature of Archegos' portfolio "induced" counterparties to enter into swaps transactions is not

part of the analysis, and the SEC cites no authority from this circuit to the contrary.[14]

## CONCLUSION

For the reasons set forth above and in ACM's opening brief, ACM respectfully requests

that the Court dismiss the Amended Complaint as to ACM in its entirety, with prejudice.[15]

Dated:  New York, New York
          January 23, 2023                    KING & SPALDING LLP

                                              By:  */s/ Carmen J. Lawrence*

                                              Carmen J. Lawrence
                                              William F. Johnson
                                              Eric A. Hirsch
                                              1185 Avenue of the Americas
                                              New York, NY 10036-4003
                                              Tel: (212) 556-2100
                                              Email: clawrence@kslaw.com

                                              *Attorneys for Defendant*
                                              *Archegos Capital Management, LP*

---

[14]  The SEC's authority from outside of the Second Circuit concerning margin loans (Opp. at 55-56) is unavailing because it is inconsistent with the Second Circuit's holding in *Charles Schwab*.  The language the SEC cites from *U.S. v. Naftalin*, 441 U.S. 768 (1979) – that the nexus requirement is "expansive enough to encompass the entire selling process" – is ripped out of context.  Opp. at 54.  What was at issue in *Naftalin* was whether a misrepresentation to brokers in the first leg of a short sale transaction was sufficiently "in connection with" the second leg of the transaction, the ultimate purchase by investors of securities sold short by the defendant.

[15]  The SEC offers no reason as to why it should be permitted another opportunity to amend.  Opp. at 79 n.22.