EXHIBIT A

N3LBKOOO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                        22 Cr. 240 (AKH)

5    SUNG KOOK (BILL) HWANG, et al,

6

7                 Defendants.

8                                          Oral Argument
     ------------------------------x
9
                                           New York, N.Y.
10                                         March 21, 2023
                                           2:30 p.m.
11

12   Before:

13
                          HON. ALVIN K. HELLERSTEIN,
14
                                           District Judge
15                          APPEARANCES

16   DAMIAN WILLIAMS
17        United States Attorney for the
          Southern District of New York
18   BY:  ANDREW M. THOMAS
          MATTHEW D. PODOLSKY
19        Assistant United States Attorneys

20   GIBBONS, P.C.
          Attorneys for Defendant Bill Hwang
21   BY:  LAWRENCE LUSTBERG
          THOMAS R. VALEN
22

23   FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS, LLP
          Attorneys for Defendant Patrick Halligan
24   BY:  MARY E. MULLIGAN
          TIMOTHY M. HAGGERTY
25

N3LBKOOO

1            (Case called; appearances noted)

2            THE COURT:  Let's start with the motion to dismiss,

3      and I guess you're going to be arguing, right, Mr. Lustberg?

4            MR. LUSTBERG:  I'll be arguing.  I'm not sure all the

5      issues that your Honor is interested in, but I'll be arguing in

6      regard to manipulation, *Rico*, and the government misconduct

7      motions, so happy to do it.  Mr. Valen will argue with regard

8      to the securities fraud and mail fraud issues.

9            THE COURT:  As you wish.  Go ahead.

10           MR. LUSTBERG:  Does the court wish them in any

11     particular order?

12           THE COURT:  You take it, Mr. Lustberg, and I'll

13     interrupt you.

14           MR. LUSTBERG:  Okay.  Thank you, Judge.  So, your

15     Honor, today before this Court are significant substantive

16     issues, which respectfully could really forever influence

17     whether and how trading in securities can be prosecuted.  And

18     there are also significant procedural issues about how persons

19     under investigation can and should be treated going to the

20     obligations of federal prosecutors to be candid and fair.

21           THE COURT:  Let's leave that for later.  Let's do the

22     substantive issue first.

23           MR. LUSTBERG:  You got it.  Thank you, your Honor.

24     I'm going to start, your Honor, with the question of

25     manipulation. The question of whether the government adequately

N3LBKOOO

alleges securities fraud in terms of manipulation is a purely

legal question, and that question is, Is it illegal, and can it

be criminal to engage in real sales if the intent of doing so

is to affect the price of securities.  Assuming for purposes of

this discussion that there is such intent, which of course we

have to do for purposes of this motion practice.

First, under both Section 10(b) and Section 9(a)(2),

the Supreme Court has made absolutely clear that

manipulation -- to quote the Court, connotes intentional or

willful conduct designed to deceive or defraud investors by

controlling or artificial affecting the price of securities.

That is, your Honor, it requires misleading practices,

practices that -- again quoting, artificially affect the

securities price in a deceptive matter.  That is, that are

aimed at deceiving investors as to how other market

participants have valued a security.  That is the standard.

And this occurs, your Honor, under the case law when a

transaction sends a false pricing signal to the market. That's

what the Second Circuit said in the *ATSI*, which I call *ATSI*

case.  Which in turn requires some deceptive conduct that

results in the market receiving false information.  That is,

that the defendant conveyed some sort of false impression to

the marketplace.  At bottom as with all fraud, what is required

is a misrepresentation, an act of deception -- in the words of

the United States Supreme Court in the *Schreiber* case.  In its

N3LBKOOO

decision in *Mulheren*, the Second Circuit stated that it

harbored doubt -- that its words -- as to whether it was

sufficient for a manipulation conviction that the purchase was

for the sole purpose of raising the price, rather than for

investment purposes.

        The Court didn't reach that question there because

there was no proof that there had been, that that had been the

sole purpose as to what occurred, and it pointed out that it

was not enough that the defendant in that case, like the

defendant here, engaged in high volume trading; but did so

there in a way that concealed its trading.

        THE COURT:  The indictment alleges, among many other

things, that the effect of the swaps was to avoid disclosure

that would be required under Section 13(d) if more than 5

percent ownership of stock was obtained, was held.  And it

alleges that through the particular swaps and the effect of the

swaps, particular to Mr. Hwang, that a great deal more control

was exercised by Mr. Hwang and his company without telling

anybody.  So that the obtained positions that controlled a

significant percentage of the float, someone who wanted to buy

or sell would really want to know how much of a float there was

because it has a lot to do with the liquidity of the stock and

the free play of the market.  Wouldn't you say that's an

adequate allegation of manipulation?

        MR. LUSTBERG:  Respectfully, your Honor, no, it isn't,

N3LBKOOO

1   and here's why.  Just like many other of the allegations -- and

2   your Honor has said there were a number of allegation in this

3   indictment.  The allegations regarding swaps go directly to

4   what is and is not lawful.  That is that there's no question,

5   but that Mr. Hwang's swaps trading did not have to be disclosed

6   in the way that it would if it were actual securities.  That

7   is, that's the effect of swaps, is that one does not have to

8   make the disclosures -- and by the way in his case, there's the

9   additional protection against disclosure that comes about

10  because he's working from a family office, which you've kind of

11  alluded to.  But the truth is that his --

12      THE COURT:  I don't think that makes a difference.

13  We're not talking about the Investment Advisers Act.  We're

14  talking about manipulation.

15      MR. LUSTBERG:  I understand.  So the question you've

16  asked is whether he concealed his -- he somehow concealed his

17  investments in a way that deceived the market.  Leaving aside

18  that everyone --

19      THE COURT:  That's what's alleged.

20      MR. LUSTBERG:  That's what's alleged.  He didn't

21  because his actions in disclosing or non-disclosing were in

22  precise conformity with the law.  It's interesting.  Your

23  question is an interesting public policy question which as

24  you've seen is being debated at the SEC and in Washington as to

25  whether the statute should be changed to require a greater

N3LBKOOO

1  disclosure in situations where swaps are involved.

2          THE COURT:  It will not be the first time that an

3  issue of fraud was also a subject of discussion whether or not

4  to issue a policy position.

5          I recall a case decided by Judge Friendly, who I think

6  very few people in this room will recognize -- but you and I

7  will.

8          MS. MULLIGAN:  Thank you, your Honor.

9          THE COURT:  -- with accountants, accountants fraud

10  where the accountants defense was that they did everything that

11  was permissible, but where the effect of what they did and the

12  intent of what they did was to have a material

13  misrepresentation of the books and records, and that was

14  considered a fraud.

15          And the question here is, Can acts that are legal in

16  and of themselves get perverted in a way that carries out a

17  scheme or artifice to defraud.  And we could assume that if one

18  exercises sufficient control over a stock to command the price,

19  then there can be a manipulation.  It may not be, doesn't have

20  to be, but it can be.

21          MR. LUSTBERG:  Your Honor, you've stated the question

22  with precision.

23          THE COURT:  Really.  You're a good flatterer,

24  Mr. Lustberg.

25          MR. LUSTBERG:  Well, you know that that's not my way.

N3LBKOOO

1    But an assignment case, which is what you're referring to --

2                THE COURT:  Yes, right, an assignment.

3                MR. LUSTBERG:  -- what Judge Friendly held there was

4    not simply that it was -- that doing something completely legal

5    could turn into something illegal if you had some sort of

6    mal-intent.  In that case, it was an accountant, and the

7    accountant had certain disclosure obligations.  He had to

8    certify, and that was the crime there.  Here's the thing about

9    this case.  This case is about trading.  It's about huge

10   amounts of trading that was ultimately very unsuccessful.  And

11   the question there is, Was that trading unlawful.

12               The government cites numerous cases for the

13   proposition that if you add, quote, unquote, manipulative

14   intent to the equation, then what was otherwise lawful suddenly

15   can become unlawful.  But what I'm really requesting that your

16   Honor do very carefully is to look at each and everyone of

17   those cases.  Because each of those cases, your Honor, are

18   cases in which there is classic securities fraud.  There is

19   deception on the market.  There are false signals being sent to

20   the market.

21               THE COURT:  Isn't there an allegation of false signals

22   and deception?  The government may not be able to prove them,

23   but they're alleged.

24               MR. LUSTBERG:  They're not, your Honor.  There really

25   are not allegations of false statements of deception.  What

N3LBKOOO

1  there is, there's a number of allegations of fact that they say

2  amount to fraud.  But each and everyone of those, every single

3  one of them is lawful conduct.  So, for example, you yourself

4  just mentioned a few moments ago, high volume trading,

5  concentrated portfolios.  Even if that's true, that is not

6  unlawful.  And it's very clear that it's not unlawful to trade

7  in a big way, which is what Mr. Hwang did.  They talk about the

8  trades were timed.

9          THE COURT:  What was the purpose of the trading?  Why

10  didn't he want to concentrate and buildup such large positions

11  and create an illiquidity that may have prevented him from ever

12  getting out?  This is not in the indictment.  I'm straying from

13  the indictment, but it's my curiosity.

14          MR. LUSTBERG:  Sure. You're asking a fact question,

15  and here's what the facts would show.  Mr. Hwang liked these

16  stocks.  He traded in a very limited portfolio of names that he

17  studied well, and these particular names, these particular

18  securities were securities for companies that he believed in.

19  Not only did he believe in them, but he particularly believed

20  like every other investor in the world that the best time to

21  buy was when the number is low, is when the price is low.  And

22  so as the price fell, he did as he had done for years, he

23  bought more.

24          But this goes to a proof question, and I think the

25  government would say the same thing that what I'm saying now to

N3LBKOOO

1  you is a proffer of what the evidence will show, but they have

2  to show, they have to allege that there's actual fraud, that

3  there's something that happened in the marketplace, the classic

4  indicia of securities fraud that the case law talked about.

5          THE COURT:  They're talking about a fraud of using the

6  swaps as a way of building up the value of his position without

7  letting the market know that he really controlled more than 5

8  percent. That's fraud.

9          MR. LUSTBERG:  So, your Honor, first of all, there is

10 a certain transparency in the marketplace because as the

11 government alleges each -- not every single time, but when

12 Mr. Hwang would buy sometimes, the counterparties would hedge

13 and buy those shares.  All of which was readily disclosed to

14 the marketplace.  But there's no allegation --

15         THE COURT:  That's not so, is it?

16         MR. LUSTBERG:  Pardon me.

17         THE COURT:  How does the market know?

18         MR. LUSTBERG:  Well, the market doesn't know it's

19 Mr. Hwang doing the trading, but they know that what's being

20 purchased in the market.

21         THE COURT:  You can collect all that information, but

22 not very easily.

23         MR. LUSTBERG:  Well, none of it is gathered very

24 easily, that's sort of not the point.  But the question here is

25 whether in buying swaps which -- and remember, a swap is --

N3LBKOOO

your Honor knows what a swap is.  You're essentially betting on

a stock.  That doesn't have to be disclosed.  And so what

you're saying is that -- what they're saying is that -- or if

they are saying this, and I'm not sure this allegation appears

anywhere in the indictment.  In fact, I'm sure it doesn't

appear anywhere in the indictment.  That by purchasing swaps

that he failed to disclose to the marketplace, he was obeying

something the law.  The law does not -- and by the way --

THE COURT:  I concede to you that entering into a swap

transaction is not forbidden by law.

MR. LUSTBERG:  That's correct.

THE COURT:  The issue whether is whether doing it in

such a way as to amass a control position over the trading of a

security for the purpose of inflating the value of its own

security in an artificial way cannot be illegal, cannot be a

fraud, cannot be a scheme or artifice to defraud.  I take your

position.  I understand what you're saying.  May I ask a few

questions to Mr. Thomas.

MR. LUSTBERG:  May I just respond to one thing that

your Honor just said, just one thing quickly.

THE COURT:  Sure.

MR. LUSTBERG:  I want to emphasize a word that you

just used when you summarized the allegation, and that summary

included the idea that his position was artificial.  That there

was something artificial about the pricing.

N3LBKOOO

1          THE COURT:  That's alleged.

2          MR. LUSTBERG:  That's what's alleged.  Well, yes and

3  no it's alleged.  I mean the artificiality.

4          THE COURT:  It's alleged that there was a false

5  inflation to the value of the stock.

6          MR. LUSTBERG:  Well, the allegation is that that was

7  his intent.  But artificiality requires a false statement to

8  the marketplace.  That false statement comes about in cases of

9  spoofing or layering.  It comes about in cases of wash sales.

10  It comes about in specific situations where false information

11  is injected into the marketplace.

12          THE COURT:  You made that point somewhere earlier, and

13  I made the government give you a letter which outlined and will

14  give you more detail about the specific allegations and

15  misrepresentations.

16          MR. LUSTBERG:  No, your Honor.  That letter was on

17  something different.  There's two sets of allegations in this

18  case.  One set of allegations has to do with whether there were

19  false statements to the marketplace.  The answer is, No, there

20  weren't.  These were sales that the marketplace had the same

21  ability to understand as it would with regard to any other

22  swaps; and then if there was hedging, any other subsequent

23  transactions.

24          What you required the government to provide to us was

25  a list of the misrepresentations that Archegos allegedly made

N3LBKOOO

1    to the counterparties, to the banks.  That's what you required

2    the government to provide.

3          THE COURT:  This is responding to your point that

4    there was no misrepresentation involved regarding the swaps and

5    the intent of the swaps.

6          MR. LUSTBERG:  So, your Honor --

7          THE COURT:  You make a good point here.  There are two

8    aspects of wrongdoing basically here.  One is the conspiracy to

9    violate *Rico*, and the other is a securities fraud.

10         MR. LUSTBERG:  There are two different securities

11   fraud violations that are alleged.  One is manipulation, and

12   the other is fraud in connection with communications between

13   Archegos and the counterparties, the banks.  Those are the two

14   different types of fraud allegations that are at issue.  I'm

15   now only addressing the manipulation claim.  And our argument,

16   your Honor, is that mere intent to influence the price is

17   insufficient to allege manipulation in a nutshell.

18         THE COURT:  I think there's more than that, but let's

19   see what Mr. Thomas has to say on this.

20         MR. THOMAS:  Your Honor, Mr. Podolsky is eager to

21   address this topic, so I'll turn it to him.

22         MR. PODOLSKY:  Thank you, your Honor.  Let me start

23   just by responding to a comment that Mr. Lustberg made several

24   times and led to the end of the colloquy that there must be

25   false statements made in connection with a market manipulation

N3LBKOOO

1    claim to proceed.  I'm just going to quote now from the case

2    law, because this is not an open question.  And I'll start with

3    *United States v. Royer*.  This was Judge Rakoff sitting by

4    designation on the Second Circuit, and considering a market

5    manipulation claim.  And what he pointed out was that in this

6    context 10(b)(5) prohibits not only conventional frauds brought

7    about by making materially false or misleading statements, but

8    also so-called constructive frauds; that is, other forms of

9    misconduct that have the same practical effect as a

10   conventional fraud.  So that's 2008 in the Second Circuit.

11           And this point has actually been addressed more

12   recently by judges in this district, including Judge Cote in

13   *SEC v. Lek Securities*.  And among other things she pointed out

14   that market manipulation can be accomplished through otherwise

15   legal means.  As the Second Circuit has noted, and she goes on

16   to quote*, ATSI*, a Second Circuit decision; in some cases,

17   scienter is the only factor that distinguishes legitimate

18   trading from improper manipulation.  And I'll point to one

19   other decision.  This is Judge Holwell's decision in *Masri* in

20   2007.  And Judge Holwell also stated, market manipulation can

21   also be accomplished through otherwise legal means, such as

22   short sales and large or carefully timed purchases or sales of

23   stock.

24           THE COURT:  And that's what you allege?

25           MR. PODOLSKY:  And that is exactly what we allege.

N3LBKOOO

1   And these are decisions of this district and this Circuit

2   stating clearly that the defendant's legal position is wrong,

3   and their view of what is required to be alleged is incorrect.

4         THE COURT:  I think, Mr. Lustberg, that's what I hold.

5   I think that is what I hold.  There is an adequate allegation

6   in the indictment just to that effect, that the entering into

7   the swaps along with the manipulative purpose that's alleged

8   and the misstatements that are alleged carry out a fraud.  It

9   sufficiently alleges a conspiracy among the four to carry out

10  this manipulation.

11        Now, I want to ask this of Mr. Thomas.  What is the

12  bright line, if any, between lawful trading in swaps, between

13  lawful placement of trades.  The timing of trades at the close

14  or at the beginning of the market or after hours or before

15  hours, permissible activities and a manipulative activity, such

16  as you allege in the indictment?  Is there a bright line?

17        MR. PODOLSKY:  I think that's a great question, your

18  Honor. I think the best way to answer it is to point to the

19  elements that I expect the government will prove at trial which

20  is, first, as relevant to your question, that the defendant

21  engaged in practices that affected or controlled the price of

22  the securities.  So those are the techniques that your Honor

23  was just adverting to.

24        And then second that the defendant did it knowingly

25  and willfully and with the intent to affect or control those

N3LBKOOO

1   prices.  And so the government does --

2              THE COURT:  Affect or control are different.

3              MR. PODOLSKY:  That's right, your Honor.  And I

4   believe the case law provides either one would be sufficient.

5   So in order to either control or increase or decrease the price

6   of the security.

7              THE COURT:  It can be argued that every single sale or

8   purchase of a security can affect the price.

9              MR. PODOLSKY:  That's right, your Honor.  And that's

10  why that intent, that knowing and willful and intent to

11  manipulate are what distinguishes lawful from unlawful

12  manipulation.

13             THE COURT:  How do you define manipulation?

14             MR. PODOLSKY:  Your Honor, just as I said, and I'm

15  happy to pull up a citation here.

16             THE COURT:  Tell me what you understand is

17  manipulation.

18             MR. PODOLSKY:  Yes, your Honor.  It's any technique,

19  in this case it's trading techniques that are carried out with

20  the intent, as I said, to create an artificial price; that is

21  to interfere with the natural interplay of supply and demand by

22  controlling, increasing or decreasing the price of the

23  security.

24             THE COURT:  You agree with that definition,

25  Mr. Lustberg?

N3LBKOOO

1        MR. LUSTBERG:  I really don't disagree with that

2   definition, your Honor, except that there's more to.  And if I

3   might let me explain.

4        THE COURT:  What more is there to it?

5        MR. LUSTBERG:  The more to it has to be some

6   fraudulent conduct.  This is securities fraud.  And, your

7   Honor, I'm going to take --

8        THE COURT:  I believe the Second Circuit has said

9   that, Mr. Thomas.  It must be some fraudulent activity, some

10  deception.  I think you allege it --

11       MR. PODOLSKY:  We do extensively, your Honor.

12       THE COURT:  -- to the things that were said and not

13  said to the counterparties for one, and perhaps in other ways

14  as well.  But there does have to be some kind of fraudulent

15  activity.

16       MR. PODOLSKY:  That's right, your Honor.  What we've

17  alleged as we've stated, and I think your Honor adverted to

18  this several times, is that by using swaps to carry this out,

19  by timing the trades, by the size of the trades and so on, each

20  of those were techniques that were used to deceive the market,

21  to send a false pricing signal to the market.

22       THE COURT:  Give me those incidents again.

23       MR. PODOLSKY:  Sure. So, for example, your Honor, and

24  I believe this is alleged throughout the indictment including

25  at paragraph four, but your Honor referred to it.  The use of

N3LBKOOO

swap counterparties to disguise and deceive the market as to

the extent of demand for these stocks.  And at paragraph 35 of

the indictment, the indictment alleges manipulative and

deceptive trading techniques, such as purchasing or selling

securities at particular strategic times of day, transacting in

certain securities in large amounts or high volume.

THE COURT:  Mr. Lustberg is going to answer, those are

conventional activities.

MR. PODOLSKY:  That's right, your Honor.  And that's

why I adverted to, for example, *Lek Securities*, Judge Cote's

decision, Judge Holwell's decision in *Masri*, that when those

activities, which as your Honor noted, can impact the price of

a stock are carried out with the intention to impact the price

of the stock, they become manipulative.  As we've said in our

briefing and as I read a few moments ago, that's what the case

law in this circuit holds.

MR. LUSTBERG:  Your Honor, I don't want to interrupt,

if I may.

THE COURT:  One moment.  Every purchase, every sale

can affect the market.

MR. PODOLSKY:  That's correct, your Honor.

THE COURT:  If it's a large purchase for sale, it can

affect the market.  No one would say it's illegal to engage in

a large transaction.  No one can say that it's illegal to enter

into a swap transaction.  But you're saying the combination of

N3LBKOOO

these activities can be illegal?

MR. PODOLSKY:  That's right, your Honor.  As we note both in the indictment, as I think your Honor said a few moments ago, the way that these techniques were designed and used was intentionally deceptive and designed to manipulate the market.  And as I pointed out, that's what the Second Circuit as well as Judge Cote, Judge Holwell have held to be sufficient to allege market manipulation.

THE COURT:  Let me make this observation.  At this point, given the different contentions of the parties, the difficulty in defining manipulation, the difficulty in drawing a bright line between activity that is lawful in itself and activities that taken together and with a malevolent purpose can be unlawful, that's a mistake for a district judge to dismiss the indictment.

The government may not prove its point.  The government may not be able to prove its manipulation, but I think it needs to be done on a complete record; and then maybe I can decide or more likely a jury can decide whether there is or is not manipulation.

MR. LUSTBERG:  We agree, your Honor.

THE COURT:  Let's go over now the techniques of it. First allegation, a conspiracy to commit a *Rico* fraud. Mr. Lustberg points out that you never alleged a pattern.  What is the pattern?  Does it have to be alleged or is it sufficient

N3LBKOOO

1    to say you conspired to commit a *Rico* fraud?

2             MR. THOMAS:  Your Honor, I'll address this one if I

3    could. The indictment contains all the allegations that are

4    necessary to allege --

5             THE COURT:  Where is the pattern?

6             MR. THOMAS:  -- that there was an agreement to conduct

7    the affairs of Archegos through a pattern of racketeering.

8             THE COURT:  You sufficiently allege an agreement.

9    Ms. Mulligan may disagree, but we'll have that later on.

10            MR. THOMAS:  Yes, your Honor. I underscore this

11   distinction --

12            THE COURT:  Listen to me.  I'm not commenting on an

13   allegation of a conspiracy.  I'm in agreement.  I'm not at this

14   point commenting on the existence of an enterprise.  I'm asking

15   you about a pattern of racketeering activity.  Where in the

16   indictment do I find that; and is it necessary to allege that?

17            MR. THOMAS:  Your Honor, the answer to the second

18   question is no.  What needs to be alleged is that there was an

19   agreement to conduct the affairs of the enterprise through a

20   pattern of racketeering activity.  The only charge under the

21   racketeering statute that is contained in the indictment is a

22   conspiracy charge.  There is no substantive count.  So all that

23   need be alleged is that the participants, the conspirators in

24   the scheme agreed to conduct the affairs through a pattern of

25   racketeering activity.

N3LBKOOO

1          THE COURT:  So it's sufficient for an indictment to

2     allege the comprehensive fact or comprehensive theory, but not

3     the underlying facts?

4          MR. THOMAS:  Yes, your Honor.  Including --

5          THE COURT:  It's not necessary for the indictment to

6     allege the specific acts that constitute a pattern?

7          MR. THOMAS:  Your Honor, the indictment does do that.

8     The answer to the legal question that you're asking is, it is

9     sufficient for the government to allege for an indictment to

10    contain an allegation that there was an agreement to operate it

11    through a pattern of racketeering activity, and to provide no

12    further delineation of the pattern.  As it happens here, the

13    indictment does contain specific allegations about the pattern.

14         THE COURT:  I concede the first part, but not the

15    second part.  Where is the second part?

16         MR. THOMAS:  Your Honor, a couple of things.  First of

17    all, if you look, for example, in paragraph 68 which is printed

18    page 48 as numbered of the indictment.  Starting at the bottom

19    of the page the indictment alleges that the conspirators

20    agreed -- and I quote now, "To conduct and participate directly

21    and indirectly in the conduct of the affairs of the Archegos

22    enterprise through a pattern of racketeering activity, as that

23    term is defined in Title 18, United States Code, 1961(1) and

24    1961(5)."

25         THE COURT:  I see subparagraphs A to C.  They're not

N3LBKOOO

1   very helpful.  It maybe sufficient I guess, but they're not

2   very helpful.  They don't tell us anything.

3          MR. THOMAS:  Your Honor, they're plainly sufficient

4   under the Second Circuit's decision in *Applins* which said for

5   conspiracy allegations of this sort where there are categories

6   of criminal conduct that are at the object of the scheme, it is

7   sufficient for the indictment to allege those categories.  And

8   those categories are themselves a pattern of racketeering

9   activity if they are related to the enterprise.  And those

10  allegations too are found more specifically in the paragraphs

11  that follow where it identifies in the indictment the purposes

12  of the racketeering conspiracy.

13         THE COURT:  Where is that?

14         MR. THOMAS:  Starting at paragraph 70, and then

15  continuing to paragraph 71, 72 and 73.

16         THE COURT:  What pattern?  I understand.

17  Mr. Lustberg, would you agree with Mr. Thomas that

18  subparagraphs A, B and C sufficiently allege for the purpose of

19  an indictment the pattern?

20         MR. LUSTBERG:  Absolutely not, your Honor.  Let me

21  start with his legal point.  The agreement that they have to

22  allege under the Second Circuit cases of *Cain* and *Satinwood* is

23  they have to agree that the co-conspirators would further and

24  endeavor, which if completed would satisfy all of the elements

25  of a substantive *Rico* offense.  That is, they want to say that

N3LBKOOO

1   just because this is a conspiracy charge and not a substantive

2   *Rico* charge that they don't have to adequately allege, as

3   you've asked, a pattern, but that isn't correct.

4           THE COURT:  That's their allegation.

5           MR. LUSTBERG:  That's their argument.

6           THE COURT:  And they accuse you of importing civil

7   cases into the criminal law.

8           MR. LUSTBERG:  Your Honor, their brief is replete with

9   civil cases, both in the manipulation context and in the *Rico*

10  context.  It's not the least bit unusual to rely on civil

11  cases.

12          THE COURT:  We take the law where we find them, but I

13  think Mr. Thomas is correct about the obligations of pleading.

14          MR. LUSTBERG:  Except, your Honor, that the

15  agreement -- so, for example, Judge, if you were to say, there

16  was an agreement to violate -- to rob a bank, but there was no

17  bank involved, then you haven't adequately alleged a

18  conspiracy.  Here, the agreement has to be to violate *Rico*;

19  that is, through a pattern of racketeering activity.  So it's

20  perfectly appropriate -- and the case law does this -- looks to

21  whether a pattern is alleged.  And a pattern, as we've set

22  forth, is not alleged here for two reasons:

23          Number one, there's not two predicate acts.  There's

24  one in.  And the one is mail fraud, which as we know is their

25  theory is under attack in the Supreme Court.  But the second

N3LBKOOO

1    one --

2          THE COURT:  Offenses involving fraud in the sale of

3    securities.

4          MR. LUSTBERG:  Fraud in the sale of securities, and

5    under *Rico* uniquely it has to be fraud in the sale of

6    securities.  But, your Honor, one looks not just to the

7    conclusory allegations of the indictment, but look at all the

8    allegations.  And what these allegations are about has to do

9    with Mr. Hwang's purchase of securities, not sales.

10         THE COURT:  I think you're requiring too much of an

11   indictment.

12         MR. LUSTBERG:  Your Honor, I mean, it's not about

13   requiring too much.  An indictment is measured -- one looks at

14   an indictment and says, Does this indictment allege a crime.

15   If everything they say is true, does it amount to a crime?

16   They do not in this indictment --

17         THE COURT:  Let me ask Mr. Thomas, the allegation of

18   offenses involving fraud in the sale of securities, and that's

19   to "B" as well.  Mr. Lustberg is arguing that if there's a

20   fraud here, it's involved in the purchase of securities, not in

21   the sale.  And so these allegations contradict other

22   allegations in the indictment.

23         MR. THOMAS:  Your Honor, Mr. Lustberg is wrong on this

24   point, both factually in terms of describing what's in the

25   indictment.  The paragraph 35 that Mr. Podolsky referred the

N3LBKOOO

1   Court to talks about, for example, instances in which Archegos

2   used sales itself as the seller in order to further its

3   fraudulent scheme.  And as the Court just observed in paragraph

4   68 --

5           THE COURT:  Let me read 35.  Just a minute.

6           (Pause)

7           THE COURT:  Subparagraph B talks about purchases, as

8   does C, as does D.

9           MR. THOMAS:  Your Honor, I direct the Court to the

10  introductory paragraph that says, "In particular Bill Hwang

11  influenced the prices of stocks by utilizing manipulative and

12  deceptive trading techniques, such as purchasing or selling

13  securities at particular strategic times of day."

14          THE COURT:  I skip that because it's the generality.

15          MR. THOMAS:  Your Honor, the indictment need not

16  contain more than a concise statement of the offense, and that

17  paragraph doesn't stand alone.  It stands next to the paragraph

18  68 allegations which assert literally that there was fraud in

19  connection with the sale of securities.  But Mr. Lustberg is

20  also wrong as a matter of law that these allegations about the

21  purchases are not themselves related to the sale of securities.

22  Obviously for every security --

23          THE COURT:  How so?

24          MR. THOMAS:  Every security that Archegos purchased

25  was sold to it by a deceived counter-party, so there's a sale

N3LBKOOO

1   of securities involved in every transaction.

2            THE COURT:  The sale gave more benefit to the sellers

3   because of the manipulation of the price.  In other words, the

4   sellers sold into an inflated price, and therefore made more

5   money.

6            MR. THOMAS:  Your Honor, I'm referring to the

7   counterparties who loss billions of dollars because of their

8   reliance on Mr. Hwang's team's false statements.

9            THE COURT:  Maybe because they built up their own long

10  position.

11           MR. THOMAS:  Well, as Mr. Lustberg referred to, the

12  typical practice at the counterparties was to go into the

13  market and buy one share of the stock.  And so when Mr. Hwang

14  wanted to take a particular bet, there would be a corresponding

15  echo in the equities market by the counter-party.

16           THE COURT:  The counterparties are hedging.  It's a

17  classic hedge.  They have to sell back the security which is

18  the swap at a certain time and at a certain price.  And so they

19  go into the market and buildup a long position.  They hedge

20  against that.  The problem here is that the buyer of the

21  counter-party, that is Archegos, didn't have the money to honor

22  the trade; and so the price collapsed and the counter-party was

23  left holding stock that didn't have the value it was supposed

24  to have.

25           MR. THOMAS:  Your Honor is absolutely correct in

N3LBKOOO

1    assessing those dynamics.  What I wanted to draw the Court to

2    was first a factual point, which is that Archegos's involvement

3    with the counterparties is an involvement in the counterparties

4    selling swaps to Archegos, so sales are involved.  And Justice

5    O'Connor in a concurrence in the *Holmes* case observed that this

6    language best be read to require there to be conduct

7    sufficiently willful to constitute a crime and a sale of

8    securities; not that the seller be the one or the sale itself

9    be the thing that affected the fraud.  That leads me to the

10   second point --

11          THE COURT:  The consequences of the fraud would be for

12   selling the liquidation.  It doesn't have to be part of the

13   fraud, it could be the consequence of the fraud.  Is that what

14   you're saying?

15          MR. THOMAS:  Your Honor, what we're saying is that the

16   law only requires there to be a sale somewhere in the scheme,

17   and here there are many sales, and judges in this Circuit have

18   so found.

19          THE COURT:  I'm sure Mr. Hwang did not consider sales

20   as a part of his scheme.

21          MR. THOMAS:  Your Honor, that also is factually

22   inaccurate in the sense that the indictment alleges that

23   Mr. Hwang took short positions in certain of the securities.

24   And there's a table at the beginning of the indictment that

25   identifies various tickers that Mr. Hwang manipulated through

N3LBKOOO

1   his trading, and includes in it a list of two tickers that he

2   manipulated on the short side.

3           THE COURT:  I noticed that, but there are no

4   allegations to make me understand what they were and how they

5   did it.  I know what they are.  I saw the table, but I don't

6   know how that was part of a manipulative scheme.  There's no

7   allegation regarding that.

8           MR. THOMAS:  Respectfully, your Honor, we think that

9   paragraph 35 and paragraphs 68 do provide all that's required

10  under Rule 7 to describe there being a sale of securities in

11  connection with the fraud.  And further as I pointed out,

12  judges in this Circuit, including Judge Cabranes when he was on

13  the district court have held essentially that any willful

14  violation of 10(b) is a *Rico* predicate.  And so the suggestion

15  that there needs to be some very specific type of sale conduct

16  in the fact pattern is both wrong legally, but also ignores the

17  instances in the indictment in which sales are described.

18          THE COURT:  Something with all of this is that this

19  case is different.  I've never seen a swap case like this in

20  the literature.  Bottom line is that you've alleged a

21  conspiracy.  You've alleged the enterprise and you've

22  sufficiently alleged a pattern of racketeering activity by the

23  general allegations of the subparagraphs under paragraph 35.

24  that's your position?

25          MR. THOMAS:  Yes, your Honor.  And in our briefing we

N3LBKOOO

1   point --

2              THE COURT:  And Mr. Lustberg points out that they

3   don't make sense.  It maybe it's true, Mr. Lustberg.  But

4   again, I think at this time on this record I cannot rule

5   against the government in the sufficiency of the indictment.

6              MR. LUSTBERG:  Your Honor, I understand the Court's

7   ruling.  I'm not quarreling with the Court, except that I sort

8   of am.

9              THE COURT:  Well, sure you are.  That's what you're

10  paid to do.  You do it so well.

11             MR. LUSTBERG:  Which is to say this:  The government,

12  as Mr. Thomas has and Mr. Podolsky have both talked about

13  sufficiency of allegations and Rule 7 of the Federal Rules of

14  Criminal Procedure.  And in fact in their brief they talk about

15  the fact that the elements of the crime is alleged in each

16  case, and that we are on notice of the allegations against us.

17  And when they talk about the notice, they talk about the

18  extensive factual allegations in this indictment.

19             And what we're saying to your Honor right now is that

20  those extensive allegations, to the extent that that is the

21  basis for them arguing to the Court that we have sufficient

22  notice should be taken seriously.  And when one looks at this

23  indictment, one is left with the firm conviction that that the

24  fraud that's alleged here is that Mr. Hwang traded in order to

25  keep the price up or get the price to go up.  That is the

N3LBKOOO

1   allegation of this indictment.  And now suddenly they're saying

2   that, well, even though the language of the statute, that is

3   the *Rico* statute, requires a fraud in the sale of securities,

4   that a set of allegations that go purely to purchases of

5   securities is sufficient to allege the crime.

6          Congress could easily have said when it wrote *Rico*

7   that it went to purchase of sale of securities, the same way as

8   they said it under 10(b), but they didn't.  They focused on the

9   sale of securities.  And the government wants to read that out

10  of the statute today, and respectfully we don't think you

11  should.  I hear your Honor when you say that there's enough to

12  get pass an indictment, that we should do this on a full

13  record, that we should do it at a trial.  But a trial here,

14  Judge, with regard to this whole range of conduct, which is --

15  I thought Mr. Podolsky did a very good job of summarizing for

16  your Honor what was in the indictment with regard to what they

17  say shows fraudulent intent, the fraudulent intent that's

18  required for a securities fraud violation.  He said three

19  things.  He said that it's the use of swaps.  It's timing, and

20  it's the size of the trades.  None of those things is remotely

21  unlawful.

22          THE COURT:  We've gone over that.

23          MR. LUSTBERG:  I know you have, but I told you I was

24  going to quarrel.

25          THE COURT:  We've gone over that.

N3LBKOOO

1          MR. LUSTBERG:  Respectfully, Judge, I just think that

2     we're going to have a trial here on a set of allegations that

3     do not amount to a crime.  And this is true in the *Rico*

4     context, and it's true in the securities fraud context, and

5     it's absolutely true in the manipulation context.  Mr. Hwang's

6     trades were just that, trades.  There's no spoofing.  There's

7     no layering.  There's no wash sales.  There's none of the

8     traditional indicia of fraud.

9          And all of the cases that Mr. Podolsky cited to the

10    Court, *Lek Securities*, *Royer* and *Masri* all had indicia of

11    fraud, all had the same indicia of fraud that the Court

12    requires over and over.  Respectfully, I think a careful

13    reading of the case law that's cited leads inexorably to the

14    conclusion that these allegations are insufficient.  And we can

15    wait and have your Honor decide that on a Rule 29 motion, but

16    this is an apt time to decide it.

17         MS. MULLIGAN:  I'm happy to wait until later in the

18    conference --

19         THE COURT:  I heard everybody else, Ms. Mulligan.  Let

20    me hear you.

21         MS. MULLIGAN:  I'm hearing decisions and I'd like to

22    weight in.

23         THE COURT:  Go ahead.

24         MS. MULLIGAN:  First of all with respect to the

25    manipulative trading.  The indictment alleges no role by my

N3LBKOOO

1   client Mr. Halligan with respect to the manipulative trades in

2   the indictment, and indeed he's not charged with the

3   substantive count of manipulative trading.

4        Now with respect to this *Rico* conspiracy, your Honor,

5   I think a decision that's directly on point is by your former

6   colleague the late great Judge Patterson, and that is discussed

7   in pages eight and nine of my reply brief which is *In re Par*

8   *Pharma*.  In that case Judge Patterson is very clear.  This *Rico*

9   statute, it requires more or every securities fraud would be

10  swept in, and you know that's not the case.  This is a very

11  unusual securities *Rico*.  It's not the type of *Rico* that the

12  Southern District typically charges.  We would in fact have a

13  very different detailed allegations.

14       If this was a gangs *Rico* indictment, your Honor.  We

15  would have may to wit clause where we would know when the

16  narcotic sales were, who they were sold to, and this is not

17  that type of indictment.  But with respect to this issue of the

18  predicate act.  As Judge Patterson said in that case, your

19  Honor, it has to be in relation to the sale of the security.

20  Congress meant that when they said it.  They didn't hedge on

21  this language, and that's the law, your Honor.  And that's just

22  not alleged here.  And this *Rico* indictment it fails on

23  numerous grounds.

24       THE COURT:  What are we talking about Section 1348?

25  What section of the criminal code?

N3LBKOOO

1          MS. MULLIGAN:  This is 1961(d), the *Rico* conspiracy,

2     your Honor.  And the predicate acts are defined in 1961, I

3     believe it's (1)(D).  Congress was very clear, your Honor, in

4     delegating certain specific acts.  In other parts of the law,

5     it uses the term "purchase or sale of securities." In other

6     specific parts of the criminal code it uses, "in connection

7     with." And, your Honor, precision is particularly required in

8     criminal cases where defendants have to have full and fair

9     notice.

10          THE COURT:  I'm looking for that part of 1961.

11          MR. HAGGERTY:  Your Honor, the reference appears at

12     18, U.S.C., 1961, Section 1, Subsection D.  It's a long

13     somewhat rambling provision with multiple statutory references,

14     fraud in the sale of securities provision appears --

15          THE COURT:  Where?

16          MR. HAGGERTY:  It appears maybe 7/8 of the way down.

17          THE COURT:  After biological weapons?

18          MR. HAGGERTY:  Yes, it is. In the copy I have six

19     lines below biological weapons.

20          THE COURT:  Fraud in the sale of securities.

21          MR. THOMAS:  Your Honor, may I respond to

22     Ms. Mulligan's point?

23          THE COURT:  Yes.

24          MR. THOMAS:  In our responsive briefing on this at

25     page 20, we collect a number of authorities, including the

N3LBKOOO

Judge Cabranes' decision that I mentioned before that interpret

than phrase.  They include, for example, a decision by Judge

Nickerson that rejects this very argument that that language

ought to be read in a cribbed and specific way, who held, "Any

violation of 10(b) sufficiently willful to trigger the criminal

penalties of Section 32(a) constitutes fraud in the sale of

securities."

Then there's the Judge Cabranes decision that I

mentioned, and other decisions that we collect too that

essentially support the idea that fraud in the sale of

securities is used in the *Rico* statute reaches a broader swath

of conduct than what Ms. Mulligan or Mr. Lustberg would have

the Court conclude here.  And there is congressional reason to

believe that reading is accurate because when the PSLRA was

amended to strip from civil plaintiffs the ability to bring

*Rico* claims alleging securities fraud, Congress stripped from

them the right to bring any fraud actionable in the purchase or

sale of securities.  And the citation for that Congressional

action is set forth in footnote three also on page 20.  So the

notion that Congress could have spoken on this topic is of

course true and goes against --

THE COURT:  The healing argument that this shorthand

reference in Section 1961 left out the typical phrase, in

connection with the purchase or sales.  I understand that.

We're in error of a strict interpretation of law.  Let me ask

N3LBKOOO

you a different question.  What was the goal of Mr. Hwang

allegedly, claimedly?  What did he want to do at the end of the

day?

MR. THOMAS:  Your Honor, the indictment alleges that

his goal was to run Archegos through a pattern of criminal

conduct.  But if you're asking me as someone familiar with the

facts what he had in his mind beyond that?

THE COURT:  Yes.

MR. THOMAS:  I think Mr. Hwang wanted to control the

markets, your Honor.  I think he wanted to be an

extraordinarily wealthy person, that he wanted to be successful

beyond measure.

THE COURT:  So it's a pump and dump scheme?

MR. THOMAS:  I think it's a pump and brag scheme, your

Honor.

THE COURT:  Pump and brag?

MR. THOMAS:  Mr. Hwang decided that if he affected the

trades that we allege that he did, he could take over the

majority of multiple major U.S. corporations freely trading

stock.  And as a result on paper claim absolutely unimaginable

wealth, and that's precisely what he did until his scheme

failed and it unraveled.

THE COURT:  Is there any indication that he used it to

inflate his balance sheet to get personal loans or somehow get

distributions of money into his own pockets?

N3LBKOOO

1      MR. THOMAS:  Your Honor, the indictment describes

2  multiple instances in which the very success of the fraud was

3  recycled in the form of further statements to the

4  counterparties to obtain yet additional trading capacity.

5      THE COURT:  I understand that.  I understand that

6  allegation.  What I'm trying to figure out in my mind to what

7  end?  A price can't stay artificially inflated.  The bubble has

8  to be pierced at some point in time.  And when that happens,

9  the position that Mr. Hwang built up would come to haunt him

10  which is what happened here.  He lost his money.  If he were

11  doing a certain amount of inflation to cover a larger amount of

12  short selling, I could understand it.  But I'm trying to figure

13  out in my mind that I'm not succeeding, What was in it for him.

14  What did he want.  What did he want to achieve.  Being a big

15  shot, I suppose that's possible, but it doesn't seem to me that

16  that was his aim.  I can't figure out his aim.

17      MR. THOMAS:  We certainly appreciate the Court's

18  questions.  I think there will be trial proof that would fill

19  in some of that context as to what Mr. Hwang had in mind.

20      THE COURT:  Like what?  You want to give me a hint.

21      MR. THOMAS:  Yes, your Honor.  One immediate object

22  was in order to achieve the kind of wealth and success that he

23  desired, they had to convince all of these counterparties to

24  give them sufficient trading quantity to make it happen.  So

25  for a period of the scheme, the intention is just that, to

N3LBKOOO

achieve it's criminal object.  Later on Mr. Hwang, we expect

there'll be witnesses to say, will describe the sort of king of

the universe type thinking that I was laying out for the Court,

and that he had visions of grandeur to put it bluntly.  And

also there'll be evidence that Mr. Hwang did look for

profitable offramps, ways to close out of these positions and

lock in enormous gains; but that he was less successful at

doing that than he was at driving up the stock price.

THE COURT:  What are we not covering in the form of

dismissal?  I think we covered all the points?  My ruling is

the indictment is legally sufficient at this point in time,

although it raises numerous questions in my mind.

MR. VALEN:  Your Honor, if I may.  I think the

arguments so far have addressed Counts One through Nine, but

not the counts that come after as to which we have different

arguments.

THE COURT:  Let me check that.  Ten seems to be a

repetition of one through nine.

MR. VALEN:  I think, Judge, and as I read it, I

welcome the government's clarification, Count One is *Rico*.

Counts Two through Nine are securities fraud through market

manipulation.  But Count Ten is more traditional securities

fraud through what alleges subsections A and C as well.  The

last line of paragraph 80 makes clear that it's securities

fraud through false and misleading statements regarding

N3LBKOOO

1   Archego's business portfolio and assets.

2           THE COURT:  We've gone over that before.  The

3   misrepresentations that makeup part of a manipulation story.  I

4   take it out and in and of themselves make the subject of Count

5   Ten.  I rule, it's the same reasons I ruled before, legally

6   sufficient.  Wire fraud, again it's the same thing since the

7   use of wires are involved, that's wire fraud, as well as

8   securities fraud.

9           MR. VALEN:  Judge, with respect to Count Ten, we have

10  an argument regarding the Second Circuit's controlling

11  precedent in the *Charles Schwab* case and the "In connection

12  with" requirement that we briefed.  If you have any questions

13  about it, I'd be happy to address them, but I think Count Ten

14  in particular is deficient in the regard.

15          THE COURT:  Address it.  Make sure I understand it.

16          MR. VALEN:  Sure.  Count Ten is charged under Section

17  10(b) and 10(b)(5) as the other fraud counts are.  And the

18  Supreme Court and Court of Appeals, and the government I think

19  would not dispute that those claims require that the

20  misrepresentations were made in connection with the purchaser

21  sale of the security.  That language is included in both

22  Section 10(b) and in 10(b)(5), and it applies to claims under

23  Subsections A, B and C of 10(b)(5).  But the Court of Appeals

24  for the Second Circuit in particular has addressed the

25  requirement, the "In connection with" requirement in a bit more

N3LBKOOO

1    detail.  And most recently in a 2018 decision, which is

2    described in our briefs, *Charles Schwab Corp v. Bank of America*

3    *Corp*, the Court of Appeals has described the "in connection

4    with" requirement as follows:  A claim fails where the

5    plaintiff does not allege that a defendant misled him

6    concerning the value of the securities he sold or the

7    consideration he received in return?

8              THE COURT:  Or the what?

9              MR. VALEN:  Or the consideration he received in

10   return. Now I'm adding, for those securities, but I think

11   that's implicit in the quote.  And one thing when you focus on

12   that language, it's important to recognize --

13             THE COURT:  You think that's the language of

14   limitation or a language of description?

15             MR. VALEN:  I think it's a language if -- it works

16   both ways.  It's a language of description in the sense that

17   the Court of Appeals is telling us what the subject matter of

18   the misrepresentation has to be.

19             THE COURT:  It describe that case.  It doesn't

20   describe all kinds of fraud.  That doesn't work.  Okay.  We're

21   finish with that.

22             MR. VALEN:  Your Honor, we also have arguments with

23   respect to Count 11, the wire fraud count.  Although our

24   argument is simply that there's a pending United States Supreme

25   Court case that's been fully argued.  And I check this morning,

N3LBKOOO

1   the decision hasn't issued today, but it'll certainly issue on

2   a Tuesday between now and the end of June that promises to

3   impact that count.  All we ask is that you give us leave to

4   file a future motion depending on the outcome of that decision.

5           THE COURT:  Mr. Valen, it makes no difference.  When

6   you go into the jury trial, this particular count doesn't

7   matter.  Everything that is put into Counts One through Nine is

8   what matters.  And the jury doesn't see this indictment, which

9   answers another part of the problem.  I don't give the

10  indictment to the jury.  It will be summarized and perhaps read

11  verbatim, though I hesitate to do that because I don't think

12  the jury will hear anything else.  They'd be sleep by time you

13  finish.  It will be summarized and then you'll argue.  And I

14  don't think the arguments going to hang on wire fraud or not.

15          MR. VALEN:  Thank you, Judge.  With respect to what's

16  done with the indictment, we do have a motion to strike

17  references to some prior allegations.

18          THE COURT:  Allegation four.  Look, the question is,

19  Can you use it before a jury.  You can argue you can't.  And

20  the government said -- I don't know what the government is

21  going to say.  I'll decide that issue, whether it's in the

22  indictment or not doesn't mean anything.  It's public on

23  public, so it doesn't matter.  That motion is denied as

24  academic.

25          MS. MULLIGAN:  Your Honor, will your Honor be issuing

N3LBKOOO

1   a decision or are today's rulings the decision of the Court?

2          THE COURT:  Thanks, I was going to say something about

3   that.  My habit is to follow my oral rulings with a short

4   summary decision.  It will not be as long as Judge Rakoff's

5   decisions, but it will be quite short and will hit the points.

6   Until that time, I reserve the right to change my mind, but I

7   thought it would be useful to you to give you my considered

8   judgments at this point in time.

9          MS. MULLIGAN:  Thank you, your Honor.

10          THE COURT:  I have now heard your arguments, and I'll

11   take them into consideration before I issue a written

12   statement.

13          MS. MULLIGAN:  Your Honor, I'd just like to raise a

14   few additional points on behalf of Mr. Halligan.

15          THE COURT:  Sure.

16          MS. MULLIGAN:  As we mentioned in our brief with

17   respect to the *Rico* count, your Honor.  We believe the *Rico*

18   count fails because it does not allege Mr. Halligan's agreement

19   to engage in manipulative trading.

20          THE COURT:  It says they all conspired, agreed and

21   conspired.

22          MS. MULLIGAN:  Right, your Honor.  But they don't give

23   us any specific details.  And under *United States v. Benjamin*

24   when these terms "conspire" are used, they need to descend into

25   the particulars.  And we're sitting here right now not knowing

N3LBKOOO

1   what that is.  Because as I opened with, and obviously there's

2   no dispute, Mr. Halligan did not participate or have a role in

3   the trades that are alleged in the indictment to be

4   manipulative.

5        THE COURT:  He was the chief financial officer, and

6   it's alleged that he participated, and I suppose he

7   participated by supporting the documentation of all the

8   transactions.  Each trade is reflected in some kind of a

9   record.  The indictment does not specify.  It says they

10  conspired and agreed, and that's sufficient.

11       MS. MULLIGAN:  Thank you, your Honor.  Obviously, I

12  think more is required because every CFO in the United States

13  would then be indicted if they're a company.  But with respect

14  to individual, your Honor, there needs to be some showing of

15  the agreement, and that's just not here.  But, your Honor, we

16  await your decision, and we rely on all of the arguments in the

17  opening brief and in our reply brief.  Thank you very much.

18       THE COURT:  Any matter of controversy given the rules

19  of pleading that exist in a criminal case, there's a danger you

20  talked about.  It sweeps in criminal conduct and permissible

21  conduct.  I can't cure that now.  What's left, the bill of

22  particulars.

23       MR. THOMAS:  Particulars and the defense misconduct

24  motion, your Honor.

25       THE COURT:  Let's do the bill of particulars.  The

N3LBKOOO

first aspect of this is the government should identify all

alleged misrepresentations, requests themselves as for every

and all. That's denied because it seeks evidence.  A bill of

particulars is there just to give notice.  The government has

done that in the indictment and by the supplemental letter of

August 18, 2022, and that's sufficient.

The government should identify uncharged

co-conspirators and others.  That's an allegation in every

conspiracy case I've seen, and I think the cases are legion

that the unindicted co-conspirator did not have to be alleged.

Having said that, it may be something that I want the

government to be more specific about when we approach trial.

MR. THOMAS:  Yes, your Honor.

THE COURT:  And "C" is the government should identify

all acts and transactions alleged to comprise the purported

schemes.  I think there is sufficient allegation to give notice

on that, and that is denied as well.  "D", the government

should identify allegedly defrauded victims.  That's not part

of the case.  You don't have to -- withdrawn.  One defrauded

victim is the counterparties.  All the counterparties have been

allegedly defrauded.  Anyone who lost money having a hedged

position and being able to liquidate the collateral that was

put up by the conspirators is a defrauded victim.  I don't

think you need anything more specific than that.  "E" the

government should identify the date of the alleged Archegos

N3LBKOOO

enterprise was formed and the alleged scheme to defraud began.

The government gave a span of a year of 2020 to what,

Mr. Thomas?

MR. THOMAS:  Your Honor, let me read for you exactly

what's alleged.  In or about 2020, up to March 2021.

THE COURT:  That's sufficient for the dates.  "F" the

government should identify all instances in which defendants

are alleged to have aid and abetted supposed misrepresentations

to counterparties.  The instances do not all have to be alleged

in the indictment.  There is sufficient notice to allow the

defendants to form a defense.  I deny all these aspects of the

motion for bill of particulars.

The next is the *Brady* obligation.  This is a claim

about the inadequacy in the *Brady* obligations is based on a

supposed on a part of the prosecutor to search the

investigative files of the SEC and of the Commodities Futures

Trade Commission, the CFTC, to see if there's anything that

would be of a *Brady* type of document and to produce it.

There's no indication that these were joint investigations.

The fact that representatives of the SEC and the CFTC may have

been present at the interviews of various witnesses,

particularly of the proffer given by Mr. Hwang doesn't show any

joint investigation.  The SEC and the CFTC have not played a

part in this criminal prosecution.  They have not appeared

before the grand jury.  They have not appeared in any of the

N3LBKOOO

pretrial proceedings here, and there is no connection for

the -- if the prosecutor were required to search the immense

files that can be built up by the SEC and the CFTC, it would be

an impossible obligation.  The motion is denied.

MS. MULLIGAN:  Your Honor, if I just may.  I think

this *Brady* issue is particularly significant to defense

counsel, and I would like to make a record on this because when

we were in court at our clients' arraignment on April 27, I was

very happy to hear the magistrate put an order on the record

advising the government of what their *Brady* obligations were.

THE COURT:  Yes, it's an order in every case.

MS. MULLIGAN:  And that order, your Honor, is in my

hand and I'm happy to hand it up to the Court.

THE COURT:  Yes, it's in every case, Ms. Mulligan.

MS. MULLIGAN:  But the order clearly says, your Honor,

that for purposes of this order, the government has an

affirmative obligation to seek all information subject to

disclosure under this order from all current or former federal,

state, sand local prosecutors, law enforcement officers and

other offices who have participated in the prosecution or

investigation that led to the prosecution of the offenses with

which the defendant has charged.

Reading this order, your Honor, which is very clear --

and again, the term "or" is used, and we all know as lawyers

what that means.  The investigation is included.  Reading this

N3LBKOOO

1    order in light of *United States v. Gupta*, your Honor, they're

2    under an obligation to search the records and the notes from

3    the interviews were the SEC and CFTC was present.  That is not

4    a burden.  That helps the integrity of the entire system, your

5    Honor.

6             THE COURT:  The cases are to the contrary, and there

7    is no joint or association in the investigation.  The SEC was

8    present at whatever interviews there were, some of them anyhow

9    for the purposes of its own investigation and not to help the

10   prosecution.  Motion's denied.

11            The last motion I think is the motion of prosecutorial

12   misconduct, and I I'll hear you, Mr. Lustberg.

13            MR. LUSTBERG:  Thank you, your Honor.  I want to start

14   by talking about the limited relief that we're seeking with

15   regard to this motion right now, and that is the relief we're

16   seeking is a hearing.  I hope that was very clear from our

17   reply brief.  Let's be clear what the concern is here.  I've

18   been a defense attorney for almost 40 years, and maybe that

19   means I should have been wearier of the government's conduct

20   here.  But to the contrary I, like the Court and indeed like

21   our entire system of justice, depend upon prosecutors given the

22   tremendous power that they wheeled to do the right thing, to

23   turn square corners, to seek justice, to be candid.

24            This is embodied in doctrines like *Brady*, and in many

25   places in the criminal law where prosecutors are required to

N3LBKOOO

1    tell the truth.  We argue in our motion that that did not occur

2    in two ways.  First, the government told us -- and this is

3    undisputed -- that our client was a subject of the

4    investigation.  They never corrected that record to tell us

5    when he became a target.  I don't know when he became a target,

6    but I can tell you -- and I don't think that they disagree that

7    they never used the words "Now he's a target."  They say that

8    they point to places where they say he was a concern. They

9    talked about how they wanted to get his passport.  There's

10   other facts, but they never told us that.  And that's okay.

11   They don't have to tell us that.

12          But when they're continuing at the same time to

13   interact with us, to ask us specific questions, to request that

14   we make presentations on particular subjects, then it's a

15   different thing.

16          And that leads to the second concern that we have.

17   The second concern that we have -- and I've never seen this

18   before ever is that we continued to interact with them in good

19   faith.  We continued to make presentations.  We produced our

20   client for interviews, and we did that because they purported

21   to have an open mind.  There's a lot of evidence, your Honor,

22   that they didn't have an open mind.  And we've tried to muster

23   that proof for the Court so you can see that this is a

24   colorable claim.  But, I will admit that we don't know the

25   point at which their mind was closed.  I can tell you that on

N3LBKOOO

1    the last day -- I'll wait till they finish consulting.

2          That on the last day when we went in and made a

3    presentation specifically directed to answering questions that

4    they posed as to Mr. Hwang's intent, a particularly important

5    and difficult piece of factual information for them to gather,

6    that within hours -- and we don't know exactly when, but within

7    hours of the conclusion of that meeting Mr. Hwang was indicted.

8          Look, if they had told me he was a target, that would

9    have been good information for me to have and I might have

10   behaved differently.  But I can tell you that if they told us

11   that he was going to be indicted that afternoon, we would not

12   have provided all the information that we did.  Now their

13   argument is, we didn't know until then.  But, your Honor, I

14   think that that is a disputed fact.  And what I'm asking the

15   Court to do is to hold an evidentiary hearing where we can

16   explore that, where we can find out when they made that

17   decision.  There are indicia that it was made before.

18         We know, for example -- and maybe they didn't do this,

19   but under the department of justice's manual in order to bring

20   *Rico* charges, they had to get permission from Washington.  We

21   know that they booked grand jury time for that day.  I don't

22   know whether they knew at that time that they were going to

23   indict him.  But if they knew that, just a matter of common

24   decency, of candor, of honesty would have encouraged them to

25   tell us where they were.

N3LBKOOO

What happened here, your Honor, was implicit, was an
implicit false statement by the government, and many ways
explicit.  Because at the conclusion of that meeting on the day
that Mr. Hwang got indicted, the government raised a question
with us.  It had to do with the issue that Mr. Valen raised a
little while ago about the 2013 investigation of Mr. Hwang.
And we said, we'll get you more information on it.  And we
communicated with them as we were walking out the door, and we
communicated that with them on the next day.

And what occurred was that by that next day, we didn't
know this because it was sealed and Mr. Hwang was arrested the
next day, they had already indicted him.  Your Honor, it's just
not turning square corners.  It's just not candid.  However,
maybe I'm wrong.  Maybe the truth of the matter is that this
Court after listening to this will conclude that
notwithstanding all that, that they had an open mind an hour
before they indicted our client.  Maybe that's what the Court
will conclude.  But I think the Court in order to decide this
very serious issue, and I can tell you I really hesitate to
bring these sorts of allegations.  We had extremely
professional ongoing communication with the government
throughout this process.  It was something that I was proud of.
I was proud of the presentations we made.  I was proud that we
made our client available or speak to them, all of which turned
on my clear understanding that they were listening.  That they

N3LBKOOO

1    were considering our arguments.

2            I think the record would show that they weren't, and

3    that what they were doing was deceiving us.  And we would

4    like -- we respectfully request that the Court -- and it can do

5    this in-camera.  It can do this in open court.  It can do this

6    under seal if there's confidential information, gather the

7    appropriate facts so that it can make that determination,

8    because this is not how a system of justice, your Honor is

9    suppose to work.

10           Our assistant U.S. Attorneys and U.S. Attorneys in

11   this country have particular obligations to be truthful.  And

12   I'm disappointed to say, I don't think that was the case here,

13   but I could be wrong.  And if I'm wrong, the Court should

14   hold -- the Court should hold a hearing to decide whether I'm

15   wrong.  I can't imagine that the government would oppose the

16   opportunity to set forth why the facts are not what they seem

17   to be, which is that their minds were made up even as they were

18   eliciting information.  But I think that the Court should in an

19   exercise of its obligation to make sure that our system of

20   justice is fair should require that type of showing in much

21   more detail than has occurred here.

22           What's occurred so far here is very vague, conclusory

23   affidavits that don't address the facts that we say

24   circumstantially show that they made up their mind even as they

25   elicited information from us.  Let me say just two other things

N3LBKOOO

quickly.  Your Honor, our position is not that the government

ever has to tell our client whether he's a witness, subject or

target.  I have many cases where prosecutors refuse to give me

that information.  Most times they do, but they're cases where

they don't.  But what I'm saying is that when they tell us

something, that it has to be true.  The representatives of our

government who are trying to put my clients in jail have to

tell us the truth. That's what this application respectfully is

all about.  And truth can be not told in two different ways.

There can be affirmative lies, or there can be failures to

correct known misimpressions.

     THE COURT:  Before you had the first proffer, who

suggested the idea of a proffer?

     MR. LUSTBERG:  We did.  I'll take responsibility for

that.  I'm not sure whether that's true, but I'll say that for

purposes of this record, we wanted to open up a dialogue with

them.  And that dialogue --

     THE COURT:  That's not uncommon.

     MR. LUSTBERG:  No.  Let me tell you, this was

extensive, your Honor.  We made a presentation to them.

     THE COURT:  If Mr. Hwang was not going to be the

subject or object of prosecution or investigation, who was?

     MR. LUSTBERG:  Well, so just for example --

     THE COURT:  Here's a heavy investigation by the

prosecutor of Mr. Hwang's company.  So it's either a company or

N3LBKOOO

1    Mr. Hwang who's going to be the defendant if a case is brought.

2              MR. LUSTBERG:  Your Honor, just so you're aware, there

3    are two co-defendants here who have pled guilty.  With respect

4    to at least one of them, the allegations have to do with

5    statements that were made to the counterparties.  There is a

6    disputed fact in this case as to whether Mr. Hwang had anything

7    to do with those statements.  Our position -- and we think the

8    record will show at a trial, and what we argued to the

9    government -- was that he had nothing whatsoever to do with

10   those statements.  Those were made by Mr. Becker.

11             THE COURT:  It's not uncommon in complicated cases

12   like this, particularly in SEC type cases to have submissions

13   made and beyond in order to dissuade the government from

14   bringing a prosecution.

15             MR. LUSTBERG:  100 percent that's correct.

16             THE COURT:  Let me hear from Mr. Thomas.

17             MR. LUSTBERG:  Let me just say one last thing which

18   is, I also don't think that the government has an obligation to

19   tell us our client is being indicted --

20             THE COURT:  You made the point.  Once they say, it's

21   got to be true.

22             MR. LUSTBERG:  But if they're not going to tell, then

23   it's not just that.  They're doing that while they're

24   continuing a dialogue that results in our providing information

25   to them.

N3LBKOOO

1        THE COURT:  I heard you.  Mr. Thomas.

2        MR. THOMAS:  Thank you, your Honor.  The most

3   outrageous thing about this circumstance is the defense motion

4   itself.  Throughout --

5        THE COURT:  Let's not worry about outrageous.  Just

6   respond to the point.

7        MR. THOMAS:  The first and absolutely determinative

8   point is the Supreme Court's decision in the *Bank of Nova*

9   *Scotia* case which makes it clear that accusations of misconduct

10  cannot be the basis for the dismissal of an indictment, unless

11  the misconduct supposedly goes to the impairment of the grand

12  jury process itself.  And I'm surprised to hear Mr. Lustberg

13  say that the relief they want is merely a hearing, because as

14  the Court will observe from the cover page of its motion, the

15  defense moved to dismiss the indictment, which is not relief

16  that this Court can lawfully provide.

17        Mr. Lustberg in the reply concedes that at no point

18  did the government impair the grand jury process which

19  basically ends the claim.  And they further concede --

20        THE COURT:  Can I feasibly have a hearing in this

21  case?

22        MR. THOMAS:  Not on this issue, your Honor.

23        THE COURT:  Everything that would be subject of

24  inquiry would be privileged.

25        MR. THOMAS:  Your Honor, that's absolutely true.  But

N3LBKOOO

1    it's also true that there's nothing that the outcome of a

2    hearing would do that would entitle Mr. Lustberg to relief

3    under the law.

4           THE COURT:  Mr. Lustberg knows very well how to

5    protect his client if he wants that protection.  I think it's

6    the calculation of the benefits and the burdens of going in and

7    talking with a prosecutor.  And whatever the prosecutor says in

8    that regard is always subject to a change of mind or a change

9    of view.  Since we're dealing with issues of intent, there's a

10   possibility of persuasiveness up to the last minute.  Motion is

11   denied.  All right.  Where do we go from here?

12          MR. THOMAS:  Your Honor, we're scheduled for trial now

13   at beginning of January 2024, and the parties have been

14   conferring about a potential agreeable pretrial schedule for

15   the filing of various notices and pretrial motions.  If we can

16   hash that out, we'll submit a proposal to the Court.

17          THE COURT:  Are you going to be using experts?

18          MR. THOMAS:  We expect that we will, and the schedule

19   that we're discussing would contemplate deadlines by which each

20   side would file expert reports and submit any associated

21   briefing.

22          THE COURT:  Where are you in your discussions?

23          MR. LUSTBERG:  I can answer that.  The government made

24   a proposal with regard to certain dates working backwards from

25   the trial date.  We accepted parts of that, and we ask them to

N3LBKOOO

1   reconsider other parts.  I believe we had a meet and confer,

2   counsel can correct me if I have the timing wrong, a few weeks

3   ago, and we have not heard back on their response to our

4   proposed changes to the schedule.  We're happy to continue to

5   meet and confer and come up with a schedule if we can.  And if

6   we can't agree, we'll bring those to the Court.

7         THE COURT:  Have I set a final pretrial conference

8   date?

9         MR. THOMAS:  I believe that you have.  You did for the

10   first trial date.  Let me just look at the docket to see if you

11   did.

12         THE COURT:  Cause I can see this as a process.

13         MR. THOMAS:  Yes, and the proposal advanced by the

14   government would have expert disclosures due more than two

15   months in advance of trial, and the defense has proposed even

16   earlier than that.  All parties agree that we want to give the

17   Court time to deal with the expert issue among the other issues

18   well in advance of trial.

19         THE COURT:  We have a *Daubert* hearing here or a

20   *Daubert* motion.

21         MR. LUSTBERG:  Yes, your Honor.

22         THE COURT:  This is a complicated case, folks.  It's a

23   complicated case.  I believe in disclosure.  There should be an

24   absence of surprise at trial.  It's going to be a difficult

25   enough trial to deal with not to be burdened by side issues

N3LBKOOO

1  that could have been ventilated beforehand.  My rulings will be

2  bias in favor of disclosure.  You should know that.

3          MR. THOMAS:  Yes, your Honor.

4          THE COURT:  And early rulings as well.  Both of you

5  have a lot of technical difficulties to deal with.  The

6  government in terms of ordering its proof and keeping the

7  attention of a jury in a long and complicated case.  And the

8  defense in just knowing what's the best thing to do with their

9  clients, and they need time.  Both sides need time to work this

10 out.  And perhaps two final pretrial conference dates.  One

11 early to rule on motions *in limine* and *Daubert* and that sort of

12 thing, and the next one is necessary to be a bar date for the

13 production of all -- the word escapes me.  Not *Brady*.

14         MR. THOMAS:  3500 and *Giglio* material.

15         THE COURT:  Not particularly witness material.  What's

16 the Supreme Court case?

17         MR. LUSTBERG:  Maybe *Jencks* or *Giglio*.

18         THE COURT:  *Giglio* material.  I'll be at your

19 disposal.  Let me block it out as early as I can.

20         MR. THOMAS:  Thank you, your Honor.  I think we

21 probably all collectively share your aims.

22         THE COURT:  Final pretrial conference date is January

23 3.  We should keep it close to trial, see if there's any

24 lingering problems, but we need a date in December to argue

25 everything out.

N3LBKOOO

1          MR. THOMAS:  Yes, your Honor.  We'll confer with the

2     defense and propose a schedule including a date for motion

3     conference.

4          THE COURT:  And call Bridgette and work it out.

5          MR. THOMAS:  Yes, your Honor.

6          THE COURT:  Is there anything else I can do today?

7          MR. THOMAS:  Not from the government, your Honor.

8          THE COURT:  Mr. Lustberg?

9          MR. LUSTBERG:  No, your Honor.

10          THE COURT:  Ms. Mulligan?

11          MS. MULLIGAN:  No, your Honor.  Thank you.

12          THE COURT:  Thank you all.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25