UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | 22-CV-3402 (JPO) |
| -v- | OPINION AND ORDER |
| SUNG KOOK (BILL) HWANG, *et al.*, Defendants. | |

J. PAUL OETKEN, District Judge:

The Securities and Exchange Commission ("SEC") brings this action against Defendants Sung Kook (Bill) Hwang, Patrick Halligan, William Tomita, Scott Becker, and Archegos Capital Management LP ("Archegos"), alleging that they engaged in a fraudulent scheme to manipulate the market for certain securities and to deceive Archegos's swap counterparties about the riskiness of its overall investment portfolio. The effect of this alleged scheme was to artificially inflate the price of those securities, to induce the counterparties to execute further swaps, and to avoid margin calls from the counterparties, all to the benefit of Archegos.

Pending before the Court are three separate motions to dismiss the Amended Complaint, filed by Archegos, Hwang, and Halligan. (ECF Nos. 54, 57, and 59.) For the reasons that follow, Archegos's and Hwang's motions to dismiss are denied in their entirety, and Halligan's motion is granted in part and denied in part.

I.      **Background**

The following facts are taken from the Amended Complaint (ECF No. 47) and are assumed true for the purposes of resolving the motions to dismiss.

**A.      The Parties**

Archegos was Defendant Hwang's "family office," serving as the investment manager for his personal funds.  (*Id.* ¶ 20.)  It had no outside clients and managed no external funds.  (*See id.*)  By March 2021, Archegos managed over $36 billion in invested capital.  (*Id.* ¶ 15.)

Hwang was the 99% owner of Archegos and was solely responsible for all investment decisions made by Archegos or on its behalf.  (*Id.* ¶ 16.)  Halligan was Archegos's Chief Financial Officer; Tomita its head trader; and Becker its Director of Risk Management.  (*Id.* ¶¶ 17 –19.)

**B.      Archegos's Investment Strategy**

Archegos pursued a long/short equity strategy.  In simple terms, the firm took long exposures in single-name issuers — meaning that it invested with the expectation that their securities would rise in value.  (*See id.* ¶ 27.)  Those investments took the form of either buying the issuer's equity shares (stocks) or buying a swap instrument that referenced their stock.  (*See id.*)  At the same time, Archegos hedged those long exposures through short exposures — investments made with the expectation that their value would fall.  Those short exposures were primarily to exchange-traded funds and custom baskets, though the firm also did some hedging by buying single-name stocks.  (*Id.*)  Archegos's long positions were "highly leveraged and highly concentrated."  (*Id.* ¶ 28.)  Archegos maintained leverage ratios between 400% and 700%, sometimes reaching 1000%.  (*Id.*)  In the latter scenario, for example, Archegos would have had $1,000 in exposure (financed through margin extended by its counterparties) for $100 in cash investment (financed with Archegos's own funds).  (*Id.*)  Archegos's long positions were also highly concentrated, typically with "between a third and half of its overall gross exposure concentrated in just its ten largest positions."  (*Id.*)

C.      **Archegos's Swaps with Counterparties**

Archegos's primary method of maintaining its long exposures was through total return securities-based swaps (SBSs).  (*Id.* ¶ 33.)  Swaps are contractual arrangements in which Archegos and a given counterparty agreed to exchange cash flows depending on the performance of a referenced security.  (*Id.* ¶ 34.)  Archegos typically purchased swaps on margin, meaning that it borrowed money from its counterparty to fund the swap and used cash it had deposited with the counterparty to serve as collateral (referred to as "initial margin").  (*Id.* ¶¶ 95 – 96.)  Over the life of the swap, the parties exchanged variation margin, which was calculated on a daily basis according to the end-of-day value of the stock in question.  (See *id.* ¶¶ 34, 88.)  If the price of the stock decreased on a given day, the counterparty could call on Archegos to post variation margin (that is, additional collateral) to cover that mark-to-market loss.  (*Id.* ¶ 34.)  And if the price of the stock increased, Archegos could call on the counterparty to post variation margin to cover the mark-to-market gain.  (*Id.*)  Archegos entered into swap agreements with "about a dozen" counterparties and retained some of them as prime brokers.  (*Id.* ¶ 32.)

According to the SEC, Archegos's use of swaps was part of a deliberate strategy to avoid public disclosure requirements that are triggered once an investor's beneficial ownership exceeds 5% of the outstanding shares of any particular issuer.  (*Id.* ¶¶ 30 – 31.)  By avoiding this public disclosure, the Defendants were able to curtail the visibility of Archegos's counterparties and other market participants into the extent of Archegos's aggregate holdings.  (*Id.* ¶ 29.)

As for the counterparties, their standard practice was to hedge the synthetic exposure created by their execution of the Archegos SBSs by purchasing shares of the referenced security in the market.  (*Id.* ¶¶ 37 – 38.)  For example, if Archegos purchased 100 shares of exposure to Stock A via an SBS, then the counterparty would buy 100 shares of Stock A on the open market.  (*Id.* ¶ 38.)  Then, if shares of Stock A increased in value by $1, Archegos would gain $100 from

the SBSs and the counterparty would owe it $100.  (*See id.*)  But because the counterparty had

hedged, that $100 loss from the SBS would be offset by its $100 gain from owning the stock

directly.  (*See id.*)  The counterparties profited from this structure by charging Archegos

financing fees for the SBSs.  (*Id.*)  According to the SEC, Hwang and other Archegos employees

were aware that each of Archegos's counterparties would hedge in this way when Archegos

embarked on an SBS trade with them.  (*Id.* ¶ 39.)

### D.    The Manipulative Trading

The SEC alleges that Archegos, through decisions made by Hwang and executed by

Tomita, used massive SBS purchases — in combination with equity purchases — to establish

market dominance over and artificially inflate the market value of the securities of its "Top 10

Holdings" between September 2020 and March 2021 (the "Relevant Period").  (*Id.* ¶ 43; *see also*

¶¶ 52, 56 – 58, 65 – 66.)  For example, during the Relevant Period, Archegos's trading of both

equities and SBSs referencing the Top 10 Holdings "frequently exceeded 20%, often reached

30%, and even surpassed 40% of certain issuers' daily trading volume, which was intended to

inflate the stock prices."  (*Id.* ¶ 72.)  This high trading volume created "upward pressure" on the

share prices and "often" caused them to increase.  (*Id.* ¶ 76.)

The Defendants conducted this activity while concealing the extent of Archegos's

aggregate holdings and misleading counterparties to the same end.  (*Id.* ¶¶ 43, 52, 56 – 58, 65.)

The desired result was "twofold: (1) to increase the stock prices of its Top 10 Holdings and, thus,

allow Archegos to increase its market share of those holdings[] and (2) to avoid stock price

declines in the stock prices of the Top 10 Holdings . . . ."  (*Id.* ¶ 51.)  A decline in the stock price

could cause counterparties to call on Archegos to post variation margin.  According to the SEC,

Archegos would have to sell the stock to meet that margin call, which would in turn cause a

decrease in the stock price — a situation that would create a "downward spiral of the market value of Archegos's Top 10 Holdings." (*Id.*)

In particular, the Amended Complaint identifies five trading strategies that Archegos employed to satisfy those goals:

1. **High volume trading**: Hwang directed Archegos traders to add exposures (equities and SBSs) quickly and at large volumes in order to drive up the share price of the Top 10 Securities. (*Id.* ¶¶ 69; 71 – 76);

2. **Setting the Tone**: Archegos engaged in transactions prior to the opening of the market with the goal of "'setting the tone' for the trading day," *i.e.*, indirectly inducing other market participants to buy the same securities based on the belief that they were experiencing a non-artificial upward movement in price. (*Id.* ¶ 85.)

3. **Marking the Close**: Archegos engaged in substantial trading at the end of the trading day ("marking the close")[1] in order to push the stock price of certain issuers' stocks upward and therefore increase the variation margin owed to Archegos. (*Id.* ¶¶ 88 – 90.)

4. **Bidding Up Securities**: Archegos traders entered limit order[2] instructions for shares in its Top 10 Holdings and incrementally increased the limit throughout the trading day as SBS orders were filled, "both in an attempt to increase the stock price and to induce others to purchase the stock." (*Id.* ¶ 91.)

5. **Trading Solely to Counteract Selling Pressure**: Archegos executed certain "non-economic" trades for the sole purpose of "counteract[ing] selling pressure or to otherwise maintain share prices." (*Id.* ¶ 92.)

---

[1] "'[M]arking the close' is defined as the practice of repeatedly executing the last transaction of the day in a security in order to affect its closing price." *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 369 (S.D.N.Y. 2007) (citation omitted). The Court takes judicial notice of the definition of this and other technical terms pursuant to Federal Rule of Evidence 201(b)(1).

[2] "A limit order is an order to buy or sell a security at a specific price. A limit order to purchase a set number of shares at $20 per share would be executed if and only if the shares could be purchased for $20 or less. If the market price never dropped to or below $20 per share, the order would never be executed. Limit orders tend to support prices because they affect purchases as the price falls." *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 109 n.242 (S.D.N.Y. 2009).

### E.   Misrepresentations to Counterparties

By the second half of 2020, Archegos's large and concentrated trading positions led counterparties to require it to post additional margin before it could add to existing SBS positions or put on new positions.  (*Id.* ¶ 95.)  As Archegos ran into these constraints, Halligan, Tomita, and Becker, on orders from Hwang, worked to secure capacity increases and obtain more favorable margin rates by providing false and misleading information to Counterparties 1 through 8 about the concentration and liquidity of its portfolio.  (*Id.* ¶¶ 104 – 105; *see generally* ¶¶ 108 – 59.)  In general, Becker was responsible for speaking to employees at the various counterparties directly, often after conferring with Tomita and Halligan about what to tell them. (*Id.* ¶¶ 106 – 07.)

### F.   Archegos's Collapse

On March 22, 2021, after market close, ViacomCBS announced a $3 billion secondary offering of its shares, which caused a 10% drop in its share price. (*Id.* ¶ 160.)  ViacomCBS was by then Archegos's single largest long position.  (*Id.*)  During the same week, the SEC announced that it was enhancing regulations on China-based companies, which implicated some of Archegos's largest positions.  (*Id.* ¶ 165.)  Archegos was subject to large margin calls in the following days and soon began to run out of cash.  In the ensuing period, the successive margin calls and Archegos's rapidly dwindling capital caused the company to collapse.  (*Id.* ¶¶ 175 – 179.)

### G.   Procedural History

On April 21, 2022, Becker entered a guilty plea in a criminal case concerning the same underlying facts as those alleged here; Tomita did the same on April 22, 2022.  (*Id.* ¶¶ 18 – 19; 44 – 45; *see United States v. Sung Kook (Bill) Hwang, et al.*, 22 Crim. 240 (S.D.N.Y.).)

On April 27, 2022, the SEC commenced the instant civil action.  (ECF No. 1.)  It alleges that Hwang, Tomita, and Archegos violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2).  It further alleges that Halligan and Becker violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  It asserts aiding-and-abetting liability against Halligan, in violation of Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), and Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).  Finally, it alleges that Hwang is subject to control person liability pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The Court entered judgment against Becker on May 11, 2022 and against Tomita on May 31, 2022.  (ECF Nos. 23, 29).  The SEC filed an Amended Complaint on August 29, 2022.  (ECF No. 47.)  Defendants Archegos, Hwang, and Halligan each separately moved to dismiss the Amended Complaint on October 25, 2023.  (ECF Nos. 54, 57, 59.)  The Court heard oral argument on the pending motions on May 4, 2023.

## II.   Legal Standards

### A.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint need not contain "detailed factual allegations," but it must offer something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  In resolving a motion to dismiss,

the court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014).

### B.    Rule 8

The general pleading standard, Rule 8(a) of the Federal Rules of Civil Procedure, requires a complaint to make a short, plain statement of a plausible claim for relief. *Iqbal*, 556 U.S. at 678 – 79 (citing *Twombly*, 550 U.S. at 555).  To determine whether a complaint satisfies Rule 8, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Id.*  But the court need not accept "[t]hreadbare recitals of the elements of a cause of action," which are essentially legal conclusions. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  After separating legal conclusions from well-pleaded factual allegations, the court must determine whether those facts make it plausible — not merely possible — that the defendants acted unlawfully. *Id.*

### C.    Rule 9(b)

Fraud claims are subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Specifically, Rule 9(b) requires that a complaint based on misrepresentations: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citation omitted).  A complaint bringing claims of fraud based on market manipulation must also comply with Rule 9(b) and plead with particularity "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the

scheme had on the market for the securities at issue." *ATSI Commc's, Inc. v. Shaar Fund, Ltd.*,

493 F.3d 87, 102 (2d Cir. 2007) (citation omitted).

**D.      Section 10(b) of the Exchange Act and Rule 10b-5**

The SEC promulgated Rule 10b–5 pursuant to its authority under Section 10(b) of the

Exchange Act.  The Rule makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit . . .
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**E.      Section 17(a) of the Securities Act**

Under Section 17(a) of the Securities Act,

> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement . . . . :
>
> (1) to employ any device, scheme, or artifice to defraud; or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.  Section 17(a)(1) and 17(a)(3) claims do not require that the defendant obtained

money or property.  *See* 15 U.S.C. § 77(q)(a)(1) and (3).  Section 17(a)(1) requires an allegation

of scienter, while an allegation of negligence suffices for Section 17(a)(2) and 17(a)(3) claims.

*See S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citing *Aaron v. S.E.C.*, 446 U.S. 680, 701 (1980)).

## III.    Discussion

Each moving Defendant adopts the arguments made by the others in their separate briefs. The Court therefore generally addresses their arguments jointly.  Arguments raised by Halligan or Hwang individually are addressed separately.

The SEC's complaint outlines two major theories of liability against the Defendants: (1) that they engaged in market manipulation to inflate the price of the securities of Archegos's Top 10 Holdings from September 2020 to March 2021, and (2) that they made misrepresentations to eight counterparties about Archegos's portfolio in order to secure better margin rates and additional trading capacity.  Defendants move to dismiss the Amended Complaint on three primary bases: (1) that the SEC has failed to plead its claims with the particularity required by Rule 9(b); (2) that the SEC has failed to state a market manipulation claim; and (3) that the SEC lacks jurisdiction over the alleged misrepresentations to Archegos's counterparties.

### A.    Rule 9(b) and Pleading Requirements

The moving Defendants argue that the SEC has failed to satisfy the heightened pleading standards of Rule 9(b) with respect to the claims levied against them.

#### 1.    Halligan

Halligan argues that the SEC has failed to satisfy Rule 9(b) in alleging a primary violation against him for two reasons:  First, he argues that the SEC has not properly alleged that he acted with the requisite scienter, undermining any claim for liability under Rule 10b-5 or Section 17(a)(1).  Second, he argues that he did not "make" any of the misrepresentations offered by Tomita and Becker to the Counterparties, thus eliminating liability under Rule 10b-5(b).

### a. Rule 10b-5(b)

To start, the Court can dispatch with the SEC's 10(b)-5(b) claim against Halligan because it has failed to allege scienter as to its only colorable material misrepresentation claim against him.

A person violates Section 10(b) and Rule 10b-5 if the person has: "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (citation omitted). The Supreme Court has held that Rule 10b-5(b) liability can be imposed only on the person who makes the statement. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("One 'makes' a statement by stating it.").[3] As the SEC appears to concede, the only actionable misrepresentation in the Amended Complaint that Halligan is alleged to have made himself was in the form of transaction confirmations disseminated to Counterparty 3. It alleges that Halligan signed those confirmations and that each included a representation that "the aggregate amount of all Shares beneficially owned by [Archegos] for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative positions, is less than 5% of the outstanding shares." (ECF No. 47 ¶¶ 125 – 127.) According to the SEC, Halligan knew those representations to be false. This allegation fails as a matter of law because the SEC has failed to plausibly allege scienter.

---

[3] The Supreme Court explained that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142. Ultimate authority rests in the actual delivery of the statement: "This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said." *Id.* at 143.

While Rule 9(b) "permits . . . conditions of a person's mind to be alleged generally," plaintiffs do not have "license to base claims of fraud on speculation and conclusory allegations." *Bryant v. Silverman*, 284 F. Supp. 3d 458, 470 (S.D.N.Y. 2018) (quoting *Acito v. IMCERA Group. Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  However, "conclusory allegations of scienter are sufficient if there exist[s] a minimal factual basis giving rise to a strong inference of fraudulent intent." *Id.* (quoting *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)) (alterations in original).  Therefore, "[t]o establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) (internal citations omitted).  If the plaintiff relies on circumstantial evidence of conscious misbehavior or recklessness rather than motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater' to support a finding of scienter." *SEC v. Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 – 99 (2d Cir. 2009)).

The SEC stakes Halligan's liability for the misrepresentation to Counterparty 3 on three facts: (1) that Halligan's role as CFO necessarily entailed access to and familiarity with Archegos's portfolio; (2) that Halligan received a daily internal report "that tracked Archegos's cash equity positions in each issuer it held relative to the issuer's outstanding shares to ensure that Archegos never exceeded the 5% beneficial ownership disclosure threshold" (ECF No. 47 ¶ 31), and (3) that Halligan "was privy to" internal analyses detailing Archegos's overall positions and how long it would take to exit them (ECF No. 82 at 61).

These facts do not give rise to a strong inference of fraudulent intent.  First, the SEC's conclusory argument that conscious misbehavior or recklessness can be inferred from Halligan's position as CFO does not withstand scrutiny.  *See, e.g.*, *In re Sotheby's Holdings, Inc.*, No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).

Second, the SEC contradicts itself regarding the salience of Halligan receiving the internal daily report.  The Amended Complaint states that the transaction confirmations misrepresented Archegos's combined exposure (cash equity holdings *and* swaps).  But the daily report apparently tracked cash equity holdings *alone*.  Therefore, the information in the daily report may not have contradicted the representation in the transaction confirmations.

Third, the SEC's contention that Halligan was "privy to internal analyses detailing Archegos's overall positions and how long it would take to exit them" (ECF No. 82 at 61 (citing ECF No. 47 ¶ 115) is impermissibly conclusory in the context of the misrepresentation at issue here, which specifically concerned the issue of beneficial ownership in particular securities.  *See, e.g.*, *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (concluding that plaintiff had failed to allege strong circumstantial evidence of recklessness where "complaint fail[ed] to specify exactly what information was contained in the report or how said information contradicted Defendants' public statements) (citation and internal quotation marks omitted).

Halligan's motion to dismiss is therefore granted as to the Rule 10b-5(b) claim.

**b.      Rules 10b-5(a) and 10(b)-5(c); Section 17(a)(1) and 17(a)(3)**

Next, the Court must determine whether the SEC has sufficiently alleged that Halligan acted with scienter for the purposes of Rules 10(b)-5(a) and 10(b)-5(c) and Sections 17(a)(1) and 17(a)(3).

"Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rules 10b–5(a) and (c) thereunder create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct." *SEC v. Jean–Pierre*, No. 12 Civ. 8886, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015) (citation omitted). To state a claim for scheme liability, the SEC must allege that the defendant: "(1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) [with] scienter," while meeting Rule 9(b)'s heightened pleading requirement. *SEC v. Wey*, 246 F. Supp. 3d 894, 915 – 16 (S.D.N.Y. 2017) (citation omitted). For Section 17(a)(3) claims, the scienter requirement is replaced with a negligence requirement. *SEC v. Ginder*, 752 F.3d 569, 574 – 75 (2d Cir. 2014).

The first issue is whether the SEC has alleged that Halligan committed a manipulative or deceptive act. In *SEC v. Rio Tinto*, the Second Circuit held that misstatements and omissions cannot form the sole basis for scheme liability; the plaintiff must allege "something extra that makes a violation a scheme," such as dissemination of the allegedly false information. 41 F.4th 47, 54 (2d Cir. 2022). It did so with the purpose of maintaining the distinction between conduct that violates the first and third subsections of Rule 10b-5 and Section 17(a) (the manipulative or deceptive act) and the second subsection of each (the material misstatement). *See id.* at 54 ("Were misstatements and omissions alone sufficient to constitute a scheme, the scheme subsections would swallow the misstatement subsections."). In *Rio Tinto*, the Second Circuit indicated that there is no primary liability for "participation in the preparation of misstatements." *Id.* at 54 (quoting *Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*, No. 18-CV-8460, 2020 WL 611506, at *7 (S.D.N.Y. Feb. 7, 2020) (rejecting scheme liability claim where plaintiff premised primary liability on defendant's participation in preparation of documents that was part of larger scheme to defraud)).

The Court concludes that the SEC has not alleged that Halligan engaged in a manipulative or deceptive act for the purposes of the scheme liability provisions. Because the Court has rejected the SEC's sole colorable claim that Halligan himself disseminated any misstatements to anyone outside Archegos, the fate of the SEC's claim turns on his role in Becker and Tomita's misstatements to counterparties. There, the allegations that are pleaded with sufficient particularity and are clearly in connection with the purchase or sale of a security are those in relation to Counterparty 8.

The strongest argument in the SEC's favor is that Halligan did much more than "participate" in the creation of the misstatements. Rather, he had supervisory authority over Becker and played a leadership role in a coordinated, long-running campaign to deceive Archegos's counterparties, which is itself a "scheme" or "course of business" undertaken with the intent to defraud. But this line of argument is precluded by *Rio Tinto*. There, the Second Circuit rejected the SEC's proposed "expanded conception" of scheme liability, which would have premised liability on participation in the making of alleged misstatements. 41 F.4th at 52. The court carefully distinguished the scheme subsections of Rule 10b-5 and Section 17(a) from the misstatement subsections, with an eye toward preserving the distinction between the requirements for proving a defendant's primary liability and their secondary liability as an aider-and-abettor:

> To respect the line that Congress has drawn between primary and secondary liability, subsections (a) and (c) [of Rule 10b-5] have been used historically only to state a claim against a defendant for the underlying deceptive devices or frauds themselves, and not as a short cut to circumvent *Central Bank*'s limitations on liability for a secondary actor's involvement in making misleading statements.

*Id.* at 55.

15

While the SEC points to *SEC v. Collins & Aikman Corp.* for the proposition that "knowingly supervising employees who are carrying out a fraudulent scheme is itself the employment of a deceptive device," that case predates *Rio Tinto* and *Janus*. 524 F. Supp. 2d 477, 495 (S.D.N.Y. 2007). And more to the point, the only actionable conduct that Halligan is accused of in this case is his participation in crafting the misstatements disseminated to Archegos's counterparties by Becker. While it does seem an odd result that a supervisor can avoid liability if he (1) directs a subordinate to make false statements while (2) making sure not to 'disseminate' any communication himself, that outcome comports with *Rio Tinto*'s emphasis that such situations are properly addressed by the SEC's special authority to bring aiding-and-abetting claims. *See* 41 F.4th at 55. The aiding-and-abetting claims against Halligan are discussed below.

Halligan's motion to dismiss is therefore granted as to the Rule 10b-5(a) and 10(b)-5(c) claims, as well as the Section 17(a)(1) and 17(a)(3) claims.

### 2.   Hwang

#### a.   Rule 10b-5(b) and Section 17(a)(2)

Hwang argues that the SEC has failed to adequately allege that he is liable for the false statements allegedly made by Tomita and Becker to Archegos's counterparties, eliminating liability under Rule 10b-5(b) and Section 17(a)(2). According to the Amended Complaint, Hwang directed Tomita and Becker to secure favorable capacity increases and margin changes without providing full information on Archegos's positions to counterparties. The Amended Complaint generally lists occasions when Tomita and Becker made such false statements "with the implicit and at times explicit permission and direction of Hwang." (ECF No. 47 ¶ 105.) The only statement directly attributed to Hwang is his signing of Portfolio Swap Annex forms with

Counterparty 8 in 2015 and 2020, by which he falsely represented that Archegos's overall concentration in any single position was below 5% (in 2015) or 20% (in 2020).[4]  (*Id.* ¶¶ 157-59.)

Similar to Rule 10b-5(b), for which the legal standard was given in the preceding section, a person violates Section 17(a)(2) if the person (1) obtains money or property; (2) by means of any untrue statement of a material fact or any omission of material fact; (3) in the offer or sale of a security.  15 U.S.C. § 77 q(a)(2).  While Rule 10b-5(b) and Section 17(a)(2) use slightly different language — "in connection with the purchase or sale" versus "in the offer or sale" — the two terms have been used interchangeably.  *United States v. Naftalin*, 441 U.S. 768, 773 n.4 (1979).

Hwang is correct that he cannot be held liable as the 'maker' of the misrepresentations stated by Tomita and Becker, for reasons discussed above.  *See Janus*, 564 U.S. at 142.  The only potential basis for liability, then, is Hwang's signature on the PSA with Counterparty 8.  Hwang argues that the SEC fails to allege that "he was ever aware of the existence of this representation, thus belying any intent on his part to defraud."  (ECF No. 58 at 16 (citing *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015).)  A "plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements."  *Plumbers & Pipefitters*, 89 F. Supp. 3d at 614 – 15.  The SEC has done so here:  It has alleged that when he signed the PSA amendment in December

---

[4] "In 2015, Archegos's PSA included a representation that 'on the date the parties enter into any Transaction, the aggregate amount of all such Shares beneficially owned by it for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative position, is less than 5% of the outstanding Shares.'" (ECF No. 47 ¶ 155.)  In December 2020, the PSA was amended to raise the threshold from 5% to 20%.  (*Id.* ¶ 156.)

2020, Hwang (1) was aware that Archegos's cumulative exposure in several issuers exceeded the 20% threshold and (2) continued to direct Archegos traders to add additional exposure after signing the certification.  (ECF No. 47 ¶¶ 158–159.)  This, combined with the fact that "courts consistently hold that signatories of misleading documents 'made' the statements in those documents," *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163–64 (S.D.N.Y. 2012), is sufficient to plausibly allege Hwang's liability for the material misrepresentation to Counterparty 8.

### b.  Rule 10b-5(a) and (c); Sections 17(a)(1) and (3)

Here, Hwang makes the same arguments as Halligan regarding scheme liability, asserting that he cannot be liable for a primary violation based on misstatements made by Tomita and Becker.  In contrast to its allegations against Halligan, the SEC's scheme liability allegations against Hwang are quite distinct from its misstatement allegations against him.  As a baseline, the SEC alleges that Hwang had sole responsibility over all investment decisions made by Archegos or on its behalf.  It further alleges that he directed Archegos's staff to trade in a manner that would artificially inflate the price of the securities of the company's Top 10 Holdings to the benefit of Archegos.

For example, the SEC alleges that in March 2021, Archegos traders, acting at Hwang's direction, traded Discovery Class C shares solely for the purpose of preventing the price from falling below $60.[5]  (ECF No 47 ¶ 93.)  It alleges that the share price was $61.68 at opening, that Archegos traded the shares aggressively throughout the day, and that the price was $62.99 at

---

[5] The Amended Complaint quotes a message sent from an Archegos trader to Hwang stating that the firm "should enter orders of '60.00-61.00 and be aggressive below 60.00 because some short term people see whether the stock can keep 60.00 floor as psychological level."  (ECF No. 47 ¶ 94).  Hwang responded, "I LIKE THAT PLEASE GO AHEAD WITH $50 MIL."  (*Id.*)

market close.  (*Id.*)  This allegation alone, taken as true, is sufficient to state a scheme liability

claim against Hwang, given that his direct actions represent a "scheme" to defraud or a "course

of business" operating as a fraud.

### c.  Scienter

Scienter is a requirement for the Rule 10b-5 claims and the Section 17(a)(1) and 17(a)(2)

claims against Hwang, but mere negligence suffices for Section 17(a)(3).  Like Halligan, Hwang

argues that the SEC has failed to sufficiently allege that he acted with scienter — either

conscious misbehavior or recklessness — and that its allegations reveal nothing more than the

actions of an enthusiastic investor.  The SEC has adequately pleaded Hwang's scienter as to both

the market manipulation and misrepresentation allegations, especially given that "conclusory

allegations of scienter are sufficient if supported by facts giving rise to a strong inference of

fraudulent intent." *Bryant v. Silverman*, 284 F. Supp. 3d 458, 470 (S.D.N.Y. 2018) (internal

quotation marks and citation omitted).

On market manipulation, Hwang's subordinate, Tomita, admitted in his allocution that he

agreed with Hwang to carry out Archegos's business through a pattern of manipulating the prices

of securities.  (ECF No. 47 ¶ 45.)  The Amended Complaint describes Hwang's role in ordering

the execution of transactions designed to manipulate the market and supplies facts that permit a

strong inference of fraudulent intent.  (*See, e.g.*, *id.* ¶¶ 85, 91 – 92, 94.)

On misrepresentation, the SEC alleges that Hwang mandated Archegos personnel not to

provide full information to counterparties in order to secure the capacity to put on more SBS

trades.  (*Id.* ¶¶ 102 – 05.)  While the SEC's allegations are conclusory, the Court concludes that,

taking the Amended Complaint as a whole and considering Tomita's allocution, it has supplied a

sufficient factual basis to infer that he acted with at least recklessness as to the possibility that

Halligan, Tomita, and Becker would provide false and misleading information to Archegos's counterparties.

### 3. Archegos

Archegos contends that the SEC has failed to point to any specific trades constituting manipulative acts or their effect on the market price of the securities in question, which would eliminate liability under Sections 17(a)(1) and (3) and Rules 10(b)-5(a) and (c).  Considering the Amended Complaint as a whole and drawing reasonable inferences in favor of the SEC, the Court concludes that the Amended Complaint sufficiently alleges market manipulation under Rule 9(b) against Archegos.

For example, the SEC alleges that on every morning between January 14, 2021 and January 22, 2021, Archegos traded GSX stock solely for the purpose of artificially pushing the price upward (a practice known as "setting the tone").  (ECF No. 47 ¶¶ 85, 87.)  The Amended Complaint quotes a message from Tomita to Hwang on January 22, in which he said: "eyeing premarket for GSX [] just 12k shares traded and down -1.9%, I think it's good to think about getting involved premarket again today."  (*Id.* ¶ 87.)

Likewise, the SEC alleges that Archegos "marked the close" on Baidu stock from January 25, 2021 to March 23, 2021, trading during the last 30 minutes on the majority of those trading days.  (*Id.* ¶ 89.)  On 22 days, it put in orders exceeding the equivalent of 100,000 shares; on four days, its orders exceeded the equivalent of 500,000 shares.  (*Id.*)  The SEC alleges that the goal of doing so was to increase the margin on Archegos's SBSs, which would yield Archegos more cash, "thereby providing Archegos with even more leverage to purchase more exposure to the same issuers the next day . . . ."  (*Id.* ¶ 88.)

These allegations are sufficient to plead what manipulative acts were performed, which Defendants performed them, when the manipulative acts were performed, and what effect the

scheme had on the market for the securities at issue, thus fulfilling the pleading requirements identified in *ATSI Communications*.

Finally, Archegos argues that the SEC has failed to properly allege scienter in connection with the market manipulation claim because the allegations in the Amended Complaint are impermissibly conclusory. To the contrary: the SEC has alleged facts that create strong circumstantial evidence of conscious misbehavior. In his plea allocution, Tomita, who worked as the company's head trader, admitted to using Archego's accumulated market power in each of its Top 10 Holdings "to trade in such a way as to artificially manipulate the prices of its securities." (ECF No. 47 ¶ 45.) This provides the "minimal factual basis" required to support the SEC's allegation of Archegos's scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("To prove liability against a corporation[,] . . . a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." (gathering cases)).

B.   **Market Manipulation**

Having addressed the basic pleading requirements for the claims asserted against the moving Defendants, the Court now addresses the substance of their arguments against the SEC's two primary theories of liability, beginning with its market manipulation allegations. Defendants[6] argue that the SEC's market manipulation claims fail for two principal reasons: (1) that Archegos's trading activity was not manipulative because it did not send a false signal to the

---

[6] The Section 10(b), Rule 10b-5, and Section 17(a) claims against Halligan have been dismissed, as stated above. But because the SEC's aiding and abetting claims against him under Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act rest on the existence of a primary violation, his arguments are considered here as well.

market or inflate the price of the relevant securities, and (2) that the SEC's case rests on a theory of open-market manipulation that is not viable in the Second Circuit.

To state a market manipulation claim under Section 10(b) of the Exchange Act, "a plaintiff must plausibly allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Set Cap.*, 996 F.3d at 76 (citation omitted).

A manipulative act "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id.* (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)). The term "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)). To determine whether market activity has "artificially" affected the price of a security, courts ask "whether the transaction or series of transactions sends a false pricing signal to the market or otherwise distorts estimates of the underlying economic value of the securities traded." *Id.* (citation omitted). "While a defendant may manipulate the market through open-market transactions, some misrepresentation or nondisclosure is required." *Id.* at 76 – 77.

The elements of a claim under Section 17(a) of the Securities Act are "essentially the same" as the elements under Section 10(b) and Rule 10b-5. *Frohling*, 851 F.3d at 136.

Section 9(a)(2) prohibits the making of a "series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2); *see also Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 77 (S.D.N.Y.

2015).  Therefore, to state a Section 9(a)(2) claim, the plaintiff must "show (1) a series of

transactions in a security creating actual or apparent trading in that security or raising or

depressing the price of that security, (2) carried out with scienter and (3) for the purpose of

inducing the security's sale or purchase by others . . . ."  *S.E.C. v. Malenfant*, 784 F. Supp. 141,

144 (S.D.N.Y. 1992) (citation and quotation marks omitted).  "The central purpose of section

9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to

keep an open and free market where the natural forces of supply and demand determine a

security's price."  *Id.* (quoting *Trane Co. v. O'Connor Securities*, 561 F. Supp. 301, 304

(S.D.N.Y. 1983)).  The SEC's Section 9(a)(2) claim is asserted against only Hwang, Tomita, and

Archegos, via Count 6 of the Amended Complaint.

### 1.    Manipulative Act: False Signal to the Market or Artificial Price Impact

Defendants argue that Archegos's swap transactions cannot constitute manipulative acts

for the purposes of Section 10(b) (or Rule 10b-5), Section 17(a), or Section 9(a)(2) because

Defendants were not responsible for any false signal to the market or artificial impact on the

price of the securities of the Top 10 Holdings.

Defendants emphasize that (1) the swaps were executed via private contracts with each

counterparty and (2) the swaps gave Archegos synthetic exposure to the price movements in the

underlying security without requiring the direct purchase or ownership of the shares.  Therefore,

Defendants contend, the swap transactions were not trades in the market; instead, the only

market activity alleged here originated from the counterparties via their hedging strategies,

which typically involved purchasing shares of the referenced security in the open market.  They

argue that this theory does not state a market manipulation claim because Archegos cannot have

sent a false signal to the market or caused an artificial price via "discretionary trades made by

[counterparties] Archegos did not direct or control."  (ECF No. 55 at 17.)  Further, Defendants

submit that the SEC fails to allege that *all* of Archegos's counterparties hedged by buying the

referenced security, as opposed to using other hedging strategies, and fails to allege that the

counterparties maintained this hedging activity throughout the Relevant Period.  (*Id.* at 18 – 19.)

These arguments are not convincing.  The "gravamen" of market manipulation "is

deception of investors into believing that prices at which they purchase and sell securities are

determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary*

*v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999) (citing *Schreiber v. Burlington Northern, Inc.*, 472

U.S. 1, 12 (1985)).  Courts consider market manipulation allegations on the presumption that

"Congress meant to prohibit the full range of ingenious devices that might be used to manipulate

securities prices." *Santa Fe Indus.*, 430 U.S. at 477.  The SEC has alleged that Archegos's swap

transactions disrupted the natural interplay of supply and demand in the securities of its Top 10

Holdings and that the Defendants were aware of the effect of their activities, given the standard

market practices of Archegos's counterparties.  The SEC has therefore stated a claim that

Archegos's activity "distort[ed] estimates of the underlying economic value of the securities

traded." *Set Cap.*, 996 F.3d at 76.

And more to the point, the Second Circuit has rejected arguments similar to those

Archegos is making here:  "[W]e are not aware of any authority explicitly stating that such a

claim must concern a defendant's trading activity.  Instead, § 10(b) and Rule 10b-5 prohibit all

fraudulent schemes in connection with the purchase or sale of securities." *City of Providence,*

*Rhode Island v. Bats Glob. Markets, Inc.*, 878 F.3d 36, 50 (2d Cir. 2017) (rejecting argument that

plaintiff had failed to state a market manipulation claim where trading activity was conducted by

third parties rather than defendants themselves) (citation omitted).

### 2.   Open Market Manipulation

Next, Defendants argue that the SEC cannot rely on a theory of "open market manipulation" to properly state a claim for market manipulation under the applicable statutes. Some courts have used the term "open market manipulation" to refer to activity that is not "patently manipulative" but instead "appears facially legitimate and is not expressly prohibited." *CFTC v. Gorman,* 587 F. Supp. 3d 24, 41 (S.D.N.Y. 2022) (quoting *SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007)).  Defendants argue that the SEC has failed to allege that Archegos's trades were truly manipulative, rather than the lawful activity of a "very well-funded and exuberant, but genuine, market speculator."  (ECF No. 55 at 24; *see also id.* at 27 ("It is not unusual for well-funded investors to aggressively build large positions").)  To this end, they assert that no regulation or statute prohibited Archegos's swap trading activity, in terms of volume, size, or timing.

In *Set Capital*, the Second Circuit considered allegations that the defendant, Credit Suisse, had engaged in market manipulation through hedging trades that had the effect of depressing the price of certain exchange-traded notes that it had issued.  *Set Cap. LLC*, 996 F.3d at 77.  While Credit Suisse argued that its hedges were "done openly for the legitimate purpose of managing risk," the court concluded that its activities still created an artificial impact on the price of the notes: "Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent."  *Id.* (cleaned up).  This holding followed the Second Circuit's prior holding in *ATSI Communications v. Shaar Fund*, where it held that "[t]o be actionable as a manipulative act, short selling must be willfully combined with *something more* to create a false impression of how market participants value a security."  493 F.3d 87, 101 (2007) (emphasis added).  It concluded that intent to manipulate was "something more."  *Id.* at 102; *see also SEC v. Vali Mgmt. Partners*, No. 21-453, 2022 WL 2155094, at *1

(2d Cir. June 15, 2022), *cert. denied sub nom. Pustelnik v. SEC*, 143 S. Ct. 788, 788 (2023)

(reiterating that "in some cases . . .  scienter is the only factor that distinguishes legitimate

trading from improper manipulation.").

Taking the allegations in the Amended Complaint as true, the Court concludes that the

SEC has plausibly alleged that Archegos acted with manipulative intent in conducting its swap

transactions during the Relevant Period.  For example, the Amended Complaint references the

following statements from Defendant Tomita's plea allocution:

> Acting at the direction of the head of the fund [Hwang], I traded to
> increase the prices of names in which Archegos held long positions
> and reduced the prices of securities in which the fund hel[d] short
> positions . . . I manipulated the prices of these securities in order to
> influence others in the market to buy or sell the securities in ways
> that would benefit Archegos'[s] key positions and increase
> Archegos'[s] purchasing power through variation margin.

(ECF No. 47 ¶ 45.)

The Amended Complaint also contains specific allegations that Archegos conducted six

types of trading activity — establishing domination by accumulating exposure of up to 70% of

an issuer's outstanding stock; high volume trading; setting the tone; marking the close; bidding

up the price of securities; and trading solely to counteract pressure — with the intent of sending

false pricing signals to the market about the true demand for the securities of the Top 10

Holdings.  (*See generally id.* ¶¶ 66 – 93.)  Archegos contends that none of these activities, taken

in isolation, was unusual for an investor of its size, and that no statute or regulation required

affirmative disclosure of these activities.  But neither argument detracts from the plausibility of

the SEC's market manipulation claim, given that this is a case where "scienter is the *only* factor

that distinguishes legitimate trading from improper manipulation."  *Set Cap. LLC*, 996 F.3d at 77

(citation omitted) (emphasis added); *Vali Mgmt.*, 2022 WL 2155094, at *1.

Similarly, Hwang argues that the SEC has failed to show that his conduct evinced an intent to manipulate the market because the techniques he employed, such as large volume trading, "setting the tone," or "marking the close," were all (1) legal and (2) evidence of his legitimate interest in buying the subject securities.  His arguments fail for the reasons discussed above.

Finally, Defendants assert that the SEC's market manipulation theory does not plausibly state a claim because it "makes no economic sense" and because the SEC "does not allege how Archegos would supposedly capture the benefits of this alleged scheme."  (ECF No. 55 at 41.) To the contrary, the Amended Complaint contains substantial allegations about how Archegos and the individual Defendants stood to gain from artificially inflating the value of the securities of the Top 10 Holdings and avoiding margin calls on its over-leveraged investment portfolio. The fact that Archegos ultimately lost money after the alleged scheme imploded does not diminish a plausibly pleaded allegation of manipulative intent.  Nor does Second Circuit precedent require the Court to speculate on how the Defendants would have successfully unwound the scheme without causing a selloff in the Top 10 Holdings.[7]

Defendants' arguments for the dismissal of the open market manipulation claims therefore fail.

### C.    Misrepresentations to Counterparties

The SEC alleges that Tomita and Becker made misrepresentations to Archegos's counterparties regarding the size and composition of the company's investment portfolio in order

---

[7] While Archegos invokes *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994), the cited portion of that case concerned whether a theory that "defies economic reason" could support a showing of motive or opportunity for the purposes of alleging scienter.  Here, the SEC has plausibly alleged scienter and the other prima facie elements of a market manipulation claim against Archegos and Hwang.

to obtain more favorable margin rates and avoid capacity limits on swap trades. (*E.g.*, ECF No. 47 ¶ 104.) Many of those statements involved concealing from individual counterparties the extent of Archegos's total, simultaneous exposure in its Top 10 Holdings across all of its counterparties. Defendants argue that the SEC has failed to allege an actionable misrepresentation under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5.

Defendants make two related arguments. The first is that the statements attributed to Tomita and Becker are not actionable because the misrepresentations took place during due diligence conversations regarding the characteristics of Archegos's portfolio and as such were not associated with trade execution or the value of the subject securities. In effect, Defendants argue that the SEC has failed to allege that the misrepresentations concerned a "purchase or sale of securities" (Rule 10b) or "the offer or sale of a security" (Rule 17(a)). The second is that the misrepresentations were not "in connection with" a purchase, sale, or offer — meaning that the SEC has failed to allege a sufficient jurisdictional nexus for its claims. These arguments, which the Court addresses jointly, are unpersuasive.

A person violates Section 10(b) and Rule 10b-5 if the person has "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *Frohling*, 851 F.3d at 136 (citation omitted). A person violates Section 17(a)(2) if they (1) obtain money or property; (2) by means of any untrue statement of a material fact or any omission of material fact; (3) in the offer or sale of a security. 15 U.S.C. § 77q(a)(2). While the two statutes use slightly different language — "in connection with the purchase or sale" versus "in the offer or

sale" — Courts have used the same analysis to interpret them. *United States v. Naftalin*, 441 U.S. 768, 773 n.4 (1979).

The Supreme Court has "espoused a broad interpretation" of Section 10(b) and Rule 10b-5's "in connection with" language. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006).  In *Dabit*, the Court considered and rejected a narrow construction of the phrase, which would have held that an alleged fraud is "in connection with" the purchase or sale of a security "only when the plaintiff himself was defrauded into purchasing or selling particular securities." *Id.*  Instead, the Court held that "it is enough that the fraud alleged 'coincide' with a securities transaction — whether by the plaintiff or by someone else." *Id.* (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)).  "The requisite showing, in other words, is 'deception in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." *Id.* (citing *O'Hagan*, 521 U.S. at 658).

The Second Circuit has held that while "tangential misrepresentations about a security are insufficient to support a claim under Section 10(b)," the "in connection with" standard requires only that "the act complained of somehow induced the purchaser to purchase the security at issue." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999) (citing *SEC v. Tx. Gulf Sulphur Co.*, 401 F.2d 833, 860 – 61 (2d Cir. 1968) (en banc)).  The court has also held that the "in connection with standard" is met where the plaintiff's claims "necessarily allege," "necessarily involve," or "rest on" the purchase or sale of securities. *Romano v. Kazacos*, 609 F.3d 512, 521 – 22 (2d Cir. 2010) (referring to the statutory language of the Securities Litigation Uniform Standards Act of 1998, which includes "in connection with" language that is "the same" as that of Section 10(b) and Rule 10b-5) (citation omitted).

The SEC has plausibly alleged that Archegos's misrepresentations about its portfolio composition, as conveyed through Tomita and Becker, "coincided with" or "necessarily involved" a securities transaction — the counterparties' decision to enter additional swap trades with Archegos.  For example, the Amended Complaint alleges that in February 2021, Tomita misrepresented the magnitude of Archegos's position in GSX in conversations with Counterparty 4.  (ECF No. 47 ¶¶ 128 – 32.)  As a result, Counterparty 4 "extended additional trading capacity in GSX to Archegos," and in turn, Archegos "used this capacity to add to its already concentrated GSX position."  (*Id.* ¶ 133.)  Defendants are correct that the extension of additional trading capacity alone is insufficient to state a claim — as Halligan argues, a change in a capacity limit is not a securities *transaction*.  But a capacity extension that is premised on a misrepresentation and then directly followed by the execution of additional swaps is sufficient to satisfy the nexus requirement.  The same logic applies to the allegations pleaded involving Counterparty 1 at paragraphs 111 through 116 of the Amended Complaint.

Defendants rely on the Second Circuit's decision in *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984), for the proposition that the misrepresentations about Archegos's portfolio, made with the intention of obtaining favorable margin rates and increased trading capacity, were too attenuated from actual swap transactions to satisfy the "in connection with" requirement.  But the circumstances underlying *Chemical Bank* are distinguishable.  There, the plaintiff banks had extended loans to a company that later filed for bankruptcy; the banks sued the company's auditors for knowingly approving false financial statements.  *Id.* at 933.  The only allegations involving securities were that certain stocks were pledged as collateral for the loans.  The Second Circuit determined that this was too attenuated from a purchase or sale of a

security to state a 10(b) or 10b-5 claim.  Here, by contrast, the SEC alleges that the

misrepresentations *directly* induced the sale of securities.

Additionally, Defendants argue that the SEC's claim fails because its theory of liability

relates to representations about the riskiness of Archegos's portfolio, rather than the value of a

security.  The Second Circuit has held that:

> Typically, a plaintiff satisfies the "in connection with" requirement
> when the fraud alleged is that the plaintiff bought or sold a security
> in reliance on misrepresentations as to its value.  A claim fails where
> the plaintiff does not allege that [a defendant] misled him
> concerning the value of the securities he sold or the consideration he
> received in return.

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (citations omitted).

Here, the SEC's allegations relate to the value of the SBSs.  Defendants allegedly represented

that Archegos's portfolio was more liquid and more diversified than it actually was.  The

counterparties relied on those representations in deciding whether to execute more SBSs with

Archegos.  In the SBS transactions, the counterparties were short (expecting the price of the

securities to fall) while Archegos was long (expecting the price of the securities to go up).  For

the counterparties, the value of the SBSs depended on Archegos's ability to provide downside

protection against price declines in the referenced stock.  If the price of the stock referenced by

the SBS decreased on a given day, the counterparty could call on Archegos to post variation

margin (that is, additional collateral) to cover that mark-to-market loss.  It follows that

Archegos's level of risk and exposure to the same few securities across several counterparties *at

the same time* would affect the value of each individual SBS.

As the Supreme Court has counseled in the context of Section 17(a) claims, "[t]he

statutory terms [of the Securities Act] . . . are expansive enough to encompass the entire selling

process."  *United States v. Naftalin*, 441 U.S. 768, 773 (1979) (citation omitted).  The statutory

language defining 'sale' and 'offer' "does not require that the fraud occur in any particular phase of the selling transaction." *Id.* And as the Second Circuit made clear in the context of Section 10(b):

> The purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Chem. Bank*, 726 F.2d at 943.

Here, the SEC has alleged that the sellers of the SBSs (the counterparties) were induced into executing additional trades with Archegos (the buyer) based on misstatements that massively understated the firm's risk profile. The principles set out by the governing case law counsel against dismissal at this stage. There is a plausible allegation of liability where the counterparties' decision to sell additional swaps to Archegos was premised on misrepresentations about the magnitude and concentration of risk that the company had developed by accruing such substantial exposure in its Top 10 Holdings.

Additionally, the SEC has stated a claim on its theory that Archegos made a material misrepresentation that "induced" a single counterparty — Counterparty 1 — to purchase securities via hedging. To the extent that the SEC premises liability on the fact that Archegos was aware that its counterparties were highly likely to hedge the SBS trades by buying the referenced securities in the open market because doing so was standard industry practice, its allegations are insufficient. (*See* ECF No. 47 ¶¶ 37 – 39). For example, the SEC alleges that Archegos personnel knew that "certain of the Counterparties would not finalize and price their SBS contracts with Archegos until they had first hedged the contracts by purchasing an equivalent number of shares of the underlying issuers." (ECF No. 47 ¶ 39.) This is the type of

unadorned allegation of liability that does not state a claim under Rule 12(b)(6).  However, those are not the only allegations connected to the misrepresentation claim in the Amended Complaint.  Rather, paragraph 116 specifically states in March 2021, Becker made material misstatements about Archegos's risk profile, which yielded a favorable capacity increase, more swap trades, *and* led Counterparty 1 to purchase additional shares of the referenced security to hedge its increased exposure.  This latter allegation is sufficiently specific to state a claim.

The SEC has therefore alleged an actionable misrepresentation claim.

### D.    Hwang's Individual Arguments

#### 1.    Rule 8

Hwang argues that the Amended Complaint fails to satisfy Federal Rule of Civil Procedure 8(a) because it does not indicate which aspects of Sections 17(a) of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5 he is accused of violating, or otherwise apprise him of the conduct alleged to give rise to his liability.  To the contrary, the Amended Complaint sufficiently apprises Hwang of the claims against him.  The purpose of Rule 8(a) is "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.  The Amended Complaint does that, both in terms of describing the alleged conduct attributed to Hwang and the statutory violations he is accused of.  Count 1 asserts claims from all three subsections of Section 17(a) against Hwang; Count 3 asserts claims from all three subsections of Section 10(b)/Rule 10b-5 against him.

In the Second Circuit, courts resort to dismissal under Rule 8 when "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).  That is not the case here.

2.      **Control Person Liability**

Count 7 of the Amended Complaint asserts a claim against Hwang under Section 20(a) of the Exchange Act, alleging that he is liable as a control person for Tomita's and Archegos's violations of Section 10(b) and Rule 10b-5.  Hwang argues that Count 7 should be dismissed because the SEC has failed to allege a primary violation and because he was not a "culpable participant" in the fraud.  Both arguments fail.

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *In re Bernard L. Madoff Inv. Sec. LLC*, 818 F. App'x 48, 55 (2d Cir. 2020) (citation omitted).  In light of the foregoing discussion and the fact that Tomita pleaded guilty to the same conduct underlying the claims at issue here, the SEC has established a primary violation on the part of both Archegos and Tomita regarding the market manipulation and misrepresentation claims.  Additionally, for the purposes of this motion, Hwang does not contest that he wielded control over Tomita and Archegos.  The question of Hwang's liability as a control person therefore turns on the third factor of this test.

To establish that Hwang was a "culpable participant" in Archegos's and Tomita's alleged fraud, the SEC must allege "particularized facts of the controlling person's conscious misbehavior or recklessness."  *Sason*, 433 F. Supp. 3d at 514 (citation omitted).  First, the SEC alleges Hwang's conscious misbehavior or recklessness by integrating Tomita's allocution into the Amended Complaint.  He stated that:

> Acting at the direction of the head of the fund [Hwang], I traded to increase the prices
> of names in which Archegos held long positions and reduced the prices of securities in
> which the fund hel[d] short positions . . . I manipulated the prices of these securities in
> order to influence others in the market to buy or sell the securities in ways that would
> benefit Archegos'[s] key positions and increase Archegos'[s] purchasing power

through variation margin . . . While engaged in the activities I described, I worked under the supervision of [Hwang].... I agreed with [Hwang] and others to carry out the business of Archegos through a pattern of manipulating prices of securities and deceiving counterparties.

(ECF No. 47 ¶ 45.)  This representation from Tomita — Archegos's head trader — regarding Hwang's role in the purported scheme supports a conclusion that Hwang acted with at least recklessness in directing Tomita to manipulate the market in Archegos's Top 10 Securities. More specifically, the Amended Complaint contains allegations permitting a conclusion that Hwang acted with at least reckless disregard as to the manipulative effect of the trades.  For example, from January 24, 2021 to January 22, 2021, "Archegos traded GSX pre-open each day, with Tomita alerting Hwang, among others, at 8:11am on January 22: 'eyeing premarket for GSX [] just 12k shares traded and down -1.9%, I think it's good to think about getting involved premarket again today.'"  (*Id.* ¶ 87.)  This supports a conclusion that Hwang acted with reckless disregard as to the artificial price impact of Archegos "getting involved premarket" in GSX stock.

As to the misrepresentation claims, the SEC alleges that in February and March 2021, Becker misled Counterparty 1 about Archegos's portfolio and its total exposure in GSX, which became the basis for a capacity increase and additional trades.  (*Id.* ¶¶ 109–11.)  The factual allegations support a conclusion that Hwang was a culpable participant in this aspect of Defendant Archegos's fraud, given that Hwang has a regular practice of "direct[ing] Tomita and Becker on numerous occasions to secure capacity increases and obtain more favorable margin changes" without giving the counterparties truthful information.  (*Id.* ¶¶ 102–03.)

The SEC has sufficiently alleged Hwang's participation in Tomita's and Archegos's alleged fraud.

E.       **Halligan's Individual Arguments**

1.       **Aiding and Abetting**

The SEC alleges that Halligan aided and abetted Becker's violations of Sections 17(a)(1) and 17(a)(3) (Count 4) and his violations of Section 10(b) and Rule 10b-5 (Count 5).  To establish a claim for aiding and abetting liability, the SEC must sufficiently allege: "(1) the existence of a securities law violation by the primary . . . party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation."  *S.E.C. v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).

Halligan argues that there has been no primary violation because the SEC has failed to establish that Becker's alleged misconduct occurred "in connection with" the purchase, sale, or offer of a security.  The Court considered and rejected this argument above.

Next, the SEC has plausibly alleged Halligan's actual knowledge of Becker's primary violations.  For example, it alleges that on or about March 8, 2021, Halligan agreed with Becker and Tomita that Becker would provide false information to Counterparty 1, and that Counterparty 1 relied on that information to grant Archegos additional trading capacity, and that Archegos then executed additional SBSs.  (ECF No. 47 ¶¶ 114 – 15.)  With these allegations taken as true, Halligan had actual knowledge that Becker disseminated materially false information to Counterparty 1 in connection with the purchase or sale or offer of a security.

Finally, the SEC has plausibly alleged substantial assistance.  This requires a showing that Halligan "in some sort associated himself with the venture, that [Halligan] participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed."  *Apuzzo*, 689 F.3d at 213 (cleaned up; citation omitted).  The SEC's allegations regarding Halligan's active role in directing and supervising Becker's misrepresentations, toward

the larger goal of deceiving Archegos's counterparties, satisfy this standard.  (*See, e.g.*, ECF No. 47 ¶ 149.).

Halligan's motion to dismiss the aiding and abetting claims under Counts 4 and 5 is therefore denied.

### F.    Motion to Intervene and Stay Discovery

On November 4, 2022, the United States moved for an order authorizing intervention and staying discovery in this civil case pending the conclusion of the parallel criminal case, *United States v. Sung Kook (Bill) Hwang et al.*, 22 Cr. 240.  (ECF No. 70.)  Defendant Archegos, which is not a defendant in the criminal case, takes no position on the motion, nor does the SEC. Defendants Hwang and Halligan, who are defendants in the criminal case, oppose the motion. (ECF Nos. 72 and 73.)

Intervention is appropriate under Rule 24 of the Federal Rules of Civil Procedure because the United States "claims an interest relating to the property or transaction that is the subject of the action" and "is so situated that disposing of the action may as a practical matter impair or impede [its] ability to protect its interest."  Fed. R. Civ. P 24(a)(2).  The Second Circuit has recognized that, in cases like this one, "[t]he government ha[s] a discernible interest in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter."  *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988).  It is also the case that no existing party adequately represents the Government's interests.  *See* Fed. R. Civ. P 24(a)(2).

As to the motion to stay discovery, the Court has considered the party's submissions in light of the six factors considered by courts in this district.  *See, e.g.*, *SEC v. Treadway*, No. 04-CV-3464 (VM), 2005 WL 713826, at *2 (S.D.N.Y. Mar. 30, 2005).  The Court concludes that a stay of discovery is warranted, especially considering the high degree of factual and legal

overlap in the two actions, the status of the criminal case, including the existing indictment and impeding trial date; and the strong interest in judicial economy.

The United States's motion to intervene and to stay discovery in this case is therefore granted.

## IV.    Conclusion

For the foregoing reasons, Archegos's motion to dismiss is DENIED in its entirety; Hwang's motion to dismiss is DENIED in its entirety; and Halligan's motion to dismiss is GRANTED in part and DENIED in part.

The United States's motion to intervene and to stay discovery is GRANTED.

The Clerk of Court is directed to close the motions at ECF Nos. 54, 57, 59, and 70.  The Clerk is also directed to mark this case as STAYED pending further order.

SO ORDERED.

Dated: September 19, 2023
      New York, New York

_____
J. PAUL OETKEN
United States District Judge